MR. AARON L. COOPER E-28703
K.V.S.P-ASU2-159
PO BOX 5102
Delano, Ca. 93216

(O) SI

FILED
MAR 19 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aaron L. Cooper E-28703<br>Petitioner<br>V<br>Jeanne S. Woodford Director CDCR<br>Respondent | CASE CV 08 1516<br>PETITION FOR HABEAS CORPUS |

E-filing

SI (PR)

This Petition is an Appeal from the Conviction in the Superior Court of Alameda County, Oakland, Judge Jon Rolefson presided.

Respectfully submitted by

Dated 3-14-08

Aaron L. Cooper E28703
Aaron L. Cooper E-28703
In Pro-Per

08-1516 SI

MR AARON L. COOPER E-28703
K.V.S.P.- ASU2-159
PO BOX 5102
Delano, Ca. 93216

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON L. Cooper E28703<br>Petitioner<br>V<br>Jeanne S. Woodford Director C.D.C.R.<br>Respondent | CASE #<br><br>Certificate of Interested Persons Parties and/or Intities |

I plaintiff certify that I Aaron L. Cooper is the petitioner in this action making me the sole party of interest in this matter on the plantiff/petitioner side.

I am housed in California Dept. of Corrections and have been so housed for over 12 years

I being this Habeas Corpus to attack my illegal conviction which occurred in Alameda County Superior Court, Oakland.

This Habeas Corpus is also to seek compliance with this April 14, 2004 order 314 F.Supp2d 967

I declare under penalty of perjury that the foregoing is true and correct.

Dated 3-14-08

Aaron L Cooper E28703
AARON L. Cooper E28703
IN PRO-PER

**LIBERAL CONSTRUCTION PRAYER**

Petitioner prays that this Honorable court will grant this request for a liberal construction of this pro per ~~liberal~~ HABEAS corpus petition.

Petition is a layperson at law and is having difficulty using the faculty's law library to do this habeas corpus. Even if Petitioner has access to the law library here or anywhere, it would be a difficult proposition at best due to Petitioner lack of legal knowledge and procedure.

Petitioner pray that this court will construe this petition in less stringent than when it's drafted by Bar approved legal counsel and construe this petition allegations more liberally and include any excluded allegations of apparent errors present by the facts of those ~~they were~~ that are presented in this habeas corpus.

**See:**

Williams v Griswald 743 F. 2d. 1535

Williams v Lockhart 849 F 2d 1134

Antoneli v Sheahen 81 F 3d 1422 and

Crotts v Smith 73 F 3d 861

Pro per Petition liberally construe to include second claim of ineffective assistant of counsel arising from substance of first claim.

Petitioner thanks this court for its consideration in this matter of dire consequences.

**REQUEST FOR COURT TO TAKE JUDICIAL NOTICE**

By this reference the accompanied memorandum of points and authorities declaration, petitions, motion briefs, and exhibits are request to be made part of this petition as if fully set forth herein.

Petitioner claims under this petition will authorities contained therein, the exhibits attaché hereto, all records, documents and proceeding, pleadings, on file with:

**Alameda County Superior Court - People v. Cooper #125227A**

**California Court of Appeal v Cooper A073986, A078141**

**California Supreme Court People v Cooper A073986, S075397, S090651, S061835**

**United State Supreme Court Cooper v California 98-9504 00-7820 and the Habeas Corpus proceeding in this matter**

**In re Cooper A096123 California Court of Appeal**

**In re Cooper S101365 California Supreme Court**

**Cooper v McGrath C2-5569SI Northern District of California and Opening Brief**

**People of California v Cooper A108723 California Court of Appeal**

**Evidence Code 459 & 452 gives this court authority to grant petitioner's writ.**

Petitioner prays that this court will order the above-cited cases to get a full view of the denials Petitioner has suffered.

Also please take judicial notice of the petition for Review filed in California Supreme Court on 5-11-07 where 7 claims are briefed and argued and present with controlling case cites.

**STATEMENT OF FACT & CASE**

August 1995 petitioner arrested and charged with murder, kidnap, carjacking, and ex-felon in possession of a firearm. Two co-defendants also charged with murder, kidnap, and carjacking. They are Cross and Kingdom. Co-defendant Kingdom arrested in November 1995 and did not attend trial with petitioner and co-defendant Cross.

Co-defendant Kingdom gave a statement to the Oakland Police blaming petitioner for all charged crimes. Co-defendant Cross and Kingdom are first cousins. Petitioner presented alibi defense and witnesses at the trial and denied being with co-defendant that day. Co-defendant Cross gave two different taped statements to the Oakland Police. Co-defendant Cross testified at petitioner's trial and his statement impeached him.

The trial court allowed co-defendant Kingdom's out-of-court statement into Petitioners trial. Petitioner and co-defendant Cross were convicted on all charges except the special circumstances.

Petitioner received a sentenced of 71 years to life. The California Appeal and the California Supreme Courts denied petitioner's direct appeal. The United State Supreme Court granted certiorari, vacated conviction, and remanded case to California Appeal Court to reconsider in light of Lily v Virginia. The California Appeal Court found error but ruled its finding as harmless to petitioner, but reversed co-defendant Cross and affirmed petitioner. The California Supreme Court denied review again. The United State Supreme Court denied certiorari, and reconsideration of Certiorari.

Petitioner filed a pro per state habeas in Alameda County Superior Court, California Appeal Court, California Supreme Court and each court denied petitioner. Petitioner filed a pro per federal habeas corpus that the District Court granted. The Order to Release petitioner in 60-days or State of California would have to reinstitute proceedings.

Alameda County Superior Court re-charged petitioner with murder, kidnap, and ex-felon with a gun and appointed Counsel Deborah Levy whom took petitioner to trial.

The Federal Order was granted on several issues, one being insufficiency of evidence to sustain 187. Petitioner appointed attorney did not present any evidences or call any witness at

petitioner's second trial. Jury found petitioner not guilty as ex-felon in possession of a gun, but convicted petitioner on 187 and kidnap. Petitioner received a fifty-eight (58-years) to life sentence. The First Appeal Project appointed Counsel Kyle Gee to represent petitioner and counsel filed direct appeal opening brief February 27, 2006. Opening brief case # A 108723 was denied on 4-6-07 (see exh. K).

Petitioner filed Pro-Per Habeas Corpus case # A 114440 in California Court of Appeals which was denied 4-6-07 (see exh. L).

On 5-11-07 petition for Review was mailed to California Supreme Court, case# S 152666

Petitioner filed state habeas corpus in California Supreme Court stamped filed 6-28-07 case # S 153965 pro-per.

California Supreme Court denial of Petition for Review Case # S 152666 dated July 25, 2007

California Supreme Court denial of State Habeas Corpus case # S153965 dated 1-16-08.

Appellant Counsel KYLE exhauted claims #11 thru 17 in Petitioners opening brief.

Petitioner exhausted claims #1 thru 10 and #18 in Pro Per State habeas corpus case # S153965 filed on 6-28-07 which was denied 1-16-08

**GROUNDS FOR WHICH THIS HABEAS SHOULD BE GRANTED**

Petitioner presents this Honorable Court with [redacted] (18) claims of error, which denied petitioner his due process, and equal protection of the law and rendered the trial of petitioner unfair. This is a violation of the United State Constitutional Rights guaranteed petitioner.

**The Errors are:**

a. Ineffective Assistance of Appellate Counsel

b. Inconsistent verdict

c. Insufficiency of evidence to sustain kidnap verdict and that the kidnap verdict was affected by the once ruled insufficient evidence of a 187

d. Confrontation clause violation of admitting impeached prior testimony of co-defendant Cross.

e. Denial of preliminary hearing by pre-trial Judge Reardon

f. Trial court judge abuse of discretion evidentiary and twice failing to follow law of the case

g. Six act of prosecution misconduct

h. Prejudicial and suggestive identification by inspector Wright

i. 14 acts of Ineffective Assistant of Counsel

j. Cumulative effect of all claimed errors

k. Statue of limitation barred conviction of kidnap.

l. Insufficiency of Evidence to sustain Murder conviction

m. Failure to adhere to Collateral Estoppel Doctrine

n. Failure to adhere to Law of the Case Doctrine

o. Wrongful denial of Faretta Motion for Self-Representation

p. Wrongful denial of Marsden Motion for Substitute counsel

q. Trial Error of Advising Jury of Petitioner In-custody status

r. Trial court Prejudicial error in going beyond permissible scope in addressing jury on Last day of deliberations.

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name COOPER AARON L
(Last) (First) (Initial)

Prisoner Number E-28703

Institutional Address P.O. BOX 5102, Delano, Ca. 93216

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Aaron LYNDALE COOPER E28703
(Enter the full name of plaintiff in this action.)

vs.

Jeanne S. Woodford DIR. C.D.C.R

(Enter the full name of respondent(s) or jailor in this action)

Case No. ________
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

Request for Evidentiary Hearing

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

<u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Alameda County Superior Court Oakland

Court Location

(b) Case number, if known C125227

(c) Date and terms of sentence 12-3-04, 58 years to Life

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes ✓ No ____

Where?

Name of Institution: Kern Valley State Prison

Address: P.O. BOX 5102, Delano, Ca. 93216

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Murder 187 p.c. and Kidnap 207 p.c.

3. Did you have any of the following?

Arraignment: Yes ✓ No ____

Preliminary Hearing: Yes ____ No ✓

Motion to Suppress: Yes ____ No ✓

4. How did you plead?

Guilty ____ Not Guilty ✓ Nolo Contendere ____

Any other plea (specify) ____________________

5. If you went to trial, what kind of trial did you have?

Jury ✓ Judge alone ____ Judge alone on a transcript ____

6. Did you testify at your trial? Yes ____ No ✓

7. Did you have an attorney at the following proceedings:

(a) Arraignment Yes ✓ No ____

(b) Preliminary hearing Yes ____ No ✓

(c) Time of plea Yes ✓ No ____

(d) Trial Yes ✓ No ____

(e) Sentencing Yes ✓ No ____

(f) Appeal Yes ✓ No ____

(g) Other post-conviction proceeding Yes ____ No ✓

8. Did you appeal your conviction? Yes ✓ No ____

(a) If you did, to what court(s) did you appeal?

Court of Appeal Yes ✓ No ____

Year: 2007 Result: Denied

Supreme Court of California Yes ✓ No ____

Year: 2007 Result: Denied

Any other court Yes ____ No ✓

Year: ____ Result: ____________________

(b) If you appealed, were the grounds the same as those that you are raising in this

petition? Yes ✓ No____

(c) Was there an opinion? Yes ✓ No____

(d) Did you seek permission to file a late appeal under Rule 31(a)? N/A

Yes ____ No ✓

If you did, give the name of the court and the result:

______________________________

______________________________

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes ✓ No____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court: California Court of APPEALS

Type of Proceeding: State Habeas Corpus

Grounds raised (Be brief but specific): 10 claims

a. I.A.C., I.A.A.C., Inconsistent Verdict, insufficiency Evidence

b. Kidnap; Confrontation Clause Violation, Denial of Pre-lim hearing

c. Trial Judge evid. errors, Prosecution Misconduct, Suggestive I.d.

d. Statute limitation violation Kidnap, and Cumulative error

Result: Denied Date of Result: 4-6-07

II. Name of Court: California Supreme Court

Type of Proceeding: State Habeas Corpus

Grounds raised (Be brief but specific): 10 claims

a. I.A.C., I.A.A.C., Inconsistent Verdict, Insufficiency Evidence
b. Kidnap, Confrontation Clause Violation, Denial of Pre-lim hearing
c. Trial Judge evid. errors, Prosecution Misconduct, Suggestive
d. I.D., Statute limitation Violation Kidnap, and Cumulative error

Result: Denied Date of Result: 1-16-08

III. Name of Court: U.S. District Court Northern District

Type of Proceeding: Habeas Corpus

Grounds raised (Be brief but specific):

a. Trial Court err. of Admission of Out of Court cod
b. statement being harmless error, Insufficiency Evidence
c. Prosecution Misconduct, Cumulative error
d. __________

Result: Granted Date of Result: 4-14-04

IV. Name of Court: __________

Type of Proceeding: __________

Grounds raised (Be brief but specific):

a. __________
b. __________
c. __________
d. __________

Result: __________ Date of Result: __________

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____ No ✓

Name and location of court: __________

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

need more space. Answer the same questions for each claim.

[Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: SEE AttacHed FOR ALL CLAIMS 1 thru 18

Supporting Facts: SEE ATTACHED FOR ALL FACTS

Claim Two: SEE ATTACHED FOR ALL CLAIMS 1 thru 18

Supporting Facts: SEE ATTACHED FOR ALL FACTS

Claim Three: SEE ATTACHED FOR ALL CLAIMS 1 thru 18

Supporting Facts: SEE ATTACHED FOR ALL FACTS

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why: N/A

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

COOPER V. MCGRATH 314 F.SUPP. 2d 967 ALSO SEE attached Memorandum Points and Authorities and Petition for Review attached as EX. M.

Do you have an attorney for this petition? Yes____ No ✓

If you do, give the name and address of your attorney:

______________________________

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on 3-14-08 Aaron L. Cooper E28703

Date Signature of Petitioner

(Rev. 6/02)

**CLAIMS – GROUNDS FOR RELIEF (1)**

Due Process Violation, Equal Protection of the Law Violation by appellate counsel, appointed appellate counsel refused to raise all petitioner's substantial allegations of errors that would have resulted in reversal. Petitioner gave these claims to counsel upon his appointment to represent petitioner.

**SUPPORTING FACTS:**

1). Petitioner brings this habeas to present claims of error, which appointed counsel Gee refused to present.

2). Petitioner and petitioner's wife gave counsel the list of appealable issues for petition's appeal. (See Exhibit A)

3). Petitioner and petitioner's wife gave the First District Appellate Project the list of issues. (See Exhibit A)

4). Petitioner's opening brief contain five (5) claims, which are from the list Petitioner gave to counsel. (See Exhibit A)

5). Petitioner's issues in this habeas, are the claims from the list provided to counsel by petitioner. (See Exhibit A)

6). Counsel under Penalty of Perjury petition ~~this~~ APPEAL court numerous times for extensions of time to file the direct appeal/opening brief. Counsel Gee said he would present the following claims: (See Exhibit C)

1. Prosecution Misconducts
2. Ineffective Assistance of trial counsel,
3. Trial Court and Evidentiary Ruling Errors

7). At the time, Mr. Gee was working on petitioner's case, counsel had at least seven other cases he was working on and prior to taking on petitioner's case. (See Exhibit C)

8). Petitioner filed at least two(2) motions for change of appellate counsel due to Mr. Gee refusal to file all issues. (See Exhibit F)

9). Mr. Gee while still appointed to represent petitioner, advised petitioner in a habeas corpus. (See Exhibit B)

10). Mr. Gee in his request to extend time to file opening brief swore under penalty of perjury that the preparation of direct appeal/opening brief was complex and contained numerous issues. (See Exhibit I)

11). Counsel Gee asked for over the allowed number of extension to file opening brief.

**ARGUMENT and PREJUDICE**

The First District Project assigned attorney Kyle Gee to represent petitioner in appeal court. Petitioner upon notification of counsel appointment immediately supplied Mr. Gee with a prepared list of issues for reversal. Petitioner's wife also gave Mr. Gee the same list. Petitioner also gave the First District Appellant Project whom assigned Mr. Gee a copy of the same list of reversable issues. Petitioner wrote at least two dozen letters to Mr. Gee and only received two responses from counsel. Of the two responses petitioner received from counsel, one stated he was the attorney and he would decide what issues to file. The second letter was a list of 47 cases published opinion. Petitioner had these forty-seven (47) case researched and found that Mr. Gee lost all but two. These finding caused concern.

Petitioner pleaded with counsel to file all issues so that petitioner's claims could exhaust all his claims before a Federal habeas would have to be filed on petitioner's behalf. Petitioner believed relief was not come from state level because petitioner had been in front of these courts before without relief for issues that a higher federal court ultimately found and ruled in favor of petitioner. Mr. Gee win record was not impressive.

Petitioner believed his only remedy would be with the federal courts so it was most important to exhaust all claims to comply with the exhaustion rule. This fact was conveyed to Mr. Gee in numerous weekly letters, which counsel failed to respond. Mr. Gee only presented five (5) issues in direct appeal opening brief and those five claims were on Petitioner list. However, the claims in this present habeas were on the list. Mr. Gee under penalty of perjury in his time extension request said he was going to present claims of ineffective assistant of counsel, prosecutor misconduct and trial court evidentiary rulings errors, which he ultimately did not.

It is petitioner's belief that Mr. Gee was over-burdened at the time he accepted petitioner's case. Counsel has seven (7) other cases he continuously told court he was working on and he asked for over the allowed number of extensions and this shows counsel was over-burdened. Although counsel claim that petitioner's issues were complex and in need of much

research, counsel raised the issues that petitioner supplied. Counsel did not raise any issue that he found.

Counsel while still appointed to represent petitioner, delegated his work to petitioner by giving petitioner advice on how to do a habeas corpus on claims he should have filed on behalf of petitioner. Mr. Gee denied petitioner the opportunity to exhaust all claims of errors that petitioner requested counsel file. Counsel's actions have left petitioner with only one alternative to file a habeas to exhaust claims that should have been presented in the direct appeal/ opening brief by counsel. Mr. Gee failure to submit all errors that occurred at petitioner's trial, deprived petitioner chance to prove to this court that petitioner's trial was unfair. Petitioner believes counsel presented opening brief to appellate courts in a manner to cover up the violations which plagued petitioner's trial. Counsel did not include in this opening brief all issues that would have allowed this court to make a fair and just ruling by granting of the cumulative effect if not on the claims themselves.

Counsel denied petitioner his due process of law rights, his equal protection of the law rights, and his right to effective appellant counsel. This court should allow petitioner's claims within this habeas to be heard and this court should grant this habeas based on the facts within this habeas. Petitioner was denied effective appellate counsel because appellate counsel intentionally excluded claims that would give petitioner relief in this court. Counsel had knowledge of these issues that he excluded and therefore denied petitioner his rights, which are guaranteed by the US Constitution and was substantial, injurious, and prejudicial because those left out issues are reversible claims and Mr. Gee was denying petitioner liberty by his refusal.

**CLAIMS – GROUNDS FOR RELIEF (2)**

Petitioner was denied equal protection of the law, which is a guaranteed constitutional right when a conviction of murder and kidnap is allowed to stand when a jury finds petitioner not guilty as an ex-felon in possession of a gun. Ex-felon in possession of a gun is a necessary element of the theory argued by the prosecutor for the murder and kidnap making petitioner's conviction an inconsistent verdict.

**SUPPORT FACTS**

1. Petitioner was charged with murder, kidnap and ex-felon in possession of a gun
2. No gun was in evidence on this case, or presented as evidence in petitioner's case.
3. Prosecutor argued that the murder and kidnap was committed by petitioner's possessing a gun to do the crimes.
4. The murder victim was killed with gun.
5. The kidnap was committed with a gun.
6. The jury found petitioner not guilty on the charge of ex-felon in possession of a gun for the charged crime.

**ARGUMENT AND PREJUDICE**

Trial counsel should have objected to the conviction. The trial judge should have Sua-sponte ruled that the murder and kidnap could not stand based upon the jury not guilty verdict of ex-felon with gun. Trial counsel rendered ineffective assistant of counsel and the trial court failed to ensure that petitioner received a fair trial with full due process and equal protection of the law.

A charge such as murder and kidnap as argued and presented by district attorney thus makes possession of a gun a necessary element of the murder and kidnap charge. Without the finding for the possessing of a weapon makes the verdict an inconsistent verdict and violates petitioner's constitutional right of equal protection on the law, due process of the law, and a fair trial.

This prejudices petitioner because the lost a life sentence and this is the ultimate act of prejudice that is substantially injurious to petition that this court must cure by granting this habeas petitioner.

**CLAIMS – GROUNDS FOR RELIEF (3)**

Petitioner was denied due process of the law, equal protection of the law, and a fair trial by the reading of co-defendant Cross impeached prior testimony to the jurors. Co-defendant Cross was granted immunity and co-defendant Cross impeached prior testimony did not meet trustworthy and reliability standard.

**SUPPORTING FACTS**

1. Co-defendant Cross was charged with same crimes in 1995 and was convicted along with petitioner.

2. Co-defendant Cross testified in 1995-1996 trial against petitioner and was impeached by the district attorney.

3. Jurors rejected co-defendant Cross impeached testimony by convicting him on all charges in 1996.

4. Trial court granted co-defendant Cross immunity to testify in petitioner second trial.

5. Co-defendant was in custody in County jail per order of prosecutor for petitioner's second trial.

6. Co-defendant refused to testify in petitioner's second trial.

7. Petitioner had different defense lawyer at second trial.

8. Within co-defendant Cross impeached prior testimony was evidences that was found to be error by the California Appeal court in November 1998 typed Opinion and by the Federal Order granting Habeas dated April 4, 2004, which as evidence of petitioner's prior bad acts.

9. Prosecutor presented less evidence at second trial.

10. Petitioner's counsel did not present any defense evidence.

11. Petitioner first trial lawyer presented alibi defense and evidence in support thereof.

**ARGUMENT AND PREJUDICE**

The inclusion of co-defendant Cross prior impeached testimony denied petitioner his Confrontational Rights. The United States Constitution and the Due Process Clause of the 14th Amendment guarantees these rights.

The trial judge ruled co-defendant unavailable, but co-defendant refused to testify. The trial judge granted co-defendant Cross immunity, therefore, making him available. The use of this unavailable ruling was incorrect. To protect my rights, the prior testimony must be weighed to find whether it has the particularized guarantees of trustworthiness and reliability. Petitioner states here that it is impossible for any prior testimony to have reliability and trustworthiness when it had been impeached. Especially so when that impeachment was done by the same office that previously fought against the co-defendant and now tries to bite the other side of the apple and use it as its case in chief evidence. Petitioner states that no court can say evidence, which is known before hand to be impeached is ever trustworthy or reliable.

More importantly, this may be a novel look at the law, but this is a fact. When the impeached testimony was cross-examined by petitioner's lawyer, nine years had past and petitioner's lawyer at first trial is not the lawyer at second trial. Petitioner state that the laws governing confrontational clause when a witness is unavailable to testify. The court reviews whether the defense had the opportunity to cross-examine co-defendant. When the court speaks of a defense, it is talking about a specific lawyer representing his client. This petitioner states that he had a different lawyer at subsequent trial. Petitioner proposes that if a strategic cross-examination had been conducted extracting facts that would have helped petitioner, based upon what the district attorney submitted. It is apparently clear that the opportunity of actual hindsight would have discovered more probing questions and answers from co-defendant that would have led to petitioner's acquittal. The prosecutor presented less evidence at petitioner's second trial. Petitioner's lawyer did not present any evidence and that proves she was attacking or doing something quite different from first trial lawyer whom put on vigorous alibi defense.

The denial of the confrontational clause was substantially and injurious error the prejudice petitioner beyond a reasonable doubt and this court should grant this habeas to correct the US Constitutional Rights Violations.

24

AARON L.COOPER'S PETITION FOR HABEAS CORPUS

**CLAIMS – GROUNDS FOR RELIEF (4)**

Petitioner due process, right to a fair trial, and equal protection of the law was violated when petitioner was convicted of the kidnap for two reasons:

(1) Insufficiency of the Evidence

(2) The Insufficient Evidence of a Murder presented by DISTRICT ATTORNEY when United States District Court had ruled that the evidence was insufficient to sustain a murder charge.

**SUPPORTING FACTS**

1. The United State Northern District Court Order gave a detailed description of the evidence as it pertains to the kidnap charges and all the charges in whole and said these statement

a. This court is not alone in seeing something suspicious about Walton's reported behavior. She had received threats from people who thought she had set up Coco.

b. Walton also flip flop on several key details such that she was caught telling different stories in a taped statement to police and in her preliminary testimony.

c. Although Walton was at the scene after police arrived, she did not speak to police at that time.

d. Another concern with Walton's testimony was the strong possibility that she was not even present at time of the abduction and that she had given a description of the abduction that was composed of second-hand information she heard from the crowd around the crime scene after the crime had occurred.

e. Both Cross and eyewitness Rodney Love states that Walton was not there before or during the abduction. KK Parker denied seeing Zanetta Hodges or Zanetta Hodges' car.

f. There also was evidence that suggested that if she (Walton) had been at the scene at all. She had left the area before the abduction had occurred. The time stamp from the food stamp store, which is a half mile away, showed the Walton food stamps were issued to her at 4:09 pm and the time stamp from the OPD dispatch record showed that the 911 calls from the shooting started at 4:08 pm.

g. In light of her description of the crime her absence from the scene of the crime at the time of the abduction would call into question her credibility overall.

h. In other words even if she had **(*991)** seen Cooper, Cross, and Kingdom in the Blue Delta 88 and left before the red Corvette had even arrived, her description of what had transpired when Coco was abducted would cast grave doubt over the truthfulness of any of her testimony.

i. In short, Walton's **(1)** may have been there to facilitate the crime **(2)** may not have been there at all or **(3)** may have been present earlier but not at the time of the abduction.

j. None of these scenarios made Walton a credible witness about the abduction and the person involved.

k. Additionally, the blue car into which Coco was stuffed was found parked in front of Walton's home the night of the abduction. She knew the car was there, yet there was no evidence that she checked it to see if Coco was still in the trunk.

l. Zanetta Hodge's version of the abduction also had some inconsistencies. Although nowhere near as great as those for Walton, however, the believability of Hodge testimony largely depends on the believability of Walton's testimony because they were in one car together. Both either were or were not present at the time of the abduction.

m. Another witness who testimony causes concern is KK Parker. The sequence of events support the inference that Parker set up Coco to be accosted by the men

in the blue Delta 88 and his refusal to sign his witness statement before he spoke with a lawyer, even after the officer assured Parker it was just a witness statement and Parker was not a suspect raises eyebrows.

n. This court is not alone in seeing something suspicious about Parker's reported behavior; the DISTRICT ATTORNEY also though Parker had set up Coco.

o. A read through of the testimony leaves the court with the strong impression that the eyewitnesses who put Cooper at the abduction scene were far from candid about what occurred. The court had strong doubts that these witnesses and Parker truthfully described what physically happened, why they were at the scene and what their roles in were in the crimes.

p. Left with the impression that so many key witnesses were not candid about so many details, one cannot embrace the trial as a reliable and fair one.

2. The Northern District Order April 14, 2004 ruled that the evidence about the murder was insufficient.

3. Petitioner was re-tried on the murder charge and the DISTRICT ATTORNEY used the same evidence that District Court found to be insufficient, infact significantly less evidence.

**ARGUMENT AND PREJUDICE**

Petitioner takes on the same stance as the Northern District did when it dissected the key witnesses' evidence in its order from pages 990-992 where the court found that the trial was unfair and unreliable one. That violates petitioner right to fair trial guaranteed by the Constitution of the US. In addition, those key witnesses and the evidence cannot support the kidnap verdict to the criteria of a rational tier of facts would be able to say beyond a reasonable doubt it was proven. The Northern District court has done this measurement for us when it dissected the evidence in regards to the abduction and found it to be unfair and unreliable. Therefore, the conviction of kidnap is substantially injurious to petitioner who has been sentenced base in part on the kidnap, and lost of liberty is always prejudicial. Petitioner is away from his family due to this violation of the US Constitution.

**CLAIMS – GROUNDS FOR RELIEF (5)**

Petitioner was denied his due process of law by pre-trial judge Reardon when on May 13, 2004 Petitioner requested a preliminary hearing after petitioner returned to court after vacation of conviction by Northern District Court Granting Habeas Corpus.

**SUPPORTING FACTS**

1. Petitioner returned to Superior Court after Northern District granted Habeas Corpus to judge Reardon's court.
2. On May 13, 2004, Petitioner requested a preliminary hearing due to Insufficiency findings of District Court Order and Judge Reardon denied it saying petitioner was not entitled to preliminary hearing.
3. District Court Ordered that the state of California re-institute criminal proceedings or release within sixty-days.

**ARGUMENT AND PREJUDICE**

Trial judge denied petitioner a preliminary hearing stating that petitioner had had his preliminary hearing nine years earlier. If petitioner had the opportunity to have a preliminary hearing, the persecutor would not have been able to overcome the hurdle of the insufficiently ruling (see exhibit D page 999) and that would have been the end of the case with the preliminary hearing judge dismissing the case based upon the district order. This prejudice petitioner because his rights were denied to a preliminary hearing and this denial was substantially great and must be seen as such. Anything that prevents one from trial is great and when that right is taken away a person is not being afforded his/her US Constitutional right to weigh the evidence to see if it is worthy of a trial. In addition, the district order said that the state of California would have to reinstitute criminal proceeding against petitioner and this did not mean or state that a preliminary hearing was not included. It meant that the state would have to start as if petitioner was fresh from the street. Denying petitioner his preliminary hearing, denied him is fundamental Right and therefore was substantial and injurious to petitioner. This court should grant this habeas to correct the violations petitioner suffered, the lost of liberty that petitioner has suffered and is suffering can be remedied by the issuance of this habeas.

3). **ABUSE OF DISCRETION & EVIDENTIARY RULING ERRORS**

a. Trial judge ruled co-defendant Cross unavailable after granting immunity and on 10/28/2004 during trial allowed the prior impeached testimony of co-defendant to be read into trial

b. Trial judge on 9/30/2004 refused to rule co-defendant Cross prior trial testimony untrustworthy per petitioner request to trial court.

c. Trial judge allowed co-defendant Kingdom to refuse to testify in front of jurors, but brought co-defendant Cross in to refusing to testify outside of presence of jurors.

d. Trial judge allowed reading of co-defendant prior reading of the prior trial testimony of Love and Mohamed because they could not remember details.

e. Trial judge denied petitioner's "Wheeler Motion".

f. Trial judge on 10/25/2004 argued with petitioner lawyer about law of case and when that days trial in front of juror started to judge denied every objection defense made in a very abrupt and curt way.

**CLAIMS - GROUNDS FOR RELIEF (6)**

Petitioner was denied his due process of the law, right to a fair trial, equal protection of the law by trial court judge. The trial court judge abused his discretion. When it made seven (7) erroneous evidentiary rulings, and failed to Sua Sponte three (3) times and twice failed to follow the law of the case doctrine.

**SUPPORTING FACTS**

1. **SUA SPONTE ERROR**

   a. Trial judge allowed Sergeant Krupp to testify to hearsay while Sergeant Krupp was attempting to corroborate Walton's testimony.

   b. On 10-21-04, trial judge failed to stop DISTRICT ATTORNEY from asking leading questionings of Walton when petitioners trial lawyer belatedly objected, the judge overruled and stated that the objected **about** statement was not leading, but the others were.

   c. Failed to instruct jury that the witnesses Walton, Hodges, and Cross were impeached and suffered from moral turpitude.

2. **LAW OF THE CASE ERROR**

   a. Judge overruled defense objections to allow Inspector Wright to testify that petitioner was not inconsistent with height or age to person he saw standing by the corvette. When he could not identify petitioner when petitioner was only person in courtroom fitting that description.

   b. California Appeal had ruled that Inspector Wright Identification of petitioner had no probative value in their November 1998 opinion page 33.

   c. Trial Judge allowed co-defendant Cross testimony to be read into trial saying petitioner had done prior bad acts of shooting at people.

   d. Cal. App, typed opinion ruled that co-defendant Cross testifying to petitioner prior bad acts was violation of Penal Code 1108 in November 1998 opinion see (exhibit G page 19-20).

e. Northern District order granting habeas stated that co-defendant Cross testifying of alleged prior bad acts done by petitioner was error on page 994 and it used this fact to support the cumulative error granting. (See exhibit D page 994).

f. 10/06/04 judge said that law of case did not apply and he would not barred district attorney from presenting case. (See exhibit G where Cal App found prosecutor misconduct and Ex D where that court found prosecutor misconduct error.

3. **ABUSE OF DISCRETION AND EVIDENTIARY RULINGS ERRORS**

a. Trial judge ruled co-defendant Cross unavailable after granting him immunity. On 10-28-04 during trial, the judge allowed the prior impeached testimony of co-defendant Cross to be read into trial.

b. Trial judge on 9-30-04 refused to rule co-defendant Cross prior trial testimony untrustworthy per petitioners request to trial court.

c. Trial judge allowed co-defendant Kingdom to refuse to testify in front of jury but allowed co-defendant Cross to refused to testify outside presence of jury.

d. Trial judge allowed reading of the prior trial testimony of Love and Mohamed because they could not remember details of their prior testimony.

e. Trial judge denied petitioner's Wheeler Motion.

f. Trial Judge on 10-25-04 argued with petitioner's lawyer about law of case and when that day's trial in front of jury started the judge denied every objection defense made in a very abrupt and curt way.

**ARGUMENT AND PREJUDICE**

**SUA SPONTE ARGUMENT AND PREJUDICE**

The trial judge failure to strike the testimony given by Sergeant Krupp who was testifying to hearsay in an attempt to collaborate Walton's testimony, which was [illegible] helpful to district attorney. This failure denied petitioner his right to a fair trial. This violation in a case as close as this one was a substantial error. The trial judge failed to sua sponte and stop the district attorney's leading questions and strike the questions and answers the district attorney asked. It was most egregious when the judge admitted that defense objection was late, but other questions

by the DISTRICT ATTORNEY to Walton **WAS** leading. So, in the trial judge's arrogance he admitted that the DISTRICT ATTORNEY had asked leading questions, but had failed to sua sponte stop and strike them, therefore, allowing a violation of petitioner's right to a fair trial to occur. After the witnesses Walton, Hodges, and Cross testified to having been convicted of felonies, which falls within the moral turpitude standard, the trial judge failed to act upon his own and sua sponte the jury with the instruction that these witnesses are impeached by rule of law and suffer from moral turpitude. Instead, trial judge allowed their testimony to stand as if it was credible, where by the law it was not.

Allowing these errors in this close trial was substantially injurious to petitioner's liberty and goes to show also that this trial judge failed to act in his capacity of making sure that a fair trial was held.

**LAW OF THE CASE ARGUMENT AND PREJUDICE**

The trial judge failure to acknowledged the "Law of the Case Doctrine" allowed the district attorney to present to the jurors errors which the CAL.APP. and District Court found to be errors in two instances: one being when Inspector Wright testifying that petitioner was not inconsistent to person he saw by the corvette. Inspector Wright could not identify petitioner. The second act was when the trial judge on 10-06-2004 said the law of the case did not apply and that he would not bar district attorney from presenting case. This led to the presentation of alleged petitioner's prior bad acts in co-defendant Cross prior testimony. Again, in judge's chamber on 10-25-04, trial judge ruled law of case did not apply. Although the California Appeal court and the Northern District found no probative value in Inspector Wright's testimony. Therefore making it prejudicial being that is the measurement of whether its probative or prejudicial so these appeal court ruled it prejudicial and the California Appeal court and District court found error in the prosecution misconduct claim of presenting prior bad acts (see exhibit D page 1000). Although the prosecutions misconduct errors when presented to Northern District and California Appeal court (were found to be error, but not reversible errors (see exhibit D, G) that does not allow district attorney to present the same error in subsequent trial. In-fact, the Northern District did find reversible error for cumulative effect involving prosecution misconduct.

**ABUSE OF DISCRETION AND EVIDENTIARY RULINGS**

**ARGUMENTS AND PREJUDICE**

**(a & b)**

Petitioner claims that there were numerous abuses of discretion and evidentiary ruling errors. The first being the erroneously ruling of co-defendant Cross unavailability, when Cross was actually there and had been granted immunity to overcome the possibility of him refusing to testify, but when the trial judge was informed that even though co-defendant Cross was given immunity he was still going to refuse to testify. The court then ruled him unavailable and allowed his impeached prior testimony to be read to the jury although a prior jury had ruled it as unbelievable by their guilty verdict against co-defendant Cross in first trial. But this trial judge went above and beyond abuse of discretion by ruling co defendant Cross unavailable while he had been granted immunity and then allowed impeached prior testimony to be read to jury therefore rendering petitioner trial was an unfair one because their was no way to cross examine that known impeached testimony which implicated petitioner.

The trial judge should have ruled the impeached prior testimony of co-defendant Cross as untrustworthy as it had been done so by the DISTRICT ATTORNEY who impeached co-defendant Cross and by the jury who convicted Co-defendant Cross. This trial court error denied Petitioner a fair trial and was a substantial injurious act that cost Petitioner his liberty and should now be corrected by granting of this habeas.

(c) The second claim of error and abuse of discretion is an easy one for Petitioner to prove because there was a unique situation where there were two co-defendants and there was a question of whether either of them would testify. The court brought Co-defendant Kingdom in front of jury where he refused to testify. Co-defendant Kingdom was not granted immunity, but when it came time for co-defendant Cross (who refuse) to testify, which this was done outside the presence of jurors, because the trial judge knew that the DISTRICT ATTORNEY wanted to present co-defendant Cross impeached prior testimony, and it would've lost

weight had the jurors been able to see co-defendant Cross refuse as they the jurors were allowed to see co-defendant Kingdom do. This harmed petitioner greatly because credibility was lent to that testimony by just telling jury he was unavailable which seem like some innocent act when in reality he was there and refused to testify with immunity. This substantial injurious error denied a fair trial to petitioner because co-defendant Cross blamed Petitioner for the crimes and claimed that petitioner was there. This court should grant this habeas to correct this violation to cure the lost of liberty petition is continuously suffering due to this violation of US Constitutional Rights.

(d) Third claimed abuse of discretion and evidentiary ruling error is the allowing of the prior testimony of witnesses Love and Mohamed testimony to be read to jurors because they could not remember details. This denied Petitioner his right of confrontation because almost ten years had past and new questioning of them could have help petitioner prove to jury that he did not do crimes. The courts violation of Petitioner Confrontation Rights and the abuse of discretion and Evidentiary Ruling error rendered the trial an unfair one and substantially injured petitioner with that error infecting the verdict. The court should grant this habeas to correct these violations of us constitutional right denied petitioner.

(e) The fourth claim of abuse of discretion was the denial of the **Wheeler Motion**, when it was clear that the two panels which consisted of 180 people was not close to peers of petitioner. There were less than 12 black people and that was below 10% of the entire panels, This was brought to the court attention in the **Wheeler Motion**, but the judge refused to dismiss the panel for one that was more close to petitioner's peers and racial groups. This denial denied petitioner a trial by his peer group which is a guaranteed right of the US Constitution. Had a jury of peers been sat, petitioner would have been found not guilty because the experience of black people. Petitioners peer group would have been able to see through the impeached witnesses and recognize that they were not credible without a doubt as

the federal district judge saw and ruled in its order granting habeas.(see p 990-992)

a. The denial of the wheeler motion was substantial and injurious in that it cause petitioner to be and found guilty whereas jury of peer would not. This lost of liberty is great and can be corrected by this court granting this habeas. To correct these violations of the US Constitutional Rights denied petitioner.

(f) The final act of abuse of discretion is when the trial judge allowed a disagreement he had with defense lawyer in chamber to spill out into petitioners trial when the judge who was clearly perturbed denied every objection made by the defense in a most abrupt curt manner. This act of revenge on defense lawyer denied petition a fair trial and allowed erroneous evidence to be presented to the jurors. This act of abuse of discretion was a substantial error and injured petitioner by infecting the jury who later rendered a guilty verdict causing lost of liberty, which is always prejudicial. This court should grant this habeas to remedy the violations of the United State Constitution the petitioner suffered.

**CLAIMS – GROUNDS FOR RELIEF (7)**

Petitioner was denied a fair trial, equal protection of the law, and due process of the law when the district attorney committed seven (7) acts of prosecution misconduct.

**SUPPORTING FACTS**

1. The district attorney knowingly presented false evidences to jurors when he introduced co-defendant Cross impeached prior testimony.

2. The district attorney knowingly elicited hearsay from Sergeant Krupp

3. The district attorney told jurors in his closing argument that jurors had not heard from petitioner as to his whereabouts, and told jurors that if petitioner had not done the crime, he would have testify to that fact.
4. The district attorney during jury selection and after the rotation had been listed as to how the jury panel would be called to sit in the box to be questioned. The district attorney called up a black juror who was 50 positions down the list.

5. District Attorney asked leading questions of Walton.

6. District Attorney told jury that petitioner had been in prison twice and that petitioner told co-defendant Cross about his prior bad acts.

7. Petitioner did not testify at trial.

8. Northern District Order and California Appeal typed opinion of November 1998, found prosecutor misconduct when district attorney questioned co-defendant Cross about petitioner prior bad acts of violence. This error occurred again in the reading of co-defendant Cross prior impeached testimony, where the act was initially done.

**ARGUMENT AND PREJUDICE**

1. Petitioner states that the district attorney knowingly presented false evidence in the form of impeached prior testimony of co-defendant Cross. The fact that the testimony was impeached proves to his court that it was false and it was the prosecution that impeached the testimony so the district attorney WAS aware of it. However, there was no question that co-defendant Cross prior testimony was impeached.

. Impeached testimony by definition means the "testimony is false" most likely different statements were made or the facts had proved false. The district attorney knew this testimony was false in advance, but made the decision to present false testimony to the jury. The district attorney's decision denied petitioner his fair trial right and due process rights because petitioner was unable to cross-examine the co-defendant on his false testimony. Co-defendant's testimony also claimed petitioner was at scene of crime when the crimes took place. This denial of Rights by the misconduct of the prosecution was substantial and injurious to petitioner and cause lost of liberty. This court should grant this habeas to correct any and all violations suffered by petitioner under the United State Constitution.

2. The district attorney eliciting hearsay from Sergeant Krupp was a successful attempt to corroborate witness Walton who was not a credible witness. Nevertheless, the illegal questioning of Sergeant Krupp was to give credibility to Walton's testimony since the jury was hearing from the Oakland Police to give it support illegally. This act denied petitioner a fair trial and due process and equal protection of the law which cause the lost of liberty which is always a substantial and injurious prejudicial act. This court should grant this habeas to correct the denial of petitioner United States Constitutional Rights.

3. The district attorney violated petitioner's Constitutional Right not to testify when the district attorney inform the jury that petitioner had not testified to his whereabouts or denied the committing of these crimes. The prosecutor's misconduct cannot be corrected by the corrective admonition by the trial judge because the genie was out of the bottle and it was set in the juries mind at a crucial time; **right before deliberations**. The district attorney violated petitioner's rights guaranteed by Constitution. This type of violation cannot be justified as an accident because every lawyer knows and understand this fundamental right. This was a strategic and devious tactic used by the district attorney to intentionally violate petitioner's rights. This court should treat it as the devious act it is and grant this habeas to cure the violation of petitioner's US Constitution suffered by petitioner that has caused lost of liberty, which is always a substantial and injurious fact.

4. The district attorney brought a black juror up fifty positions and told defense lawyer that he would not seat another black juror. Thereafter, the prosecutor dismissed all others black potential jurors. This blatant misconduct by the prosecutor denied petitioner his right to have a jury trial of his peers. This is a denial of guaranteed rights of the US Constitution. The denial caused petitioner to be found guilty and suffer lost of liberty, which is always a substantial and injurious fact, which therefore, infected entire trial. This court should grant this habeas to correct the denial of the US Constitution Rights denied to petitioner.

5. The district attorney asked leading questions of Walton, which allowed him to present illegal testimony from an already impeached witness. This act of prosecutor misconduct denied petitioner a fair trial, due process of law, equal protection of the law, and caused jurors to render a guilty verdict against petitioner. The prosecutor misconduct caused a denial of guaranteed rights. By the US Constitution and caused lost of the liberty, which is always prejudicial and substantially injurious. This court should grant this habeas to correct these violations of rights suffered by petitioner.

6. The district attorney committed prosecutor misconduct when he told jurors that petitioner had been in prison twice and had told co-defendant Cross about his prior bad acts of shooting at people. This act of prosecutor misconduct violated petitioner's right to not testify and therefore to not have jurors hear of prior convictions. Again, the district attorney quoted from co-defendant's Cross impeached prior testimony about the prior bad acts and he is one who fabricated the story. Although California Appeal typed, opinion of November 1998 found prosecutor misconduct in the questioning of co- Cross about appellant prior bad acts of violence, but did not find that error reversible. The district attorney cannot commit that same error in the subsequent trial because it had not been reversed. In fact, the Northern District Court did too find the same error and used it to reverse on cumulative effect error.

This district attorney committed many acts of prosecutor misconduct as stated above by petitioner and all these acts were errors that violated petitioner's right to due process, fair trial, equal protection of the law, and this court should grant this habeas to correct the lost of liberty suffered due to these substantial and injurious violation of the US Constitution.

**CLAIMS – GROUNDS FOR RELIEF (8)**

Petitioner was denied due process of law, a fair trial, and equal protection of the law when inspector Wright was allowed to testify that petitioner was not inconsistent to the person whom he saw by the corvette. Inspector Wright could not positively identify the petitioner.

**SUPPORTING FACTS**

California Appeal type opinion Nov 1998 ruled that when Inspector Wright testified in petitioner first trial to petitioner not being inconsistence to who he saw by Corvette that it had no probative value.

1. At second trial, Inspector Wright testified again that petitioner was not inconsistent with whom he saw by the Corvette.

2. Inspector Wright was not able to identify petitioner.

3. Petitioner was only Black male in courtroom.

4. Northern District also said it had no probative value on page 980 of order.

**ARGUMENT AND PREJUDICE**

California Appeal Court ruled the testimony of Wright identification () petitioner was not probative therefore, it was prejudicial testimony because that is the other side of the scale when ruling whether or not something is probative or not. It was very suggestive because petitioner was the only black male in court when Wright testified. That suggestiveness was bolstered because Wright is an Ex Oakland officer. The reliability is also in question because petitioner's second trial had taken place almost ten years later.

Also when some evidence or testimony is being debated and set up to be weighed to see whether it has probative value or too prejudicial, and if its found not to be probative, then it's not allowed to stand. Therefore, when the California Appeal Court found it to have no probative value, it should have been found error and the conviction reversed due to that error. This court should issue this habeas because two courts found that Wright identification of petitioner did not

have any probative value. If the trial court had ruled in the same light, that Wright's testimony did not have any probative value, it would not have been allowed. Therefore, this court should remedy this violation of due process by granting this habeas to correct this substantive, injurious, and prejudicial violation of petitioner US Constitutional Right and lost of liberty due to this suggestive and misleading identification of petitioner infecting entire trial.

**CLAIMS – GROUNDS FOR RELIEF (9)**

Petitioner was denied his guaranteed right of representation by effective assistance of counsel, when attorney Levy rendered ineffective assistant of counsel throughout the proceedings before and during trial on fourteen occasions.

**SUPPORTING FACTS**

1. Levy did not put on defense, did not call any witness, or present any evidences.

2. Levy failed. to object to leading questions asked by district attorney to Walton

3. Levy failed to prepare opening statement and closing argument, although Levy told petitioner she had done both.

4. When Levy cross-examined Sergeant Krupp about a clip filled with.45's bullets that co-defendant Cross' mother gave to police, Levy associated petitioner name with that evidence.

5. Levy elicited hearsay from Sergeant Krupp about what Walton had seen, which opened the door for the district attorney to do the same.

6. Levy failed to object to co-defendant Cross two taped statements that were played to jurors.

7. Levy failed to object to Sergeant Krupp and officer Downum referring to petitioner's arrest for carjacking when that was not a charge on trial.

8. Levy had numerous sidebars instead of objecting.

9. Levy said Law of case did not apply to California Appeal finding of errors.

10. Levy failed to object to co-defendant Cross prior impeached testimony, which stated petitioner alleged prior bad acts.

11. Levy failed to stipulate to petitioner defense evidence or present it, which was a credit card and car wash receipts.

12. Levy failed to impeach Walton, Hodges, co-defendant Cross and to state that they suffer from moral turpitude

13. Levy failed to object to co-defendant Cross testifying outside of juror that he refused to testify.

14. Levy failed to object to the judge telling the jurors that co-defendant Cross was unavailable.

15. Levy failed to tell jurors that co-defendant Cross refused to testify and had been granted immunity.

16. Petitioner begged Levy to present defense daily.

17. Levy called Petitioner curse words and called petitioner crazy if he thought she would visit with him about juror's background for selection.

18. When Levy would dismiss a juror, she would lean toward petitioner first in the fake act of conferring with petitioner.

19. Levy continuously walked away from petitioner at court dates when she would get angry, which was every court date.

20. Levy stated sarcastically that she was glad petitioner graduated from law school and had a law degree.

21. Levy gave petitioner and wife documents which stated lawyer made decision and that petitioner had no right to make any decision on his behalf.

22. On November 4, 2004, while jurors was deliberating, Levy stated in a very dissatisfied voice that it looks like petitioner was going to walk even on the kidnap due to district attorney's lack of evidence.

23. Levy only attacked the 187 in Motion for acquittal 1118.1

24. Levy only mention kidnap in 1118.1 Motion orally after petitioner begged her to do so.

25. Levy failed to introduce to jurors the District Court's Evaluation of the key witnesses, where they all lack credibility. Something she promised petitioner she would do.

26. Petitioner did three Marsden motions against Levy. The very first was the very day attorney she was appointed.

27. Petitioner presented uncontroverted witness at first trial and presented same witness in pro per habeas corpus, which Northern District granted.

28. District attorney did not charge petitioner in second trial with car jacking.

29. Levy did not raise statue of limitation to bar kidnap charge.

30. District successfully made the simple kidnap charge that petitioner had in first trial into life tops kidnap for second trial. Infact, Judge Reardon granted the district attorney's motion, but the district attorney subsequently withdrew the charge when he was shown case law barring it when it was brought once again in front of judge Reardon for reconsideration on that ruling.

**ARGUMENT AND PREJUDICE**

Petitioner and Levy did not get along. From the moment of introduction, that feeling continued throughout the ineffective representation. Day one, Levy expose petitioner interpretation of case and strategy to judge Reardon, district attorney Jacobson, and told petitioner she did not even want the case. From there on, there was never any confidence to have Levy handling the case, which was void of any input from petitioner, who had just been granted a pro per habeas from Northern District Court and who had fought and studies case from August 1995 up until that point, which was May 2004. Levy would cuss petition when petitioner would ask her to file motion. Levy refused to prepare a defense and presented no evidence at all at trial although, petitioner had presented uncontroverted witnesses at first trial and in pro per habeas corpus, which was granted. Levy sabotage petitioner. Levy did not prepare an opening or closing argument. She only sporadically responded to points the district attorney made and this proves that she was very unprepared, which she was. Jurors believe counsel Levy was poorly prepared. Levy throughout trial failed to object to hearsay and leading questions, and she was trying to prevent petitioner from having appealable claims by, instead of objecting, Levy would have sidebars when the district attorney or judge did an objectionable act. Levy stated to petitioner that the district attorney had told her he did not want petitioner to come back on another appeal. Petitioner states here that Levy did her best, as the supporting fact shows to make sure petitioner did not return on appeal by Levy sabotaging petitioner's case by not presenting any evidence, or making any record for appeal by objecting.

During trial, Levy would not create a record for appeal for petitioner when the judge would allow objectionable evidence and rulings because every day prior to trial with the jurors. There would be an in chamber meeting where the judge would tell what he was allowing, so

therefore, Levy did not object to it when actual jurors was seated. Levy had antagonized/sabotaged the jurors against petitioner when jurors were picked. When petitioner had requested that Levy visit with him to go over juror's background, she told petitioner's he must be crazy. Nevertheless, when the actual picking was going on, petitioner had no input into who would stay or go. Levy would lean in toward Petitioner as if petitioner was telling her to get rid of a particular juror and then get rid of a juror. Levy did this the enter selection process. Levy allowed the district attorney to move one black juror up 50 positions with the threat of that being the only Black he would allow. Therefore, Levy stopped selecting soon after that was done. Although, she still had a challenge left.

Levy sabotaged petitioner during trial when she did not object to petitioner's name being associated with the clip of a 45, which belong to co-defendant Cross. In fact, Levy associated petitioner name with the .45 clip herself, but she also did not object to the officer associating petitioner's name with a carjacking, which was an uncharged crime at trial.

She did not object to co-defendant Cross refusing to testify outside of the jurors or his impeached prior testimony or his prior two taped statements. She also failed to impeach co-defendant Cross, Walton, and Hodges whom all suffered from felony conviction and moral turpitude. Any request petitioner ask of Levy, she would reply, "I am glad you went to law school", or I am glad you got your law degree, or she would stalk off because petitioner would insist that she do so. Nevertheless, Levy was intent on making invalid any reversible issues that petitioner may have been granted.

Levy continuously told petitioner the district attorney did not have any new evidence in regards to the insufficiency ruling that was granted, and that against the murder charge. Petitioner's states that Levy's only concern was the murder charge and she did nothing to prepare for the trial because Levy claimed she **knew** that district attorney did not have any new evidence to present. Levy did not even prepare to fight off the kidnap and possession of a gun charge because she did not want petitioner to go free. Levy believed petitioner had something to do with crimes, she stated that to petitioner, and her actions showed such. When petitioner told Levy she had associated his name the .45 bullet clip, she said "it is not like you were not

involved." While the jurors were deliberating on first day, Levy came to petitioner and said in a very disgusted voice that 'it looks like you are going to walk even on the kidnap case", which the district attorney could not prove. Levy was fully aware of the outcome, but wanted petitioner to believe he was about to walk. When petitioner was pleading with her to call his witnesses, she said she did not believe them. Those witnesses were uncontroverted. The fact was Levy did not believe petitioner was innocence and therefore rendered sub par representation. More evidence of Levy not trying to win kidnap and gun charges is in her actual 1118.1 motion to acquit it was only for 187 charge and petitioner had to plead that she orally request the same for all charges which Levy did half heartily.

Petitioner asks this court to take judicial notice of the Marsden Motion hearings that petitioners put on record. The denial of a fair and strategic defense highlights Levy's deficiency and lack of a vagarious defense. This court should be able to see that from petitioner's first meeting with Deborah Levy, the attorney/client communication and relationship went down hill from their initial meeting. Not at any time during Levy's representation of petitioner was petitioner satisfied or confident in Levy's representation. Which the court can see was not acceptable with the given facts. And to see that the jury still deliberated five(5) days just goes to prove that had petitioner had competent counsel putting on defense petitioner would have gotten an acquittal. In addition, there was evidence of a jacket and a pair of gloves that was in the car petitioner was a passenger in when arrested. The driver of that car claimed ownership of those items at first trial and Levy refuse to call him as a witness. The district attorney harped over that evidence continuously in second trial.

Levy rendered ineffective assistant of counsel when she refuse to raise a statue of limitation bar to the kidnap as petitioner requested. Being that it was a simple kidnap charge and 10 years had passed, Levy refused even when she seen that the district attorney did not recharge the carjacking and brought a motion to elevate the simple kidnap to a life tops the kidnap which would not be time barred. The failure by Levy caused petitioner to be convicted on a time barred charge. A charge petitioner should not have had to face and with the petitioner begging her to raise this barred claim and her refusal goes to demonstrate her sabotaging of petitioner case in

association with all the rest of these listed acts and rendering ineffective assistance of counsel and denied competent counsel to petitioner.

Petitioner knows as this court should know by these fact that petitioner was denied competent representation of counsel, denied a defense, and therefore, denied due process of the law, a fair trial, and equal protection of the law. These acts by Levy were substantially injurious to petitioner and the prejudice of these denial cause petitioner to lose his liberty and this court should grant this habeas to correct this injustice suffered.

**CLAIMS – GROUNDS FOR RELIEF (10)**

Petitioner was denied due process and equal protection of the law by the conviction of kidnap, which was time barred.

**SUPPORTING FACTS**

1. Petitioner was charged in August 1995 with kidnap and was convicted of that kidnap in 1995/96.

2. Petitioner was re-charged in June 2004 with the same kidnap charge when initial conviction had been reversed.

3. After reversal district attorney moved court successfully to enhance kidnap to kidnap with life tops.

4. District attorney subsequently withdrew the enhanced kidnap charge making it only simple kidnap same as it was when initially charged in August 1995.

5. Petitioner was convicted by jury of kidnap from August 1995 in November of 2004 nine year and three month later.

**ARGUMENT AND PREJUDICE**

Although there is no record of an objection to the statue of limitations on the kidnap that should not prevent this court from ruling on this issue because that was ineffective assistance of counsel for failure to object. Petitioner should not be further harmed by trial counsel's errors. As shown, the kidnap was found and charged in 1995, which was subsequently reversed. That same kidnap was again charged in 2004 beyond the statue of limitation for such crime. The 2004 conviction of this time barred charge must be seen as a violation of due process and equal protection of the law violation. Petitioner was substantially injured by this conviction of kidnap on a time barred charge This court should grant this habeas corpus to correct the prejudice suffered by petitioner's lost of liberty due to this violation of the US Constitution.

CLAIMS · GROUNDS FOR RELIEF (1)

Petitioner was denied Due Proces and Equal Protection of the Law and denied a Fair Trial when the Reconviction of Murder was allowed to stand based upon Insufficient Evidence to support that Verdict.

SUPPORTING FACTS

1. U.S. District Court for Northern California Ruled that evidence in petitioners first trial was insufficient to support Murder verdict Conviction, that order was 314 F. Supp. 2d 967 dated 4-14-04.

2. Second trial consisted of same evidence presented in first trial, except,
   a. Petitioner not charged with Carjacking
   b. District Attorney did not call all witnesses from first trial for second trial.

3. Petitioner recieved Not Guilty verdict on charge of Ex-felon in Possession of a firearm

4. D. A. witness Rodney Love at 2nd trial had no memory of events so his 1st trial testimony was admitted in which he did not I.D. petitioner as being at scene of Kidnap.

5. California Court of Appeals typed opinion dated 4-06-07 confirmed conviction based upon, claims that evidence presented at 2nd trial, and
   a. evidence different
   b. Federal Order not final
   c. Federal Order was not Legal Conclusion
   d. Federal Order did not find quantum of evidence insufficient.

6. See Petition for Review attached herein as exhibit M where this claim is also argued.

ARGUMENT AND PREJUDICE

Petitioner is in a rare situation which feels fortunate, because this claim has once already been presented to this court which issued that petition to be granted based upon that claim of Insufficiency of the evidence to support the Murder conviction.

Since that time petitioner was retried and reconvicted of Murder and the same evidence which this court found to be insufficient was used again, in fact less evidence, because the D.A. didn't recharge Carjacking and did not call all the witnesses from 1st trial.

Although petitioners trial lawyer refused to present defense witnesses the jury retuened a Not Guilty verdict on Ex-felon in Possession of a firearm. This makes the evidence even more insufficient if that is possible from this court conclusion in April 2004 because the Murder was done with a bullet fired from a gun, And that verdict should spare petitioner doubly so along with this court first assessment of that evidence which also without Carjacking.

Basically petitioner Relys Relies upon this court's order and Ruling that the evidence was insufficient to maintain Murder viewed in light most favorable to prosecution. And that trial Judge did not claim that the 2nd trial was different from 1st evidence, he said he did not have to follow order issued by District Court. And the Court of Appeal rulings made in it's typed opinion are untenable in every aspect. Cal. App claimed the evidence was different. But that is not the standard which is used the criteria is whether the evidence is materially different which it was not. Cal. App. claim of difference is based upon erroneous Ruled evidence not being presented in the form of co-d Kingdom's statement, and that defense didn't present a alibi defense, and that Walton's prelim testimony was not read to 2nd jury as it was done to 1st jury. Cal. App. fails to state that Walton testimony didn't differ from her prelim testimony. So the difference which

Cal.App. claims is that LESS EVIDENCE was presented. Not new or materially factually different evidence. But a Review of the Record can easily prove that the evidence and petitioner two trials was basically the same and in fact less.

And Cal.App. ruling that the federal order was not final, legal conclusion is also totally wrong and it is not in accord with law it is not law at all it's more of a personal opinion based upon misquoted facts. Cal. App. continuously stated throughout it typed opinion 4-6-07 that I petitioner was arguing the legality of the Retrial being barred, this is not what was presented by petitioners appellant lawyer but Cal. App. continued to focus on that to get away from the insufficiency claim.

Petitioner declares that the prejudices of the denial of Equal Protection of the Law which would protect petioner from a sustaining of murder conviction based upon previously ruled insufficient evidence is soo blatant that the only relief should be reversal of all charges. This Due Process violation and errors are soo substantial and injurious to this petitioner that continued lost of Liberty will only aggravate the injury suffered twice now wh with the reconviction. This Court should grant this habeas corpus and give petitioner an acquittal on all charges.

CLAIMS- GROUNDS FOR RELIEF - 12

Petitioner was denied Due Process and Equal Protect of the Law and a Fair Trial when the Collateral Estoppel Doctrine was not adhered to during petitioners trial and subsequent Direct Appeal. And was Double Jeopardy Violation.

SUPPORTING FACTS

1. U.S. District Court for Northern California ruled that evidence in petitioners first trial was insufficient to support murder conviction in order 314 F. Supp. 2d. 967

2. Petitioners second trial consisted of same evidence presented in first trial, except,
   a. petitioner not charged with Carjacking
   b. D.A. did not call all witnesses from 1st trial to testify at 2nd

3. Cal. App. typ. opn. 4-6-07 affirmed 2nd trial conviction and denied that Collateral Estoppel Doctrine applied.

4. Trial Judge declared that he was not bound by U.S. District Court Rulings.

5. see Petition for Review attached herein as exhibit-M where this claim is also argued.

ARGUMENT AND PREJUDICE #12

Petitioner again is in a rare situation for this claim to has in a sense been in front of this court Basically only leaving the court with having to determine whether the evidence in first trial was basically the same as that presented in 2nd trial.

This petitioner declares to this court that the evidence in first trial was NOT Materially factually different, and that when District Attorney rested his case or before the case was submitted to jury the Collateral Estoppel Doctrine should have prevented the conviction on Murder again because the District court had ruled in it's order 314 F. Supp2d. 967 that the first trial evidence was Insufficient and that ruling made the Doctrine of Collateral Esttoppel an issue that had to be ac-knowledge at the end of the prosecution case in chief and before the jury recieve the case for deliberations.

Trial Judge and Cal. App refusal to adhere to the Doctrine of Collateral Estoppel by claiming they were not bound to that Doctrine prejudice petitioner by denying Due Process and Equal Protection of the Law and caused Petitioner to Suffer Double Jeopardy violation. This Double Jeopardy violation and errors are soo substantial and injurious to this petitioner that this court should grant this habeas corpus to end the suffering by this petitioner that this lost of Liberty is continuing to aggra-vate. This court should give petitioner acquittal to relieve the injuries done by the blatant ignoring of these Rights & Laws.

CLAIMS-GROUNDS FOR RELIEF -13

Petitioner was denied Due Process and Equal Protection of the Law and a Fair Trial when LAW OF THE CASE DOCTRINE was not adhered to during Petitioners trial and subsequent Direct Appeal, And was a Double Jeopardy Violation.

SUPPORTING FACTS

1. U.S. District Court for Northern California ruled that evidence in petitioners first trial was Insufficient to support Murder conviction in ORDER 314 F. Supp 2d 967

2. Petitioner second trial consisted of same evidence presented in first trial, except,
   a. petitioner not charged with carjacking
   b. D.A. did not call all witnesses from 1st trial to testify at 2nd trial.

3. Trial Judge declared that he was not bound by U.S. District court Rulings.

4. Pre-Trial Judge Reardon acknowledge that Law of the Case Doctrine was applicable.

5. Cal. App. typ. opn. 4-6-07 affirmed 2nd trial conviction and denied that Law of the Case Doctrine applied.

6. Prosecutor agreed with Pre-Trial Judge Reardon that Law of the Case Doctrine applied to this petitioners trial.

7. see Petition for Review attached herein as exhibit-M where this claim is argued also.

ARGUMENT AND PREJUDICE #13

Petitioner again is in Rare situation for this claim to has in a sense been in front of this court. Leaving this court to only have to determine whether the evidence in first trial was basically the same as that presented in 2nd trial.

Petitioner declares to this court that the evidence in first trial was NOT Materially factually different, and that when D.A. Rested his case or before the case was submitted to Jury the LAW of the Case Doctrine should have prevented conviction on Murder again because U.S. District Court order 314 F.Supp2d 967 Ruled the evidence presented to be Insufficient to support Murder conviction, this Ruling Made the LAW of the Case Doctrine a hurdle that the prosecution had to clear before the case could be submitted to Jury on Murder charge.

Prosecution also agreed with pre trial Judge Reardon Ruling that Law of the Case Doctrine was applicable to petitioner in 2nd trial.

Trial Judge and Cal. App Refused to adhere to LAW of the Case Doctrine by claiming they were NOT BOUND to the District Courts Ruling which is a blatant ignoring of the Supremacy Rules governing courts which does bind the trial Judge and Cal. App. to a Ruling by the U.S. District Court. But they ignored the law and undermined the integrity of the judicial system and caused significant harassment and vexatious litigation against petitioner and cause Double Jeopardy violation to occur. This Double Jeopary violation and errors are soo substantial and injurious they cause lost of Liberty and this court should grant this habeas Corpus to end the suffering of petitioner by this continued lost of Liberty and give petitioner an acquittal.

## CLAIMS - GROUNDS FOR RELIEF - 14

Petitioner was denied Due Process and Equal Protection of the Law and a Fair Trial when Petitioner Motions for Self Representation brought under Faretta v. California was denied violating the 6th and 14th admendments to the Constitution.

## SUPPORTING FACTS

1. U.S. District Court For Northern California ordered the release of petitioner or Alameda County had 60 days to reinstitute proceedings against petitioner.
2. Alameda County chose to reinstitute charges against petitioner and first court appearance was 5-13-04 where petitioner was temporarily represented by Mr. Giller who informed court that he would contact panel of lawyers being that he Mr. Giller could not represent petitioner, because petitioner would not waive time.
3. On 5-14-04 and 5-18-04 numerous lawyers including Ms. Levy refused to take petitioners case because of no time waiver.
4. On 5-19-04 Ms Levy told court that she would take case and could be ready in 60 days for trial.
5. On 5-19-04 petitioner spoke with Ms Levy and knew that there was going to be problems because Ms. Levy said she didn't want case, was not going to take case, and Ms Levy exposed to court & D.A. what petitioner interpretation of case were.
6. On 5-19-04 the day Ms. Levy was appointed petitioner asked Judge how to represent self.
7. petitioner presented three(3) Marsden Motions to discharge Ms. Levy and all were denied.
8. on 9-21-04 petitioner request to go pro-per pre trial Judge Reardon denied on 9-22-04

9. On 9-23-04 Ms. Levy asked Judge Reardon to Reconsider Request to go pro-per, pre trial Judge Reardon denied.

10. Trial was not schedule until 9-29-04 when Judge Reardon denial of final Faretta Motion brought by Ms. Levy on 9-23-04.

11. Petitioner was told by Ms. Levy that No defense witnesses would be called by the defense during trial. And none were presented.

12. See Petition for Review attached herein as <u>exhibit-M</u> where this claim is argued also.

ARGUMENT AND PREJUDICE #14

When petitioner was assigned Ms. Levy on 5-19-04, Ms. Levy had once already refused to be assigned on 5-14-04 & 5-18-04. because there was a no time waiver on the case. Ms. Levy again told petitioner on 5-19-04 that she did not want case and when petitioner stated this fact to Judge Reardon he denied the Marsden Motion and assigne Ms. Levy.

Petitioner in total move for 3 Marsden Motions and all were denied and the reasons those Marsden Motions were brought was because Ms. didn't work with petitioner, cussed petitioner out, said she hates petitioner, and she was misinterpreting law harming petitioner on Motions filed and her view of the Federal Order, there are many more greviences petitioners had with Ms. Levy which are listed in the Marsden Motion hearings themselves, but the major problem was her refusal to present a defense, and she over petitioners objections did NOT call any witnesses.

On 9-21-04 when petitioner notified the Reardon Court that I wanted to go pro-per, Reardon had petitioner fill out Faretta Form which was done 9-22-04 and on that day Judge Reardon denied Faretta Motion as untimely because petitioner stated that he must read discovery which Ms Levy had not given to petitioner.

On 9-23-04 Ms. Levy asked pretrial Judge Reardon to reconsider Faretta Motion because she had moved to disqualify a trial Judge therefore trial was not set until 9-29-04, this time Judge Reardon again denied because petitioner needed to read discovery and Judge Reardon found this to be untimely and equivocal and he denied Faretta Motion.

Each denial of Faretta Motion was abuse of discretion and error because petitioner should have been allowed reasonable time to read the discovery which had been in Ms. Levy possession. And even when

petitioner asked court what would be a Reasonable time to Read the entire discovery no answer was given. Also when petitioner stated that he preferred to have counsel for trial just not Ms. Levy pretrial Judge Reardon erroneously found that to be equivocal and un-timely.

This denial of my 6th and 14th amendment Rights cause petitioner to be found guilty and cause petitioner the Right to present a defense to prove innocence. Even with the ineffective counsel Ms Levy the Ex-Felon in Possession of firearm was found Not Guilty. Had petitioner been allowed to Represent self and call the alibi defense witnesses it is very likely petitioner would have recieved acquittal for Murder and Kidnap, because the alibi witnesses would've Rebutted the D.A. case in chief. Ms. Levy didn't even call the owner of a jacket and gloves in which the D.A. was trying to associate with petitioner. In first trial Carl Anderson admitted that Jacket and gloves were his when he testified.

For this denial of 6th and 14th amendment violation which caused Due Process and Equal Protection of Law violations and denied petitioner a Fair Trial and Competent Counsel this Court should find that these substantial and injurious errors harmed petitioner and caused Lost of Liberty. therefore this court should grant this habeas corpus to relieve petitioner of this great sufferring cause by these violations.

CLAIMS - GROUNDS FOR RELIEF - 15

Petitioner was denied Due Process and Equal Protection of the Law and a Fair Trial when Petitioners Marsden Motions for substitute Counsel were denied violating the 6th and 14th amendment to the Constitution because Ineffective Representation Resulted.

SUPPORTING FACTS

1. Petitioner was granted an order 314 F. Supp 2d 967 which stated Release in 60 days or Alameda had to reinstitute proceedings,
2. On 5-13-04 petitioner had first court appearance and indicated no time waiver would be requested.
3. On 5-14-04 and 5-18-04 numerous lawyers refused petitioners case including Ms. Levy because of the no time waiver status
4. On 5-19-04 Ms. Levy told court she would take case and could be ready in 60 days
5. On 5-19-04 Ms. Levy spoke with petitioner and stated she did not want case, would not take case, and Ms. Levy exposed petitioners interpetation of case to court
6. Petitioner had (3) ther three Marsden Motions to discharge Ms. Levy on 5-19-04, 7-6-04, and 9-21-04 all denied
7. At trial NO witnesses or evidence was presented by Ms. Levy for defense even though petitioner begged her to present alibi defense that had been used in 1st trial.
8. during the entire appointment of Ms. Levy to petitioner it was antagonistic and disrespectful, during court appearances and at visits, and even to my wife.
9. Ms. Levy misinterpetated the Federal Order and Law and allowed the pre-trial Judge to do during Motion hearings.
10. see Petition for Review attached herein as exhibit-M where this claim is argued also.

ARGUMENT AND PREJUDICE #15

Petitioner was assigned Ms. Levy on 5-19-04. Ms. Levy had on 5-14-04 or 5-18-04 Refused to take petitioners case because of the no time waiver status. And on 5-19-04 Ms. Levy told petitioner that she did not want case and would not take case. Ms. Levy had even told court of petitioners intrep interpetation of case. When petitioner Move Judge Reardon for a Marsden Motion against Ms. Levy for the above Reasons Judge Reardon denied.

From first contact and every subsequent contact with Ms. Levy was totally antagonistic, we would argue in court and she would stalk off, we did not agree on hold how she was going to handle defense by not presenting defense. And when Ms. Levy misintepeted the law and allowed the Judge to misintepete the Law although I was telling her of the error that cause me to move forward with the second Marsden Motion where I stated how irrepairable the relationship was between petitioner and Ms. Levy, but although Ms. Levy did Not totally disagree with my assessment of our relationship she still maintain to the court hearing that 2nd Marsden Motion that she wanted to keep case. This bewildered petitioner until days laters when Ms. Levy confessed to wanted this case because she was sure that D.A. had no new evidence to present therefore the Murder was and an easy win. Petitioner now declares that is why Ms. Levy did nothing to prepare for this case because she was so sure that the D.A. had no new evidence and therefore the trial would be force to grant an acquittal if the D.A. proceeded to trial. She did not even prepare opening or closing arguments. But Ms. Levy never counted on the trial Judge not following the Federal Order, especially after pre-trial Judge Reardon said Law of the Case applies.

Leading up to the 3rd Marsden Motion the Relationship continued to deteoriate greatly until in the beginning of September 2004 Ms. Levy visited me and the arguing commenced immediately and ended with Ms. Levy saying she hates petitioners and that he was an asshole. When petitioner got the 3rd Marsden Motion on 9-21-04 the above was cited to the court by petitioner and again Ms. Levy agreed with most of petitioner cites although w she tried to lie about the cursing, she again made the plead to keep the case which again astonished petitioner because things were soo terrible, but Ms. Levy wanted what she believe to be a sure Murder win.

Judge Reardon, Goodman, and Horner each denied Marsden Motions when clearly the relationship petitioner had with counsel was beyond repair, there was no confidence held by petitioner for Ms. Levy at all but these Judges all denied and that cause petitioner to recieve ineffective representation and cause petitioner to be convicted because Ms. Levy presented no defense and was incompetent in her cross examinations, she even associated with petitioner some 45 bullets that belonged to co-defendant cross.

The denial of the Marsden Motion denied petitioner substitute competent counsel and cause petitioner to suffer a conviction and Life sentence. These denials were substantial and injurious errors that violated the 6th and 14th amendment and cause Lost of Liberty. This court should grant this habeas Corpus to Relieve petitioner of the sufferring caused by these violations.

CLAIMS - GROUNDS FOR RELIEF -16

Petitioner was denied Due Process and Equal Protection of the Law when Trial Judge Advised Jury that petitioner was in Custody without petitioners consent. This denied a Fair Trial Right.

SUPPORTING FACTS

1. Petitioner 2nd trial was set on 9-30-04 in front of Judge Rolefson
2. Judge Rolefson granted petitioners Motion to be allowed extra changes of civilian clothes.
3. On 10-18-04 Judge Rolefson told Jury that petitioner was in custody for the charges on trial without petitioners consent.
4. The following court Judge admitted to petitioner that he had erred when advising jury of custody status and readvised jury not to consider custody status and denied petitioner motion to Re sit another jury claiming no prejudice occurred.
5. Jury deliberated over the course of (5) five day before finding petitioner guilty.
6. Every Day of trial, including post trial sentencing, and Every Day the jury was in Court before enpanelling petitioner wore different civilian clothes.
7. see Petition for Review attached herein as exhibit-M where this claim is also argued

ARGUMENT AND PREJUDICE #16

Petitioner declares that the admitted error of disclosing to the jury petitioner in custody status by trial Court was very harmful due to the fact petitioner went to great efforts to conceal that fact from the jury by requesting to be allowed extra sets of civilian clothes which the trial granted.

Petitioner knew that 2nd trial would be a close case just as 1st trial was in which that 1st trial jury deliberated for 5 day also, but the 2nd trial was to be so be cause over 9 years had passed and the harmful erroneous statement of co-d. Kingdom would not be allowed.

But it seems that every effort taken by petitioner was countered by the Trial Judge as if he had made a personal goal to inject every negative prejudice statement to jury he could which he did.

Petitioner declares that the Trial Judge admission to this error coupled with the fact that petitioner dressed in casual civilian clothes every appearance in front of jury was harmful. Petitioner believes that Jury would not have found out about custody status by observing petitioner in courtroom first, or by not observing petitioner in hallways, elevators, or streets.

For this admitted error violating my Due Process and Equal Protection of the Law Rights which was substantial and injurious in light of how close case was and how weak case was against petitioner this court should grant this habeas Corpus to give relieve to petitioner from the suffer of Lost of Liberty this error caused.

CLAIMS- GROUNDS FOR RELIEF -17

Petitioner was denied Due Process and Equal Protection of the Law and a Fair Trial when Trial Judge Erred and Prejudiced Petitioner in its Comments to the Jury on Last Day of Deliberations by exceeded what is Permissible under the 6th and 14th amendment, violating both.

SUPPORTING FACTS

1. Petioner 2nd trial was set and tried over 9 years after the charging of the crimes, On 9-30-04
2. On 10-18-04 trial Judge Rolefson told jury that petitioner was in custody without defense consent and trial Judge admitted that it erred in doing so.
3. Jury deliberated over the course of (5) five days and on the final day trial Judge spoke at length to Jury about question of acomplish, corroboration which Jury had.
4. Petitioner objected to trial Judge about it's lengthy ad lib comments to jury as being directing the jury and infecting jury with trial Judges biases
5. Trial Judge after petitioner objection recalled jury to admonish them that he the trial Judge was not trying to direct them only aid them in there questions.
6. Jury returned guilty verdict on same day that trial Judge gave the length ad lib comment to jury which were basically another prosecutor closing argument.
7. see Petition for Review attached herein as exhibit-M where this claim is argued also.

ARGUMENT AND PREJUDICE #17

Petitioner now declares that the trial Judge comment to Jury on last day of deliberation was error because trial Judge was not scrupulously fair his comment came through clearly as another prosecutors closing argument. At no point did trial Judge point to alternative evidence or viewing of that evidence that was in petitioner favor. Trial Judge only gave examples of how the Jury could convict, and directed to that evidence even failing to state the fact that the witnesses he was directing the jury to consider had all been Impeached.

As petitioner has previously stated this Trial Judge Rolefson took every opportunity to prejudice petitioner throughout the trial and when caught by the defense only cursory admonition/ corrections were given which were always outweighed by the error and therefore stuck in jurys mind, therefore prejudicing petitioner with evidence and coercion which the jury should not have had. Such as when trial Judge told Jury petitioner was in custody although petitioner was dressed in street clothes daily.

When petitioner objected to the comments the trial Judge had made to the jury, the trial basically admitted that it had gone beyond the permissible scope and attempted to correct that error by calling the jury from deliberations and advising them that he was not trying to direct them only aid them.

Petitioner declares that trial Judge correction was unable to relieve the prejudice suffer by that error and therefore the jury returned a guilty verdict in accordance with the impermissible comments beyond scope which the trial Judge gave to jury. Which was his opinion which came through as an prosecution closing

argument directing jury to prosecutions version of evidence, Failing to give defense version of those same witnesses.

For this violation of 6th and 14th amendment Right and Due Process and Equal Protection Rights this court should grant this habeas Corpus to overcome the substantial and injurious effect this error caused petitioner which resulted in Lost of Liberty. This court should grant an acquittal cause it's clear petitioner did not and will not recieve a Fair Trial.

**CLAIMS – GROUNDS FOR RELIEF (●) 18**

Petitioner was denied due process of law, equal protection of the law, and a fair trial by the cumulative effect of all those clamed errors set forth in this habeas along with those presented in the direct appeal/opening brief. This denial requires reversal of this conviction.

**SUPPORTING FACTUAL ARGUMENT OF PREJUDICE**

Petitioner's conviction was marred by numerous errors that prejudiced Petitioner and denied due process and equal protection of the law and the cumulative effect of all these error require reversal.

These errors reinforce the effect of each error and raise the prejudice to substantial and injurious levels beyond the necessary criteria that would warrant reversal.

The accumulative errors are more than the sum of their parts alone, because it is reasonable to say had not all these errors occurred petitioner would have received a not guilty verdict.

Numerous lawyers told petitioner that only the best claims should be presented so as not to confuse the reviewing court. Petitioner disagrees with that advice and that is why in this habeas all claims are laid out in as much detail as possible. Petitioner hopes that this court can see how unfair the trial was, and show this court that at every juncture errors were committed either by the trial judge, district attorney or defense counsel. That made it impossible for petitioner to receive a fair trial and due process. If petitioner had listed maybe two big claims then this court would not see the full picture of what happened. And by this court already working from a handicap of not being at the lower court proceedings this petitioner believes it a mandate to specify each and every error to show and help paint a picture to this court of the denial of us const. Rights suffered by petitioner. Petitioner hopes this court is open to this opportunity to view all these errors in total. Eleven (11) acts of abuse of discretion by trial court and seven (7) acts of prosecutor misconduct and 14 acts of ineffective assistance of counsel along with the five (5) other claimed errors, and the 7 ERRORS presented in Direct appeal NOW included.

Therefore, finding that without a doubt, petitioner received a denial of due process, equal protection of the law by the errors herein listed and along with those presented in the direct

appeal/opening brief, petition for Review, which is in front of this court at Present. All this shows that beyond a Reasonable doubt, this Petitioner did not recieve a fair trial. The reversal of this conviction is neccessary to correct the miscarriages of Justice sufferred by Petitioner.

Dated 3-14-08

Aaron L. Cooper E-28703

Aaron L. Cooper E-28703
Petitioner

VERIFICATION

I am the Petitioner in this action. I have read the foregoing Petition for Writ of Habeas Corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own knowledge information and belief and as to those matters, I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Kern Valley State Prison, Delano Ca 93216

Dated 3-14-08

Aaron L. Cooper E28703

Aaron L. Cooper E-28703
IN PRO PER

Mr. Aaron L. Cooper E-28703
K.V.S.P. - ASU2-159
P.O. Box 5102
Delano, Ca. 93216

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON L. COOPER E-28703<br>Petitioner<br>v.<br>Jeanne S. Woodford Dir. C.D.C.R.<br>Respondent | Case #<br>Memorandum of Points and Authorities, To Support Grounds For Relief Presented In Petition For Habeas Corpus |

## INTRODUCTION

This Memorandum of Points and Authorities is in Support of Claims Raised within Petition for Writ of Habeas Corpus attacking Conviction in the Alameda County Superior Court, Judge Rolefson Presided.

The Petition for Writ of Habeas Corpus has ~~eleven~~ eighteen 18 claims set forth as Grounds for Relief and this Memorandum of Points and authorities will support them as they are numbered in Petition. They will also have the correlating number here.

**MEMORANDUMS OF POINT AND AUTHORITIES**

**LEGAL STANDARD FOR GOUNDS FOR RELIEF (1)**

Due Process Violation and Equal Protection of the Law Violation by appointed appellate counsel. Appointed appellate counsel refused to raise all petitioners' substantial allegations of errors that would have resulted in reversal. Petitioner gave these claims to counsel upon his appointment to represent petitioner.

The appellate history of **People v Rhoden 6 C 3d 519** – was "Strikingly Similar to **In re Smith C 3d 192** and resulted in the same conclusion, a finding of "Ineffective Assistance of Appellate Counsel".

**In people v Scobie 36 C A 3d 97** – California Appeal Court observed that the Supreme Court has determined that there is a category of arguable but unmeritorious issues that must be argued as a requirement of Due Process on Appeal. To follow SMITH & RHODEN we are required to judge not only the merits of the appeal, but also the performance of counsel. A defendant may have been fairly tried and justly convicted and have no ground for reversal, yet be still entitled to attack the judgment in appellate court under **SMITH V RHODEN**.

Appointed counsel (Kyle Gee) requested numerous time extensions and he declared under penalty of perjury that he would file Ineffective Assistant of Counsel claim on trial lawyer Deborah Levy, Prosecution Misconduct claim, and Evidentiary Error Rulings. These claims were

not included in petitioner's ~~writ~~ Opening Brief and therefore this petitioner must mitigate the damages done by appellant counsel to petitioner by filing this present writ of habeas.

Petitioner predicts that Attorney Gee will try to point to his oversized brief to show his competence, but in fact, what appointed counsel's ~~writ~~ Brief shows is his lack of strategic astuteness. The oversized opening brief is due to the exigent level counsel went to to prove a known fact. It is the same facts that petitioner, the trial court, and the district attorney agrees upon about the evidence. That is, the evidence used in petitioner's second trial is the same evidence used in petitioner's first trial. If counsel truly researched petitioner's case or communicated with petitioner, he could have avoided the situation. The issues counsel did file, were issues that petitioner submitted to counsel by petitioner and his wife. Since counsel used issues submitted to him by petitioner, this is evidence that counsel did not place any valued effort on preparing petitioner's brief. Although the brief is oversized, it is oversized because counsel detailed petitioner's first trial evidence with second trial evidence. Counsel used the already prepared statement of facts from the Attorney General pleading against petition in first round of appeals after first trial.

If the court deduce all those detailed comparisons of petitioner's first and second trial and the fact that petitioner gave counsel a list of reversible issues, it will become clear to this court that counsel himself is guilty of ineffective assistant by counsel. Counsel wasted time, time that he should have used to raise related issues. At the very least, the responsibility falls upon counsel to state all reversible issues to this court. If counsel had included all petitioners' issues, the reviewing appellant court would have been in a position to reverse the decision of the lower court on cumulative effect error. Petitioner had cumulative error granted on this case in the Northern District Court **<u>314 F. Supp 2d 967, at pages 999 -1000</u>**. Counsel's refusing to exhaust

all petitioner's claims and make them inclusive in petitioner's opening brief is further proof that counsel executed ineffective assistant of counsel on behalf of petitioner.

PETITIONER PRAYS that this court will find Counsel Kyle Gee rendered ineffective assistant of appellate counsel and grant this habeas. In addition, petitioner prays that this court hears the issues within this petition, which appointed counsel should have included in petitioner's direct appeal. Also, see **KIMMELMAN V MORRISON 477 US 365** and **STRICKLAND V WASHINGTON 466 US 668**.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**LEGAL STANDARD FOR GROUND FOR RELIEF (2)**

Denial of Due Process of the Law and Equal Protection of the Law when the Inconsistent Verdict of Conviction for Murder and Kidnap was allowed to stand, when jury found petitioner not guilty of possessing a weapon.

The issue here is whether the verdict of guilty on murder and kidnap is so inconsistent as to amount to reversible error. (See **People v Doxie 34 Cal App 2d. 511**)

Petitioner states that the finding of the not guilty verdict on the weapon mandates reversal. The not guilty verdict on the weapon possession charge makes the evidence that remain insufficient to sustain a conviction of murder and kidnap. The weapon was needed to prove both the murder and the kidnap. The evidence without the weapon possession cannot justify either conviction. (See **Hancock v State 127 Ga; App 21, 192 Sd 435**) Where a jury acquits a defendant of pointing gun at a victim, the verdict of kidnapping by pointing that same gun is inconsistence therewith and trial judge should have arrested that conviction.

A weapon possession is needed to commit the kidnap by force or instilled fear, and the gun is needed to commit the murder when victim was killed by a gunshot. The not guilty on possession of gun is a verdict which is irreconcilable conflicting with the guilty verdict for murder and kidnap (see **People v Chambers 22 Cal. App 2d 687**)

This court should grant this habeas to correct the equal protection of law and due process of law violations, which prejudiced petitioner with lost of liberty. The lost of liberty is always a substantial injury. Petitioner was sentence to a life term, as a result, of said violation of the US Constitution Right of being found guilty on charge of all elements beyond a reasonable doubt. Here the "not guilty" verdict on weapon possession prevent the conviction of murder kidnap due to its being a necessary element in the case presented by prosecution against petitioner.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**LEGAL STANDARD FOR GROUNDS FOR RELIEF (3)**

The Confrontation clause violation occurred when trial Judge ruled co-defendant Cross unavailable and his prior impeached testimony was read to jurors at petitioner's second trial. This deprived petitioner of his due process, equal protection of the law, and a fair trial guaranteed by the US Constitution.

**The 6th Amendment** provides that in criminal cases the accused have a right to confront a witness.

**The 14th Amendment** - applies the Right to Confront in the State Court.

**IMPEACH** – is defined as in reference to testimony of a witness, to impeach means to call into question the veracity of the witness by means of evidence offered for that purpose, or by showing that the witness in unworthy of belief.

**Crawford v Washington 124 S CT 1354** – states the witness must be unavailable or prior testimony is barred.

**Lily v Virginia 527 US 116, 131-34** - says a declaration against penal interest by an accomplice that implicates a defendant is problematic and cannot be considered reliable.

Petitioner states that co-defendant Cross prior impeached testimony was not reliable or contained the particularized guarantees of trustworthiness. Co-defendant Cross was an accomplice who placed the blame on petitioner by placing petitioner at scene of the crime with a weapon. Co-defendant Cross lied about petitioner having a motive to do crime.

(See **Forn v Hornung 343 F S3d 990, 996-97)** where it said, "You must have particularized guarantees of trustworthiness and reliability in order to not violate due process clause."

Co-defendant's prior impeach testimony did not have the required trustworthiness and reliability. The prosecutor had impeached co-defendant's Cross prior testimony in its presentation at petitioner's second trial. The impeachment kills the reliability and trustworthiness of all evidence, especially evidence where a co-defendant is blaming another co-defendant.

This Constitutional Right's Error must be reviewed under the harmless error test.

**Chapman v California 386 US 18**.

Co-defendant Cross prior impeached testimony infected the jury's verdict because the prosecutor read his prior testimony to jurors. The district attorney used statements from co-defendant's prior impeached testimony in his closing argument to convince jurors that petitioner did these crimes. This infraction is the requirement stated in Brect to demand reversal.

**Brect v. Abrahams 507 US 619, 629**

States that the trial errors must have had substantial and injurious effect or influence in determining the jury's verdict.

That is the case here because co-defendant Cross prior impeached testimony was the chief evidence for the prosecutor. This case was weak nine years ago when petitioner was initially tried, but made even more so by the passage of nine (9) years. At petitioner's second trial, the district attorney presented less evidence

Petitioner was denied his right to confront his accuser. The denial of the confrontation clause and the erroneous ruling of a co-defendant unavailable farther violated petitioner when that co-defendant was granted immunity by the trial Judge. Co-defendant Cross was in custody for the duration of petitioner's second trial. The fact hat the co-defendant Cross was granted

immunity and his refusing to testify makes his refusing to testify invalid. Co-defendant Cross was in custody and the ruling of unavailability is error.

For the stated reasons, this court should find that it was error in denying petitioner the use of the confrontation clause. This court should find that it was error to rule a witness unavailable when he was in-fact in custody and granted immunity. This court should grant this habeas because of the unfairness and the denial of petitioner's due process and equal protection of the law rights and for the denial of fair trial rights. (See **Whelchl v Wood 996 F Supp at Pg 103** and **Bruton v United States 291 US 123**)

**MEMORANDUM OF POINTS AND AUTHORITIES**

**LEGAL STANDARD FOR GROUNDS FOR RELIEF (4)**

DUE PROCESS VIOLATION BY THE INSUFFICIENCY OF THE EVIDENCE TO SUSTAIN A KIDNAP CONVICTION, AND THE TAINTING OF THE KIDNAP VERDICT BY THE INSUFFICIENT MURDER EVIDENCE, WHICH THE **NORTHERN DISTRICT ORDER 314 F. SUPP 2d 96**WAS RULED AS SUCH BY

**The Fourteenth Amendment** says, "One must have every element of a charged crime to be proven beyond a reasonable doubt. These elements protect the accused against conviction except for beyond a reasonable doubt".

**In re Winship 397 US 358** – the constitutional standard of due process protects an Accused against a conviction except upon proof beyond a reasonable doubt.

**Jackson v Virginia 443 US 307** insufficiency of the evidence is whether after reviewing the evidence in light most favorable to prosecution, a rationale tier of fact could not have found the essential element beyond a reasonable doubt.

Petitioner case is devoid of any relevant evidence to sustain a conviction in violation of the standard set forth in **Jackson v Virginia** and in **Thompson v. Louisville 362 US 199**.

The only evidence presented against petitioner was the testimony of Walton, Hodges, and Cross. Cross had an obvious motive to shift blame to petitioner and all three witnesses were impeached at petitioner's second trial. The Northern District Order granting petitioner's Habeas

**<u>314 F Supp 2d 967 at page 989-992</u>,** the court dissected all three witnesses' testimony and found all to be unreliable and not creditable.

When the District Court assessed Walton and Hodges neither had been impeached. At petitioner's second trial, all three were impeached on grounds of moral turpitude committed by them.

So it a fair claim to say that after the district court found them "unreliable and un-creditable, they are even more so now in the present instance because of their impeachment.

Although no defense was presented by defense lawyer, the prosecution resented Rodney Love who testified that petitioner was not there at scene of abduction. That he witnessed the crime and did not see Walton or Hodges.

Furthermore, Hodges did not testify to seeing an abduction Walton gave numerous statements saying she had seen abduction, but she recanted that and said she only repeated what she head from crowd.

The District Order page 996 ruled that the kidnap, carjacking, and weapon possession is sufficient because the victim was took unlawfully by use of force or instilled fear by petitioner's gun.

Now a jury found petitioner "not guilty" of possessing a weapon. Petitioner was not recharged or convicted of carjacking. The District Court ruled that the kidnap was sufficient. Now without the necessary element, the kidnap cannot stand. Without a gun conviction, there cannot be force or fear to commit kidnap. Jury found petitioner not guilty of "possessing of a firearm", which is a necessary element of kidnap. Without the gun possession, it cannot be said that a rationale tier of facts would have found petitioner guilty of kidnap, therefore, the kidnap conviction is in violation of the due process clause and equal protection of the law, which is guaranteed by the US Constitution. This court must grant this habeas to correct petitioner's denied rights.

The District Court **<u>Order 314 F Suppl 2d 967</u>** found insufficient evident to sustain a murder conviction. The district attorney violated that ruling by recharging and winning a conviction against petitioner with the same evidence that the District Court found to be

insufficient. Petitioner states that illegal murder convictions tainted the entire trial and influence the jury. The murder was presented as the result of the kidnap.

It is reasonable to say that if the jury heard evidence of a murder they would evoke a visceral prejudicial state toward petitioner. It can reasonably be said that murder is the worst of crimes, so it can be said to have affected all the other charges of kidnap.

This violation meets the standard set forth in Brect; it was substantial and injurious to petitioner; there was actual prejudice due to these errors. Therefore, this court should grant this habeas for denial of due process and equal protection of the law and the denial of a fair trial.

**MEMORANDUM OF POINT AND AUTHORITIES**

**LEGAL STANDARD FOR GROUND FOR RELIEF (5)**

Denied Due Process of the law, equal protection of the law, and denied of a fair trial when pre-trial judge Readon denied petitioner a preliminary hearing. The Alameda county prosecution office on behalf of the state of California recharged petitioner in 2004 for charges initially charged in 1995.

**California Criminal Defense Practice §41.01**

The preliminary hearing is a practical examination whereby evidence designed to determine if there is sufficient cause to believe that the defendant is guilty of a public offense

**California Criminal Defense Practrice§41.02**

The statutory purpose of a preliminary hearing is to determine whether there is sufficient evidence to bring a defendant to trial, thereby weeding out groundless charges and to relieve an accused of the degradation and expense of a criminal trial.

**California Criminal Defense Practice §41.03**

A preliminary examination is required before a defendant can be brought to trial on a Felony charge. When prosecution is brought by means of an informant.

Petitioner shows by the above rules governing a preliminary hearing that had petitioner been allowed his right to a preliminary hearing, the trial would not have commenced because the district attorney would not have been able to overcome the insufficiency finding of the district court. The statue of limitation would have banned the kidnap. The district attorney presented the

same evidences at petitioner's second trial, which had been ruled insufficient; it is likely the same would have been presented to the magistrate hearing. The preliminary would have been bound by law of the case doctrine to find that the e evidence is insufficient for trial.-

Judge Reardon abused his discretion by denying petitioner's request for a preliminary hearing. This denial cause petitioner to go to trial on a time barred kidnap charge and forced petition to go through a trial on evidence which had been ruled insufficient. The resulting conviction is so substantial and injurious that the prejudice is clearly the lost of liberty for which petitioner is serving a life sentence. This court must grant this habeas to correct the denial of due process, abuse of discretion caused petitioner when petitioner was held on information to go to trial without a preliminary hearing. This court should grant this habeas and order petitioner released from custody to correct this injustice.

**MEMORANDUM OF POINT AND AUTHORITIES**

**LEGAL STANDARD FOR GROUND FOR RELIEF (6)**

Due Process violation, Equal Protection of the Law violation, Denial of a Fair Trial by the trial Judge's, abuse of discretion, seven erroneous evidentiary ruling, and failure to Sua Sponte three time, twice failing to follow law of the case doctrine.

**SUA SPONTE** Is defined as this; "of itself or of one's self," without being prompted, as where the court moves to declare a mistrial Sua Sponte, that, is thought the court own volition on its own motion, without such a motion being made by either of the parties.

**Law Of The Case Doctrine** Is defined as; "a determination of law once made will be treated as correct throughout all SUBSEQUENT stages of the proceeding except when the issue is raised in a higher court."

**Stare Decisis** states, "A court will follow a prior ruling".

**Brect v Abraham 507 US 619 629**

**Kotteakos v United States 328 US 75**

Both state that when errors is found, real relief the error had to substantial and injurious effect or influence in determining the jury's verdict.

The burden of proof is on the state to show that an error did not substantially influence the jury's decision and any doubt should be resolved in favor of the petitioner see **O'NEAL v McAninch 513 US 432.** **US v Lai 944 f2d 1434** – admission of prior bad act of defendant is prohibited

**<u>United States v Hoac 990 F2d 1099</u>** – all plain error are harmful. See Federal Rules of Evidence **<u>403, 28 U.S.C.A. & 804(b) (3)</u>**

Petitioner has presented three errors of failing to Sua Sponte on trial court Judge. Trial court Judge's failure cause substantial harm to petitioner. The first being that judge allowed Sergeant Krupp to testify to hearsay and to corroborate Walton's testimony. The second act was blatant in that the trial judge acknowledged that the prosecution had gotten away t with asking leading questions when defense lawyer objected to the persecutor's leading questions. Judge said that question was not, but the one before was. Third act was allowing the jury to deliberate without telling them that as a matter of law, the witnesses Walton, Hodge, and co-defendant Cross were impeached and suffer from moral turpitude because of their conviction. Instead, trial judge allowed the juries examine their credibility when the law states they were under deserving of that weight.

The jurors had need of such Sua Sponte action from judge. While deliberating the jurors asked questions about accomplices and credibility and about how much weight to give the witnesses. The trial Judge in his eagerness to violate petitioner's right gave what amounted to another persecution closing argument in telling jurors they could believe Walton, Hodges, and co-defendant Cross. Clearly, this violated petitioner's due process right.

Trial judge ignored the law of the case doctrine. He allowed the persecutor to present his case unhampered, and although there had been findings of law made in the California Appeals Typed Opinion of November 1998, and in the Northern District Order 314 F suppl 2d 967, it had been ruled that Inspector Wright identification of petitioner had no probative value. Therefore, meaning it was prejudicial, but it did not have enough weight to warrant reversal; however, it was still error.**<u>(US v Hih 981 f2d 422)</u>** says where evidence is of very slight if any probative values it is abuse of discretion to admit it if there is even modest likelihood of unfair prejudice or small ~~rest~~ RISK of misleading jurors. To allow the district attorney to present evidence that he knew had been found to be error was unfair and a denial of due process.

The allowing of the prior bad acts alleged by co-defendant Cross to again be heard by a jurors, who California Appeals Typed Opinion of Nov 1998 found violated California Evidence Code 1101. The Northern District Order 314 F Supp 2d 967 also found that same act to be error and very close to reversible error by itself when reviewing petitioner's first trial. Petitioner believe it to be a reasonable statement to say that the Northern District would find that this error now has the necessary effect of being reversible; due to the differences in the second trial where petitioner was acquitted of possessing a gun, but still found to have murder and kidnapped. And it cannot be said that the evidence of prior bad acts did not affect the jury verdict whereby violating petitioner's right to due process, equal protection of the law, and the denied a fair trial. This court should grant the habeas corpus to correct the denial of US Constitution.

The evidentiary rulings errors by the trial court are many; petitioner names seven (7) acts, which denied petitioner a fair trial, due process, and denied equal protection of the law, which is; guaranteed by the US Constitution.

The trial court granted immunity to co-defendant Cross, then found co-defendant Cross unavailable to testify. Trial judge allowed co-defendant impeached prior testimony to be read to jurors. The trial Judge failed to find that impeached prior testimony untrustworthy. In addition, trial judge allowed co-defendant Cross to refuse to testify outside the presence of jurors when that same Judge allowed co-defendant Kingdom to refuse in front of jurors. Petitioner believe that the trial Judge and prosecutor was trying to lend weight to the prior testimony because all knew co-defendant Cross was not going to testify based upon visits by both side's investigators.

Trial Judge allowed the prosecutor to read both Love and Mohamed's prior testimony to jurors, when both Love and Mohamed were at trial. Neither Love nor Mohamed could remember any details about their prior testimony. Petitioner was denied the right to confront these witnesses due to new circumstances and the case proceeding in different light than petitioner's first trial. The previous cross-examination by first trial defense lawyer was insufficient especially noting that second defense lawyer did not put on any defense and attacked from different prospective.

The **WHEELER** violation denied petitioner a jury of his peers, and that denied him his guaranteed right by the US Constitution. Trial judge allowed dispute over the law with defense counsel in chambers to spill-out over into petitioner jury trial by denying her ~~very~~ every objection without legal authority and it was done it such a abrupt and curt way as to show the trial judge displeasure with defense counsel in front of jury. This is an act that may lose some of its affect when reading the transcript of October 25, 2004 proceedings, but reading it will show that all those objections overruled by trial judge was a blatant act of abuse of discretion. Petitioner was denied a fair trial; his due process was violated, as well as, his equal protection of the law rights, which is guaranteed to Petitioner. For all the stated trial court errors, this court should grant the habeas corpus to correct the denied of the US Constitution Rights.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**LEGAL STANDARD FOR GROUND FOR RELIEF (7)**

Due Process Violation, Equal Protection of the law Violation, Denial of a Fair Trial by seven acts of prosecution misconduct

**US v LeQuire 943 F.2d 1554** Says Prosecution elucidation of testimony on five occasions about previous conviction of defendant was reversible error despite curative instruction.

**The Brect Case** Says "a pattern of prosecution misconduct may infect integrity of the proceeding and warrant habeas relief even if it did not substantially affect jury verdict".

**Martin v Parker 11F3d 613, 616** Due process violated because prosecution made improper comments and repeated reference to petitioner prior bad acts.

**US v Adam 70 F3D 776**

The factors relevant to determine the prejudice

1). Degree to which the prosecutor's remarks had a tendency to mislead jurors and to prejudice defendant.

2). Whether remarks were isolated or extensive.

3). Absent the remark, the strength of competent proof introduced to establish guilt.

4). Whether the comments were deliberately place before the jurors to divert attention to extraneous matters.

**Mooney v Holohan 294 US 103**

**Napue v Illinois 360 US 26** Both these case cites say "when persecution knowingly elicit false or misleading testimony to jury, its reversible.

**US v. Agurs 427 US – at page**103 A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any likelihood that the false testimony could have affected the judgment of the jury.

**BERGER v US 295 US 78** When a prosecutor deliberately asked questions o induce inadmissible evidence it constitutes prosecutor misconduct. In addition, it is the prosecutor's duty to refrain from improper method calculated to produce a wrongful conviction.

**US v Christopher – 833 F3d 1296** **Reversal is warranted** only if it is more probable than not that the prosecutorial misconduct materially affected verdict.

**Us v Sanchez 176 R3d 1212** Wrongful admission of prior Bad Acts by persecutor misconduct reverse granted.

**Napue v Illinois 360 US 264** Prosecution knowingly use of false testimony criteria.

1). that testimony was actually false;

2). testimony was material;

3). that the prosecution knew that testimony was false

See also **US v Blackburn F3d 353** and **Brown v Borg 961 F2d 1011**.

Petitioner states that the Prosecution committed **GRIFFIN Error** by commenting on defendant's failure to testify therefore violating due process of equal protection of the law and infected the jury verdict see **(Griffin v California 380 US 609)**.

Persecution told jurors that petitioner had been in jail and told co-defendant Cross about his prior bad acts in violation of **California Evidence Code1101.** The prosecution infringing upon petitioner's right to not testify and get prior convictions in front of jury was denied by district attorney's comments. The calling a black female juror up fifty (50) positions then telling the defense attorney he will only remove all other black when seated denied petition a right to have a jury of peers to decide case.

The district attorney knowingly presented false testimony in the form of the beforehand impeached witness. Walton who was declared hostile and impeached by the district attorney Backers. Co-defendant Cross was impeached by the district attorney's office. The prosecutor willingly presented false evidence to mislead jurors. This court cannot deny that the persecutor violated petitioner's due process, his equal protection of the law, and denied petitioner a fair trial. This court should grant the habeas to correct the denial of US Constitution Rights suffered by petitioner.

The prosecution remarked that petitioner had not testified to juror to inform juror of his whereabouts. Prosecution told jurors about petitioner's prior convictions even though petitioner did not testify. The prosecutor's misconduct prejudiced petitioner. See **US v Cotnam 88 F 3d 487 at 500-501** where the court ruled the "prosecution misconduct remarks standing alone would not necessitate a new trail, but the combined impact of all the remarks mandates that a mistral be declared".

The court should remedy this violation by grating this habeas corpus.

**MEMORANDUM OF PONTS AND AUTHORITIES**

**LEGAL STRANDARD FOR GROUND FOR RELIEF (8)**

Due Process of the Law Violation, Equal Protection of the Law Violation, Denial of a Fair Trial, due to the faulty and suggestive identification of petitioner by Inspection Wright.

"A conviction which rest on a mistaken identification is a gross miscarriage of justice "**Stovall v Denno 388 US 293, 297".** Procedures by which a defendant is identified as the perpetrator, therefore, must be examined to assess whether they are unduly suggestive. "It is the likelihood of misidentification which violates a defendants right to due process "**NEIL V Biggers 409 us 188, 198.**

Due process protects against the admission of evidence deriving from suggestive identification procedure. **See ID at 196 93 S. CT. 375; CF Manson v Brathwaite 432 US 98, 106** standard are not different for pretrial and in-trial identification.

An in-court identification of a defendant who looks different from everyone else around him and is clearly the person on trial may be suggestive. See **United State v Roger 126 F3d 655**. It is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who the defendant is.

Petitioner states that asking Inspector Wright to identify a particular man at the defense table was suggestive because petitioner was the only black male around him. Petitioner's defense counsel was a white woman, the district attorney was a white male, the court reporter was an Asian female, and petitioner was only one at defense table.

Petitioner also states that Inspector Wright admitted that he could not conclusively identify petitioner, but was allowed to present to juror the highly suggestive testimony of petitioner not being inconsistence with who he saw height, weight, and agewise. This was prejudiced and ruled by Cal App Type Opinion of November 1998, The **Northern District Order 314 F supp 2d 967** too said it had no probative value and since that is the measurement on the trial level and should not have been allowed.

Inspector Wright merely drove by suspect and had two fleeting glances, this is highly unreliable when petitioner case rest solely on not being at scene, making identification a real factor. See **US v Bouthot 878 F2d 1506** where it states identification unreliable because witness merely drove by robbing not paying special attention and had only 30 seconds to observe. **Us v Emanuele 51 F3d 1123** it was not harmless error when court admitted impermissible suggestive in-court identification because defendant identify was crucial issue at trial.

**MARSDENv MOOR 847 F 2d 1536** Identification is unreliable because witness had only two brief glimpses of suspect neither from front.

If petitioner defense lawyer failed to properly object to this evidence but petitioner should not be barred due to ineffective assistance of counsel of defense counsel from having this court rule on this claim of suggestive unreliable identification. The second trial was extremely weak against petitioner for many reasons:

1. There were less charged crimes
2. Less evidence presented by district attorney at second trial
3. Jury deliberate for 5 days and found petitioner "not guilty" of gun possession.

So, it is clear that in a close case like this one every error such as these claimed errors was paramount. **US v Hitt 98f2d 422 -** states where evidence is of very slight if any probative value it is abuse of discretion to admit it if there is even modest likelihood of unfair prejudice or small risk of misleading jurors.

Petitioner state that the suggestive and unreliable identification of petitioner by inspector Wright was a due process violation and rendered the trial unfair because inspector Wright was the only witness the district attorney presented who was not impeached. Inspector Wright place petitioner at the scene and this clearly affected juror's verdict. A reasonable trier of facts can when viewing this error in whole find that it did infect verdict therefore the court should grant

this habeas corpus for the denial of due process and equal protection of the law and denial of the fair trial denied petitioner.

**MEMORADUM OF POINT AND AUTHOIRTIES**

**LEGAL STANDARD FOR GROUNDS (9)**

Due Process of Law Violation, Equal Protection of the Law Violation, Denial of Fair Trial when defense counsel Deborah Levy rendered Ineffective Assistant of Counsel throughout the proceeding, pre-trial and during trial.

**Sixth Amendment** States that an accused will be provided assistant of counsel.

**Fourteenth Amendment** Provides that all courts of the state are to follow the Federal Constitution and provides Due Process of the Law, Equal Protection of the Law.

Defense attorney Deborah Levy did not meet the standard of effective assistance of counsel. Levy failed to present a defense, she did not prepare opening or closing argument, and she intentionally elicited hearsay from witnesses that was harmful to petitioner. Levy failed to object to unallowable hearsay testimony; she failed to object to unallowable evidence. These acts and many more cannot be construe in any light as having a strategic or calculated effect. There were available witnesses who had testified at petitioner's first trial and could have defeated evidence presented by prosecutor. There was documented evidence, which was submit at petitioner's first trial proving that petition was in-fact elsewhere when the crime occurred. Ms. Levy did not present that documented evidence, nor did she get a stipulation. Ms. Levy's action is a sign of her incompetence and fall short of the standard set by **Strickland v Washington 466 US 669.**

Ms. Levy violated petitioner Sixth Amendment Right and Violated petitioner's Due Process and Right to a Fair Trial.

Ms. Levy's failure to advocate for petitioner ***vigorously*** cannot be excused by the fact petitioner tried to have her removed from representation due to Ms. Levy expressing that she did

not want petitioner's case and she did not believe petitioner to be innocent. No strategically, explanation can explain why counsel did not take advantage of the evidences available and the fact that she chose not to put on a defense. What ***excuse*** can she give to this court as to why she refused to seek out witnesses that testified on petitioner's behalf in his first trial and have them testify in his second trial? It does not make any sense. The witness could have proven petitioner's innocence. The only conclusion is that Deborah. Levy intentionally rendered Ineffective Assistant of Counsel thereby violating petitioner's sixth and fourteenth amendment rights. Ms. Levy serious lack of effort made it necessary for petitioner to present this habeas to attack errors, which Deborah Levy failed to, put on record. Levy continually failed to object therefore, not presevering petitioner's rights on appeal. She tried to ensure that petitioner did not return via appeal in concert with prosecution.

Levy without a doubt rendered Ineffective Assistant of Counsel and caused petitioner to suffer substantially and injuriously. Petitioner has suffered lost of liberty when Levy allowed errors and the committing of errors by her; therefore affecting the jury verdict.

This court should grant this habeas corpus to correct the denial of the US Constitution Right caused by numerous acts of Ineffective Assistant of Counsel suffered by petitioner.

**MEMORADUM OF POINT AND AUTHOIRTY**

**LEGAL STANDARD FOR GOUNDS FOR RELIEF (10)**

Due process of the Law Violation Equal Protection of the Law Violation when petitioner was charged and convicted on the time barred kidnap.

**CALIFORNIA SUPREME COURT** held firmly that if the charging document indicates on its face that the charge is time barred, and the defendant has not expressly waived the status of limitations, the defendant convicted of the charge may raise the statue of limitation at ANY TIME. The defendant may not inadvertently forget the statue of limitation and remain convicted of a time barred charges offense, (See Cowan v Superior Court 14 CA. 4th 367).

**STATUTE OF LIMITATION** Felonies punishable by death or life imprisonment or embezzlement there is no limitation. All other felon's punishable by impressments for eight years or more, must be brought within six years after commission of the offense.

**Penal Code 207** - Kidnap has a punishable term if convicted of three (3), five (5), and eight (8) years.

**Penal Code 207** - Kidnap charge was barred by the time petitioner was re-charged in June 2004.

Petitioner had been initially charged and convicted in 1995/96 of same charge. The initial charging in 1995 to the last charge in 2004 was an elapse of nine (9) years. This is well over the six-year bar of the statue of limitation. This court must overturn the conviction for kidnap and should grant this habeas because the time barred evidence on the kidnap infected the verdict of

the jury. As to the other charge, the errors cannot be ruled harmless due to the substantial injurious effect it had throughout trial. The kidnap charge is believe to have led to other charge of murder.

For these reasons, this court must grant this habeas and order petitioner released from custody to correct the violations of due process of the law and equal protection of the law and the denial of a fair trial to petitioner.

# MEMORANDUM OF POINTS AND AUTHORITIES

## LEGAL STANDARD FOR GROUNDS FOR RELIEF -II

Due Process and Equal Protection of the Law and Denial of a Fair Trial By the Re Conviction of Murder based upon Insufficient Evidence to Support that Verdict.

The 14th amendment says, On must have every element of a charged crime to be proven beyond a Reasonable doubt. These elements protect the accused against conviction except for beyond a Reasonable doubt.

IN Re Winship 397 U.S. 358, the constitutional standard of Due Process protects an accused against a conviction except upon proof beyond a Reasonable doubt.

Jackson v. Virginia 443 U.S. 307, insuffiency of the evidence is whether after Reviewing the evidence in light most favorable to prosecution, a rationale trier of fact could not have found the essential elements beyond a Reasonable doubt.

NORTHERN DISTRICT ORDER 314 F. Supp. 2d. 967, says in part that 'The evidence in 1995 trial was Insufficient to support the Murder conviction. The state courts presumed Rejection of the claim was an unreasonable application of clearly established federal law, as determined by U.S. Supreme Court.'

Burks v. U.S. 437 U.S. 1, and Greene v. Massey 437 U.S. 19, states 'A determination on appeal of Insufficient Evidence bars a retrial under federal twice-in-jeopardy principles.

By the evidence in 2nd trial being same as 1st trial evidence with the exception of the erroneously admitted statement by Co-d. Kingdom this issue of Insufficiency of Evidence to Maintain Murder Conviction has already been Ruled upon in this Courts 314 F.2Supp2d 967 Order.

Petitioner Request that this find again that the evidence for the Murder charge is insufficient to Maintain that conviction and this time no Retrial will be permitted so as to not violate the 5th amendment Double Jeopardy clause.

Also see Thompson v. Louisville 362 US 199 and FAHY v. STATE OF CONNECTICUT 375 U.S. 85 and BRECHT v. ABRAHANSON 507 U.S. 619

AND "Petition for Review" attached herein as exh-M where this claim is also argued.

MEMORANDUM OF POINTS AND AUTHORITIES

LEGAL STANDARD FOR GROUND FOR RELIEF - 12

Due Process and Equal Protection of the Law and denial of Fair Trial Right when the Collateral Estoppel Doctrine Was not adhered to during Petitioners Trial and Subsequent Direct Appeal violating the Double Jeopardy Clause.

Collateral Estoppel Doctrine, is the doctrine of res judicata giving a binding effect to a former judgment in subsequent litigation involving the same controversy. It is issue preclusion aspect preventing a party from re-litigating in a second proceeding matters litigated and determined in a prior proceeding

RESTATEMENT SECOND of JUDGEMENT section 13,- the rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

RESTATEMENT SECOND of JUDGMENT section 27,- When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

ARIZONA V. CALIFORNIA 460 U.S. 605 - A fundament precept of common law adjudication is that an issue once determined by a competent court is conclusive.

5th Amendment RIGHT, A person shall not suffer twice-in-jeopardy.

MONTANA V. U.S. 440 US 147, says in part 'To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources and fosters Reliance on judicial action by minimizing the possibility of inconsistent decisions

ASHE V SWENSON 397 US 436, says in part 'that issue preclusion principles are a component of the Fifth Amendment guarantee against double jeopardy. "Collateral Estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Collateral estoppel has been an established Rule of federal criminal law at least since this Courts decision more than 50 years ago in U.S. v Oppenheimer 242 US 85. As Mr Justice Holmes put the matter in that case, "It cannot be that safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt" 242 US, at 87.

The ultimate question to be determined, then is whether this established rule of federal law is embodied in the 5th amendment guarantee against double jeopardy. We do not hesitate to hold that it is.

BRADLEY V. DUNCAN 315 F.3d 1091, -deems a state courts failure to apply issue preclusion principles to be a potential violation of the 14th amendment Due Process Clause.

At this point of this habeas corpus petitioner believes its not necessary to belabor the point of what this courts order said or that that finding was final and Binding on the trial court and state appeal courts. When this court ruled that the 1995/1996 evidence was insufficient to Maintain the Murder conviction.

Petitioner states and declares that there were no material or factual difference between the evidence this Court ~~wb~~ Ruled insufficient and the evidence presented at petitioners 2ND 2004 trial which the state court affirmed.

The case law presented in this section is listed to aid the Court and Really isn't necessary But petitioner does not want to presume anything. This court 314 F. Supp2d. 967 Order didn't bar retrial against petitioner which is clearly stated but as soon as the Prosecution Rested his case and there was no new evidence this Court order did become a Bar against conviction on Murder, which these listed case and Rules state.

Petitioner Request that this court find that the Collateral Estoppel Doctrine was not adhered to and that the trial court and State Court Reasons for not following the Law was opposed to current establish federal Law and those substantial violations injured petitioner greatly by violating the double jeopardy clause and the due process and Equal Protection of the Law clause of the Constition of the U.S. This court should grant this habeas Corpus and issue petitioner an aquittal to correct this blatant harassment and vexation litigation. see FAHY v. CONNECTICUT 375 U.S. 85 and BRECHT v. ABRAHAMSON 507 U.S. 619

Also Petition for Review attached herein as exh.-M where this is argued

MEMORANDUM OF POINTS AND AUTHORITIES

LEGAL STANDARD FOR GROUNDS FOR RELIEF - 13

Due Process and Equal Protection of the Law and the denial of a Fair Trial when the LAW OF THE CASE DOCTRINE was not adhered to during Petitioners Trial and Subsequent Direct Appeal Violations of Double Jeopardy occurred.

LAW OF THE CASE DOCTRINE, when an appellant court states in it's opinion a principle or Rule of law necessary to the decision, that principle or Rule becomes the law of the case and Must be adhered to throughout the case's subsequent g progress, both in the trial court and upon subsequent appeal. Also this doctrine Requires both trial and appellant courts to follow the rules laid down upon former appeal whether such Rules are Right or wrong. It doesn't limit the evidence at a Retrial. But does control the outcome only if the evidence on retrial of an issue is substantially the same as that upon which the ~~appellant~~ appellate Ruling was Made. Collateral Estoppel and Law of the Case are EACH issue preclusion doctrinces. Both are component of Double Jeopardy barring Retrial on substantially the same evidence which was previously found legally deficient

SUPREMACY CLAUSE of the CONSTITUTION, says The federal law is higher than the State law

DOUBLE JEOPARDY CLAUSE, person shall not suffer twice-in-jeopardy

BROWN v ALLEN 344 US 443,499, Congress could have left the enforcement of federal constitutional Rights governing the administration of criminal justice in the States exclusively to the State courts. It is not for us to determine whether this power should have been vested in the federal courts. JUSTICE FRANKFURTER states further 'an issue which calls for interpretation of the legal significance of historical facts in the federal constitutional context is resolved by a District Judge.

HANDI INVESTMENT Co. V. MOBIL 613 F.2d 391 (9th CIR), although "law of the case" is not an "inexorable command", prior decision of legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous and would result in injustice.

Petitioner declares that the only question left to answer is whether the Retrial evidence was same as 1st trial evidence. Petitioner states that it was indeed. Therefore the above stated and quoted cites easily show that LAW of the Case Doctrine was the controlling factor in petitioner case at the conclusion of the District Attorneys case in chief, at that point the Machination of Law of the Case ~~becaus~~ became a hurdle for the trial court and State court to ensure was leapt and cleared by the D.A. which it was not which the trial court acknowledged when it denied Law of the Case not because he felt new evidence was presented but solely because he felt he was NOT BOUND BY federal ORDER Ruling.

This blatant disregard of the Supremacy Clause of the

Constitution cause substantial and injurious violations to petitioner and the trial and state court are clearly violating establish federal law set by the U.S. Supreme Court This violation should be corrected by this court with the granting of the habeas Corpus to Relieve the Lost of Liberty sufferred by petitioner this court should grant an acquittal.

see also FAHY V. CONNECTICUT 375 U.S. 85 and BRECHT V. ABRAHAMSON 507 U.S. 619

Please see Petition for Review attached herein as exh. M where this is ~~agr~~ argued

# MEMORANDUM OF POINTS AND AUTHORITIES

## LEGAL STANDARD FOR GROUNDS FOR RELIEF - 14

Due Process and Equal Protection of the Law and denial of a Fair Trial When Petitioner Motion for Self Representation brought under Faretta v. California was denied violating the 6th and 14th amendment to the Constitution.

FARETTA V. CALIFORNIA 422 US 806, U.S. Supreme Court held that a criminal defendant has a Right to Represent himself if he so desires, a Right guaranteed by Sixth and Fourthteenth amendment to the Constitution. Also, even though "in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," that the Right to defend oneself in the face of criminal charges was fundamental to Anglo-American jurisprudence.

U.S V. HERNANDEZ 203 F.3d. 614, States in part 'A Request for Self-Representation Must be unequivocal. This requirement prevents defendants from waiving their Right to counsel inadvertently or impulsively, and it precludes Manipulation of the Mutually-exclusive rights to counsel and self-representation.

ADAMS V. CARROLL 875 F.2d 1441 (9th CIR), the requirement of an unequivocal request resolves these problems by forcing the defendant to Make an explicit choice.

U.S. V. ROBINSON 913 F2d 712 (9th CIR), states in part A Request for self Representation is not equivocal when the defendant Makes the request separate ~~for~~ FROM and after an unsuccessful MARSDEN Motion where denial of the MARSDEN Motion left self Representation as the only Means of avoiding Representation by an attorney the de-

fendant did not want. Also it's not equivocal where the defendant was not seeking to waive his right to counsel in a thoughtless manner, where the trial court engaged him in a discussion about the dangers of self-representation and where the request for self representation did not appear to be 'a momentary caprice or the result of thinking out loud. Nor is a request for self representation viewed as equivocal where the defendant's decision did not constitute 'a mere whim or caprice'.

<u>ARMANT V. MARQUEZ 772 F.2d 552 (9th CIR)</u> - held that a defendants request to represent himself must be granted if it is knowing and intelligent, unequivocal, and timely asserted.

<u>FRITZ V SPALDING 682 F.2d 782 (9th CIR)</u> - held that a request for self representation is timely as a matter of law if it is made before the jury is empaneled, unless it is shown to be a tactic to secure delay.

<u>MAXWELL V. SUMNER 673 F.2d 1031 (9th CIR)</u> says that a request made prior to jury selection was not made for the purpose of delay and thus was timely as a matter of Law.

Petitioner declares that when the Faretta Motion was brought on 9-21-04 it was not equivocal, in fact Judge Reardon forced petitioner to fill out proper forms and return to court on next day 9-22-04. Petitioner states that that act by Judge Reardon cleared the hurdle by allowing petitioner a 24 hour period to think it over. So the denial as equivocal and untimely was error because we were still in pre trial courtroom not jury had been selected. And when ~~defend~~ petitioners trial lawyer asted for a reconsideration of the Faretta Motion on 9-23-04 after she had disqualified

the assigned trial courtroom therefore putting off recieving a trial courtroom 6 more day that eliminated the untimely barrier altogether.

And petitioner claim that yes he preferred to go to trial with a lawyer was a conditional waiver which is allowed see cited law above. Petitioner just refused to go to trial with Ms. Levy who from day one did not get alone with petitioner and who denied petitioner a defense against the charges and whom cursed petitioner out and who was totally ineffective throughout proceedings

Petitioner declares that he made and Unequivocal Request of self Representation and Judge Reardon and California appeal court denial and affirmation was a violation of the 6th and 14th amendment, these violations were contrary to establish federal law and these violations were substantial and injurious to petitioner causing great harm and Lost of Liberty, this court should grant this habeas Corpus to Relieve the suffering caused by this Miscarriage of justice to petitioner. See also FAHY v. CONNECTICUT 375 U.S. 85 and BRECHT V. ABRAHAMSON 507 US. 619

Please see Petition for Review attached herein as exh. M where this is argued

# MEMORANDUM OF POINTS AND AUTHORITIES

## LEGAL STANDARDS FOR GROUNDS FOR RELIEF -15

Due Process and Equal Protection of the Law and a denial of a Fair Trial When Petitioners MARSDEN Motions for Substitute Counsel were denied violations of the 6th and 14th amendment occurred and Resulted in Petitioner Recieving Ineffective Representation.

CALIFORNIA LAW, Recognizes the functional Relationship between trust and communication, on the one hand and effective Representation, on the other,. Refusal to appoint substitute counsel upon a defendant's request violates his Sixth Amendment Right to the assistance of counsel "if the record clearly shows that the first appointed attorney is not providing adequate representation or that defendant and counsel 'have become embroiled in such an irreconcilable conflict that ineffective representation is likely to Result People v. Welch 20 Cal 4th 701, 728, citing People v. Smith 6 Cal 4th 684, 691-694.

JACKSON v. YLST 921 F.2d 882 (9th CIR), recognizes that a breakdown in the attorney-client relationship Requires the trial judge to substitute counsel on request. pg 888

U.S. v. WILLIAM 594 F.2d 1258 (9th CIR) held that defendant's Repeated Motions for Substitute counsel should have been granted because 'a strong showing was Made' of the state of disagreement bad relationship, and lack of communication between appellant and his lawyer in regard to the preparation of a defense so that denial of appellant's motion for change of appointed counsel deprived him of his Constitutionally guaranteed right to have the effective assistance of counsel at his trial. at pg 1260

UNITED STATES V. WALKER 915 F2d 480 (9th cir) found it improper denial of the defendants Request for substitute counsel where defendants 'lack of confidence in his attorney arose out of a disagreement over trial preparation and potential witnesses, Rather than any general unreasonableness or Manufactured dicontent. at pg 484. Also found Reversal to be required because 'to compel one charged with a grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever pg 483

Petitioner states that the grounds given at each of the 3. Marsden Motion were legitimate reasons demonstrating clear grounds for substitution of Ms. Levy as counsel. She had one day one say she did not want case, she violated privilege by revealing petitioner view and theory/stragatem of case, she allowed the court to misquote the Law becoming cowed by the court, she never discussed case with petitioner, always argued with petitioner or stalked off, and cursed out petitioner and didn't prepare an opening or closing argument instead trying to ad-lib her opening & closing argument and failed miserably trying to counter D.A. argument, these and more grounds were listed and transcribed during the 3 Marsden Motion and are clearly Reason enough showing that Petitioner met the criteria set forth in the above cited cases. The law and petitioner were in accordance good cause was shown and admitted to by Ms. Levy concession of confirmation of how stormy the relationship was between herself and petitioner. Ms. Levy even admitted that she had

no idea as to an opening statement, on the eve of trial.

Petitioner clearly showed distrust, lack of confidence in Ms Levy and the denial of the Marsden Motions Resulted in a ineffective assistance of counsel at trial for petitioner and caused the conviction. This court should find that it was error to deny the Marsden Motions and grant this habeas corpus because of the substantial and injurious effect of that error causing lost of Liberty, this Court should grant an acquittal. to Correct the sufferring these violations caused.

See also FAHY v. CONNECTICUT 375 U.S. 85 and BRECHT v. ABRAHAMSON 507 US 619

Please see Petition for Review attached herein as exh-M where this is argued

# MEMORANDUM of POINTS AND AUTHORITIES

## LEGAL STANDARD FOR GROUNDS FOR RELIEF -16

DUE PROCESS and Equal Protection of the Law and a denial of a Fair Trial when TRIAL JUDGE ADVISED Jury of Petitioners IN custody status without the consent of petitioner.

ESTELLE V. WILLIAMS 425 US 501, says in part. there are substantial Reasons for the Rule that a criminal defendant is entitled to be tried in ordinary clothing. Foremost is the Rationale that compelling a defendant to go to trial in jail clothing could impair the fundamental presumpstion of our system of criminal justice that the defendant is innocent until proven guilty beyond a Reasonable doubt pg 504. To implement and protect the presumption of innocence courts must be alert to factors that may undermine the fairness of the factfinding process. pg 503. Apart from the violation of due process inherent in Requiring a defendant to attend trial attired in jail clothing the practice also impings on the tenets of Equal protection. The Supreme Court has noted that the practice operates usually against only those who cannot post bail prior to trial. Persons who can secure Release are not subject to this condition. To impose the condition on one category of defendants, over objection would be repugnant to the concept of Equal justice embodied in the 14th amendment. pg 505-506

Petitioner declares that when the trial Judge advised the Jury that petitioner was in custody it stripped petitioner of

the civilian clothes he was wearing and made it as if only jail clothing was being worn during trial. Because petitioner has a signed order by that same trial Judge for extra sets of civilian to be delivered for trial, this was done so that petitioner would not be in jail clothes for trial so the jury would not have that factor to be involved in the proceeding. But the trial Judge denied petitioner that right and although petitioner had and wore a different set of clothes during trial in front of jury the trial Judge comment to jury had it to where it was as if jail clothing were worn.

This caused a substantiall injurious violation of the 14th amendment and Equal Proction of the Law Rights and being that case was relativitily weak after 9 year passage those rights violated had a direct influence on the verdict. This court should find that it was error to advise jury of in custody status especially with petitioner going to great mean to hide that fact was a violation of Due process and Equal Protection of Law and this court should grant this habeas Corpus and grant an acquittal to correct this violation suffered by petitioners resulting in the lost of Liberty.

See also FAHY v. STATE OF CONNECTICUT ~~35~~ 375 US 85 and BRECHT v. ABRAHAMSON 507 U.S. 619

Please see Petition for Review attached here in as exh-M where this is argued

///

MEMORANDUM of POINTS AND AUTHORITIES

LEGAL STANDARD FOR GROUNDS FOR RELIEF - 17

Due Process and Equal Protection of the Law and the denial of a Fair Trial When Trial Judge Erred and Pre-Judiced Petitioner in its Comments to the Jury on Last day of deliberations by Exceeding what is permissible under the 6th and 14th amendment, n violating both.

PEOPLE V. RODRIGUEZ 42 Cal 3d 730, says in part - A trial court that chooses to comment to the jury must be extremely careful to exercise its power with wisdom and Restraint and with a view to protecting the Rights of the defendant. The courts comments must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. pg 772 citing People v. Cook 33 Cal 3d 400, 408

PEOPLE V. MONTERROSO 34 Cal 4th 743 says The trial court may not, in the guise of privileged comment withdraw material evidence from the jurys consideration distort the Record expressly or impliedly direct a verdict or otherwise usurp the jurys ultimate fact finding power People v. Slaughter 27 Cal 4th 1187, 1218, accord Patton v. United States 281 U.S. 276, 288

Petitioner declares that the above a Laws and the limits set by the 6th and 14th amendment were violated by trial Judge comments to Jury and Resulted in a directed verdict from trial Judge. The jury had Requested reback

and had questions for the court during deliberations. But trial Judge in his continuous efforts to ensure a guilty verdict against petitioner was unfair in his ~~and~~ ad-libbed comment, he only used examples that were favorable to prosecution and only used prosecution witnesses without stating that those witnesses had been impeached and suffered from Moral torpitude, But he directed the jury their way without doing so and knew it was a case of believability that was at the heart of Matter.

This trial Judge showed no restraint and did not consider petitioner rights it was another prosecution closing argument, and the attempt to admonish the jury that the trial ~~jur~~ Judge did was a farce compared to his lengthy and enthusiastic comments against petitioner and directing the jury to witnesses who were against petitioner.

This act by the trial Judge was one in many which he tried to sway the jury against and it worked.

This court should find that the trial Judge comment were beyond the permissible scope and the corrective attempt did not cure that error. This court should grant this habeas corpus to correct this substantial and injurious act which denied petitioner his Due Process and Equal Proctection Right and denied a Fair Trial. Also this court should grant an acquittal to correct the lost of Liberty sufferred by petitioner. see also FAHY v. STATE of CONNECTICUT 375 US 85, and BRECHT v. ABRAHAMSON 507 US 619

Please see Petition for Review attached herein as exh. M where this is claim is argued

**MEMORADUM OF POINT AND AUTHOIRTY**

**LEGAL STANDARD FOR GOUNDS FOR RELIEF (15) 18**

Denial of Due Process, Equal Protection of the Law, and Denial of Fair Trial Right by the Cumulative Effect of ALL the claimed Errors set forth in this Habeas Corpus and the claims in the Petition for Review, Direct Appeal/Opening Brief attacking same convictions.

In same cases where no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much, that his conviction must be overturned. See **ALCALA v WOODFORD 334 F. 3d. 862, 893-95** (reversing conviction where multiple constitutional errors hindered defendants efforts to challenge every important element of proof offered by prosecution).

**THOMAS v HUBBARD 273 F. 3d at 1179-81** reversing conviction based on cumulative prejudicial effect of:

(a) Admission of triple hearsay providing only evidence of defendant motive and access to murder weapon.

(b) Prosecution misconduct in disclosing to jurors that defendant had committed prior crimes with use of gun.

(c) Truncation of defense cross examination of police officer, which prevented defense from adducing evidence that someone else may have did crimes and evidence casting doubt on credibility main prosecution witness. **UNITED STATES v FREDERICK 78 F. 3d. 1370, 1381** prejudice resulting from cumulative effect of improper vouching by prosecution, improper comment by prosecution about defense lawyer, and improper admission of evidence previously ruled inadmissible required reversal even thought each error evaluated alone might not have warranted reversal.

Cumulative Error is more likely to be found prejudicial when the government case is weak see **Thomas 273 f. 3D. AT 1180** noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime. District Court's Order 314 F. Supp. 2d 967 found Cumulative effect error in the petitioner case.

Now, Petitioner states that the [illegible] 7 ([illegible]) claims presented in Petitioner's Opening Brief/Petition for Review of Insufficiency of Evidence on 187, Farretta Motion violation, Marsden Motion Violation, and Trial Court admitted statement to jury beyond the permissibility, and Trial Court admitted divulging of Petitioner in custody status to jurors without Petitioner approval. Those claims ARE NOW along with the ten (10) claims in the present Habeas Corpus of Ineffective Assistance of Counsel of both trial and appellant lawyers, Prosecutor's Misconduct, trial court judge error, Inconsistent Verdict, Insufficiency of kidnap conviction, Faulty Id by Inspector Wright, and Statue of Limitation Barring the Kidnap charge. All these claims in totality amounts to cumulative error, which violated Petitioner's Due Process Right and rendered the trial an unfair one. This court should grant this Habeas Corpus to correct the denial of petitioner United States Constitutional Rights.

## CONCLUSION

Accordingly, this court should grant petitioner's Habeas Corpus Petition to correct the Due Process Equal Protection of the Law Violation suffered by petitioner and the wholesale denial of a fair trial also suffered by petitioner.

PRAYER FOR RELIEF

THIS COURT SHOULD FIND:,

1. Issue this Habeas Corpus
2. Petitioner suffered due process of law denials Presented and shown within Habeas Corpus. & Points and authorities.
3. Petitioner was denied equal Protection of the law as Presented within Habeas Corpus and Points and Authorities
4. Petitioner was Denied a Fair Trial as Presented within Habeas Corpus and Points and Authorities
5. Petitioner's U.S. Constitutional Rights were violated as Presented within Habeas Corpus and Points and Authorities.
6. Order the Immediate Release of Petitioner from Custody
7. And any and all Remedies this court deems proper due to the injustices and errors found.

I declare under penalty of perjury that the foregoing is true and correct.

Dated 3-14-08

Aaron L. Cooper E28703

Aaron L. Cooper E28703
In Pro Per

# VERIFICATION

I, Aaron L. Cooper E28703 state;

I am the Petitioner in this action. I have read the foregoing Petition for Writ of Habeas Corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Kern Valley State Prison, Delano, Ca. 93216 on;

Dated 3-14-08

Aaron L. Cooper E28703

Aaron L. Cooper E-28703
In Pro Per

# PROOF OF SERVICE

I, Aaron L. Cooper E28703 is above the age of 18 yrs. I am a Party to the above title case Cooper v Woodford.

I mailed the Habeas Corpus petition to:

U.S. District Cort for the Northern District of California
450 Golden Gate Ave 16th floor, S.F., Ca 94102 - ORIGINAL + 2 copies

Attorney General
455 Golden Gate Ave Suite 11000, S.F., Ca 94102-3664 1 copy

Jeanne S. Woodford Director of C.D.C.R., PoBox 942883, Sac, Ca 94283
1 copy

By Placing said evelopes with postage in mail at PO BOX 5102 Delano, Ca 93216

I declare under Penalty of Perjury that the above is true and correct

3-14-08

Aaron Cooper

# TABLE OF CONTENTS

| | Page |
|---|---|
| NOTIFICATION TO COURT | 1 |
| COVERSHEET FOR PETITION FOR HABEAS CORPUS | 2 |
| CERTIFICATE FOR INTERESTED PARTIES | 3 |
| LIBERAL CONSTRUCTION PRAYER | 4 |
| REQUEST FOR COURT TO TAKE JUDICIAL NOTICE | 5 |
| STATEMENT OF FACT & CASE | 6 |
| GROUNDS FOR WHICH THIS HABEAS SHOULD BE GRANTED | 8 |
| CLAIMS, | |
| GROUNDS FOR RELIEF-1- | 16 |
| SUPPORTING FACTS | 16 |
| ARGUMENT and PREJUDICE | 17 |
| GROUNDS FOR RELIEF-2- | 20 |
| SUPPORTING FACTS | 20 |
| ARGUMENT and PREJUDICE | 20 |
| GROUNDS FOR RELIEF-3- | 22 |
| SUPPORTING FACTS | 22 |
| ARGUMENT and PREJUDICE | 23 |
| GROUNDS FOR RELIEF-4- | 25 |
| SUPPORTING FACTS | 25 |
| ARGUMENT and PREJUDICE | 27 |
| GROUNDS FOR RELIEF-5- | 28 |
| SUPPORTING FACTS | 28 |
| ARGUMENT and PREJUDICE | 28 |
| GROUNDS FOR RELIEF-6- | 30 |
| SUPPORTING FACTS | 30 |
| ARGUMENT and PREJUDICE | 31 |
| GROUNDS FOR RELIEF-7- | 36 |

## Table of Contents cont.

| | Page |
|---|---|
| SUPPORTING FACTS | 36 |
| ARGUMENT and PREJUDICE | 36 |
| GROUNDS FOR RELIEF-8- | 39 |
| SUPPORTING FACTS | 39 |
| ARGUMENT and PREJUDICE | 39 |
| GROUNDS FOR RELIEF -9- | 41 |
| SUPPORTING FACTS | 41 |
| ARGUMENT and PREJUDICE | 43 |
| GROUNDS FOR RELIEF-10- | 47 |
| SUPPORTING FACTS | 47 |
| ARGUMENT and PREJUDICE | 47 |
| GROUNDS FOR RELIEF-11- | 48 |
| SUPPORTING FACTS | 48 |
| ARGUMENT and PREJUDICE | 49 |
| GROUNDS FOR RELIEF-12- | 51 |
| SUPPORTING FACTS | 51 |
| ARGUMENT and PREJUDICE | 52 |
| GROUNDS FOR RELIEF-13- | 53 |
| SUPPORTING FACTS | 53 |
| ARGUMENT and PREJUDICE | 54 |
| GROUNDS FOR RELIEF-14- | 55 |
| SUPPORTING FACTS | 55 |
| ARGUMENT and PREJUDICE | 57 |
| GROUNDS FOR RELIEF-15- | 59 |
| SUPPORTING FACTS | 59 |
| ARGUMENT and PREJUDICE | 60 |
| GROUNDS FOR RELIEF-16- | 62 |
| SUPPORTING FACTS | 62 |
| ARGUMENT and PREJUDICE | 63 |
| GROUNDS FOR RELIEF-17- | 64 |
| SUPPORTING FACTS | 64 |
| ARGUMENT and PREJUDICE | 65 |
| GROUNDS FOR RELIEF-18 | 67 |

TABLE OF CONTENTS Cont.

Page

SUPPORTING FACTS ____ 67
ARGUMENT and PREJUDICE ____ 67

VERIFICATION ____ 68

MEMORANDUM of POINTS and AUTHORITIES To SUPPORT GROUNDS FOR RELIEF PRESENTED IN PETION FOR HABEAS CORPUS ____ 69

INTRODUCTION ____ 69

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -1- ____ 70

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -2- ____ 73

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -3- ____ 74

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -4- ____ 77

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -5- ____ 80

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -6- ____ 82

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -7- ____ 86

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARDS FOR GROUNDS FOR RELIEF -8- ____ 89

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -9- ____ 92

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -10- ____ 94

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -11- ____ 96

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -12- ____ 98

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -13- ____ 101

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -14- ____ 104

TABLES OF CONTENTS CONT.

Page

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -15- 107

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -16- 110

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -17- 112

MEMORANDUM of POINTS and AUTHORITIES LEGAL STANDARD FOR GROUNDS FOR RELIEF -18 114

CONCLUSION 115

PRAYER FOR RELIEF 116

VERIFICATION 117

EXHIBITS

A- Issues For Reversal

B- Letter From Lawyer KLYG GEE dated 2-27-06

C- Lawyer KLYE GEE Time Requests

D- Federal Order 314 F. SUPP. 2d. 967

E- Opening Brief

F- Change Of Counsel Request Letters

G- California Court of Appeal TYP. OPN. Nov. 1998

H- Jurors Answers To Investigators After Verdit

I- California Court Of Appeals Log Showing Time Request Extensions BY LAWYER KLYE GEE

J- Motion District Attorney Filed and Got Granted To Enhance Kidnap Charge To a Life Topps Kidnap

K- California Court of Appeal TYP. OPN. 4-6-07

L- California Court of Appeal Denial of Petition For Writ Of Habeas Corpus case # A114440 dated 4-6-07

M- Petition For Review dated 5-11-07

N- California Supreme Court denial of Review case # S152666 dated 7-25-07

O- California Supreme Court denial of Habeas Corpus case # S153965 dated 1-16-08

Mr. Aaron L. Cooper E-28703
K.V.S.P. - ASU2-159
P.O. Box 5102
Delano, Ca. 93216

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aaron L. Cooper E-28703<br>Petitioner<br>V<br>Jeanne S. Woodford Dir. C.D.C.R<br>Respondent | NOTICE TO COURT<br>EXPLANATION OF DELAY<br>In filing this Petition |

EXPLANATION OF DELAY

Petitioner had this present writ of Habeas Corpus prepared and ready to file months ago, and was only waitting for California Supreme Court to rule upon State habeas corpus exhausting 11 claims.

That ruling was done 1-16-08 and recieved by Petitioner on 1-25-08.

I notified the building legal officer Ethridge on 1-28-08 that I need my habeas corpus from my property to file in court.

Officer Ethridge was relieved from legal officer position before my habeas was given to me.

On 2-4-08 I notified the new legal officer R.L. Martinez that I need my legalwork from property. On 2-13-08 R.L. Martinez signed the trust withdrawal form for me to pay the $5.00 filing fee and told me the next she would get me my legalwork. From that point forward legal officer R.L. Martinez until she was relieved of legal officer slot

on 2-29-08 Refuse to give Me my legal work and she continued to denied Me access to the court to file this Prepared Writ solely on some hateful act; she lied and said other officers were going to give Me My legal work but when I would speak with that allege officer he would say R.L. Martinez had NOT SPOKE with him about my legal work.

Petitioner did not recieve legalwork until new legal officer took over slot in which Petitioner recieved legalwork within 3 days.

R.L. Martinez is Responsible for the 25 day delay in the filing of this Federal Habeas Corpus.

Dated 3-14-08

Aaron L Cooper E28703

Aaron L. Cooper E-28703

MR. Aaron L. Cooper E-28703
K.V.S.P. - ASU2-159
P.O. BOX 5102
Delano, Ca. 93216

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aaron L. Cooper E-28703<br>Petitioner<br>V<br>Jeanne S. Woodford DIR. C.D.C.R.<br>Respondent | Request For Counsel APPOINTMENT FOR Habeas Corpus |

I, Aaron L. Cooper am the Petitioner in the above named case. I recieved a 58 to Life sentence for Murder and Kidnap. There were numerous violations which occurred during Pre-trial and trial that were of constitutional magnitude.

I do not have access to funds to retain a lawyer to present and defend and argue these claim.

I have been incarcerated for over 13 Years and have no funds.

Petitioner Prays that this court allows appointment of cousel to assist in Presentation of these complex claims which violated Petitioners Constitutional Rights.

I declare under Penalty of Perjury that the foregoing is true and correct.

Dated 3-14-08

Aaron L. Cooper E28703
Aaron L. Cooper E-28703
IN PRO PER

MR. AARON L. COOPER E-28703
K.V.S.P. - ASU 2-159
PO BOX 5102
Delano, Ca. 93216

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON L. COOPER E-28703<br>Petitioner<br>v<br>Jeanne S. Woodford<br>Respondent | CASE#<br><br>NOTIFICATION TO COURT<br><br>This Habeas Corpus is in Relation to this Courts APRIL 14, 2004 order - COOPER v. McGRATH 314 F.Supp. 2d. 967 |

This Courts HONORABLE JUDGE SUSAN ILLSTON issued order Cooper v. McGrath 314 F.Supp2d 967 on ARPIL 14, 2004. Which resulted in Re-trial and NON COMPLIANCE to that order also resulting in this current attached Petition for Habeas Corpus.

Dated 3-14-08

Aaron L Cooper E28703
AARON L. COOPER E28703
In PRO-PER

RECEIVED
MAR 19 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing
CV 08

1516 SI

# EXHIBIT – A

(PR)

# ISSUES FOR REVERSAL

## ISSUES FOR REVERSAL

**1. DOUBLE JEOPARDY VIOLATION**

U.S. District Court vacated Order filed on April 14, 15, or 16th of 2004; case number C-02-5569 in which Insufficiency of Evidence was found on Murders Conviction. The entire conviction was vacated based upon insufficiency of evidence, as well as, other issues. The United State District Court ordered Aaron Cooper's release within 60 days, unless Alameda County re-instituted charges against Cooper, which the district attorney's office so did. Cooper received trial courtroom on September 29, 2004, Department 10, Judge Rolefson. Jury selection started on October 18, 2004. The first witness put on October 20, 2004. Prosecution rested on November 2, 2003. The evidence used in Cooper's second trial was the same evidence used in Cooper's first trial, but significantly less. In 1118.1 Motion filed and argued on November 2, 2004, both judge and district attorney admitted that there was not any new evidences to put on; evidence for new trial was same evidence used in Cooper's first trial, but that judge or prosecutor stated they were not bound by United States District Court's Order.

**2. INSUFFICIENCY OF THE EVIDENCE**

Only impeached witnesses Hodges and Walton claimed Cooper was on scene, but stipulated evidence proved that both Hodges and Walton were elsewhere during the time the crime was committed. Fred Cross, who was a co-defendant, uncorroborated and impeached prior testimony was read to the jury. Fred Cross also claimed he did not see the kidnap or the 187. Rodney Love's testimony was stipulated too and he stated that Cooper was not present at the scene.

**3. CONSTITUTIONAL ERROR OF DOUBLE JEOPARY**

Infected Kidnap Verdict that is an analysis that must be done when constitutional error occurres. The murder evidences and the district attorney's murder theory cannot be said to have not affected the verdict beyond a reasonable doubt that. Brect v Abrahamson 507 U.S. 619, 629 (1993). Murder is one of the most terrible crimes a jury can hear and Aaron Cooper's jury heard detailed evidences of a 187, which should not have been heard.

**4. INCONSISTENT VERDICT**

Where not guilty on Possession of firearm, bars conviction on 187 & kidnap since possession of firearm is a necessary element of 187 & kidnap. The district attorney's theory presented Aaron Cooper using a firearm to do a kidnap & 187.

**5. PRE-TRIAL COURT ERROR**

a. On May 13, 2004, Judge Reardon denied Cooper's preliminary hearing. Reardon misinterpreted Cooper's status after Vacate Order. The preliminary would have given both the Judge and Cooper an opportunity to view whether there was any new evidence to try Cooper on in accord with Order.

b. Denied Marsden Motion to fire attorney Deborah Levy when she was first assigned to Cooper's case on or about May 18-21, 2004. Deborah Levy hostilely stated to Cooper that she did not want his case, and even exposed Cooper's interpretation of his case to judge Reardon and the district attorney after Cooper gave her his interpretation of his case

c. July 6, 2004, Judge Goodman denied 2nd Marsden Motion when Aaron Cooper complained that Levy refused to work with him on his case. Deborah Levy stated to Aaron Cooper that she believed he did the crime and that she

would not put on a defense or alibi that supported by Cooper's un-controverted witnesses.

d. Deborah Levy didn't have a prepared defense; she only said that the district attorney does not have a case.

e. September 21, 2004, Judge Horner denied Cooper's 3rd Marsden Motion after Cooper told judge that on September 7, 2004, Levy visited him and stated she "hate him" and called Cooper a "fucking asshole" when Cooper tried to talk about his case.

f. On September-21, 0404, Cooper requested to go pro-per, Judge Reardon told Cooper to come back on September 22, 2004 with Farretta Motion filled out, which Cooper did and judge Reardon denied the Farretta Motion because Cooper had been on his calendar for trial since the previous month.

g. Levy had disqualified a trial Judge on September 22, 2004 when judge Reardon denied Cooper's Farretta Motion because he had a courtroom ready, and Levy had 800 pages of new discovery that would take four (4) days to redact.

h. On September 23, 2004, Judge Reardon denied reconsideration of Cooper's Farretta Motion brought on Cooper's behalf by Levy. Cooper asked Judge if he could read the Ferratta Motion quickly or at any pace he deemed appropriately in order to not delay. Cooper asked judge if he could go pro-per because Cooper had no faith in Levy's ability or skills to present a defense on Cooper behalf. Cooper wanted to present a defense to his case, which Deborah Levy was clearly incapable of doing or had not done.

**6. TRIAL COURT JUDGE ERRORS**

a. Judge ruled co-defendant Cross unavailable when he had been granted immunity.

b. At beginning of trial when instructing freshly impaneled jury, judge told jury Aaron Cooper was in custody without consent which prejudice jury against Cooper.

c. September 30, 2004, Cooper's request for in camera hearing was denied. Cooper had hoped that the camera would be used to log his issues & complaints against Levy for her failure to present a defense in Cooper's case. Cooper states that Rolefson stated to him "you're stuck with her." Judge failed to rule and find co-defendants prior testimony trustworthy as law dictates.

d. Allowed co-defendant Kingdom to refuse to testify in front of jury, but outside presence of jury co-defendant Cross is brought in to refuse to testify therefore lending credibility to the reading of his prior testimony to jury.

e. Judge allowed Sgt. Krup to testify to hearsay that allegedly corroborated Walton's testimony.

f. Judge overruled objections when he allowed Inspector Wright to say Cooper "looks consistence" to person whom he could not Identify by Vette, when Cooper was the only person in the court room fitting such a description other than the deputy who had on his uniform and was not considered. There was no probative value only prejudicial effect.

g. Defense objections all overruled.

h.    On October 6, 2004, off the record, judge Rolefson heard Cooper's objections
to Levy failure to detail his issues. Levy tried to void Cooper's I.A.C claim
pertaining to Cooper's wife testifying and being in the audience. Levy also
denied law of case that applied to five (5) claims of Prosecution Misconduct.
Judge said that was irrelevant and he would not bar district attorney from
presenting case, and that he would no longer allow Cooper to present issues,
although, Cooper didn't trust Levy or want Levy. Cooper had to endure going
through Levy because the judged stated that he would not hear objections
from two lawyers, referring to Cooper as a lawyer. Judge stated he knows
Cooper does not trust Levy, but he (the judge) does.

L.    October 21, 2004 failed to SUA SPONTE stop district attorney from asking
Walton leading questions. When Levy finally objected, judge overruled her
saying that the prosecutor's questioning of Walton was not leading, but that
other question were leading.

i.    Allowed the reading of witnesses Mohamed & Rodney Love prior statements
to be read and played to jury, when they were at trial, but could not recall
details. Violation of Cooper's Confrontation Clause Right and the Prior
Statements Section 1237 of the Evidence Code.

j.    Allowed Cross' prior testimony about Cooper's alleged Violent and Bad Acts.
The Cal. App. ruled this to be a Violation of Penal Code 1108. The U.S.
District Court sited this same error.

k. Failed to grant Wheeler Motion. Jury not being representative of Cooper's peers; there were less than a dozen blacks out of a two panel group totally 180 people.

l. October 25, 2004 Levy and Judge argued in chambers about law of case, Judge said law of case doesn't apply which took Levy out of her emotional balance, which is easily done, and judge had Levy flustered even more when she & judge return to courtroom and their frustration with each other spilled out into Cooper's trial. Judge denied every objection Levy made in a very curt way.

m. October 28, 2004, judge allowed co-defendant Cross prior testimony to be read to jury when Cross had been impeached & convicted.

n. November 2, 2004 District Attorney Rest

o. November 2, 2004, Levy files Motion to Acquit, Judge denies.

p. November 3, 2004, Jury starts deliberations at about 4:00pm.

q. On November 10, 2004, day four (4) of Jury deliberations, Judge in response to jury's question on accomplices gave in-essence a closing (illegal direction) argument for twenty (20) minutes and jury comes back with guilty verdict.

r. Judge directed jury to Hodges' testimony to corroborate Cross's testimony and that the jury could then bring Cross's entire testimony in and believe it all. This coercion by the judge was acknowledged by him, judge stated to both the prosecutor and Levy, when the jury went up, that he had gone beyond the scope of what he intended to state to the jury. Cooper asked Levy to object, but the judge decided to call the jury back down to try and correct his mistake,

but the damage was already done. Judge then asked the jury if he had cleared up any confusion he may have caused them, but only after his coercion. The jury said "yes." Further, proof that the damage was already done. Jury was then allowed to return, and they came down with a guilty verdict that same day.

**7. PROSECUTION MISCONDUCT**

a. Knowingly presenting false evidence by introducing co-defendant Cross's false and impeached prior testimony.

b. Elicited hearsay from Sgt. Krup in an attempt to corroborate impeached witness Walton's prior statement. Walton's prior state was said and found to be lies because evidence proved her elsewhere.

c. In district attorney's closing argument, he told jury that they had not heard from Cooper as to his whereabouts. If Cooper did not do the crime, why did he not testify to that fact? This was an infringement upon Aaron Cooper's Constitutional Right not to testify.

d. During Jury selection, the district attorney brought one black juror up fifty (50) positions. The district attorney told Levy that he would dismiss all other blacks.

e. October 24, 2004 the prosecutor asked leading questions of Walton which judge allowed.

f. Persecution told Jury that Cooper had been in prison twice, and that Cooper had told Cross about his violent acts. This is a violation Penal Code 1108.

8. **INEFFECTIVE ASSISTANCE OF COUNSEL**

a. Failure to object of leading questions of Walton.

b. Failed to have a prepared opening argument. Although Levy told Cooper she had prepared an opening statement, but when Levy's time came to present her opening statement, Levy only reiterated to the jury points the district attorney had touched upon.

c. Levy questioned Sgt. Krup about a .45 clip found in Cross's property, Levy associated Cooper's name with that .45 bullet clip found in Cross's property. When Cooper asked Levy why she associated his name with the bullet clip, Levy responded, "it's not like your not involved in this case." This behavior shows Levy did not believe Cooper's innocence. Therefore, Levy line of questioning were a true reflection of her beliefs about Cooper's innocence. Shows Levy did not believe Cooper was innocent.

d. Levy elicited hearsay from Sgt Krup, which then allowed the district attorney to elicit hearsay to corroborate Walton's lies about what Walton had seen.

e. Levy violated Cooper's 6th Amendment Confrontation Clause Right by not objecting to Cross's two taped statements (2 tapes) that were played for the jury.

f. Levy failed to object or asked for instruction to jury when officer Downum and Sgt. Krup continuously testified that Cooper was arrested for carjacking when Cooper was not on trial for carjacking.

g. Levy had numerous sidebars instead of her objecting when the district attorney would violate Cooper's right to a fair trial. Cooper believes that Levy

left her status as Cooper's advocate and became an advocate for the prosecution. Cooper also believes that Levy's lack of proper representation and respect for Cooper's position, helped district attorney have an error free trial so that Cooper would not have any appealable issues on a come back or another reversal. In fact, Levy told Cooper that the district attorney did not want him to come back on an appeal again, and that he (district attorney) would be fair.

h.    Levy did not understand law of case (case law) herself; she gave a different reason why she didn't put on a defense in Cooper trial. Levy stated that Cal. App. Ruling were not applicable since Cooper didn't get a reversal from them, and, therefore; Cal. App Ruling on Prosecution Misconduct of his improper questioning of Cooper, his wife, and Cross were not binding.

i.    Levy failed to object to the reading of Cross's prior testimony to the jury that stated Cooper's alleged violence. This is a Violation of Evidence Code 1108.

j.    Levy did not stipulate to any of Cooper's defense evidence such as: credit card receipts, and car wash receipt.

k.    Levy failed to impeach Hodge, Walton, and Cross and she failed to state that Hodge, Walton and Cross suffer from morale turpitude.

l.    Levy failed to object to Cross being allowed outside the presence of the jury when he refused to testify, those lending credibility to his testimony, which was read to the jurors by the prosecutor; Cross's testimony was read to the jurors without juror's being informed that Cross refused to testify. It was his refusal to testify that made him unavailable. Levy allowed the judge to state

that Cross was unavailable which made it seem as if Cross was not presence due to an unforeseen situation or problem.

m.  Levy did not put on a defense that would have proved Cooper's innocence, and at the very least, Levy failed to call Anderson to trial to testify that the Jacket and gloves belong to him. The district attorney focused heavily upon the jacket and glove evidence, and tried to link it to Cooper numerous times. Cooper pleaded with Levy to bring Anderson in to claim evidence of glove and jacket, but she refused. Cooper was forced to keep his wife away from trial in hopes that Levy would relent and use his defense, but Levy continued to state that Cooper's witnesses who were uncontroverted and believed by a higher court when used in his Writ to U. S. District Court.

n.  Levy said she did not believe Cooper' witnesses, in-essence calling Cooper a liar when Cooper stated to Levy that he had included his witnesses in his Writ. Levy refusal to put on Cooper's witnesses is further proof that she did not believe in Cooper's innocence, and Levy's lack of preparedness spoke volume in Cooper's defense. Cooper begged Levy throughout his trial to use his defense.

o.  Every court date Cooper was subjected to confrontation, being embarrassed by Levy behavior towards him, her arguing with Cooper over her lack of direction and misquote of the law.

p.  Judge Goodman heard & denied Cooper's Marsden Motion, he said Cooper was "lucky to get reversal," and that Cooper was not a lawyer. Levy told

Cooper minutes later that "judge Goodman saw right through Cooper's act of pretending to be a lawyer" when Cooper actually knows nothing.

q. October 18, 2004 first day of jury selection. Levy told Cooper "you're crazy if you (Cooper) thought I (Levy) would come and visit you and tell you about the jury's background." During jury selection, Levy continued to ask Cooper who he wanted off, but would agued with Cooper when he picked someone she liked. Cooper stated to Levy that it was impossible for him to make an informed decision without background information on the jurors. Levy would make it appear as if Cooper was dismissing prospective jurors by her pausing and leaning toward Cooper as if Cooper were conferring with Cooper or getting Cooper's ok when she had not gotten Cooper approval for the jurors selection.

r. October 27, 2004 the district attorney allowed Levy to pick what she wanted to come in as a stipulation of Rodney Love's prior testimony; however, Levy could not find where Rodney Love said Cooper was not at the scene. This question was asked of Love by trial Counsel Cannady in Cooper's first trial. Luckily, Cooper found Love's statement within the minutes the judges gave Levy to make stipulations. Levy said "it was a good thing that Cooper was there and that he knows his case," but she had been arguing with Cooper since she was assigned to the case about Cooper's lack of knowledge in his case or knowing nothing about his case.

s. Levy regularly walked away from Cooper when he was speaking with her. Levy would say mean things like "she is glad Cooper graduated from law

school", or that "she is glad that Cooper had a law degree." Levy would also while sitting next to Cooper at counsel table, left arm extended outward, forefinger pointed in the direction of the judge, and looking at Cooper, even getting the attention of the judge, and well as all others present in the court room and speak to Cooper as if she was disciplining a child.

t. Throughout the trial, Levy was very disrespectful towards Cooper, dealt with Cooper harshly, made Cooper feel inferior, and more importantly, Levy made a mockery of Cooper's defense. Levy refused to collaborate with Cooper, to make clear certain situation to Cooper, and even gave Cooper and his wife documents state that only Counsel (Levy) made decisions in any case and that Cooper had no right to either voice his opinion or make any decision on his behalf.

u. On November 4, 2004 at a before court visit, Levy conveyed to Cooper in a dissatisfied voice that, "it looks as if you will walk <u>even</u> on kidnap" due to district attorney's lack of evidence. Levy said this as if she was only trying to win the 187 for her reputation.

v. Cooper believes Levy's statement to him was a tactic Levy used to dis-sway Cooper from voicing his opinion with his dissatisfaction with Levy's absence of a defense. It was clear from the start that Levy never believed in Cooper's innocence. Levy worked against Cooper from the start, and was unwilling to allow Cooper any participation in/or opinion(s) he may have wanted to voice about his case. Further proof that Levy was only trying to win the 187 for her reputation & practice is in her 1118.1 Motion where the kidnap is not even

mentioned, and Levy only mentioned the kidnap orally after Cooper's pleaded for her to do so.

w.    Levy did not prepare a closing argument, although, Levy told Cooper she had prepared a closing argument. In Levy closing argument, she scatteringly touched upon points the district attorney's talked about in his closing argument, which caused Levy's closing argument to not run smoothly. In fact, during Levy's closing argument, she could not find what she had promised the jury she would tell them. Levy omitted from her closing argument the fact that a higher court had impeached the main witnesses. A fact that the jury needed to know and understand in order to reach a fair verdict in Cooper's case. Cooper believes there is a questionable doubt whether Levy impeached Hodges, Walton and Cross.

# EXHIBIT – B

# LETTER FROM ATTORNEY KYLE GEE DATED 2/27/2006

LAW OFFICE OF
**KYLE GEE**
Certified Specialist in Appellate Law
(The State Bar of California Board of Legal Specialization)

Tel: 510/839-9230
FAX: 510/763-3833

2626 Harrison Street
Oakland, CA 94612

February 27, 2006

Aaron Cooper
E-28703
CSATF/S.P. C7-211
P.O. Box 5246
Corcoran, CA 93212

Re: *People* v. *Cooper*

Dear Mr. Cooper:

I am enclosing your Opening Brief and the Application for Leave to File Oversized Brief. I sent in a separate envelope a Request for Judicial Notice, to include United States District Court documents.

I am sure there are other issues you consider to have merit. However, my belief is that, if you do not win on one of these issues, you could not win it on any other issues.

I know you want to go after your trial attorney in a habeas. However, I suggest you wait to see what the Attorney General has to say in the Respondent's Brief, before you file a habeas.

I have always been concerned about the fact that your trial attorney stipulated that Mr. Kingdom was convicted of murder with a kidnapping special circumstance. I want to see if the Attorney General argues that this stipulation constitutes "substantially different evidence" that defeats your collateral estoppel and/or law of the case claims. If the Attorney General does not point to that evidence, you will not want to point to that evidence in a habeas.

Aaron Cooper
Page 2

February 27, 2006

So for now, I suggest that you wait to see what the Attorney General has to say.

Very truly yours,

KYLE GEE

KG:lo
Encl.

# EXHIBIT – C

# ATTORNEY
# KYLE GEE
# TIME REQUEST

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, | CASE NO. A108723<br>Alameda County No. C125227 |

vs.

AARON LYDELL COOPER,

Defendant and Appellant.
______________________/

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is August 30, 2005.

3. I request an extension of 30 days to September 30, 2005.

4. A notice pursuant to Rule 17 has issued.

5. My client filed two prior requests for extensions of time, for a total of 60 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, as a two strikes defendant. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986.

10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on major set of issues for the Opening Brief. I have worked on the Statement of the Case and Statement of Facts.

11. I need additional time because of the complexity and number of issues: Although this request relates primarily to other factors, Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-the-case, issue and claim preclusion, and the like. There are multiple issues

relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and *Faretta* motions. There are also multiple trial issues, such as prosecutorial misconduct, ineffective assistance, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the course of the last thirty days, I have completed and filed the Opening Brief in *People* v. *Peete*, C047514 (special circumstance murder with a 10,000-page record) and *People* v. *Ivey*, A109161 (special circumstance murder), and I have worked on the Opening Brief in *People* v. *Mabon*, A109378 (first degree murder). I have completed and filed the Reply Briefs in *People* v. *Romero*, A106797 (second degree murder and other counts) and *People* v. *Johnson*, C047560 (spousal rape). I have reviewed the 3200-page Reporter's Transcript in *People* v. *Perez*, A110304( first degree murder), and the 750-page Reporter's Transcript in *People* v. *Chavez*, H029079 (special circumstance murder).

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): None.

14. Other reasons for extension of time: In connection with the twice-in-jeopardy, law-of-the-case, and issue and claim preclusion issues, the record in this appeal has been augmented with the Reporter's Transcript in Mr. Cooper's predecessor appeal (*People* v. *Cooper*, A073986), for my examination and review. I went today to the Court of Appeal to review that prior record, but it could not be

located. I will return to the Court of Appeal to examine that prior record as soon as it has been located.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed August 29, 2005, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

EXTENSION OF TIME IS

_______ DENIED.

_______ GRANTED TO ____________________.

________________________________________
Presiding Justice

PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On August 29, 2005, I served the within MOTION AND DECLARATION OF GOOD CAUSE FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-3664

FDAP
730 Harrison St., #201
San Francisco, CA 94107

Aaron Cooper
E-28703
C.S.P. Sac 4 New Folsom
P.O. Box 290066
Represa, CA 95671-0066

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on August 29, 2005 at Oakland, California.

Lauren Osher

Lauren Osher

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>_______________________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is October 30, 2005.

3. I request an extension of 30 days to November 30, 2005.

4. A notice pursuant to Rule 17 has issued.

5. My client filed four prior requests for extensions of time, for a total of 120 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, with a strike finding. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986.

10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on a major set of issues for the Opening Brief. I have worked on the Statement of the Case and Statement of Facts.

11. I need additional time because of the complexity and number of issues: Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-the-case, issue and claim preclusion, and the like. There are multiple issues relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and

*Faretta* motions. There are also multiple trial issues, such as prosecutorial misconduct, ineffective assistance, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the course of the last thirty days, I have worked on the Opening Briefs in all of these cases: (i) Mr. Cooper's case; (ii) *People* v. *Mabon*, A109378 (first degree murder); (iii) *People* v. *Chavez*, H029079 (first degree murder); (iv) *People* v. *Orozco*, B182567 (first degree murder); and (v) *People* v. *Phan*, C049751 (second degree murder and attempted murder). In addition, I have filed the Reply Brief in *People* v. *Ballard*, H028024 (first degree murder).

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): None.

14. Other reasons for extension of time: None.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed October 27, 2005, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>_______________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |
|---|---|

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is November 30, 2005.



3. I request an extension of 30 days to December 30, 2005.
4. A notice pursuant to Rule 17 has issued.
5. My client filed five prior requests for extensions of time, for a total of 150 days. The opposition has obtained no extensions.
6. Defendant was convicted of: first degree murder and kidnapping, with a strike finding. The conviction is based on a jury verdict.
7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.
8. Defendant is not on bail pending appeal.
9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986.
10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on a major set of issues for the Opening Brief. I have worked on the Statement of the Case and Statement of Facts.
11. I need additional time because of the complexity and number of issues: Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-the-case, issue and claim preclusion, and the like. There are multiple issues relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and *Faretta* motions. There are also multiple trial issues, such as

prosecutorial misconduct, ineffective assistance, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the last thirty days, I have completed and filed the Opening Briefs in *People* v. *Mabon*, A109378 (first degree murder) and *People* v. *Chavez*, H029079 (first degree murder); the Petition for Rehearing and Petition for Review in *People* v. *Davis*, A105394 (multiple sex offenses and robberies); and the Petition for Review in *People* v. *Patterson*, A103263 (special circumstance murder). In addition, I have worked on the Opening Briefs in Mr. Cooper's case, and in *People* v. *Galvin*, C049336 (first degree murder) and *People* v. *Orozco*, B182567 (first degree murder). Finally, I have been reviewing the record in *People* v. *Younger*, A110031 (second degree murder).

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): I was in Los Angeles November 23 through 26, 2005, seeing my children for Thanksgiving.

14. Other reasons for extension of time: None.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed November 30, 2005, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>_______________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |
|---|---|

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is December 30, 2005.

3. I request an extension of 30 days to January 29, 2006.

4. A notice pursuant to Rule 17 has issued.

5. My client filed six prior requests for extensions of time, for a total of 180 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, with a strike finding. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986.

10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on a major set of issues for the Opening Brief. I have worked on the Statement of the Case and Statement of Facts.

11. I need additional time because of the complexity and number of issues: Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-the-case, issue and claim preclusion, and the like. There are multiple issues relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and

*Faretta* motions. There are also multiple trial issues, such as prosecutorial misconduct, ineffective assistance, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the last thirty days, I have completed review of the 4400-page record in *People* v. *Younger*, A110031 (second degree murder), and I have been reviewing the record in *People* v. *Wright*, A111006 (first degree murder). In addition, I have filed the Petitions for Review in *People* v. *Phan*, C049751 (first degree murder) and *People* v. *Carrasco*, H026049 (first degree murder and sex offenses), as well as the Reply Brief in *People* v. *Schoppe-Rico*, A104363 (first degree murder and other offenses). I have been working on the Opening Briefs in Mr. Cooper's case, and in *People* v. *Galvan*, H049336 (first degree murder) and *People* v. *Perez*, A110304 (first degree murder and attempted murder). Finally, I had oral argument in *People* v. *Le, et al.*, A102559 (first degree murder).

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): As seems always to occur during the latter half of December, I was unable to do as much work as I had hoped, in relation to family visits and the holidays.

14. Other reasons for extension of time: None.

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed December 28, 2005, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

EXTENSION OF TIME IS

_______ DENIED.

_______ GRANTED TO ______________________.

______________________________________
Presiding Justice

PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On December 28, 2005, I served the within MOTION AND DECLARATION OF GOOD CAUSE FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-3664

FDAP
730 Harrison St., #201
San Francisco, CA 94107

Aaron Cooper
E-28703
CSATF/S.P. C7-211
P.O. Box 5246
Corcoran, CA 93212

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on December 28, 2005 at Oakland, California.

Kyle Gee

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>______________________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |
|---|---|

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for a fifteen-day extension of time

to file the Opening Brief of Appellant. I assure the Court this is the last extension which will be sought.

2. The present due date is January 30, 2006.

3. I request an extension of 15 days to February 14, 2006.

4. A notice pursuant to Rule 17 has issued.

5. My client filed seven prior requests for extensions of time, for a total of 211 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, with a strike finding. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986.

10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on all issues for the Opening Brief. I have worked on the Statement of the Case and Statement of Facts.

11. I need additional time because of the complexity and number of issues: The Statement of Facts in Mr. Cooper's case is unusually complex, because there are issues in the case (particularly, sufficiency of the evidence and "law of the case") which require that the evidence from Mr. Cooper's first trial (where the judgment was later reversed on federal habeas) be compared with the evi-

dence at his second trial. That comparison is needed in order to demonstrate there was no meaningful difference between the evidence at the second trial and the evidence at the first trial, except that evidence admitted at the first trial in violation of the Confrontation Clause was not offered at the second trial.

In addition, Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance of the reversal on federal habeas, including twice-in-jeopardy, law-of-the-case, and issue and claim preclusion. There are multiple issues relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and *Faretta* motions. In addition, there are issues relating to the sufficiency of the evidence (including denial of a Penal Code section 11181. motion), the trial court's advisement to the jury that Mr. Cooper was in custody (without defense agreement), the failure to allow the jury to consider the fact that a witness who had been granted immunity in relation to his testimony had nonetheless refused to testify (where the witness was declared unavailable and his prior testimony was read), the trial court's improper comment on the evidence during deliberations, the admission of multiple items of hearsay in violation of state law and the Confrontation Clause, *Griffin* error in argument, asking a police office if he had believed the statement from another trial witness, prosecutorial misconduct, ineffective assistance of counsel, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the last thirty days, I have filed the Opening Briefs in *People* v. *Galvan*, C049336 (first degree murder) and *Velasquez* v. *Alameida*, Ninth Circuit Docket No. 05-55208 (first degree murder on federal habeas), as well as the Petitions for Review in *People* v. *Grice*, A106172 (aggravated mayhem) and *People* v. *Johnson*, C047560 (spousal rape). In addition, I have worked on the Opening Brief in *People* v. *Perez*, A110304 (first degree murder), and on the record review in *People* v. *Wright*, A111006 (first degree murder) and *People* v. *Davis*, C051017 (second degree murder).

7 cases

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): I was out of the state January 19 through 23, 2006, on a prepaid visit to see my mother, who lives alone on in Virginia.

14. Other reasons for extension of time: None.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed January 30, 2006, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

EXTENSION OF TIME IS

_______ DENIED.

_______ GRANTED TO ____________________.

______________________________________
Presiding Justice

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>_______________________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for a three-day extension of time to file the Opening Brief of Appellant. I have encountered three

unanticipated problems, as explained in paragraph 14, below. Again, I offer my apologies to the Court, and to Mr. Cooper.

2. The present due date is February 24, 2006.

3. I request an extension of three days to February 27, 2006.

4. A notice pursuant to Rule 17 has issued.

5. My client filed nine prior requests for extensions of time, for a total of 235 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, with a strike finding. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record was augmented to include the record in the predecessor appeal, *People* v. *Cooper*, A073986.

10. I have completed the following work in this appeal: I have reviewed and summarized the record in my possession; I have reviewed the necessary parts of the record in the predecessor appeal, *People* v. *Cooper*, A073986; and I have visited the Federal Records Archives in San Bruno, to review the file in *Cooper* v. *McGrath*, Northern District of California No. C 2-5569 SI, a 28 U.S.C. section 2254 habeas proceeding by Mr. Cooper The brief is virtually complete, as is a Request for Judicial Notice and a Motion for Leave to File Oversized Brief.

11. I need additional time because of the complexity and number of issues: The issues to be presented in the case include the following: sufficiency of the evidence, the "collateral estoppel" effect of the judgment issued by a United States District Court on Mr. Cooper's habeas corpus petition; the "law of the case" effect of that United States District Court judgment; the denial of Mr. Cooper's multiple *Faretta* and *Marsden* motions; allegedly improper comment by the trial court during the jury's deliberations; error in the trial court's advising the jury that Mr. Cooper was in custody; error in the refusal to allow the jury to learn that a key prosecution witness had refused to testify despite being granted immunity, where that witness's prior testimony was read to the jury based on the witness's "unavailability"; and error in the admission of evidence.

12. Other time-limited commitments: This request does not relate to this factor.

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): None.

14. Other reasons for extension of time: Three separate and unexpected problems have arisen, as follows:

(a) I had a problem with my computer, which led to its being replaced. I had no access to my computer, or to its files, on Tuesday and Wednesday, February 22 and 22, 2006;

(b) I had to appear on February 23, 2006, for an IRS audit of payroll records for the past five years. I lost time preparing for, and appearing at, that audit; and

(c) I was told by my wife last night that the deadline for submission of the "FAFSA" application, on which our children's student loans depend, is midnight tonight, February 24, 2006. This required that I spend part of today preparing my 2005 income and expense statements, drafting my 2005 federal return, and completing the FAFSA application online.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed February 24, 2006, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

EXTENSION OF TIME IS

_______ DENIED.

_______ GRANTED TO ______________________.

______________________________
Presiding Justice

PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On February 24, 2006, I served the within MOTION AND DECLARATION OF GOOD CAUSE FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-3664

FDAP
730 Harrison St., #201
San Francisco, CA 94107

Aaron Cooper
E-28703
CSATF/S.P. C7-211
P.O. Box 5246
Corcoran, CA 93212

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on February 24, 2006 at Oakland, California.

Lauren Osher

Lauren Osher

KYLE GEE (State Bar #065895)
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>AARON LYDELL COOPER,<br><br>Defendant and Appellant.<br>_______________/ | CASE NO. A108723<br><br>Alameda County<br>No. C125227 |

MOTION AND DECLARATION OF GOOD CAUSE

FOR EXTENSION OF TIME TO FILE BRIEF - CRIMINAL

1. I, the undersigned, am counsel for appellant AARON LYDELL COOPER, and I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is August 1, 2005.

3. I request an extension of 29 days to August 30, 2005.

4. A notice pursuant to Rule 17 has issued.

5. My client filed one prior request for an extension of time, for a total of 31 days. The opposition has obtained no extensions.

6. Defendant was convicted of: first degree murder and kidnapping, as a two strikes defendant. The conviction is based on a jury verdict.

7. The court imposed the following punishment: fifty-years-to-life, enhanced by eight years.

8. Defendant is not on bail pending appeal.

9. The record in my possession consists of 1421 pages of clerk's transcript and 1568 pages of reporter's transcript, and was filed on February 10, 2005. In addition, the record on appeal in this case has been augmented to include the Reporter's Transcript of the predecessor appeal, *People* v. *Cooper*, A073986, which I will review after I conclude my draft of the Statement of Facts.

10. I have completed the following work on this appeal: I have read and summarized the record on appeal in my possession. I have worked on two major set of issues for the Opening Brief. I have begun work on a draft Statement of Facts.

11. I need additional time because of the complexity and number of issues: Although this request relates primarily to other factors, Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-the-case, issue

and claim preclusion, and the like. There are multiple issues relating to counsel, including an objection to the appointment of counsel originally, and a set of *Marsden* and *Faretta* motions. There are also multiple trial issues, such as prosecutorial misconduct, ineffective assistance, errors in the evidentiary rulings, and misinstruction of the jury. In short, this is a case with a very large number of potential issues.

12. Other time-limited commitments: Over the course of the last thirty days, I have completed and filed the Opening Brief in *People* v. *Contreras*, F047366 (special circumstance murder), and I have almost completed the Opening Brief in *People* v. *Ivey*, A109161 (special circumstance murder), which should be mailed to the court today or Monday. In addition, I have completed and filed the Reply Briefs in *People* v. *Phan*, C046973 (first degree murder) and *People* v. *Grice*, A106172 (aggravated mayhem). Finally, I have completed review of the 6658-page Reporter's Transcript in *People* v. *Peete*, A108723), and I have been reviewing the record in *People* v. *Phan*, C049751 (first degree murder, with a very large record), and in *People* v. *Mabon*, A109378 (first degree murder).

13. Personal reasons for extension of time (illness, family emergency, planned vacation, etc.): None.

14. Other reasons for extension of time: None.

/ / /
/ / /
/ / /
/ / /

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed July 29, 2005, at Oakland, California.

KYLE GEE
Counsel for Appellant
2626 Harrison Street
Oakland, CA 94612
510/839-9230

EXTENSION OF TIME IS

_______ DENIED.

_______ GRANTED TO ____________________.

______________________________________
Presiding Justice

Item B.2: Prior testimony was read after a witness was declared unavailable. This exhibit is the record of what was heard by Mr. Cooper's jury, and it is necessary to the full presentation of his case on appeal. In addition, I believe that this transcript was read over defense objection, which would create a separate issue on appeal.

REQUEST FOR EXTENSION OF TIME

1. As counsel for defendant and appellant AARON LYDELL COOPER, I hereby move for an extension of time to file the Opening Brief of Appellant.

2. The present due date is March 22, 2005.

3. I request an extension of time until 30 days after the service and filing of the augmented materials above-described.

4. It is not reasonably practical to present the Opening Brief on the record as presently constituted, because the record is not sufficiently complete to allow proper presentation of all issues which may exist in the case.

5. My client has filed no prior requests for extensions of time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 21, 2005, at Oakland, California.

KYLE GEE

# EXHIBIT – D

# FEDERAL ORDER

# 314 F. SUPP. 2D 967

FILED
APR 1 4 2004
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON LYNDALE COOPER,

Petitioner,

v.

JOSEPH McGRATH,

Respondent.
_______________________________/

No. C 02-5569 SI (pr)

**JUDGMENT**

The petition the petition for writ of habeas corpus is granted.

IT IS SO ORDERED AND ADJUDGED.

DATED: April 13, 2004

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

FILED
APR 1 4 2004
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON LYNDALE COOPER,

Petitioner,

v.

JOSEPH McGRATH,

Respondent.

No. C 02-5569 SI (pr)

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This matter is now before the court for consideration of the merits of Aaron Lyndale Cooper's pro se petition for writ of habeas corpus concerning his 1996 conviction for murder, kidnapping and carjacking. For the reasons discussed below, the petition will be granted.

## BACKGROUND

Cooper was convicted of kidnapping, carjacking and murder. To summarize, the evidence showed that on August 3, 1995, three men (identified by some witnesses as Cooper, Cross and Kingdom) were in a parked blue car near an intersection in Oakland looking for Coco. A Corvette pulled up with Coco in the passenger seat. Coco got out of the car, talked to the three men briefly and was then put in to the trunk of the blue car at gunpoint. The blue car drove away with Coco in the trunk and the Corvette was driven away by a man (identified by a witness

as Cooper). Coco's dead body was found two weeks later in the Oakland hills. He had been gagged and shot in the head. Cooper was arrested in Oakland seven hours after the abduction, Cross was arrested in Mississippi about a week after the abduction and Kingdom was arrested in Mississippi about three months after the abduction. Cross and Cooper were tried jointly, in a jury trial which started November 29, 1995 and which ended with a guilty verdict on January 5, 1006. Kingdom, who was arrested just about a month before the trial of Cross and Cooper, was tried separately. The police had taped statements from Cross and Kingdom admitting their presence at the crime but downplaying their roles in the crime. Cooper presented an alibi defense. All three were convicted.

A. The Crimes

The description of the evidence presented about the crimes is lengthy, owing partly to conflicting versions of the events and partly to different people seeing only certain parts. Rather than add yet another new lengthy description of the crimes, the court adopts the California Court of Appeal's description of the evidence, with which neither party has taken issue. The California Court of Appeal described the facts:

> At approximately 4 p.m. on August 3, 1995, the victim, William Highsmith known by the nickname "Coco," rode as the passenger in a red Corvette driven by Kevin or "K.K." Parker to a location in front of a liquor store on the corner of 12th and Market Streets in Oakland, California. Minutes later he was abducted. Parker testified that he borrowed the red Corvette from his girlfriend, Tisha Williams, and picked up the victim earlier that afternoon to look at car auctions. Afterwards, they returned to West Oakland and he parked the Corvette in front of the liquor store. The victim got out of the car and began talking to someone in a group of people. Parker was then "grabbed from behind" and told to leave the area. He could not identify the defendants or other people at the scene. Immediately after the incident, an Oakland Police Officer, Michael McArthur, took a statement from Parker containing certain further details. Parker then said he parked behind a blue Oldsmobile with three men inside and entered the liquor store, leaving the victim in the Corvette. As he was leaving the store, he heard gunshots from where he parked the car and saw the Corvette being driven away by a single occupant. The night before, the victim had told him that "some men with guns" were looking for him because they thought he had stolen a Chevrolet IROC.
>
> Parker's girlfriend, Tisha Williams, confirmed that, earlier that day, she had allowed Parker to drive her red Corvette, license number 2YQK292. The victim's sister, Raynetta Thomas, testified that she saw him between 3:30 and 4 p.m. at her mother's home a few blocks away from the crime scene. He arrived as the passenger of a red Corvette driven by Parker and stayed 10 to 15 minutes. He was dressed in an Adidas sweatsuit with matching tennis shoes. The parties stipulated that the red Corvette

United States District Court
For the Northern District of California

contained fingerprints of the victim and Parker.

A bystander, Rodney Love, provided a detailed account of the kidnapping, though he could not identify the perpetrators. While he was eating a snack outside the liquor store at 12th and Market Streets, a man approached him from an area where a blue 1989 Oldsmobile Cutlass was parked and asked if he was "Coco." He inferred that the man was carrying a revolver in his belt because his coat was "puffed out." He told him that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. Two of the three occupants of the Oldsmobile wore black jackets and gloves.

According to Love, Parker soon drove up in a red Corvette, with the victim in the passenger seat, and parked behind the Oldsmobile. Parker and the victim got out of the car and began talking to the men in the blue Oldsmobile. One of the three men briefly grabbed Parker by the neck but then let him go, allowing him to run into the store. The three men then "pushed" the victim into the trunk of the blue Oldsmobile and closed the trunk. One of the three people got into the Corvette. Love heard gunshots from the vicinity of the car and then both the Oldsmobile and the Corvette drove off in the same direction.

Other witnesses observed fragments of the same events. A liquor store employee, Musa Hussein, took a quick look at the street when he heard sounds resembling gunshots. He saw Parker outside the store and four men standing between a red Corvette and a blue or gray car. One of the men was a little taller than the others, maybe six feet four or five inches tall. (Defendant Cross is six feet five inches tall.) He also observed one of the men with what appeared to be a gun.

Lauren Tallerico heard four or five gunshots at about 4:15 p.m. as she drove along Market Street toward 12th Street. The shots came back from the vicinity of a blue car, an older model Cadillac or Oldsmobile, containing two Black males, which she observed turn onto Market Street ahead of her and then speed off down 13th Street toward downtown Oakland.

Douglas Wright, an inspector for the district attorney, was driving home on 12th Street at about 4:10 p.m., when he heard two gunshots and saw a man standing behind a red Corvette parked about 50 feet from the intersection with Market Street. The man came quickly around the car, jumped in, and drove off down Market Street at a high speed. Wright thought the license number of the Corvette was 2YOK933. The man appeared to be in his middle twenties, about 5 feet, 11 inches tall, and weighed about 170 to 180 pounds. After observing Cooper at trial, Wright testified that there was nothing inconsistent with his height and weight and appearance from the person he saw enter the Corvette. (Cooper is 6 feet tall, and 190 pounds, and was 26 years of age at the time of trial.)

At approximately 7 p.m. on the evening of the same day, a motorist, George Archambeau, driving west on the San Mateo Bridge saw a red Corvette stopped in the right hand lane. A Black man of average height, who appeared to come from the passenger seat of the car, was engaged in throwing a package the size of a grocery bag over the side of the bridge into the water. A second African-American male remained in the driver's seat. Archambeau drove around the Corvette but the car soon passed him driving at a high speed. He noted that the license number was 2YQK292.

At 9 p.m. that evening, Moamer Mohamed, an employee of the liquor store at 12th and Market Streets, saw a red Corvette left with the engine running in the entrance to the store's parking lot. When he went to investigate, he saw a tall, skinny Black man,

United States District Court
For the Northern District of California

wearing a checked shirt and gloves, running from the parking lot. He associated the Corvette with Kevin Parker. Upon being notified by police, Parker's girlfriend, Tisha Williams, reclaimed the car later in the evening.

Later, at 11 p.m., a late-1970's blue Oldsmobile Cutlass, which Oakland police associated with the kidnapping, was found in East Oakland near 100th Street and Voltaire Street parked in front of the residence of Juanita Walton, a critical prosecution witness. An evidence technician found vehicle registration and miscellaneous papers, which identified Miltonous Q. Kingdom, a cousin of defendant Cross nicknamed "Q," as the owner of the car.

Three employees of the E-Z 8 Motel near the Oakland Coliseum testified that defendant Cross and another man registered in room 331 on July 23, 1995, and checked out around 9 or 10 a.m. on August 4, 1995. The on-site manager, Robert Britton, identified Kevin Parker as a motel guest to whom he once advanced some money to receive a U.P.S. package and testified that he had also seen defendant Cooper on occasions at the motel. The motel's registration form, introduced as a business record, identified Cross' car as a blue IROC. Another motel employee, Henry Reel, saw defendants Cross and Cooper staying in room 331. The occupants of that room used a blue IROC, and he observed them put their belongings into this car when they vacated the room on the morning of August 4, 1995. He also saw a red Corvette parked in the motel lot 10 or 15 times during the period that Cross resided there. When shown a photograph of Kevin Parker, he identified him as a person who had stayed in room 310 of the motel at that time.

On August 16, 1995, a partially decomposed body was found in a wooded area in the Oakland hills accessible by a service road. The body was identified by the Adidas sportswear and personal belongings in a pocket as that of the victim, William Highsmith. A portion of the shirt had been torn away and a cloth gag tied over the mouth. A scissors lay a few feet away on the ground. An autopsy revealed that the victim had died of a bullet wound to the head. A criminalist examined the slug extracted from the victim's brain and three shell casings found at the kidnapping scene. He determined that the casings were from a 9 millimeter firearm but that the slug was fired from a separate .40 caliber gun.[1]

A separate line of evidence served to establish a plausible connection between the defendant Cooper and a jacket and gloves with gunshot residue. At 11:30 p.m. on the evening of the kidnapping, an Oakland Police Officer, Darrin Downum, stopped a car driven by one Carl Anderson on 99th Avenue in East Oakland for having expired registration tags. The defendant Cooper sat in the front passenger seat, wearing a plaid shirt. When Cooper got out of the car, Officer Downum observed a pair of gloves on his seat and a jacket in the back seat. Both Anderson and Cooper were arrested, and the car taken to a storage facility.

Anderson's mother picked up the car the next day and drove it to her back yard where she locked it. A couple days later a police detective asked her about the jacket in

---

[1]This statement in the California Court of Appeal's opinion is not supported by the record. The evidence was that there were three casings at the abduction area: two 9MM casings and one .40 casing. The criminalist testified that the two 9MM casings didn't match the bullet in the victim's head, but there was no testimony that the .40 casing at the abduction area did or did not match that bullet. There was, however, evidence that the .40 casing was bent and oily, as if to suggest it had been in the area for a while.

the car and she said it did not belong to her son, but at trial she would say only that it was not familiar. She never saw her son wear gloves, though he had once been given a pair. Anderson's father similarly testified that the jacket was unfamiliar and that his son did not wear gloves. In contrast, when called as a witness for the defense, Anderson testified that the jacket was in fact his and that the gloves were in the car when he bought it. A criminalist testified that he found gunshot residue on both gloves and on the left cuff of the jacket.

The prosecution's case on the issue of identification of the defendants Cooper and Cross rested chiefly on the testimony of two women, Zanetta Hodges and Juanita Walton known by the nickname "Goodie," and on an out-of-court statement of Miltonous Q Kingdom. At approximately 4 p.m., on the afternoon of the crime, Hodges drove down 12th Street with Walton in the passenger seat. Upon stopping at the intersection of 12th and Market Streets, Hodges heard someone call her name and backed up a car length to come even with a blue Oldsmobile parked near the corner. There were three people in the car. Sitting in the back seat was defendant Cooper, whom she had met before at Walton's home and on another occasion. He wore a dark jacket and black gloves. Defendant Cross sat in the driver's seat. She had seen him once before near Walton's home driving a blue IROC automobile. She knew the third man by the name "Q."

Pointing to a group of youths standing outside the liquor store, Cooper asked Walton if one of "those guys was Coco." Walton replied in the negative. Defendant Cross then said, "That nigger took my car, Goodie." Walton expressed disbelief, saying that Highsmith was "not trying to get his shoes dirty." At that point a red Corvette pulled up behind the blue Oldsmobile. Defendant Cooper said "bye" to the two girls, and they drove off to a Grand Street store about six blocks away where Walton obtained food stamps.

As they left the intersection, Hodges saw Parker and Highsmith, both of whom she knew, leave the red Corvette and meet the three men in the Oldsmobile, who also got out of their car. After obtaining the food stamps, the girls returned to the intersection of 12th and Market Streets and found police officers and a crowd of people. It was stipulated that the records of the Grand Street store revealed that Walton bought food stamps at 4:09 p.m. and that police records disclosed that the first telephone call reporting the kidnapping occurred at 4:08 p.m.

The prosecution introduced into evidence the preliminary hearing testimony of Walton after the trial court ruled that she was unavailable for testimony. Walton testified that she had known Parker and Highsmith for years and saw defendants Cross and Cooper as well as Cross's cousin, "Q," on a "daily" basis before the incident. She recognized the blue Oldsmobile parked at the corner of 12th and Market Streets as "Q's" car. After she and Hodges returned to the scene, she represented to police that she had been an eyewitness of the kidnapping.[2] Later, she identified defendant Cooper in police custody as the man, who had sat in the back seat of the car. She recalled that Cooper was wearing gloves and a T-shirt at the time of the incident; she later saw him wearing a checkered Pendleton shirt at the police station. Walton gave police two somewhat inconsistent, tape-recorded statements, which were both played to the jury. At the preliminary hearing, she conceded that she was not an eyewitness and retracted many of her previous statements. Nevertheless, her varying accounts of the incident contained evidence

[2]This statement in the California Court of Appeal's opinion is not supported by the record. Walton did not speak to the police at the crime scene. She first spoke to police officers after the car used in the abduction was recovered in front of her house several hours later.

corroborating every relevant point in Hodge's trial testimony, except her description of Cooper wearing a dark jacket.

An Oakland Police Officer, Larry Krupp, presented a redacted transcript of a statement that Miltonous Kingdom gave when contacted in a Mississippi jail. On November 8, 1995, after learning that Kingdom was under arrest, Krupp and another officer traveled to Greenville, Mississippi, to take custody of him on arrest warrants for Highsmith's kidnapping and murder. When he met Kingdom in the local jail and explained his purpose, Kingdom responded, "I'm not guilty" and initially denied any involvement in the kidnapping. Krupp played a brief excerpt from a tape-recorded statement of defendant Cross. Kingdom then gave a statement providing a complete account of the kidnapping and murder. At trial, Krupp read to the jury a transcript of selected portions of the statement.

Before the incident, Kingdom had been staying with his cousin, defendant Cross, in a motel in Oakland. That day, he drove in his blue Oldsmobile to 100th Avenue and MacArthur in East Oakland "to hook up with" defendants Cross and Cooper. Cross drove the car to a store at the intersection of 12th and Market Streets in West Oakland as he sat in the front passenger seat and Cooper in the back seat. There, they talked to a girl named Goodie until a red Corvette drove up and parked behind them. He and the two defendants got out of their car and talked on the sidewalk to two men in the Corvette. Defendant Cross spoke to the men about "the car." Defendant Cooper then drew a 9 millimeter handgun and ordered one of the men to get into the trunk of his Oldsmobile. The man complied.

Defendant Cooper entered the red Corvette while Kingdom and defendant Cross got back into the Oldsmobile. They went to the Oakland hills and stopped on a dirt road in the woods. All three men "went to the trunk." A portion of Highsmith's clothes was torn off and tied to his mouth. Defendant Cooper pulled down the man's pants. The man was then shot in the face and fell to the ground.

Testifying in his own behalf, defendant Cooper presented an alibi defense in which he denied being at the crime scene or seeing defendant Cross or Kingdom on the day of the crime. He claimed that he drove his wife to California State University at Hayward in the morning. He later took his Eagle Talon car to Mission carwash in Hayward and picked up his wife at approximately 3 p.m. They paid accounts at a Nordstrom store, returned to their apartment, and watched a video. Around 9 p.m., he left their apartment to go to a card game in East Oakland. He ran into Carl Anderson and rode around in his car until he was arrested later in the evening. Cooper's wife took the stand to support the defense. In addition, an employee of Mission carwash testified that he had record of washing an Eagle Talon on August 3, 1995, and remembered seeing Cooper on that date.

In contrast, defendant Cross presented a defense that conceded much of the prosecution's case, disclaiming only personal responsibility for the kidnapping and murder. He testified that he owned a blue Chevrolet IROC which he intended to take to Greenville, Mississippi. His plans were frustrated when the car was stolen on July 30, 1995, while loaded with thousands of dollars of drugs. Defendant Cooper had contributed over $2000 to the purchase of the drugs stolen with the car. He began searching for the car in West Oakland and was told that a person named Coco was driving the blue IROC around the neighborhood and trying to sell it. He gave a person he met on the street his pager number and a message to have Coco call him.

In the afternoon of August 3, 1995, Cross and his cousin, Kingdom, joined defendant Cooper at 100th and MacArthur. While they were together, Cross received a

United States District Court
For the Northern District of California

call from Coco on his pager and made arrangements to meet him at the liquor store on 12th and Market Streets. Cross drove Kingdom and Cooper to this location in Kingdom's blue Oldsmobile. He got out of the car and asked people near the store if they were Coco. He did not see Juanita Walton and did not know Zanetta Hodges.

At this point, a red Corvette drove up. Stepping out of the car, a man introduced himself as Coco and denied taking the IROC. Cooper then grabbed him and threatened him with a gun. For his part, Cross walked back to the Oldsmobile and entered the car. As Cross sat in the passenger seat of the car, Kingdom got the car keys and opened the trunk. From his position inside the car, Cross did not see the man being put in the trunk but he heard the trunk close.

Running to the passenger side of the car, Kingdom told Cross to move to the driver's side and take off. Cooper got in the red Corvette. Cross drove to 100th and Voltaire where Cooper joined them in the red Corvette. Cooper and Kingdom then drove away in the two cars, but he did not go with them. About two minutes later, they returned in the Oldsmobile. Cross reentered the car and drove to his motel. Later, Cooper drove them to 100th and MacArthur but said nothing about the person they had abducted. Cross stayed at this location while Cooper and Kingdom drove off again in the Oldsmobile. The next day he took a plane to Mississippi. He did not ask and was not told what happened to the man in the trunk.

As impeachment, the prosecution played taped statements in which Cross said that he and Kingdom helped put the victim in the trunk. Cross insisted that he was not truthful in making the statement and never had any intention to kidnap or murder the victim.

Respondent's Exhibit B (Cal. Ct. App. Opinion filed Nov. 9, 1998), ¶. 2-10.

B. Procedural History

The jury found Cooper and Cross guilty. Cooper was convicted of first degree murder, kidnapping, carjacking, and being a felon in possession of a firearm. See Cal. Penal Code § § 187, 207, 215, and 12021. The jury found true the allegations that Cooper was armed with a firearm in the commission of the murder, carjacking and kidnapping. The trial court found in a separate proceeding that Cooper had served a prison term for prior conviction of a felony and had been convicted of a serious felony that qualified as a prior strike conviction under California's Three Strikes law. Cooper was sentenced to a total term of 71 years to life.

An appeal ensued. The California Court of Appeal affirmed the conviction in an opinion filed November 9, 1998. See Resp. Exh. B. The California Supreme Court denied Cooper's petition for review. The U. S. Supreme Court granted his petition for writ of certiorari, vacated the judgment and remanded the case for reconsideration in light of Lilly v. Virginia, 527 U.S.

116 (1999). On remand, the California Court of Appeal reinstated the judgment and affirmed the conviction in an opinion filed July 6, 2000. See Resp. Exh. A. The California Supreme Court denied Cooper's second petition for review and the U. S. Supreme Court denied his second petition for writ of certiorari. Cooper also unsuccessfully sought collateral review in state court.

Cooper then filed this action for a writ of habeas corpus in November 2002. His amended petition filed on June 5, 2003 contained eleven claims for relief, of which the court found eight cognizable. Respondent was ordered to file an answer to these claims: (1) a Confrontation Clause violation in the admission of Kingdom's statement, (2) a due process violation based on prosecutorial misconduct in eliciting improper testimony on three occasions (i.e., the cross-examination of Cooper about a trial in which Cooper introduced expert testimony about guns, the cross-examination of Cooper's wife about her 1993 marriage to Cooper in jail, and the cross-examination of co-defendant Cross about Cooper's alleged prior bad acts of shooting at people), (3) a Confrontation Clause violation in the admission of Goodie Walton's preliminary examination testimony, (4) a due process violation in the method used by inspector Wright to identify Cooper in the courtroom, (5) a due process violation in the failure to sever the trials of Cooper and Cross, (6) a due process violation because the record on appeal was incomplete, (7) a due process violation based on the insufficiency of the evidence, and (8) a cumulative error claim. Respondent filed an answer and Cooper filed a traverse. The matter is now ready for consideration on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, which is located within this judicial district. 28 U.S.C. 2241(d).

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in

United States District Court
For the Northern District of California

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362 (2000).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties agree that state court remedies were exhausted for the claims in the present petition.

**DISCUSSION**

A. In-Court Identification By Witness Wright

Douglas Wright testified for the prosecution about what he saw and heard when he drove by the liquor store at 12th and Market at about 4:00 p.m. Wright was a retired policeman who worked as an inspector for the district attorney's office. Wright heard what sounded like two gunshots and saw, among other things, a man getting into a red Corvette and departing hurriedly. He saw the man directly and as a reflection in the mirror of his car when he drove by the scene. After the man drove away, Wright pulled his car up next to the red Corvette at a street light where Wright observed the man again. Wright described the man as Black, in his mid-20s, about 5'11" and 170-180 pounds.

When the prosecutor attempted to have Cooper stand up in court so Wright could try to identify him, defense counsel objected. A conference was held outside the presence of the jury to discuss the identification problem. No line-up had been done before the trial for this witness and the prosecutor acknowledged that Wright had not seen the person well enough to be able to make a specific, personal identification. RT 750. Defense counsel thought the identification was too vague: "We're talking about a five-eleven Black man, in the city of Oakland, weighing approximately 170-180 pounds." RT 752. When the jury was <u>not</u> present, Cooper stood next to counsel table and Wright was asked, "Is there anything inconsistent about Mr. Aaron Cooper, the person who has just stood up, and the person that you saw get into the red Corvette that you already testified about?" Wright answered, "He matches, basically, the height and the weight and age." RT 751. The court overruled the defense objections and allowed the identification. RT 753. When the jury returned, Wright repeated his identification of Cooper:

Q. Now, after the jury left this morning, did you have an opportunity to observe the defendant in this case, Aaron Cooper?

A. Yes.

Q. And would you describe if there's anything inconsistent about his height and weight and appearance from the person that you saw get into the red Corvette?

A. There's none.

RT 756.

On cross-examination, defense counsel elicited some helpful testimony from Wright. Wright admitted that he did not recall how the man was dressed, admitted that he did not know whether the man wore his hair in dreadlocks as Cooper did, admitted that in his years as a police officer he had stopped many people who were Cooper's size, admitted that he did not see the man holding anything although Wright had looked at the man's hands, admitted that he had fractions of a second to observe the man, and admitted that after he heard the gunshots he tried to determine where the gun was but did not see any signs of a gun and did not see a gun in Cooper's hand.

The California Court of Appeal rejected Cooper's claim that Wright's in-court identification of Cooper was irrelevant and prejudicial. "We see relevance . . . in the fact that

United States District Court
For the Northern District of California

Wright could say that the man resembled Cooper. Though his testimony did not have the probative value of a personal identification, it still had some 'tendency in reason' to prove Cooper's presence at the kidnapping scene." Resp. Exh. B, p. 33.

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967). Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive. "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972). Due process protects against the admission of evidence deriving from suggestive identification procedures. See id. at 196; cf. Manson v. Brathwaite, 432 U.S. 98, 106 n.9 (1977) (standards are not different for pretrial and in-trial identifications). Unnecessarily suggestive identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony. See id. at 114. In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. See id. at 114; Neil, 409 U.S. at 199-200.

To obtain habeas relief, Cooper must show that the in-court identification was unnecessarily suggestive and not sufficiently reliable. An in-court identification of a defendant who looks different from everyone else around him and is clearly the person on trial may be suggestive. See United States v. Rogers, 126 F.3d 655 (5th Cir. 1997) ("it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant"). Asking Wright to identify a particular man at the defense table was suggestive if Cooper looked different from those around him -- a fact that this court cannot determine from the appellate record -- although for the reasons mentioned later, Wright's "identification" was so generalized that it was of little value. In any event, suggestiveness alone is not enough. Cooper has not shown that the identification testimony was unreliable. Consideration of the

factors identified in Manson regarding the reliability of the identification leads to the conclusion that the evidence was not unreliable. First, Wright had just a fleeting opportunity to observe the man as Wright drove by, but Wright also saw the man up close when he pulled his car up next to the man's car at a stop light. Second, Wright was likely more attentive than an average citizen because he was a retired police officer alerted by gunshots. Cf. Manson, 432 U.S. at 108 (trained police officer who realized he would have to find and arrest the person with whom he was dealing was paying attention to the identity of the person). Wright's attention had been drawn to the scene because he heard what sounded like two gunshots; he scanned the scene to try to figure out what was going on. This was not a situation where a person observed what appeared to be neutral facts but later turned out to be relevant to a criminal act. When Wright heard the gunshots in the urban locale, he doubtless was thinking it was a crime scene. And this was not a situation where the witness was the distressed and distracted victim of a crime. Third, Wright's prior description at the scene of the abduction had been general but so was his trial testimony. Fourth, the level of certainty demonstrated by Wright was adequate at trial. As to both the third and fourth points, the facts cut against Cooper because Wright's description was rather general, but so was his trial testimony. He did not actually identify Cooper as the man who drove the Corvette, but rather was only asked whether Cooper had characteristics not inconsistent with those of that man. The testimony was far less damaging to the defense than if Wright had said Cooper actually was the man. Fifth, only about four months had lapsed between the observation of the witness and the identification. Four months is not a long time in light of the generality of the description and the identification testimony given. It is far easier to believe that a witness could keep in his mind for four months an image of the general type of person he saw rather than the exact person he saw. Considering the various factors together, this court finds that the in-court identification was sufficiently reliable.

Wright did not say that Cooper was the man, but only that Cooper's height, weight and appearance were consistent with those of the man he had seen at the crime scene. Bearing in mind that the body of law about identification testimony is aimed at avoiding mistaken identification, one can say with confidence that there was no likelihood of mistaken

identification by Wright. The vice of the admission of Wright's testimony was its weakness, rather than that it may have been mistaken: one can reasonably guess that hundreds or thousands of men in the Bay Area would have an appearance consistent with the description of a Black male in his mid-20s, about 5'11" tall and about 170-180 pounds.[3]

The identification was weak and quite limited in that the witness only said Cooper's appearance was consistent with that of the man observed earlier. The defense obtained testimony that established the witness' limited opportunity to observe, the commonness of defendant's size, and the absence of a gun in the man's hands. Cooper's right to due process was not violated by the admission of Wright's testimony that Cooper's appearance was not inconsistent with that of the man he saw driving the red Corvette. Cooper is not entitled to the writ on this claim.

B. The Appellate Record

Cooper claims that his right to due process was denied because his appellate record was incomplete. At trial, the court reporter had problems with her stenography machine. Cooper's appellate counsel raised questions about the accuracy of the appellate record and sought to settle the appellate record. Cooper's counsel thought Douglas Wright's testimony was not transcribed fully. Cooper's counsel thought that the transcript had omitted a couple of questions and answers to the effect that Wright's description of Cooper "fit the description of half the young Black male population in Oakland" and that Wright could not identify the person he saw in the Corvette. See Exh. C to Resp. Exh. I. A post-conviction hearing was held by the trial court to settle the record, after which the trial court denied Cooper's application to settle the record. Resp. Exh. H.

If a state creates a system for appellate review as an integral part of the system for finally

---

[3]Though weak, the evidence was relevant in that it had some tendency in reason to prove Cooper's presence at the kidnapping scene, as the California court of appeal found. Because the evidence had some relevance to an issue in dispute, it was properly admitted.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

adjudicating the guilt of a defendant, the procedures used must comport with demands of due process and equal protection. See Evitts v. Lucey, 469 U.S. 387, 393 (1985) (citation omitted). The failure to provide a criminal defendant with a transcript of the trial court proceedings which effectively denies him his right to a timely appeal may deprive him of his constitutional right to due process of law. See Madera v. Risley, 885 F.2d 646, 648 (9th Cir. 1989) (state's failure to provide full record of trial may violate defendant's due process rights and form basis for federal habeas corpus relief). Two criteria are relevant to the determination of whether an adequate record has been supplied: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought; and (2) the availability of alternative devices that would fulfill the same functions as a transcript. See Britt v. North Carolina, 404 U.S. 226, 227 & n.2 (1971); Madera, 885 F.2d at 648. A habeas petitioner also must establish prejudice from the lack of recordation to be entitled to habeas corpus relief. See id. at 649.

Cooper cannot prevail on his due process claim on the facts. After a post-conviction hearing in the trial court, that court rejected Cooper's claim that the record was inaccurate and denied the application to settle the record. The court presumes correct the court's apparent factual finding that Cooper's counsel was incorrect in his assertion that the transcript omitted two questions and answers. 28 U.S.C. § 2254(e)(1). Cooper has not rebutted that presumption at all, let alone by clear and convincing evidence.

Even if the alleged inaccuracy did exist in the transcript, it was harmless error because the rest of Wright's testimony that was transcribed clearly conveyed that his description of the man he saw was very general and that he was only able to say that Cooper's appearance was not inconsistent with that of the man he saw. See Section A, above. Cooper is not entitled to the writ on this claim.

C. Denial Of Severance Request

The California Court of Appeal upheld the trial court's denial of Cooper's motion for separate trials for Cooper and Cross. The appellate court noted that there was a legislatively expressed preference for joint trials of co-defendants and that separate trials were within the trial

court's discretion.

> In reviewing the trial court's exercise of discretion on the motion to sever, we place great weight on the fact that this was a trial involving common action against the same victim falling squarely within the policy of Penal Code section 1098 favoring joint trials. With the redaction of Cross's statements, the only prejudice to Cooper related to his alibi defense. We have found no authority indicating that an alibi defense entitles a defendant to a separate trial to shield the alibi defense from conflicting evidence of a codefendant. The present case does not differ significantly from the common case involving alibi defense. If Cooper were entitled to severance, the policy favoring joint trials would be significantly undermined. Furthermore, we note that, while Cross's defense conflicted with Cooper's alibi defense, it did not necessarily incriminate Cooper. Cross did not directly accuse Cooper of the crime. Instead, he denied witnessing the act of forcing the victim into the trunk and denied being present at the murder.

Resp. Exh. B, ¶. 28-29.

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986). A federal court reviewing a state conviction under 28 U.S.C. § 2254 is limited to determining whether the state court's joinder or denial of his severance motion resulted in prejudice great enough to render the trial fundamentally unfair. Grisby, 130 F.3d at 370. This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000), cert. denied, 534 U.S. 847, 943 (2001).

"Antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to require severance. . . . To be entitled to severance on the basis of mutually antagonistic defenses, a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996), cert. denied, 519 U.S. 1132 (1997); see also United States v. Angwin, 271 F.3d 786, 795 (9th Cir. 2001), cert. denied, 535 U.S. 966 (2002) (same). In Throckmorton, the defendant's theory was that there was insufficient evidence to show drug importation conspiracy while his codefendant's theory was that a drug transaction had occurred but that he was involved solely as a DEA informant. The court found the defenses

were not irreconcilable at their core because the jury could find both that the codefendant was working for the DEA and that there was insufficient evidence to convict defendant. Id. at 1072. Acceptance of the codefendant's defense would not have precluded the defendant's acquittal. Id. Although the codefendant's testimony was devastating to defendant's defense, the defendant could not show that same devastating testimony would not have been admitted if the trials had been severed. Id. (rejecting defendant's conjecture that codefendant, who declined to assert his Fifth Amendment right in a joint trial, would have exercised his Fifth Amendment right had they been tried separately).

Cooper and Cross did not have sufficiently antagonistic defenses. Cross' defense was that he was present but was in the front passenger seat when Coco was put in the trunk and that he had left the criminal adventure before Coco was killed. Cooper's defense was that he was not present at all. Cross' defense was not, at its core, so irreconcilable with Cooper's alibi defense that the acceptance of Cross' defense necessarily precluded acquittal of Cooper. Both defenses could have succeeded. The jury could have believed that there was sufficient evidence that Cross was there but insufficient evidence that he was more than a spectator while still finding there was insufficient evidence that Cooper was even present at the crime scene. Although the defenses were not harmonious, they also were not mutually exclusive.

The problems that can result from joint trials were largely addressed and avoided at Cooper's trial. The jury was instructed that some of Cross' statements were evidence only against Cross when (before Cross elected to testify) the prosecution presented a redacted statement from Cross. The jury was instructed that it was to separately consider each count and to separately consider each defendant. Cooper also has not shown that there was evidence he wanted to introduce but could not because it was a joint trial. No Confrontation Clause problems were created by the holding of a joint trial. Cross testified at the trial and Cooper was able to cross-examine him. Cooper has not shown any reasonable probability that Cross would not have testified at Cooper's trial had they been tried separately.

A joint trial made sense here for the abduction and murder of a single victim. It was not an instance where a defendant was tried for multiple unrelated crimes, such that the sheer

United States District Court
For the Northern District of California

number of crimes had a prejudicial spillover effect. And it was not an instance of joining a weak case with a strong one, such that the negative impact of the strong case evidence spilled over and resulted in conviction on the weak case. And it was not an instance of defendants with dramatically different liability exposures because both faced kidnapping, carjacking and murder charges.

The state court's rejection of the severance claim was not contrary to or an unreasonable application of clearly established law. Cooper is not entitled to the writ on this claim.

D. Admission Of Goodie Walton's Preliminary Hearing Testimony

Cooper contends that his right to confront a witness was violated when the trial court admitted the preliminary hearing testimony of Goodie Walton even though the prosecutor had not made an adequate effort to find her to testify at trial.

The California Court of Appeal did not expressly mention the Confrontation Clause in its analysis and instead examined whether the prosecution had been sufficiently diligent in searching for the witness under the standard in California Evidence Code § 240(a)(5), which provides that a person is considered unavailable if she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." The trial court had held a hearing on the prosecution's efforts to serve a subpoena on the witness, concluded that the prosecution had exercised due diligence in an attempt to serve Walton, and ruled that the preliminary hearing testimony could be admitted. The California Court of Appeal examined the record and found adequate efforts to locate the witness had been made: "Without attempting to summarize Lerche's testimony, it suffices to say that he was actively engaged for about a month in efforts to serve Walton or learn of her whereabouts. Cooper faults him for not beginning the search earlier and for making repeated futile attempts to contact her at a Voltaire Street address, neglecting efforts to trace her receipt of food stamps. Despite these criticisms, we find the People exercised due diligence to locate Walton." Resp. Exh. B, at 31-32.

The Confrontation Clause applies to all out-of-court testimonial statements offered for

United States District Court
For the Northern District of California

the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford v. Washington, 124 S. Ct. 1354, 1365 (2004). Prior testimony at a preliminary hearing is testimonial hearsay and is barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 1369, 1374.

To establish unavailability, the prosecutor must show that he made a good faith effort to obtain the witness' presence at trial. See Barber v. Page, 390 U.S. 719, 724-25 (1968); United States v. Olafson, 213 F.3d 435, 441-42 (9th Cir.), cert. denied, 531 U.S. 914 (2000) (good faith effort demonstrated where border patrol agents called witness, who had been inadvertently returned to Mexico, but witness refused to return to testify); Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith effort to locate witness where he subpoenaed witness, met with witness to discuss proposed testimony after issuing subpoena, tried to call witness three times as trial date approached, contacted witness's parole officer, had a bench warrant issued for witness's arrest, and assigned a criminal investigator who searched at places witness was known to frequent).

Whether Walton was unavailable is the crux of the issue in this case. The California Court of Appeal's finding that the prosecutor had proven that he made a good faith effort to locate Walton is not an unreasonable application of or contrary to clearly established federal law. The prosecutor's investigator had been diligently but unsuccessfully searching for Walton for about a month. This court is unpersuaded by Cooper's argument that the prosecutor's investigator really wasn't diligent because the prosecutor didn't really want to find the witness who was hostile to the prosecutor's position. The court also is unpersuaded by Cooper's argument that the investigator was not diligent because he did not start earlier and did not trace her food stamp receipts. The 20/20 vision of hindsight does not mean the steps actually undertaken were not reasonable. Cooper is not entitled to the writ on this claim.

E. Admission Of Kingdom's Statement

Cooper claims that the admission of Miltonous Q. Kingdom's statement to the police that implicated Cooper in the crime violated his rights under the Confrontation Clause. The

United States District Court
For the Northern District of California

California Court of Appeal found that there was such a violation, but that the error was harmless. Respondent essentially concedes the Confrontation Clause violation but urges that it was harmless error. The Confrontation Clause error was quite obvious and thus this court, like the state court and the parties, focuses on the harmlessness question.

1. The Statement In Question

Kingdom was arrested in Greenville, Mississippi about a month before Cooper's trial began. Shortly after his arrest, he gave a statement to Oakland police sergeant Krupp on November 8, 1995, in Greenville, Mississippi. Although Kingdom initially said he was not guilty, he quickly changed his mind after the police played a brief portion of Cross' tape-recorded statement. At trial, a redacted version of Kingdom's statement was read into the record. RT 1912-1921.[4] The most damaging of Kingdom's statements[5] put all three men (Cooper, Cross and Kingdom) at the site of the murder and present when the murder occurred, although the name of the actual shooter apparently had been redacted. Kingdom also identified Cooper and Cross by name as participants in the abduction. Although Kingdom's statement was redacted in part, the names of Cooper and Cross were repeatedly mentioned in the statement the jury heard.

Oakland police sergeant Krupp read to the jury the transcript of the taped statement he had taken from Kingdom which included the following information. Kingdom stayed in a motel with his cousin Fred in the weeks before the incident. RT 1912-1913. Kingdom hooked up with Fred and Aaron at 100th and MacArthur on the day of the incident when Kingdom was driving his blue car. RT 1913. [Fred and Aaron are the first names of Cross and Cooper.] Fred and Aaron got in the car with Kingdom. RT 1914. Fred drove, Kingdom sat in the front

[4]Court and counsel discussed the admissibility of the statement out of the presence of the jury. Counsel for Cooper took the position that none of the statement should come in and that Cooper was denied his right to confront the witness. RT 1834.

[5]Only one taped statement of one interview was admitted. The references to various statements in the text are not intended to suggest there was more than one taped statement but instead are references to assertions made, sentences spoken or answers given by Kingdom during that one interview.

passenger seat, and Aaron sat in the back passenger seat. RT 1914. They drove to a West Oakland store and parked. RT 1915. They talked to a girl named "Goodie." RT 1915. A red Corvette pulled up behind them. RT 1915. They talked to the men on the sidewalk, and the man and Fred were "discussing about the car." RT 1916. Then, Aaron pulled out a gun. RT 1916. Aaron's gun was a 9MM automatic. RT 1917. Aaron then told the man to get into the trunk of Kingdom's car. RT 1917-1918. Fred and Kingdom got back into Kingdom's car and Aaron got into the Corvette. RT 1918. They then went to the Oakland hills. RT 1919. When they got up to the woods, they stopped off the road. RT 1919. They stopped on a dirt road. RT 1919-1920. The questions by the police and the answers from Kingdom that the jury heard regarding the murder are worth quoting:

Question: Okay. And what happened next?
Answer: We went to the trunk.
Question: Who went to the trunk, all three of you?
Answer: Yeah.
* * *
Question: And what did he do when he tore his clothes off?
Answer: Put them around his mouth.
Question: Put it around where?
Answer: His mouth.
Question: Did anybody pull his pants down?
Answer: Aaron pulled his pants down.
* * *
Question: Okay. Now, what happened next?
Answer: Shot him.
Question: Did he fall on his face or his back?
Answer: His face.
Question: So he landed on his face; is that correct? Is that "yes"?
Answer: Yeah.

United States District Court
For the Northern District of California

RT 1920-1921. On cross-examination by Cross' attorney, Krupp testified that Kingdom said Cross did not have a gun. RT 1949. On cross-examination by Cooper's attorney, Krupp testified that Kingdom told them that Cross drove to 109th and Foothill and after that Cooper drove up to the Oakland hills and drove back down from the Oakland hills. RT 1944. Also on cross-examination by Cooper's attorney, Krupp testified that Kingdom said that they went back to 109th and Foothill where Cooper got into the Corvette and Cross and Kingdom got into the blue Oldsmobile and went back to their hotel and that Cooper returned about an hour later without the Corvette.

2. Confrontation Clause Basics

The Sixth Amendment's Confrontation Clause provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 124 S. Ct. at 1370. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). Even before the recent Crawford decision, a declaration against penal interest by an accomplice that implicated a defendant was problematic as it was not considered reliable. See Lilly v. Virginia, 527 U.S. 116, 131-34 (1999) (plurality); see also Lee v. Illinois, 476 U.S. 530, 543 (1986) (statement made by an accomplice inculpatory of the defendant is presumptively unreliable under Roberts); Forn v. Hornung, 343 F.3d 990, 996-97 (9th Cir. 2003) (statements admitted under declaration against penal interest hearsay exception did not have particularized guarantees of trustworthiness). While much remains to be seen about how Crawford will be interpreted, it unquestionably tightens, rather than loosens, Confrontation Clause requirements. After Crawford, the method of analysis might change but the result in Cooper's case would doubtless remain the same: a Confrontation Clause violation had occurred.

United States District Court
For the Northern District of California

3. State Court Analysis

The California Court of Appeal explained why the Confrontation Clause violation was harmless:

> These considerations lead us to conclude that it was error to admit Kingdom's statement. This conclusion compels us to examine the record to determine if the error was harmless under the reasonable doubt test of Chapman v. California (1967) 386 U.S. 18, 24, which governs federal constitutional error. At oral argument counsel noted that the harmless error analysis under Chapman is distinct as to each defendant. This is so primarily due to Cross's testimony concerning Cooper's involvement in the crimes and certain physical evidence found at the time of Cooper's arrest. Our review of the record compels reversal of Cross's conviction of murder. We find, however, that the error was harmless beyond a reasonable doubt in the conviction of defendant Cooper for murder.
>
> The record reveals that Cooper possessed a motive for the murder – retaliation for the theft of the car loaded with drugs he had helped to purchase. He had helped Cross search for the perpetrator and joined him in confronting the person they believed was responsible. He played a particularly active and violent role in the kidnapping by brandishing a gun, grabbing the victim, and leading him to the trunk of the car.
>
> Cross testified that Cooper was in a car containing several handguns, with the victim in its trunk, immediately preceding the victim's disappearance. Other testimony plausibly connected him with the carjacking of the red Corvette, disposal of the weapon, and return of the Corvette. When arrested, he was in apparent possession of a jacket and gloves which tested positive for gunshot residue. He was seen wearing a similar jacket and gloves earlier in the evening and the jacket and gloves did not belong to his companion at the time of his arrest. Taking the stand, he presented an alibi defense that did little more than cast doubt on his veracity by contradicting well-established facts. The direct and circumstantial evidence against Cooper demonstrates to us beyond a reasonable doubt that the error did not contribute to the verdict.

Resp. Exh. A, pp. 25-26.

4. Analysis of Harmlessness of Error

Trial errors that occur during the presentation of the case to the jury are amenable to harmless-error analysis because they may be quantitatively assessed in the context of other evidence presented in order to determine their effect on the trial. See Brecht v. Abrahamson, 507 U.S. 619, 629 (1993); Arizona v. Fulminante, 499 U.S. 279, 307 (1991). A federal habeas petitioner is not entitled to relief unless the trial error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The error must have resulted in "actual prejudice." Id. (citation omitted); see, e.g., Alvarado v. Hickman, 316 F.3d 841, 855-57 (9th Cir.), cert.

United States District Court
For the Northern District of California

granted, Yarborough v. Alvarado, 124 S.Ct. 45 (2003) (finding Brecht prejudice where confession obtained in violation of Miranda was admitted at trial even though defendant testified at trial; defendant's testimony could be disregarded because decision to testify was a tactical choice likely influenced by the prosecutor's use of the confession, and the remaining testimonial evidence was inconsistent or only marginally useful to the prosecution); Hardnett v. Marshall, 25 F.3d 875, 881 (9th Cir. 1994), cert. denied, 513 U.S. 1130 (1995) (no actual prejudice from introduction of inadmissible hearsay regarding petitioner's intent where petitioner found not guilty of first-degree murder).

A federal habeas court reviewing the prejudicial effect of constitutional trial error does not simply examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error. Regardless whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction. If it did, the court must set aside the conviction. Ghent v. Woodford, 279 F.3d 1121, 1127 (9th Cir. 2002) (finding prejudice under Brecht from admission of evidence obtained in violation of Miranda after examining effect of erroneously admitted evidence only on disputed issue of petitioner's mental state, not on undisputed question of whether petitioner actually committed crimes).

The admission of Kingdom's statement to police had a substantial and injurious effect on the jury's verdict against Cooper. This conclusion is strongest with respect to the murder conviction, but the court also reaches the same conclusion with respect to the kidnapping and carjacking convictions.

Kingdom's statement was the only evidence that put Cooper at the murder scene in the Oakland hills. Although Kingdom's statement was redacted so that the shooter's identity was not revealed, Kingdom's statement identified Cooper by name as being present at the murder scene, as being the person who pulled down Coco's pants at the site of the murder, and as being the person who drove them to and from the Oakland hills. The statement regarding the pants corroborated the coroner's observation that the dead body's pants were down. Kingdom's statement also placed the murder in the Oakland hills where the body was found; he did not

United States District Court
For the Northern District of California

claim that Coco had been killed elsewhere and his body dumped in the hills. That was consistent with the prosecution's argument that Coco had been killed where his body was found. Without Kingdom's statement, there was not sufficient evidence to prove beyond a reasonable doubt that Cooper was present at the murder of Coco. Although the sufficiency of the evidence is not the standard for determining whether an error resulted in prejudice, see Ghent, 279 F.3d at 1127, the fact that there was insufficient evidence without the improperly admitted evidence shows how powerfully it affected the jury's verdict of guilt on the murder count. The fact that Kingdom's statement was corroborated by the independent evidence that the pants had been pulled down and argument that the victim had been killed where his body was found does not make Kingdom's statement cumulative of other evidence but instead made it even more likely that the jury had to rely on it to determine who had killed the victim.

The improperly admitted evidence also tainted the carjacking and kidnapping convictions. Other than Kingdom, the only witnesses who identified Cooper as one of the abductors were codefendant Cross, Goodie Walton, and Zanetta Hodges. Two witnesses – Rodney Love and KK Parker – testified that Cooper was not one of the abductors. The testimony at trial concerning the abduction scene was full of inconsistencies and perhaps lies.

Co-defendant Cross testified that Cooper was with him at the abduction scene. Cross tried to minimize his own participation in the crime by saying that he did not take part in putting Coco in the trunk and he dropped out of the criminal adventure before anything happened to Coco. Cross also gave Cooper a motive (which Cooper had been lacking until about midway through Cross' testimony) by stating that Cooper was one of several investors who had put up money to buy the large stash of drugs in the back of Cross' stolen IROC car. Although the California Court of Appeal referred to Cooper's motive, that court did not note Cross' motive of equal or greater value: they were in search of Cross' stolen car which was worth about $5000, which was more than the $2000-$4000 Cooper reportedly invested in the drugs. Additionally, the alleged plan was of questionable believability: Cross reportedly was going to drive to Greenville, Mississippi to peddle the drugs in his car and then give the investors a return on their investment and make a profit. Cross never testified that Cooper was going to go to Greenville,

United States District Court
For the Northern District of California

Mississippi or take any part in the distribution of the drugs. The drug story suspiciously called for the unemployed Cooper to let someone leave the state with his $2000-$4000 worth of drugs and showed Cross leaving unattended a car full of drugs in a parking area when Cross went to visit his girlfriend notwithstanding that he saw several people in the area who looked like they were going to "rip [him] off.".

Walton's testimony[6] causes grave concern to the court because the evidence suggests that Walton was part of the crime if she was present at the crime scene at all. The testimony from several witnesses suggests that the three men in the blue Delta 88 did not know what Coco looked like and that they were waiting for Coco and expected him to arrive at the 12th and Market location. Walton testified that she was a passenger in a car that drove past the blue Delta 88, but backed up so she could talk to its occupants because she had recognized the car. Her car stopped aside the blue Delta 88 and she chatted for a while until she was told at least "bye" by one of the occupants of the blue Delta 88 when the red Corvette bearing Coco pulled up behind the blue Delta 88. She and her driver then left the scene. Although Walton denied that she had alerted the occupants of the blue Delta 88 that Coco was in the red Corvette that had just arrived, the timing of her arrival, her presence in a car next to the Delta 88 chatting with its occupants, and her departure upon the arrival of Coco easily could be interpreted to be her identifying Coco for the occupants of the blue Delta 88. This court is not alone in seeing something suspicious about Walton's reported behavior: she had received threats from people who thought she had set up Coco. Walton also flip-flopped on several key details, such that she was caught telling different stories in a taped statement to police and in her preliminary hearing testimony. [7]

---

[6]Walton's testimony from the preliminary hearing was used because she was unavailable at the time of trial.

[7]Walton's testimony was riddled with inconsistencies. She gave two taped statements to the police, one or two written statements to the police, and testified at the preliminary hearing where she recanted much of what she had told police.

Depending on which of Walton's statements one wanted to believe, she had (a) not seen anyone with a gun, RT 1055, 1150, or (b) had seen Cooper with a gun and shooting when she returned to the 12th and Market location, RT 1056.

Although Walton was at the scene after police arrived, she did not speak to police then; she first spoke to police after they found the abduction car parked in front of her house. Another concern with Walton's testimony was the strong possibility that she was not even present at the time of the abduction and that she had given a description of the abduction that was composed of second-hand information she heard from the crowd around the crime scene after the crime had occurred. Both Cross and eyewitness Rodney Love stated that Walton was not there before or during the abduction and KK Parker denied seeing her, Zanetta Hodges, or Zanetta Hodges' car. There also was evidence that suggested that if she had been at the scene at all, she had left the area before the abduction had occurred. The time stamp from the food stamp store a half mile away showed that Walton bought food stamps at 4:09 p.m. and the time stamp from the Oakland police department dispatch record showed that the 911 calls from the shooting started at 4:08 p.m. In light of her description of the crime, her absence from the scene of the crime at the time of the abduction would call into question her credibility overall.[8] In other words, even if she had

Depending on which statement one wants to believe, Walton (a) saw Cooper shooting, RT 1056, or (b) did not hear any gunshots, RT 1151.

Depending on which statement one wants to believe, the last thing Walton saw was (a) the men starting to get out of their cars, but not yet together, RT 1128, or (b) the men together in the parking lot, RT 1055, or (c) Coco handcuffed and being put in the trunk, RT 1053.

Depending on which statement one wants to believe, Walton (a) saw Rodney Love before the incident, RT 1113, or (b) did not see Rodney Love before the incident, RT 1237.

[8]The instructions regarding the evaluation of witnesses included the following:

Discrepancies in a witness's testimony or between his or her testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance.

A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

CT 798-799. Jurors also were instructed that, in considering an eyewitness account, they were to consider, among other things "[w]hether the witness' identification is in fact the product of [his] [her]

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

seen Cooper, Cross and Kingdom in the blue Delta 88 and left before the red Corvette had even arrived, her description of what had transpired when Coco was abducted would cast grave doubt over the truthfulness of any of her testimony. In short, Walton (1) may have been there to facilitate the crime, (2) may not have been there at all, or (3) may have been present earlier but not at the time of the abduction. None of these scenarios made Walton a credible witness about the abduction and the participants.[9] Additionally, the blue car into which Coco was stuffed was found in front of Walton's home the night of the abduction. She knew the car was there, yet there was no evidence that she checked it to see if Coco was still in the trunk.

Zanetta Hodges' version of the abduction also had some inconsistencies, although nowhere near as great as those for Walton.[10] However, the believability of Hodges' testimony largely depends on the believability of Walton's testimony because they were in one car together. Both either were or were not present at the time of the abduction.

---

own recollection." CT 822.

[9]Rodney Love testified that he had been asked by a man from the blue Delta 88 whether he was Coco, and had watched the scene to see what unfolded. He never saw Goodie Walton, Zanetta Hodges, or a car pull up alongside the blue Delta 88 before or while the Corvette was there.

[10]Hodges' testimony had some internal inconsistencies and had some inconsistencies when compared with Walton's testimony concerning the afternoon of August 3, when they were both together in her car.

Hodges testified she talked to Cooper, RT 551, 583, although Walton said Hodges did not do any talking when they were stopped alongside the blue Delta, RT 1115. Hodges also said that Walton got out of the car to speak to the occupants of the blue Delta, RT 626, although Walton said they talked while she was sitting in Hodges' car parked alongside the Delta, RT 1115.

Hodges said she had seen Rodney Love by the liquor store before the incident and when they returned to the scene when the police had arrived. RT 582, 592, 610. Hodges also said Walton talked to Rodney Love after the police arrived at the crime scene, RT 599, 626, although Walton denied speaking to Love.

Hodges said that right before she left, the Corvette pulled up and parked. RT 559. She said she saw Parker and Coco get out of the Corvette as she departed slowly. RT 590. She had told an investigator that one of the men in the Delta grabbed Coco and walked him back through the parking lot. RT 630. By contrast, Walton claimed in one of her statements that she had seen Coco put in the trunk.

United States District Court
For the Northern District of California

Another witness whose testimony causes concern is KK Parker. At best, it was an extremely bad coincidence that Parker parked his car behind another car whose occupants happened to be waiting for Parker's passenger. The sequence of events supports the inference that Parker set up Coco to be accosted by the men in the blue Delta 88. Although Parker remained at the scene and spoke to a police officer, Parker's refusal to sign his witness statement before he spoke to a lawyer (even after the officer assured Parker it was just a witness statement and Parker was not a suspect) raises an eyebrow. This court is not alone in seeing something suspicious about Parker's reported behavior: the prosecutor also thought Parker had set up Coco. RT 1401 (comment out of presence of jury); RT 2852 (closing argument). Parker did not tell the police officer he knew what Coco was doing at the scene, and claimed at trial that they had just gone to the liquor store to "hang out." RT 1204. Also, Parker denied knowing Cross, Kingdom or Cooper and denied that he had been at the EZ-8 motel in the year before the abduction although workers from the EZ-8 motel identified him as having been there during the same time as Cross and Kingdom.

A read-through of the testimony leaves the court with the strong impression that the eyewitnesses who put Cooper at the abduction scene were far from candid about what occurred. The court has strong doubts that these witnesses and Parker truthfully described what physically happened, why they were at the scene, and what their roles were in the crimes. Left with the impression that so many key witnesses were not candid about so many details, one cannot embrace the trial as a reliable and fair one. Kingdom's statement provided a single common thread by describing the criminal adventure from start to finish. The effect of Kingdom's improperly admitted testimony was to lend credibility to the testimony of all these uncandid witnesses by corroborating the details. See, e.g., RT 2706 (prosecutor arguing that all three men were at the murder scene, an argument based solely on Kingdom's statement); RT 2709 (prosecutor's closing argument that Kingdom corroborated Hodges' and Walton's statements). The prosecutor highlighted Kingdom's statement by reading it all during closing argument. See RT 2713-2720. During its five days of deliberations, the jury asked for a readback of Kingdom's statement, but later decided it did not need the readback. See RT 2981-2983. Kingdom's

statement contaminated the entire case against Cooper. Because the Confrontation Clause violation had a substantial and injurious affect on the jury's verdict and the state court's finding of harmless error was an unreasonable application of clearly established federal law, Cooper is entitled to a retrial on all of the charges against him. The writ will issue on this claim.

F. Prosecutorial Misconduct

Cooper contends that his right to due process was violated when the prosecutor engaged in misconduct by asking Cooper's wife questions to elicit the fact that Cooper was in prison when they married, by asking Cooper about his familiarity with guns, and by asking Cross about Cooper's violent reputation and familiarity with guns. The California Court of Appeal rejected Cooper's claim, concluding that there was misconduct but it was harmless.

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair. See id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

The California Court of Appeal noted that it is misconduct under state law to deliberately offer inadmissible evidence or to ask questions calling for inadmissible and prejudicial answers. This is not as rigorous as the federal standard on a due process analysis, which requires that the improper questioning of a witness by the prosecutor so infect the trial with unfairness as to make the resulting conviction a denial of due process. See Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998), cert denied, 526 U.S. 1123 (1999). In considering whether the questioning deprived the defendant of a fair trial, the witness' testimony should be viewed as a whole to determine the impact of the improper questioning. See id. at 934-35 (prosecutor's questioning witness as to whether she was afraid of defendant did not render the proceedings fundamentally unfair in light of witness' other testimony that defendant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down their house while the victims were still inside).

United States District Court
For the Northern District of California

1. The Problems

a. Evidence That Cooper Was In Jail When Married

The first problem occurred in the cross-examination of Cooper's wife. "After receiving testimony that she had married the defendant in September 1993 in Vacaville, the prosecutor pursued several lines of questions with the apparent intent of eliciting the fact that Cooper was then in prison. He asked, for example, where she went after the marriage, where he went, and when they began living together. . . . The prosecution ultimately elicited answers allowing the jury to infer that Cooper was imprisoned at the time of the marriage." Resp. Exh. B, p. 18. This questioning was improper and direct or impeachment evidence because "it was not material to Cooper's guilt that he had been imprisoned at the time of his marriage." Id.

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. However, in light of the other evidence that Cooper had a criminal record, the prosecutor's questions eliciting testimony that Cooper had been in jail when married did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

b. Evidence About Guns

Cooper admitted that he had been convicted of robbery and being a felon in possession of a firearm. "To explore the underlying details of these crimes, the prosecution questioned him about his knowledge of guns, past ownership of guns, the use of particular weapons resulting in the robbery and possession charges, and his presentation of testimony about guns in the robbery trial." Resp. Exh. B, p. 18. The California Court of Appeal found that the prosecutor went beyond the proper scope of cross-examination about the prior felonies "in an attempt to portray Cooper as being experienced and sophisticated in the use of guns." Id. at 19.

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. The intent to inflame the jury was particularly evident when the prosecutor tried to show familiarity with guns based on the fact that Cooper had presented gun use evidence (apparently through a witness other than himself) in a previous trial. This is a much closer call than for the first alleged instance of misconduct, but the court is not able to conclude that this line of

United States District Court
For the Northern District of California

questioning alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. It does, however, affect the cumulative error analysis below.

c. Reputation Evidence

The prosecutor asked co-defendant Cross about Cooper's reputation for violence and Cooper's violent use of guns in the past. The California Court of Appeal found that the questioning regarding reputation and past violent acts was prohibited by California Evidence Code § 1101 and that the prosecutor had not shown the line of inquiry sought to prove some fact (e.g., intent, plan, or knowledge) and had not laid a foundation for the testimony on such a ground. Resp. Exh. B, p. 20.

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. The intent to inflame the jury was particularly evident with this line of questioning. See RT 2698-2699 (prosecutor using this evidence in his closing argument). The prosecutor was planting in the jury's mind that Cooper was a violent man who had shot at people before so the jury would more readily believe that he did it this time also. Cf. Thomas v. Hubbard, 273 F.3d 1164, 1177 (9th Cir. 2002) (prosecutor's questioning of defendant about his use of firearm during prior criminal act, in violation of in limine order, constituted serious error despite curative instruction, because such evidence evokes visceral prejudicial reaction; in combination with other errors, required reversal of conviction). This also is a much closer call than for the first alleged instance of misconduct, but the court is not able to conclude that this line of questioning alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. It does, however, affect the cumulative error analysis below.

2. The Procedural Default Question

Respondent contends that Cooper's prosecutorial misconduct claim must be dismissed as procedurally barred. Respondent argues that the state appellate court rejected the claim because Cooper had failed to raise a contemporaneous objection at trial on the ground of prosecutorial misconduct. The court disagrees.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The procedural default doctrine forecloses federal review of a state prisoner's federal habeas claim if the claim was defaulted on in state court pursuant to an independent and adequate state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). To find procedural default, a federal court must determine that the state court explicitly invoked a state procedural bar as an independent basis for its decision and that the state procedural bar cited was clear, consistently applied and well-established at the time of the petitioner's purported default, see id.; Calderon v. United States Dist. Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996), cert. denied, 520 U.S. 1204 (1997). An order that is ambiguous with regard to procedural bars cannot preclude federal collateral review. See id. at 1131 (California Supreme Court order that did not specify which of 39 claims was barred by which of several state rules considered ambiguous and therefore insufficient to preclude federal collateral review).

Here, the defense had raised objections to all three areas of evidence. "In each case, the trial court sustained certain defense objections but overruled others, allowing the prosecution to get the testimony before the jury." Resp. Exh. B, p. 17. Under California law, "claims of prosecutorial misconduct are subject to limited review on appeal in the absence of a contemporaneous objection raising the issue." Id. at 20. Generally the defendant must make an assignment of misconduct and request that the jury be admonished. Id. The state appellate court rejected Cooper's argument that the absence of an objection cannot bar appellate review where the error involves a denial of due process; the court did not consider "that the prosecutorial tactic at issue here can be regarded as having such an inflammatory and prejudicial impact." Id.

The California Court of Appeal's decision is at least uncertain as to whether it imposed the procedural default or overlooked it. Although respondent reads the state appellate court's decision as imposing the bar for failing to contemporaneously object, this court reads the decision as overlooking the procedural default and considering the claim on the merits. See Thomas, 273 F.3d at 1176 (alleged procedural default did not bar claim where state court addressed procedural default issue but left resolution of the issue uncertain, failing to make a clear and express statement that its decision was based on a procedural default). The California Court of Appeal's unclear decision will not result in a procedural bar to federal habeas review.

United States District Court
For the Northern District of California

G. Sufficiency Of Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326).

Cooper did not clearly focus his attack on the sufficiency of the evidence, which requires this court to consider all the crimes of which he was convicted. The evidence was sufficient to support the kidnapping, carjacking and weapon possession convictions but not the murder conviction. The state court's presumed rejection of the claim was an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.[11]

---

[11]Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002); Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Himes, 336 F.3d at 853; Delgado, 223 F3d at 982. The federal court need not otherwise defer to the state court decision under AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." Greene, 288 F.3d at 1089. In sum, "while we are

United States District Court
For the Northern District of California

1. The Kidnapping, Carjacking and Weapon Convictions

Respondent points to the evidence that would have allowed a rational jury to find that a kidnapping and carjacking had occurred and that Cooper was guilty of those offenses. Evidence connected Cooper with Cross and Kingdom at the EZ-8 motel. And Cooper had a motive to harm Coco, because Coco reportedly had stolen Cross' car that contained a large amount of drugs paid for in part by Cooper. Cooper had been with Cross the day before the abduction searching for the drug-laden car and used threatening words regarding the stolen drugs and car. Cooper was identified as being present with Cross and Kingdom in the blue Delta 88 by Goodie Walton, Zanetta Hodges, and co-defendant Cross. Rodney Love could not identify any of the three assailants but did see that Coco involuntarily entered the trunk of the blue Delta 88 forced by one or more of the three men in the Delta 88. Cross' testimony supports the inference that Coco was put in the trunk of the car involuntarily, even if one believed that Cross was sitting in the front seat when it actually happened. Evidence from Cross showed that Cooper participated in putting Coco in the trunk at gunpoint. Evidence was presented that once the victim was put in the trunk of the car, the car drove away and Cross stated the car was driven to various locations around Oakland. Parker testified that he did not give anyone permission to take the red Corvette he drove to the site from which Coco was abducted and his car was taken. Cross testified Cooper had a gun that day.

The foregoing was sufficient evidence to support the kidnapping, carjacking and weapon possession convictions. For the kidnapping conviction, there was sufficient evidence that Coco was unlawfully moved by the use of force or by the fear instilled by Cooper's gun, that the movement of Coco into the trunk of the car and thereafter in the car was without his consent, and that Coco was moved for a substantial distance in the car. Cf. CT 869-870 (defining elements of kidnapping). Whether the carjacking victim is considered to be the passenger (Coco) or the

---

not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).

driver (Parker), there was sufficient evidence that Cooper took the Corvette in the victim's immediate presence against the will of the victim and with the intent to either permanently or temporarily deprive the victim in possession of the vehicle of that possession and accomplished by means of force or fear. Cf. CT 866-867 (defining elements of carjacking). And there was sufficient evidence that Cooper had previously been convicted of a felony and knowingly possessed a firearm that was capable of being concealed upon his person on the day of the abduction. Cf. CT 877-878 (defining elements of the felon-in-possession-of-a-firearm charge).

2. The Murder Conviction

Even applying the very deferential standard of review appropriate for a sufficiency of the evidence claim, the evidence was not sufficient to support the murder conviction. No rational trier of fact could have found that the prosecution proved that Cooper had murdered Coco viewing the evidence in the light most favorable to the prosecution. Accepting that the victim was last seen alive being stuffed in the trunk of a car at gunpoint by three men including Cooper and that his dead body was found two weeks later, the two were not adequately connected. No properly admitted evidence put Cooper at the scene of the murder. That gap in evidence would have caused any rational trier of fact to find that Cooper's guilt was not proven beyond a reasonable doubt.

Identity was the key question, as the fatal bullet wound to the head of the gagged victim sufficiently showed the unlawful killing of one human being by another. The jury was instructed that the prosecution had the burden to prove beyond a reasonable doubt that the defendant was the person who committed the crime with which he was charged. CT 819.

Respondent identified several pieces of evidence that purportedly connected Cooper to the killing. First, the condition of the victim's body purportedly showed multiple perpetrators. The victim's pants had been pulled down to his upper thighs, his mouth was gagged with a piece of cloth consistent with the victim's T-shirt and the gag was secured by another cloth wrapped around his head. A pair of scissors was recovered about 4 feet from the victim's body. Respondent argues that the gagging and torture with scissors suggested the joint work of all three

United States District Court
For the Northern District of California

co-participants. While this may have suggested multiple perpetrators at the murder scene, it does nothing to show that one of those perpetrators was Cooper. Also, the evidence was speculative with respect to showing three perpetrators: none of the things done to the body actually required more than one person and one person (especially one person with a gun to compel compliance) could have done all. Second, the prosecutor tries to connect Cooper to the murder by pointing to the fact that more than one Black male was seen throwing suspected evidence off the San Mateo Bridge from the red Corvette. This requires speculation that the airborne rectangle package seen fleetingly by an observant bystander contained a gun and that gun had been used to kill Coco. See Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (mere suspicion and speculation do not support logical inferences). Cooper was not actually identified as being at the scene of that incident, although his presence in the car less than three hours earlier supports a reasonable inference that he was in the car on the bridge. Third, respondent argues that the testimony that the blue Delta 88 and the red Corvette were driven about and abandoned on the evening of the shooting shows multiple participants remained active in the hours following the kidnapping. That participants were still "active" after the kidnapping and shooting proves nothing about what they were actively doing. Fourth, Cooper was arrested riding in a car in which he was sitting on top of a pair of black gloves and in which there was a jacket in the back seat – all of which had gunshot residue on them. The criminalist admitted the gunshot residue test could not determine when gunshot residue was deposited on a surface and could not determine whether it was deposited on the surface by transferrance or because a person wore the gloves and jacket while shooting. The usefulness of the jacket and glove evidence also was limited by poor collection efforts (i.e., they were not retrieved until the car had been in and out of police impound and released to the driver's parents and they were not retrieved by a person wearing latex gloves to avoid cross-contamination). The connection between Cooper and the jacket was weak because the jacket was obtained from the back seat of the car in which Cooper had been riding as a mere passenger and the driver of the car testified to owning the jacket. The inference that Cooper owned the gloves he sat on top of was far more believable than that he owned the jacket in the back seat.

United States District Court
For the Northern District of California

There was evidence that weakened the case against Cooper. First, the coroner was unable to fix a time of death for Coco because his body was badly decomposed. There was less than a seven hour window of opportunity for Cooper to have committed the murder. Coco was abducted at 4:00 p.m. and Cooper was arrested at 11:00 that night. If one were to accept the prosecutor's theory that the murder weapon was disposed of by being thrown off the San Mateo Bridge at 7:00 p.m. the window of opportunity decreased to three hours. The longer the period of time between the abduction and the murder, the weaker the connection between the two. Because Cooper could have committed the murder only within seven hours of the abduction and the coroner could not determine the time of death, Coco could have been killed after August 3 (and therefore by someone other than Cooper). Second, there was no ballistic match. The two shell casings found at the abduction scene did not match the bullet taken from Coco's skull miles away at the murder scene. The shell casings were 9MM shells and the murder bullet was a .40 caliber. The only testimony about Cooper's gun possession that day was that he had a 9MM gun, which would be consistent with him having shot at the abduction scene but not having murdered the victim. Third, there was no blood on the gloves or the jacket that the prosecutor associated with Cooper, although the autopsy indicated that the bullet had been fired at close range. Fourth, there were no cloth fibers on the gloves, although one could get fibers on the gloves if he tore something while wearing them. Fifth, there was no fingerprint evidence connecting Cooper to either car or to the murder scene.

Lastly, there was no eyewitness to the killing. In determining the sufficiency of the evidence, the court excludes the improperly admitted statement of Kingdom which should not have been admitted at trial because Cooper was unable to confront him. See Wigglesworth v. Oregon, 49 F.3d 578, 582 (9th Cir. 1995). This piece of evidence is critical because if it was included in the evaluation, the court would find that there was sufficient evidence to support the murder conviction.

If the question was whether the evidence showed that Cooper probably murdered the victim, the answer would be yes. But "probably" is not the standard: a jury must find proof of

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

guilt beyond a reasonable doubt.[9] A rational jury could not have done so here. At the simplest level, proof that (1) a person was abducted at gunpoint and (2) his murdered body turned up two weeks later in another part of town would not be proof beyond a reasonable doubt that the abductor was the murderer. One must look for other evidence to allow one to connect the abductor to the murder. Here, there just was not enough. Cooper's right to due process was violated because the evidence was insufficient to support the murder conviction. He is entitled to the writ on this claim.

When, as here, the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation, the remedy is affected. In such a case, retrial rather than acquittal is the remedy. "[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction." Lockhart v. Nelson, 488 U.S. 33, 40 (1988). In other words, the Clause "does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the conviction." United States v. Chu Kong Yin, 935 F.2d 990, 1001 (9th Cir. 1991) (citing Lockhart, 488 U.S. at 40); see also Wigglesworth, 49 F.3d at 582.

The petition for writ of habeas corpus will issue because Cooper's right to due process was violated because there was not sufficient evidence to support the murder conviction. The claims concerning the sufficiency of the evidence on the kidnapping and carjacking convictions are rejected.

---

[9]The jurors were given California's pattern reasonable doubt instruction: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." CT 818.

The results are different for the insufficient evidence claim and the Confrontation Clause claim in that only the murder conviction must be set aside for the former while all Cooper's convictions must be set aside for the latter. This difference is not inconsistent or a mistake. Rather it results from the different standards of habeas review. In looking at the sufficiency of the evidence, the federal habeas court must view the evidence in the light most favorable to the prosecution, see Jackson, 443 U.S. at 319, but the evidence need not be viewed in the light most favorable to the prosecution in a harmless error analysis of other constitutional errors.

H. Cumulative Error

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); Thomas v. Hubbard, 273 F.3d at 1179-81 (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness); United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal). Cumulative error is more likely to be found prejudicial when the government's case is weak. See id.; see, e.g., Thomas, 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).

United States District Court
For the Northern District of California

The court has determined that there was a Confrontation Clause violation that was not harmless error. The court has also determined that Cooper's right to due process was violated because there was insufficient evidence to support the murder conviction – a determination which shows that it was not harmless error. The court also has determined that there was prosecutorial misconduct, but found that the instances of prosecutorial misconduct alone did not have a substantial and injurious effect on the verdict. This requires that the court determine whether Cooper has shown cumulative error. (The California courts did not discuss this claim.)

Cooper is entitled to relief on his cumulative error claim. The prosecutorial misconduct that occurred included eliciting evidence that Cooper was very familiar with guns, had a violent reputation and reportedly had shot at people before this crime took place. Although that misconduct by the prosecutor did not alone have a sufficient impact on the fairness of the trial such that the court could conclude a due process violation had occurred, the cumulative effect of that misconduct, plus the improperly admitted statement from Kingdom (i.e., the Confrontation Clause error), plus the insufficient evidence to support the murder conviction (i.e., the Due Process Clause error), considered together, prejudiced Cooper so much that his conviction on all counts must be set aside.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
For the Northern District of California

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is GRANTED. Cooper's conviction is VACATED and respondent is ordered to release Cooper from custody within sixty days of the date this order is filed unless the State of California reinstitutes criminal proceedings against him.

Petitioner's application for appointment of counsel, which he filed with his traverse, is DENIED. (Docket # 31.)

The clerk shall send a copy of this order to the Alameda County Public Defender's Office at Suite 400, 1401 Lakeside Drive, Oakland, CA 94612. The court requests that the Alameda County Public Defender obtain representation for Cooper if he meets the eligibility requirements.

IT IS SO ORDERED.

DATED: April 13, 2004

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

# EXHIBIT – E

# OPENING BRIEF



COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, vs. AARON LYDELL COOPER, Defendant and Appellant. | CASE NO. A108723<br>Alameda Superior No. C125227 |

---

# APPELLANT'S OPENING BRIEF

---

Appeal from the Superior Court of Alameda County
Honorable Jon Rolefson, Judge

---

KYLE GEE (SBN 065895)
2626 Harrison Street
Oakland, CA 94612
(510) 839-9230

Attorney for Appellant
AARON LYDELL COOPER

Under Appointment
By the Court of Appeal
Under the First District
Appellate Program's
Unassisted Case System

# TOPICAL INDEX

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The Original Appeal (A073986). . . . . . . . . . . . . . . . . . 2

B. The State Habeas Petitions. . . . . . . . . . . . . . . . . . . . . 2

C. The Successful Federal Habeas Petition. . . . . . . . . . . . 3

D. The Procedures on Remand. . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Introduction and Overview. . . . . . . . . . . . . . . . . . . . . 5

B. The Organization of the Statement of Facts. . . . . . . . . 5

C. Witnesses to Events of August 3, 1995, at 12th and Market Streets. . . . . . . . . . . . . . . . . . . . . . . 7

1. Rodney Love. . . . . . . . . . . . . . . . . . . . . . . . . . 7

2. Zanetta Hodges. . . . . . . . . . . . . . . . . . . . . . . . 9

3. Musa Hussein. . . . . . . . . . . . . . . . . . . . . . . . . 11

4. Moamer Mohamed. . . . . . . . . . . . . . . . . . . . . 12

5. Inspector Wright. . . . . . . . . . . . . . . . . . . . . . . 13

D. Coco's Sister, Raynetta Thomas. . . . . . . . . . . . . . . . . 14

E. The First Officer to Arrive at 12th And Market. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

F. Events on the San Mateo Bridge. . . . . . . . . . . . . . . . 15

G. Discovery of the Body. . . . . . . . . . . . . . . . . . . . . . . 16

H. The Autopsy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I. The Testimony of "Goodie" Walton. . . . . . . . . . . . . . 17

J. The Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

K. Fred "Country" Cross's Arrest in Mississippi. . . . . . . . 24

L. Evidence Relating to the E-Z Motel, Where Mr. Cross Had Been Staying. . . . . . . . . . . . . . . . . . . 25

M. Fred Cross's Testimony and Statements. . . . . . . . . . . 25

1. Cross's Testimony at the 1995 Trial. . . . . . . . . 25

2. Cross's Statements to Police in Mississippi. . . . 30

a. The First Statement. . . . . . . . . . . . . . . . . 31

b. The Second Statement. . . . . . . . . . . . . . 31

N. Other Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

PART ONE: ISSUES RELATING TO INSUFFICIENT EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF MURDER. . . . . . . . . 36

A. Introduction to the Argument. . . . . . . . . . . . . . . . . . . 36

B. The Legal Framework, Generally. . . . . . . . . . . . . . . . 36

C. The United States District Court's View of the 1995 Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

D. There May Be No Retrial in the Event of Reversal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

II IT VIOLATED THE COLLATERAL ESTOPPEL DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY TO HAVE CONVICTED MR. COOPER ON EVIDENCE PREVIOUSLY DETERMINED BY A FEDERAL COURT ON HABEAS TO HAVE BEEN INSUFFICIENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . . 44

B. The Proceedings in the Lower Court. . . . . . . . . . . . . . 45

1. The Pretrial Rulings. . . . . . . . . . . . . . . . . . . . 45

2. Proceedings in the Trial Court. . . . . . . . . . . . . 46

a. The *In Limine* Rulings. . . . . . . . . . . . . . 46

i. September 30, 2004. . . . . . . . . . . 46

ii. October 4, 2004. . . . . . . . . . . . . . 47

b. The November 2, 2004 Ruling, at the Conclusion of the Prosecution's Case. . . . 47

C. Collateral Estoppel, Generally. . . . . . . . . . . . . . . . . . 48

D. Application of That Law Here. . . . . . . . . . . . . . . . . . 53

III IT VIOLATED THE LAW OF THE CASE DOCTRINE, WHICH MUST ALSO BE SEEN AS A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY, TO HAVE RECONVICTED ON EVIDENCE PREVIOUSLY DETERMINED BY THE UNITED STATES DISTRICT COURT TO HAVE BEEN INSUFFICIENT. . . . . . . . . . . . . . . . . . . 55

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B. The Law of the Case Doctrine. . . . . . . . . . . . . . . . . . 56

C. Application of That Law Here. . . . . . . . . . . . . . . . . . 59

PART TWO: THE *FARETTA* AND *MARSDEN* ISSUES. . . . . . . . 62

IV IT WAS ERROR TO HAVE DENIAL MR. COOPER'S MOTIONS FOR SELF-REPRESENTATION BROUGHT UNDER *FARETTA* V. *CALIFORNIA*. . . . . . . . . . . . . . . . . . 63

A. The Right of Self-Representation, in Broad Strokes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1. In General. . . . . . . . . . . . . . . . . . . . . . . . . . 63

2. A Request for Self-Representation Must Be Unequivocal. . . . . . . . . . . . . . . . . . . . . . . . 64

3. A Request for Self-Representation Must Be Timely66

B. Proceedings in the Lower Court, From Appointment of Counsel Through the Unsuccessful *Faretta* Motions. . . . . . . . . . . . . . . . . . . . . . . . . 67

1. The First Hearing on Remand: May 13, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

2. The Second and Third Hearings: May 14 and 18, 2004. . . . . . . . . . . . . . . . . . . . . . . 68

3. May 19, 2004: Appointment of Counsel Over Mr. Cooper's Objection. . . . . . . . . . . 68

4. June 28, 2004: Denial of the Defense Motions to Dismiss. . . . . . . . . . . . . . . . . . . . . 70

5. Proceedings on July 6, 2004. . . . . . . . . . . . . . . 70

a. The July 6th *Marsden* Motion, Before Judge Goodman. . . . . . . . . . . . . . . . . . . . 70

b. Further Proceedings That Day Before Judge Reardon. . . . . . . . . . . . . . . . . . . . 71

6. July 7 and 8, 2004, Before Judge Rolefson. . . . . 72

7. Proceedings on September 21, 2004. . . . . . . . . 73

a. Before Judge Reardon. . . . . . . . . . . . . . 73

b. The September 21st *Marsden* Motion, Before Judge Horner. . . . . . . . . . . . . . . 73

c. Further September 21st Proceedings Before Judge Reardon. . . . . . . . . . . . . . 73

8. Proceedings Before Judge Reardon on September 22, 2004. . . . . . . . . . . . . . . . . . . . . . . . . 74

9. Proceedings Before Judge Reardon on September 23, 2004. . . . . . . . . . . . . . . . . . . . . 77

10. September 29, 2004: Assignment for Trial. . . . . 78

C. Application of That Law to This Case. . . . . . . . . . . . . 79

1. Mr. Cooper's Assertion of His Right of Self-Representation Was "Unequivocal." . . . . . . . . . . 79

2. Mr. Cooper's Assertion of His Right of Self-Representation Was Not Untimely. . . . . . . . . . . . 82

D. The Error Requires Reversal of the Judgment. . . . . . . 84

V IT WAS ERROR TO HAVE DENIED MR. COOPER'S *MARSDEN* MOTIONS, BECAUSE HIS RELATIONSHIP WITH COUNSEL WAS SO IRREVOCABLY IMPAIRED THAT INEFFECTIVE REPRESENTATION WAS A LIKELY RESULT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

A. The *Marsden* Motions on July 6 and September 21, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

1. The July 6th Motion, Before Judge Goodman. . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

2. The September 21st Motion, Before Judge Horner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

B. The Controlling Law. . . . . . . . . . . . . . . . . . . . . . . . . . 90

PART THREE: THE OTHER CLAIMS OF ERROR. . . . . . . . . . . . 94

VI THE TRIAL COURT ERRED UNDER THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT, IN ADVISING MR. COOPER'S JURY OF HIS CUSTODIAL STATUS. . . . . . . 94

A. The Issue in the Trial Court. . . . . . . . . . . . . . . . . . . . . 94

B. The Controlling Law. . . . . . . . . . . . . . . . . . . . . . . . . 96

C. The Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

D. The Error Was Prejudicial. . . . . . . . . . . . . . . . . . . . . 98

VII THE TRIAL COURT ERRED IN ITS COMMENTS TO THE JURY ON THE LAST DAY OF DELIBERATIONS. . . 101

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . 101

B. The Limits on Judicial Comment to a Jury. . . . . . . . . 101

C. Events During the Jury's Deliberations. . . . . . . . . . . . 102

D. Prejudicial Error Occurred. . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

## TABLE OF AUTHORITIES CITED

### FEDERAL CASES

*Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441 — 63, 65, 78, 80

*Adams* v. *United States ex rel. McCann* (1942) 317 U.S. 269 — 62

*Arizona* v. *California* (1983) 460 U.S. 605 — 50, 57

*Arizona* v. *Fulminante* (1991) 499 U.S. 279 — 83

*Armant* v. *Marquez* (9th Cir. 1985) 772 F.2d 552 — 65, 66

*Ashe* v. *Swenson* (1970) 397 U.S. 436 — 50, 51

*Bradley* v. *Duncan* (9th Cir. 2002) 315 F.3d 1091 — 52

*Brown* v. *Allen* (1953) 344 U.S. 443 — 58, 59

*Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166 — 90, 91

*Buhl* v. *Cooksey* (2d Cir. 2000) 233 F.3d 783 — 80

*Burks* v. *United States* (1978) 437 U.S. 1 — 42

*Chapman* v. *California* (1967) 386 U.S. 18 — 37, 99,106

*Derden* v. *McNeel* (5th Cir. 1991) 938 F.2d 605 — 99

*Estelle* v. *Williams* (1976) 425 U.S. 501 — 95, 96

*Faretta* v. *California* (1975) 422 U.S. 806 — seriatim

*Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782 — 66

*Greene* v. *Massey* (1978) 437 U.S. 19 — 42

*Handi Investment Company* v. *Mobil* (9th Cir. 1981)
    613 F.2d 391                                        57

*Jackson* v. *Virginia* (1969) 443 U.S. 307         34, 35, 36, 38

*Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882        63, 64, 90

*Johnstone* v. *Kelly* (2d Cir. 1986) 808 F.2d 214        80

*Lilly* v. *Virginia* (1999) 527 U.S. 116               2

*Lockhart* v. *Nelson* (1988) 488 U.S. 33        44, 52, 53

*Maxwell* v. *Sumner* (9th Cir. 1982) 673 F.2d 1031        66

*McKaskle* v. *Wiggins* (1984) 465 U.S. 168        83

*McKee* v. *Harris* (2nd Cir. 1981) 649 F.2d 927        91

*Montana* v. *United States* (1979) 440 U.S. 147        50, 51

*Neder* v. *United States* (1999) 527 U.S. 1        83

*Reese* v. *Nix* (8th Cir. 1991) 942 F.2d 1276        63

*Thomas* v. *Hubbard* (9th Cir. 2002) 273 F.3d 1164        99

*United States* v. *Adelzo-Gonzalez* (9th Cir. 2001)
    268 F.3d 772                                   91, 92

*United States* v. *Hernandez* (9th Cir. 2000) 203 F.3d 614      63, 80

*United States* v. *Oppenheimer* (1916) 242 U.S. 85        51

*United States* v. *Robinson* (9th Cir. 1990)
    913 F.2d 712                                   64

*United States* v. *Walker* (9th Cir. 1990)
    915 F.2d 480                                   91

*United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258 — 90, 91, 92

*Williams* v. *Bartlett* (2d Cir. 1994) 44 F.3d 95 — 80

*Wright* v. *West* (1992) 505 U.S. 277 — 38

*Wyoming* v. *Oklahoma* (1992) 502 U.S. 437 — 57

**STATE CASES**

*Barker* v. *Hall* (1987) 191 Cal.App.3d 221 — 48

*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550 — 49

*Clark* v. *Lesher* (1956) 46 Cal.2d 874 — 47

*Clemente* v. *State of California* (1985) 40 Cal.3d 202 — 56

*People* v. *Cook* (1983) 33 Cal.3d 400 — 100

*County of Santa Clara* v. *Deputy Sheriffs' Assn.* (1992) 3 Cal.4th 873 — 48

*Davies* v. *Krasna* (1975) 14 Cal.4d — 56

*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930 — 90

*Estate of Baird* (1924) 193 Cal. 225 — 55

*In re Johnny G.* (1979) 25 Cal.3d 543 — 42

*Kowis* v. *Howard* (1992) 3 Cal.4th 888 — 55, 56

*Lucido* v. *Superior Court* (1990) 51 Cal.3d 335 — 48

*Palma* v. *U.S Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 — 56

*People* v. *Anderson* (1987) 43 Cal.3d 1104      97, 98

*People* v. *Barragan* (2004) 32 Cal.4th 236      47, 48, 49, 55

*People* v. *Bradford* (1997) 15 Cal.4th 1229      66, 97

*People* v. *Burton* (1989) 48 Cal.3d 843      82, 83

*People* v. *Collins* (1968) 68 Cal.2d 319      98

*People* v. *Damon* (1996) 51 Cal.App.4th 958      47, 48

*People* v. *Fletcher* (1996) 13 Cal.4th 451      98

*People* v. *Holt* (1984) 37 Cal.3d 436      98

*People* v. *Johnson* (1980) 26 Cal.3d 557      35, 36

*People* v. *Joseph* (1983) 34 Cal.3d 936      83

*People* v. *Michaels* (2002) 28 Cal.4th 486      78, 79, 81

*People* v. *Monge* (1997) 16 Cal.4th 826      55

*People* v. *Monterroso* (2004) 34 Cal.4th 743      101

*People* v. *Morris* (1988) 46 Cal.3d 1      36, 37

*People* v. *Munoz* (1974) 41 Cal.App.3d 62      90

*People* v. *Nauton* (1994) 29 Cal.App.4th 976      63

*People* v. *Otto* (1992) 2 Cal.4th 1088      44

*People* v. *Pierce* (1979) 24 Cal.3d 199      42

*People* v. *Pitts* (1990) 223 Cal.App.3d 606      99

*People* v. *Redmond* (1969) 71 Cal.2d 745      36

*People* v. *Rodriguez* (1986) 42 Cal.3d 730      100, 101

| | |
|---|---|
| *People* v. *Rucker* (1980) 26 Cal.3d 368 | 98 |
| *People* v. *Scott* (1960) 53 Cal.2d 558 | 101 |
| *People* v. *Shirley* (1982) 31 Cal.3d 18 | 44 |
| *People* v. *Silva* (1981) 114 Cal.App.3d 538 | 56 |
| *People* v. *Sims* (1982) 32 Cal.3d 468 | 48, 50 |
| *People* v. *Smith* (1993) 6 Cal.4th 684 | 89 |
| *People* v. *Stankewitz* (1970) 32 Cal.3d 80 | 90 |
| *People* v. *Taylor* (1982) 31 Cal.3d 488 | 95, 96, 97 |
| *People* v. *Valdez* (2004) 32 Cal.4th 73 | 97 |
| *People* v. *Welch* (1999) 20 Cal.4th 701 | 89 |
| *People* v. *Windham* (1977) 19 Cal.3d 121 | 81, 82 |
| *People* v. *Woodard* (1979) 23 Cal.3d 329 | 98 |
| *People* v. *Zerillo* (1950) 36 Cal.2d 222 | 98 |
| *Pigeon Point Ranch* v. *Perot* (1963) 59 Cal.2d 227 | 56 |
| *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257 | 56 |
| *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 | 90 |
| *Tally* v. *Ganaht* (1907) 151 Cal. 418 | 60 |
| *Todhunter* v. *Smith* (1934) 219 Cal. 690 | 47 |
| *Wilder* v. *Whittaker Corp.* (1985) 169 Cal.App.3d 969 | 56 |
| *Younan* v. *Caruso* (1996) 51 Cal.App.4th 401 | 50 |

## FEDERAL CONSTITUTIONAL PROVISIONS

Fifth Amendment 34, 50, 51, 53

Sixth Amendment 62, 89

Fourteenth Amendment seriatim

## STATE STATUTES

Penal Code section 1118.1 4, 46

## OTHER AUTHORITIES

Restatement Second of Judgments, § 13 48

Restatement Second of Judgments, § 27 49

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent,

vs.

AARON LYDELL COOPER,

Defendant and Appellant.

______________________________/

## STATEMENT OF APPEALABILITY

This appeal is from a judgment that finally disposes of all issues between the parties.

## STATEMENT OF THE CASE

Appellant AARON LYDELL COOPER brings this appeal after conviction by a jury of first degree murder and simple kidnapping. There were firearm arming findings, and prior convictions were admitted by Mr. Cooper. He is serving an indeterminate term in State Prison of

twenty-five-years-to-life (doubled), enhanced by eight years. The total effective sentence is fifty-eight-years-to-life.

The procedural course of the case is complex. It will be broken down into its logical stages.

A. The Original Appeal (A073986).[1]

Mr. Cooper was convicted at a jury trial held in late 1995 and early 1996. See, 1-CT 329. On appeal to this Court in *People* v. *Cooper*, A073986, the judgment was affirmed by Opinion filed November 9, 1998. 1-CT 88.[2] After a successful Petition for Writ of Certiorari, the United States Supreme Court issued an order on October 4, 1999, remanding the case to this Court for further consideration in light of *Lilly* v. *Virginia* (1999) 527 U.S. 116. 2-CT 335, 368. Thereafter, the judgment was again affirmed by Opinion filed July 6, 2000. 1-CT 129.

B. The State Habeas Petitions.

This led on August 13, 2001 to a *pro se* habeas petition by Mr. Cooper in the Alameda County Superior Court, raising issues as to the sufficiency of the evidence. 1-CT 30, 45. After the Superior Court's denial of that petition, habeas petitions were brought unsuccessfully in this Court (*In re Cooper on Habeas Corpus*, A096123 [filed September 10, 2001 and denied September 19, 2001]), and in the California Su-

---

1/ The record in A073986 has been made a part of the record in this case, by an order of augmentation.

2/ Clerk's Transcript, with the volume number noted.

preme Court (*In re Cooper on Habeas Corpus*, S101365 [filed October 15, 2001 and denied May 1, 2002].[3]

C. The Successful Federal Habeas Petition.

This led in turn to the filing on November 22, 2002 of a Petition for Writ of Habeas Corpus to the United States District Court for the Northern District of California.[4] Ultimately, the District Court on March 7, 2003 issued an Order of Dismissal with Leave to Amend.[5] There followed an "amended" Petition for Habeas Corpus on June 5, 2003, an Order to Show Cause on June 18, 2003, an Answer by the Office of the California Attorney General on September 10, 2003, and a Traverse on September 16, 2003.[6] Ultimately, the United States District Court on April 14, 2004 issued an order granting the petition. 2-CT 443-444, 489. No appeal was taken by the State.[7]

D. The Procedures on Remand.

Mr. Cooper's first appearance on remand was on May 13, 2004. 2-CT 486. There were a number of hearings over the next four-and-a-half months, leading to the retrial. The subjects of those hearings will be further explored in the arguments which follow, but suffice it to say that the noteworthy pre-trial proceedings related to the appointment of counsel

---

3/ See, Request for Judicial Notice, filed simultaneously with this Opening Brief, at pages 4-7.

4/ See, Request for Judicial Notice, at page 14.

5/ See, Request for Judicial Notice, at page 15.

6/ See, Request for Judicial Notice, at pages 13, 31, 36 and 71.

7/ See, Request for Judicial Notice, at page 12.

over Mr. Cooper's objection (2-CT 531), his unsuccessful *Marsden* motions (2-CT 592, 625), his unsuccessful *Faretta* motions (2-CT 574, 627, 628), and his unsuccessful efforts toward dismissal of the case on various grounds, including double jeopardy, collateral estoppel, and "law of the case." 2-CT 538, 565; 3-CT 572, 589-591, 615.

Mr. Cooper was tried on a Third Amended Information filed September 30, 2004 (3-CT 635). 3-CT 641. The jury heard the first evidence on October 20, 2004 (3-CT 681), and on November 2, 2004, the trial court denied defense motions to dismiss under Penal Code section 1118.1,[8] and on "law of the case" grounds. 3-CT 782.

The jury's deliberations commenced on the afternoon of November 4, 2004. 3-CT 785. After further deliberations on November 5, 8, 9 and 10, 2004 (3-CT 787, 789, 791, 841), the verdicts and finding were returned on November 10th. 3-CT 841, 843.

Prior to receipt of the verdicts on November 10, 2004, Mr. Cooper waived jury trial on the prior conviction allegations. 3-CT 841; 5-RT 1037-1038.[9] After the verdicts were received, he admitted the truth of the prior conviction allegations. 3-CT 841; 5-RT 1048-1050.

The defense filed its Motion for New Trial on November 30, 2004 (3-CT 852), with a Supplemental Motion for New Trial being filed the following day. 3-CT 857. On December 3, 2004, the motions were denied, and Mr. Cooper was sentenced to State Prison as above-noted. 3-CT 861, 862. Notice of Appeal was timely filed December 6, 2004. 3-CT 866.

---

[8]/ All code references are to the Penal Code, unless otherwise noted.

[9]/ Reporter's Transcript, with the volume number noted.

STATEMENT OF FACTS

A. Introduction and Overview.

In a nutshell, the prosecutor's position was that William "CoCo" Highsmith was abducted August, 1995, by Miltonous "Q" Kingdom, Fred "Country" Cross, K.K. Parker, and appellant Mr. Cooper. Mr. Highsmith's body was found two weeks later in the Oakland hills.

Fred Cross refused to testify at Mr. Cooper's 2004 retrial, and Mr. Cross's testimony from the 1995 trial was read at the retrial. Other 2004 witnesses included Juanita "Goodie" Walton and Zanetta Hodges, who testified they had seen Mr. Highsmith, Mr. Kingdom, Mr. Cross, Mr. Parker, and Mr. Cooper together just before the alleged abduction. The 2004 jury also heard from two employees at "Bottles Liquors," across the street from the location of the alleged abduction. In addition, the jury at the retrial heard from a witness who saw an object thrown from the San Mateo Bridge, by someone in a Corvette which had been present at the time of the alleged abduction, and which was connected to K.K. Parker.

In addition, there were two blue Oldsmobiles involved in the case, which creates the potential for confusion. A blue Oldsmobile Delta 88 was registered to Mr. Kingdom, and it was present at the time of the alleged abduction. In addition, Mr. Cooper was arrested in a 1985 blue Oldsmobile Royale, not asserted to have been involved.

B. The Organization of the Statement of Facts.

The construction of the Statement of Facts will be unusual, because Mr. Cooper raises sufficiency of the evidence, collateral estoppel, and law of the case issues. As to these arguments, it is appropriate that the factual summary permit comparison of the evidence at the 2004 retrial with the evidence presented at the 1995 trial.

To facilitate that comparison, Mr. Cooper has adopted unusual approaches to his summary of the 2004 trial evidence. The first is that -- with the exception of reversing Mr. Cross's 1995 testimony and 1995 statements to police -- Mr. Cooper has summarized the evidence in the order in which summarized in the Respondent's Brief in *People* v. *Cooper*, A073986 (hereinafter, "RB-A073986"). The second unusual approach is that Mr. Cooper has woven into his summary of the 2004 evidence parallel references to the Statement of Facts in RB-A073986.

As to the prosecution's "star witness," Fred Cross, this process is simple, for two reasons: (i) Mr. Cross's 1995 testimony was read at the 2004 retrial, after Mr. Cross refused to testify in 2004; and (ii) the reading of Mr. Cross's 1995 testimony was not reported in 2004, leaving Exhibit 41 (Mr. Cross's 1995 testimony) as the record of what the 2004 jury heard. These circumstances enable Mr. Cooper now to present the Attorney General's summary of Mr. Cross's 1995 testimony in RB-A073986 as the evidence heard at the 2004 retrial.

As to witness Rodney Love, the process is similarly simple, for three reasons: (i) Mr. Love in 2004 had only vague recollection of events from August, 1995; (ii) his failure of recall led to the reading of Mr. Love's 1995 statement to police, supplemented by portions of Mr. Love's 1995 trial testimony; and (iii) it was stipulated that Mr. Love's statement to police, supplemented by the portions of his 1995 trial testimony, was collectively equivalent to Mr. Love's 1995 trial testimony. These circumstances enable Mr. Cooper again to present the Attorney General's summary of Mr. Cross's 1995 testimony, from RB-A073986, as the evidence heard by at the 2004 retrial.

As for other 1995 witnesses who testified in 2004, their 1995 testimony is presented below in footnotes. As to "major" witnesses, the footnotes are lengthy, as will be seen. With that backdrop, Mr. Cooper turns to the trial evidence, from 2004 and 1995.

C. Witnesses to Events of August 3, 1995, at 12th and Market Streets.

1. Rodney Love.

Rodney Love testified in 2004 that he had been incarcerated for five years. 4-RT 764. He was serving a federal sentence for bank robbery, with a concurrent state sentence for robbery. 4-RT 772-773.

Mr. Love testified further in 2004 that he had known William "Coco" Highsmith, Jr. 4-RT 763. He recalled an incident on August 3, 1995, near Bottles Liquor, after which he spoke to police and gave what he thought was, "to the best of [his] knowledge," an accurate statement. 4-RT 764-765. Mr. Love testified at the preliminary hearing that he had not seen Mr. Cooper on the day of the incident. 4-RT 778.

At the time of the 2004 retrial, Mr. Love denied memory of the incident. 4-RT 763. A tape of Mr. Love's 1995 statement to police was played. 4-RT 765, 771. On cross-examination, it was agreed by the prosecutor and defense counsel that portions of Mr. Love's previous 1995 trial testimony would also be read. 4-RT 774-777.[10] There was also a stipulation between counsel that Mr. Love's testimony in 1995, beyond

---

[10]/ The excepts from the 1995 trial were to the effect that only two of the men were wearing gloves (4-RT 775); Mr. Love had not recalled in 1995 whether the man in the back seat had been wearing gloves (4-RT 776); one of the three persons had a gun (4-RT 776); he did not see the men speak to anyone (4-RT 776-777); no one drove up to the blue car, except Coco and K.K. in the red Corvette (4-RT 777-778); and Mr. Love he saw neither Juanita Walton or Zanetta Hodges (4-RT 773-778).

the portions of Mr. Love's 1995 testimony read to the jury at the 2004 retrial, was consistent with Mr. Love's taped statement to police. 4-RT 778.

For these reasons, Mr. Cooper now presents Mr. Love's 1995 testimony, as summarized at pages 3 and 4 of RB-A073986:

"On August 3, 1995, 16-year-old Rodney L. went to Bottles Liquor Store at 12th and Market Streets to buy a snack. RT 353-355. As Rodney was eating his snack outside the store, someone approached from a blue 1989 four-door Oldsmobile parked across the street and asked him if he was 'CoCo.' RT 356, 358. Rodney said he was not. The person walked back to the Oldsmobile that also contained two other people. RT 356-358. Rodney knew 'CoCo' to be William Highsmith, Jr. RT 354. Rodney saw that the person who approached wore a coat, 'puffed out' at waist level, that 'looked like' a .357 or .38 caliber revolver was under the coat. RT 359, 361. Rodney moved away to a park across the street. RT 361. A red Corvette, with CoCo in the front passenger seat and K.K. Parker driving, pulled up and parked behind the blue Oldsmobile. RT 367-368. Rodney tried to warn CoCo but apparently he was not looking his way. RT 397. CoCo and K.K. Parker exited the Corvette and talked to the people from the blue Oldsmobile. RT 369. Two of the three occupants of the blue Oldsmobile wore black jackets and gloves. RT 378. One of the three grabbed K.K. Parker by the neck and held him in a headlock. RT 370. K.K. Parker was eventually let go and he ran into the store. RT 371. CoCo was pushed into the trunk of the blue Oldsmobile which was then closed. RT 372-374. Gunshots came from the area near the trunk of the blue Oldsmobile. RT 376. The blue Oldsmobile was driven away and the red Corvette fol-

lowed after, driven by one of the original occupants of the blue Oldsmobile. RT 375."

2. Zanetta Hodges.

Zanetta Hodges lived in West Oakland. 2-RT 163. She had met Mr. Cooper through her friend Juanita "Goodie" Walton. 2-RT 163-164. On August 3, 1995, Zanetta and Ms. Walton had smoked more than two joints of marijuana. 2-RT 232.

On the morning of August 3, 1995, Zanetta saw Coco on a bicycle. They talked about the theft of a car, and Coco said he was to meet some people at the store. 2-RT 169-171. Coco thought he was being accused of stealing a dog. 2-RT 222.

Zanetta and Goodie went to East Oakland for Goodie's food stamp card. They returned to West Oakland to pick up food stamps. 2-RT 172.

At 12th and Market, Bottles Liquor and the "Mingleton Temple" faced each other across 12th. 2-RT 172-175. Goodie drove by an Oldsmobile Delta parked beside the Mingleton Temple, and Goodie said she knew the people inside. 2-RT 176-178, 181, 230.

Zanetta backed up, recognizing Fred "Country" Cross in the driver's seat, Miltonous "Q" Kingdom in the passenger seat, and Mr. Cooper in the back. 2-RT 166-168, 187-190. Mr. Cooper was wearing black gloves. 2-RT 195.

When Mr. Cooper asked Goodie "what type of nigger" was Coco, Goodie responded: "Oh, y'all the people." Fred Cross stated, "That nigger stole my car, Goodie" to which Goodie responded: "He don't steal cars. He sells cars." 2-RT 190, 192-193.

A red Corvette pulled up behind the Oldsmobile, with Kevin "KK" Parker driving and Coco in the passenger seat. 2-RT 194-196. Mr. Cooper said, "Well, all right then."

As Zanetta drove away, she looked in her rearview mirror and saw K.K., Coco, Aaron, Country and Q walking toward the church lot. 2-RT 197-198. Aaron was touching Coco on the shoulder. 2-RT 218-219.

Zanetta went to pick up food stamps on West Grand, remaining there about ten minutes. When the women returned to 12th and Market, they found people upset and crying. 2-RT 198-200. [There was a stipulation August 3, 1995 records showed that Goodie Walton had picked up her food stamps at 4:09 p.m. 2-RT 231.][11]

---

[11]/ The Attorney General's summary, from page 4 of RB-A073986, was as follows: "Zanetta Hodges resided in the Acorn projects and knew K.K. Parker, CoCo, and Juanita 'Goodie' Walton. RT 539-540. On the morning of August 3, 1995, Hodges saw CoCo on a bicycle. CoCo said he planned to meet somebody. RT 541-542. At 4:00 p.m., Hodges was driving her blue Nova with Goodie Walton in the passenger seat. RT 543. Near Bottles Liquor Store, someone in a blue Oldsmobile called to Hodges to stop. RT 546. Hodges pulled up alongside the blue Oldsmobile. RT 547. Cross was in the driver's seat, Cooper was in the back seat, and someone else was in the front passenger seat. RT 548-549. Cooper asked Goodie if anyone by the liquor store CoCo was. RT 551-552. Cross stated, 'That nigger took my car, Goodie.' RT 553. Cooper asked Goodie what type of person was CoCo. RT 553. Goodie responded that CoCo is not the type to 'get his shoes dirty,' or steal cars but instead sells cars. RT 553. Cooper wore black leather gloves. RT 554. When a red Corvette traveling the wrong way on the one-way street parked by the blue Oldsmobile, Cooper said 'bye' to Goodie and Hodges. RT 560."

3. Musa Hussein.

In August of 1995, Musa Hussein was working at Bottles Liquor. He recalled a kidnapping at the store, but he did not have much recollection of events. 3-RT 381-382.

Mr. Hussein knew Coco as a customer. 3-RT 386. He had seen Coco that day arguing or talking with three other men outside the store. 3-RT 386-387. After Mr. Hussein had returned inside the store, there was shooting and a lot of noise; Mr. Hussein looked out and saw Coco across the street near the church, with three other people Mr. Hussein did not recognize. 3-RT 387-388. He did not remember seeing Mr. Cooper on August 3, 1995, or ever having seen him before. 3-RT 423.

Mr. Hussein recalled an old American car and a red Corvette. 3-RT 390. Later that night, someone left a red Corvette running in the store lot. 3-RT 425-426.

Officer Lau was called to read Mr. Hussein's August 3rd statement. 3-RT 393, 398-399. Mr. Hussein had reported hearing a "loud argument," and having looked out to see three black men arguing with a fourth man on the north sidewalk. There were two vehicles parked along the north curb. One man had what might have been a shotgun, another man opened the trunk, the third man grabbed the man from the back, and Mr. Hussein heard someone yell, "They're putting him in the trunk," followed by two or three gunshots. 3-RT 400-401.

According to Officer Lau, Mr. Hussein had reported that the gun had been black and about two feet long, and all of the men had been black and in their 20s. The man with the gun had been about six foot and 160 to 170 pounds, and wearing a light blue shirt and blue jeans. The man who opened the trunk was six four to six five, 190 to 200

pounds, wearing a dark beanie, dark coat, and black leather gloves. The third man was six feet tall, 160 to 170 pounds, dark complexion, with dark clothing. There had been a red Corvette, and a 1970s model, large American four door car, possibly gray. 3-RT 400-401.[12]

4. Moamer Mohamed.

Moamer Mohamed testified that he had been working at Bottles Liquors, at 1150 Market Street. At around 9:00 p.m., he saw a red Corvette parked almost in front of the parking lot, blocking his way. The engine was running. 3-RT 500-502.

He saw an African-American man wearing a checkered shirt and gloves running toward downtown Oakland. 3-RT 502, 504-505. Mr. Mohamed had seen K.K. Parker earlier that day, "maybe" driving a Corvette. 3-RT 508-509.[13]

---

[12]/ The Attorney General's summary from page 5 of RB-A073986, was as follows: "Bottles Liquor store employees Musa Hussein observed people run into the store and the sound of a shotgun or firecrackers outside. RT 659. Hussein contacted the police department and told police that he observed a blue or gray car and a red Corvette parked alongside the north curb of 12th Street. RT 660, 662-663. Four men stood between the parked cars, with one man taller than the others at about six feet, four to five inches. RT 660-663. One man handled a gun or a two-foot long black or brown stick. RT 660, 663. Hussein saw K.K. Parker outside the store. RT 675."

[13]/ The Attorney General's summary from page 5 of RB-A073986, was as follows: "At about 9:00 p.m., Bottles Liquor store employee Moamer Mohamed observed K.K. Parker's red Corvette parked in the store parking lot, blocking another parked car. RT 922-923. A "skinny" black male who wore a "checkered-like" black and white wool shirt, and a pair of gloves was running from the Corvette. RT 928. The black male stood about six feet, one to two inches tall. RT 928. The red

(continued...)

5. Inspector Wright.

Alameda County District Attorney's Inspector Wright was driving down 12th Street around 4:00 p.m., near the market, when he heard what he thought were two gunshots. 3-RT 462. He saw a man on the rear right side of a red Corvette. 3-RT 462-463, 465. The man was black, about five feet eleven, in his mid-20s, weighing 170 to 180 pounds. 3-RT 463. He testified at a prior trial that Mr. Cooper was consistent in size and build, but at this trial he had no such recollection. 3-RT 464, 496-497.

After Inspector Wright had driven past, the man ran around the Corvette and got inside. The Corvette accelerated around the corner. 3-RT 465-467. Inspector Wright noted the license plate number to be YOK953. 3-RT 468-469.

Inspector Wright pulled alongside a car and asked the driver what had happened. The driver said there had been a shooting and kidnapping. 3-RT 472-474. Inspector Wright did not recall seeing a blue car. 3-RT 476. He never saw a gun. 3-RT 483.[14]

---

[13](...continued)
Corvette's engine was running. RT 923, 1002-1005."

[14]/ The Attorney General's summary from pages 5 and 6 of RB-A073986, was as follows: "District Attorney's Inspector Douglas Wright was driving home on 12th Street when at about 4:10 p.m., he heard two gunshots. RT 736, 760. Inspector Wright saw a red Corvette parked fifty feet from Market Street on 12th Street and a man standing 'behind it.' RT 737. The man by the red Corvette was a black male, in his middle twenties, about five feet, eleven inches tall, and weighing about 170-180 pounds. RT 745. The man came around the red Corvette very quickly and 'jumped' into the driver's seat of the car as if someone were after him. RT 742. Inspector Wright testified that Cooper's height,

(continued...)

D. Coco's Sister, Raynetta Thomas.

Raynetta Thomas was William Highsmith's sister. 4-RT 664-665. On August 3, 1995, she was visiting her mother's home. Around 3:30 p.m., a red Corvette pulled up, with Kevin Parker driving and Coco in the passenger seat. 4-RT 665. They stayed 15 minutes and left. 4-RT 666.[15]

E. The First Officer to Arrive at 12th And Market.

It was stipulated the first 911 call was received at 4:08:53 p.m. Officer McArthur was the first officer on the scene, arriving at 4:10:37. 4-RT 574. Officer McArthur did not see a red Corvette. 4-RT 570-571.

As Officer McArthur was talking to Mr. Hussein, Kevin Parker interrupted to tell him what had happened. 4-RT 560-562. "We had a conversation about what Mr. Parker wanted to tell me." 4-RT 563. "I was just about to get him to sign the statement, he seemed to have a

[14](...continued)
weight, and appearance were consistent with the person he saw. RT 756. The red Corvette made a right hand turn, and with squealing tires, traveled at about 45 to 50 miles per hour onto Market Street. RT 744. Inspector Wright believed the license plate of the red Corvette was 'YOK933.' RT 745. Inspector Wright pulled up to a person seated in the driver's seat of a parked car. The driver gave a report, following which Inspector Wright radioed in a reported kidnapping. RT 759, 768-769."

[15]/ The Attorney General's summary from page 6 of RB-A073986, was as follows: "William Highsmith's sister, Raynetta Thomas, last saw him at about 3:30 to 4:00 p.m., arriving in a red Corvette at their mother's residence. RT 778-779. K.K. Parker was driving. RT 779. The residence is three to four blocks from 12th and Market Streets. RT 779. Highsmith left with Parker after a 10 to 15-minute visit. RT 780."

mood swing. He started to walk away from me." 4-RT 563-564. Officer McArthur arrested him on outstanding warrants. 4-RT 565.[16]

F. Events on the San Mateo Bridge.

On August 3, 1995, at about 7:00 p.m., George Archambeau was westbound on the San Mateo Bridge, when he saw a blue car stopped behind a red Corvette. 2-RT 237-238. An African-American man near the Corvette threw a brown paper bag off the bridge (2-RT 239), while another man was in the driver's seat. 2-RT 243. He believed they were wearing dark blue T-shirts. 2-RT 245. When the Corvette later overtook Mr. Archambeau, he wrote down the license plate number. 2-RT 241-242.[17]

---

16/ The relevant portions of the Attorney General's summary from page 7 of the RB-A073986, was as follows: "Oakland Police Officer Michael McArthur was the first officer on the scene. RT 783. As Officer McArthur was talking to a liquor store clerk, K.K. Parker interrupted to make a statement. RT 784, 1595. Officer McArthur took the report, paraphrased it into a written report, and read the report back to Parker who approved it. RT 1596. Parker, however, refused to sign the report without the presence of an attorney. RT 1596." [The balance of the officer's 1995 testimony concerned what he had been told by K.K. Parker.]

17/ The Attorney General's summary from page 8 of RB-A073986, was as follows: "On August 3, 1995, at about 7:00 p.m., George Archambeau was driving west on the San Mateo bridge when he observed a small blue car and a red Corvette stopped in the right hand lane. RT 901. Two black males outside the red Corvette 'appeared to be throwing' a package about the size of a bread box off the bridge. RT 901-902, 904. The Corvette later passed Archambeau on the bridge traveling at about 80 miles per hour. RT 907. When the red Corvette was slowed by traffic, Archambeau jotted down '2YQK292' as the license number and used his car phone to make a report. RT 906-908.

G. Discovery of the Body.

John L. Morra worked for "East Bay Mud." 3-RT 433. On August 16, 1995, he was checking Skyline Reservoir, in the 9800 block of Skyline Boulevard, when he discovered a body. 3-RT 437. He drove to a phone and reported what he had found. 3-RT 439.[18]

H. The Autopsy.

Paul Herrmann, M.D. was the pathologist who conducted the autopsy on August 17, 1995. 3-RT 361, 363. The body was very decomposed, with extensive maggot infestation. 3-RT 363. There was an unusual three-quarter inch wound to the chest which Dr. Herrmann considered might have been caused by a sharp instrument, but which he concluded was "probably" caused by maggots. 3-RT 370.

A piece of cloth had been tied around the face, and another protruded from the mouth. 3-RT 363-364. This cloth appeared to have been torn from the decedent's T-shirt. 3-RT 366-368. The jacket had been pulled to the level of the wrists, and the drawstring pants had been pulled down to thigh level. 3-RT 368.

There was a bullet wound to the cheek, and a bullet was recovered. 3-RT 372-373. A contact wound might result in extensive skull fracturing, and there was such fracturing; however, the skin was not split, which weighed against a contact wound. 3-RT 375-376. It was his opinion -- between the time the decedent was last seen and time the body

---

18/ The Attorney General's summary from page 8 of RB-A073986, was as follows: "On August 16, 1995, East Bay Municipal Utility District employee John Morra was off Skyline Boulevard in the Oakland Hills checking on logging work next to a reservoir. RT 840-842. About eight to ten feet above a roadway, Morra discovered Highsmith's body. RT 843-844."

was found -- that death would have occurred "very near" the day he was last seen alive, and it "could have been" the same day. 3-RT 376-377.[19]

I. The Testimony of "Goodie" Walton.

Juanita "Goodie" Walton lived at 9962 Voltaire. Coco was a friend, and she knew Mr. Cooper from the neighborhood. 2-RT 247. Goodie had a prior felony conviction for possession-for-sale. 2-RT 278.

Goodie had smoked marijuana that day. 2-RT 345. She and Zanetta saw Coco in the morning. 2-RT 291-292. Coco said "some guys" were looking for him, saying he had stolen an "IROC," which Coco had believed to be a rottweiler dog. 2-RT 293.

Goodie was in Zanetta Hodges's car when she saw "Q" Kingdom's Oldsmobile Delta 88 parked on 12th Street by the Mingleton Temple.

---

19/ The Attorney General's summary from pages 8 and 9 of RB-A073986, was as follows: "On August 17, 1995, forensic pathologist Dr. Paul Herrmann examined Highsmith's 'markedly decomposed' and 'heavily' maggot infested body. RT 691, 694. Highsmith's trousers were down to his upper thighs, a jacket was pulled down to the level of his wrists and hands, and most of the lower T-shirt was cut away. RT 695-696. Money was located in his pants pocket and a pager was inside his jacket pocket. RT 695-696. His mouth was stuffed with a twisted piece of cloth that was held in place by a strand of cloth that encircled the head and was tied at the back of the head. RT 697. The cloth gag was consistent with the remains of the victim's T-shirt. Rt 698. There was a bullet wound to the left side of the face at about the cheek bone. RT 698. Radiographs showed that the bullet passed through the cheek-bone and the brain and settled in the back of the head. RT 698-699, 703. The cause of death was the bullet wound to the head, while the cloth gag may have contributed to the death. RT 700-701. A three-quarter inch linear hole in the left, front chest, was consistent with a knife or scissor wound. RT 700. There was a 'great deal' of fracturing of the skull, unusual for a bullet wound. RT 701."

Aaron Cooper, "Country" Cross, and Mr. Kingdom were in the car. Goodie got out and approached the car. Everyone in the car wore gloves, but she saw no weapons. 2-RT 250-252, 254-255, 275.

At the preliminary hearing, Goodie testified that Mr. Cooper had been wearing a Pendleton shirt and green pants, and in the photograph of Mr. Cooper after his arrest, he was wearing a flannel shirt. 2-RT 321, 327, 2-RT 334-335. At trial, Goodie stated her belief that Mr. Cross and Mr. Kingdom had each been wearing a black "hoody," which is a sweat-shirt with a hood. 2-RT 285, 310.

Goodie asked what they were doing in West Oakland. 2-RT 255. Mr. Cooper said "they was coming to talk to somebody about somebody stole something from someone that day." 2-RT 256.

Zanetta testified that other persons said they "were coming to look for someone who stole their drugs," and they were "looking for Coco." 2-RT 256-257. Goodie told Mr. Cross: "Coco ain't that kind of guy. He don't get his shoes dirty. He wouldn't have stolen a car." 2-RT 293.

A red Corvette pulled up, with K.K. driving and Coco in the passenger seat, and Goodie and Zanetta drove away. 2-RT 259-260. As the women were leaving, the men were getting out of their cars and walking toward the parking lot of Mingleton Temple. 2-RT 261, 263. She recalled no physical contact among the men. 2-RT 345.

The two women went to the "check cash" for food stamps. When they returned to 12th and Market, they saw police. 2-RT 260-261.

Goodie heard assertions by people at the scene as to what had happened, and she decided to try to help Coco by telling police she had seen these things herself. Accordingly, Goodie reported to police that she had seen all of the following, although she had not: she saw Mr. Cooper

with a gun; she saw Mr. Cooper, Mr. Kingdom, and Mr. Cross put Mr. Highsmith in the trunk; she saw Mr. Highsmith handcuffed; and she heard shots. 2-RT 264, 267, 280, 306, 342.

After talking to police that night, Goodie and Zanetta spent hours searching for Coco and the other men. 2-RT 267-269. When she finally arrived home that night, she saw Mr. Kingdom's Oldsmobile parked in front of her house. 2-RT 267.

Before Goodie testified at the preliminary hearing in September 7, 1995, someone knocked on her door, and Mr. Cooper was on the phone, calling from jail. He told her, "Don't testify," and "I'll pay you," but he made no threats. 2-RT 271-272, 294, 318, 348.

After she testified at the preliminary hearing, people "from the Voltaire area" were calling her, saying they were going to kill her. It was not Mr. Cooper, and Goodie thought the callers were "Coco's people." 2-RT 272-273, 292.

When Mr. Cooper and Mr. Cross were tried in 1995, she "disappeared" and did not testify. 2-RT 284, 333-334. She attempted to avoid testifying at Mr. Kingdom's 1997 trial but was arrested. 2-RT 274-275.

At the preliminary hearing, Goodie testified that Mr. Cooper had said nothing during her conversation with Mr. Cross. 2-RT 308, 315. At the preliminary hearing, and at the trial of Mr. Kingdom, she testified that the cars had been side-by-side and that she had remained in her car as they talked. 2-RT 313, 338-340.[20]

---

[20]/ The summary from pages 9 and 10 of RB-A073986 was as follows: "The trial court found Juanita 'Goodie' Walton unavailable and allowed her preliminary hearing testimony to be read to the jury. RT 316. Walton testified that she was in an East Oakland resident and knew
(continued...)

[20](...continued)
Aaron Cooper and Fred Cross from four or five months of daily contact. RT 1028-1029. Walton knew Miltonous Kingdom from daily contact at 100th and MacArthur Streets. She also knew Highsmith. RT 1025, 1030-1031, 1038.

"On August 3, 1995, at about 3:30 to 4:00 p.m., Walton was a passenger in Zanetta Hodge's car. RT 1026-1027, 1035-1036. At a light at 12th and Market Streets, Walton recognized Miltonous Kingdom's parked car and instructed Hodges to back up. RT 1035-1037. Cross was in the driver's seat of Kingdom's 'sky blue' Oldsmobile. RT 1030-1031, 1040. Miltonous Kingdom was seated in the front passenger seat, and Aaron Cooper was in the back seat wearing gloves. RT 1042, 1055, 1066. Cross reported that he came to meet a 'CoCo' about his stolen blue IROC car. RT 1041-1042. Cross heard that a CoCo from West Oakland had stolen his car. RT 1042. Walton answered that the CoCo she knew did not steal cars. RT 1042, 1051. After about five minutes, Walton observed K.K. Parker driving his red Corvette against traffic on the one-way street and park the Corvette behind the blue Oldsmobile. RT 1043-1044. CoCo was riding in the red Corvette. RT 1045. When the Corvette arrived, Cooper told Walton 'bye.' RT 1046. Walton saw the occupants of both cars exit and meet at a nearby church parking lot. RT 1050.

"Hodges and Walton next traveled to 21st and West Grand Streets. When they returned to 12th and Market Streets about 20 minutes later, they saw police and a crowd. RT 1049, 1056. Walton asked the members of the crowd what happened and received information. RT 1056. Walton made a report to police but did not acknowledge that her report was, in part, based on observations by others. RT 1056, 1059. Walton told police that Cross and Kingdom were cousins. RT 1065. Walton told police that CoCo was handcuffed and stuffed into the trunk of the blue Oldsmobile. RT 1059. Cooper held a gun while Cross put CoCo into the trunk and Kingdom entered and sat in the passenger seat. RT 1060. Walton told police that gunshots were fired while CoCo was stuffed into the trunk. RT 1061. Walton told police that Cooper drove the Corvette from the scene. RT 1062. Later that evening, Walton saw Kingdom's blue Oldsmobile parked in front of her residence. RT 1063.

(continued...)

J. The Investigation.

A police technician recovered scissors near the body. 3-RT 445-449. Three shell casings were collected at 12th and Market Streets: two nine millimeter and one .45 caliber. 3-RT 515-516, 520-523.[21]

Late on August 3, 1995, an Oldsmobile Delta 88 (license number 423YGM) was located in front of Goodie Walton's residence at 9962 Voltaire. 4-RT 598, 620, 631. On August 5, 1995, an evidence technician processed the Oldsmobile. It contained documents with the name Miltonous Kingdom, and it was registered to Mr. Kingdom. There was no indication the Oldsmobile had been driven on a dirt road. The bottom of a muffler in the trunk was dirty, but the top was "fairly clean" and appeared to have been wiped with a damp rag. No fingerprints were found in the trunk, nor any other indication a person had been there. Latent prints were obtained from the exterior driver's door, the left front fender,

---

[20](...continued)
At the stationhouse that evening, Walton identified Cooper and noted that Cooper wore a checkered Pendleton-type shirt. RT 1057, 1066. Walton gave police a tape recorded statement in which she told the truth. RT 1053. The recording was played for the jury. RT 1068-1071.

"Walton later gave police a second tape recorded statement. RT 1074. That recording also was played for the jury. RT 1321. In her second recorded statement, Walton told police that she talked with Cooper before the Corvette arrived. RT 1081. Walton was untruthful about talking with Cooper. RT 1088."

[21]/ The Attorney General's summary from page 11 of RB-A073986, was as follows: "A police technician recovered a pair of scissors about four feet from the victim's body in the Oakland Hills. RT 882-883. A police technician collected three shell casings from the scene at 12th and Market Streets. RT 804. Two shells were nine millimeter casings. The third was a .45 caliber casing. RT 804."

and two cassette tapes. 4-RT 530-536, 538-539, 546. [It was stipulated that all latents were unidentifiable. 4-RT 541.][22]

On August 3rd, at around 11:00 p.m., Oakland Police Officer Darwin was in the 2600 block of 99th Avenue, near Macarthur, when he stopped a blue, four door 1985 Oldsmobile Royale (license number 3J1X910) because of expired registration tags. 4-RT 577, 587, 597. The driver was Carl Anderson, who was arrested on a misdemeanor warrant. 4-RT 578. The passenger was Aaron Cooper, who identified himself and was also arrested. 4-RT 579, 586. Mr. Cooper was wearing a green plaid shirt and green pants, and Exhibit 9 showed him on the night he was arrested. 4-RT 580. Black leather gloves were in the front passenger seat where Mr. Cooper had been sitting, and a black leather jacket was in the middle of the back seat. 4-RT 582-583, 584-585, 588.[23]

---

[22]/ The Attorney General's summary from page 11 of RB-A073986, was as follows: "On August 3, 1995, at about 11:00 p.m., a blue Oldsmobile Cutlass bearing license plate '423YGM' was found parked at 100th and Voltaire Streets. RT 988-990, 993. On August 5, 1995, a police technician examined the blue Oldsmobile and discovered papers in the glove box belonging to Miltonous Kingdom. RT 807, 817. The muffler of the blue Oldsmobile showed signs that it had been wiped down with a wet cloth. RT 815."

[23]/ The Attorney General's summary from page 11 of RB-A073986, was as follows: "On August 3, 1995, at about 11:30 p.m., at the 2600 block of 99th Avenue, Officer Darrin Downum effected a traffic stop of a blue 1985 Oldsmobile Royal. RT 1323-1325. The car was driven by Carl Anderson and bore expired registration tags. RT 1325. The passenger was Aaron Cooper, who was arrested without incident. RT 1325, 1327. Officer Downum saw a pair of black gloves on the same front passenger seat that Cooper had occupied and a black jacket in the back seat. RT 1327. At the time of his arrest, Cooper wore a plaid shirt, green pants, and had his hair in 'corn rows.' RT 1332. Following the arrest, Carl Anderson reported to Sergeant Larry Krupp that he was

(continued...)

On August 8th, Sergeant Krupp contacted Linda Jones, because the car Mr. Cooper was in when arrested had been released to her by mistake. 4-RT 625-626. Sergeant Krupp found gloves on the front passenger seat, and a jacket somewhere in the rear seat. 4-RT 626-627, 631. It was stipulated that a gunshot residue test was done on Mr. Cooper's hands at 3:35 a.m. on August 4, 1995. 4-RT 746.[24]

Criminalist Lansing Lee examined two 9mm Lugar casings and opined that both had been cycled through the same weapon. 4-RT 694-695, 707-708, 718. He concluded the firearm had been "S.W.D.-type" and "a 9mm Luger caliber." 4-RT 716. ["S.W.D." had changed the name of the firearm to "Cobray." 4-RT 717.] The slug from the autopsy was a .40 or 10mm auto caliber, semi-jacketed, hollow-point that had mushroomed. 4-RT 719-721. Possible weapons included Smith & Wesson and Derringer. 4-RT 721-722, 727.[25]

---

[23](...continued)
driving along when at 100th and MacArthur he saw Cooper and picked him up, just before the ensuing traffic stop. RT 1924."

[24]/ The Attorney General's summary from page 12 of RB-A073986, was as follows: "Sergeant Larry Krupp searched Anderson's 1985 blue Oldsmobile. RT 971. Sergeant Krupp seized a pair of black leather gloves and a coat from Anderson's car, both of which Linda Jones stated did not belong to Anderson. RT 971-972, 974, 982-983, 1569, 1925. Sergeant Krupp performed a gunshot residue test on Cooper's hands following Cooper's arrest. RT 1926."

[25]/ The Attorney General's summary from page 12 of RB-A073986, was as follows: "Criminalist Lansing Lee examined the shells casing from the scene. RT 1711. Lee opined that the same firearm discharged both nine millimeter rounds. RT 1717. The firing pattern demonstrated that the firearm was a S.W.D. Cobray nine millimeter Luger. RT 1717. Lee examined the bullet slug taken from the victim's head. RT 1721.
(continued...)

Mr. Lee found blood on neither the jacket nor the gloves. Gunshot residue kits were applied to both the jacket and gloves. 4-RT 700, 4-RT 702-703.[26]

Criminalist Robert Hinkley examined three gunshot residue kits. 4-RT 741, 745. He found no gunshot residue on the samples from either of Mr. Cooper's hands. 4-RT 751. He also did not find GSR on the sample from the right cuff of the jacket, but he did find GSR on the sample from the left cuff, and on the samples from both gloves. 4-RT 751-755. He conceded the potential for "gunshot residue transfer," such as from hands to objects. 4-RT 757-758.[27]

K. Fred "Country" Cross's Arrest in Mississippi.

By August 10th, Fred Cross had been arrested in Mississippi. 4-RT 628. A magazine for a .45 caliber automatic, and five .45 caliber cartridges, were found in Mr. Cross's property. 4-RT 729-730, 736. Mr.

---

[25](...continued)
The bullet was a .40 caliber round, not a nine millimeter round. RT 1721, 1767, 1769. Possible manufacturers of the weapon which fired that bullet were Smith and Wesson, Star and Iberia Arms, Wyoming Arms, and American Derringer. RT 1724."

[26]/ The Attorney General's summary from page 12 of RB-A073986, was as follows: "Lee subjected the gloves and jacket taken from Carl Anderson's car to gunshot residue tests. RT 1727."

[27]/ The summary from page 12 of RB-A073986, was as follows: "Criminalist Robert Hinkley examined the gunshot residue samples submitted. RT 1748. There was no gunshot residue on the samples taken of Cooper's hands. RT 1789, 1791. Gunshot residue was present on the jacket left cuff, and on both the right and left gloves. RT 1791."

Lee was unable to associate the magazine and five cartridges, to the .45 caliber casing from 12th Street. 4-RT 736-737.[28]

L. Evidence Relating to the E-Z Motel, Where Mr. Cross Had Been Staying.

On August 14th, Sergeant Krupp went to the E-Z 8 Motel. 4-RT 628. He was able to connect Mr. Cross with Room 331, and he determined that calls had been made from that room, including one the morning of August 4th to 562-5243; Sergeant Krupp was unable to connect with anyone using numbers called from the room. 4-RT 643-644, 658. There as a stipulation that Room 331, where Fred Cross had been staying, was on a day-by-day basis, with the money due by 11:00 a.m. each day, which was check-out time. 4-RT 810-811.[29]

M. Fred Cross's Testimony and Statements.

1. Cross's Testimony at the 1995 Trial.

Exhibit 41 represented Mr. Cross's testimony from 1995. It was read at the 2004 retrial. 4-RT 814-815, 818. That testimony was summarized at pages 21 through 25 of RB-A073986, as follows:

---

28/ The Attorney General's summary from page 20 of RB-A073986, was as follows: "Sergeant Larry Krupp received property for Cross from Cross's mother following his arrest. RT 2600. The property included two magazine clips containing five .45 caliber rounds. RT 2600."

29/ The Attorney General's summary from page 20 of RB-A073986, was as follows: "Sergeant Krupp asked E-Z 8 motel management to check what calls were placed from Cross's room. RT 2604. One call from Cross's motel room was placed to Juanita Walton's telephone number. RT 2604-2605."

"Fred Cross testified that he completed the seventh grade. A Greenville, Mississippi native, he is six feet, five inches tall, and weights 140 pounds. RT 2207-2208, 2240. Cross first traveled to Oakland the summer of 1992, and stayed with an aunt on 55th Street. RT 2208. Miltonous Kingdom is Cross's cousin. RT 2208. Cross met Aaron Cooper in 1993. RT 2210. Cross purchased a 1988 IROC car in April 1995. RT 2211. The car was stolen on July 30, 1995. RT 2211. The car contained $600 to $700 in cash, a 'nice amount' of marijuana, and a 'large amount' of powder cocaine. RT 2304, 2307, 2309, 2311. The value of the lost drugs was in the thousands. RT 2309, 2311. Cooper contributed over $2000 to the purchase price of the stolen drugs. RT 2321-2322. 'Ant' and 'D' were the other investors in the drug venture. RT 2322-2323, 2451. Cross invested no money in the drug venture, did not buy the drugs, and would only receive a portion of proceeds from drug sales that he negotiated in Mississippi. RT 2406, 2486. Cross had conducted business with Cooper before. RT 2418.

"Cross and Kingdom resided at local motels after Cross's aunt moved away. RT 2216. Cross made plans to visit his mother and take the car load of drugs to Greenville, Mississippi. The stolen car changed his plans. RT 2217, 2347. On Monday, Cross looked for the stolen car in West Oakland. RT 2218-2219. Somebody told Cross 'some fools from Ghost Town' were seen driving the car fast all day long. RT 2220. Someone else reported that somebody named CoCo with two gold front teeth from the Acorn projects was trying to sell the IROC. RT 2220-2221. A youngster reported that CoCo was earlier seen driving an IROC. RT 2222. On Tuesday, Cross spent the day looking for paperwork identifying the car and driving around with Cooper looking for the IROC.

RT 2222, 2388. On Wednesday, Cross went to the airport to purchase an airline ticket to Mississippi for a Thursday departure. RT 2222-2223. Cross also drove around West Oakland in Kingdom's Oldsmobile searching for the IROC with Cooper, who insisted on going along. RT 2223, 2389. Cross left his pager number with someone named Lon and a message to have CoCo call Cross. RT 2225. Cooper used 'threatening words' with Lon. RT 2227-2228, 2327-2328, 2395, 2489.

"On Thursday, August 3, 1995, Cross and Kingdom went to 100th and MacArthur where they found Cooper gambling and shooting dice. RT 2232. At 1:30 p.m., Cross received a page. RT 2233. Cross returned the call, talked with CoCo, and agreed to meet CoCo at Bottles Liquor store. RT 2233-2234. At 2:30 p.m., Kingdom pulled up in his Oldsmobile and Cross, Cooper, and Kingdom traveled to West Oakland. RT 2235-2236. Speaking about the stolen drugs and car, Cooper stated, 'Motherfuckers work way to hard for this shit; Let's go out there.' RT 2237.

"Cross drove the blue Oldsmobile to 12th and Market Streets and parked across the street from the liquor store. RT 2239. Cross did not see Goodie Walton that day and did not know Zanetta Hodges. RT 2241, 2263. Cross got out of the car, leaving a nine millimeter gun in the car, and asked people outside the liquor store whether they were CoCo. RT 2241-2243. Cross was aware only of his own nine millimeter gun. RT 2243. As Cross walked back to the Oldsmobile, a red Corvette pulled up. RT 2250. K.K. Parker got out and walked to the liquor store. CoCo contacted Cross. RT 2252. Cooper and Kingdom got out of the Oldsmobile. RT 2253. CoCo reported that he did not take the IROC, did not see it, and agreed to page Cross if he saw it. RT 2254-2255. Cooper

held a gun in his right hand and grabbed CoCo from the back. RT 2255. Cross walked to the Oldsmobile door and did not see Kingdom touch CoCo. RT 2255, 2257. As Cross was reentering the Oldsmobile, Cooper told Kingdom to get the car keys from the ignition to open the car trunk. RT 2258. Kingdom got the keys and opened the car trunk. RT 2259. Cooper walked CoCo to the trunk. RT 2259. From Cross's position inside the Oldsmobile, he did not witness CoCo being put into the car trunk. RT 2259. When Cross heard six gunshots, he ducked. RT 2259-2260. Cross heard the car trunk close and saw Kingdom run to the passenger side of the Oldsmobile. RT 2260. Kingdom told Cross to move into the driver's seat and drive off. RT 2261. Cooper entered the Corvette. RT 2261.

"Cross drove onto Highway 880, exited at 65th Street, and parked at 100th and Voltaire Streets. RT 2264-2265. Cooper arrived in the Corvette and instructed Kingdom to follow in the Oldsmobile as Cross stayed behind. RT 2265-2266. Two minutes later, Cooper drove the Oldsmobile back to 100th and Voltaire with Kingdom riding in the passenger seat. RT 2266. Cross reentered the Oldsmobile and Cooper drove to Cross's motel. RT 2266-2267. Cross and Kingdom went to their motel room and packed, before Cross decided that he would not make his scheduled flight. RT 2267-2268. Later, Cooper drove Cross and Kingdom in the Oldsmobile to 100th and MacArthur. RT 2268-2269. Cross did not know whether or not the victim was in the trunk of the Oldsmobile and no one said a word about the victim. RT 2269. Cross decided to stay at 100th and MacArthur while Cooper and Kingdom drove off. RT 2270.

"Rodney L. and Sean Combs drove by and asked Cross if he had seen the red Corvette. RT 2271. Later, Cross's friend Jay drove by and picked up Cross. RT 2271-2272. At about 8:30 p.m., Cross saw Oakland police by 100th and MacArthur, asked to be dropped off at the motel, and went into his room. RT 2273-2274. Kingdom later arrived at the motel room and reported that the Oldsmobile was left 'up there.' RT 2275. The next day, Cross took a plane to Mississippi. RT 2275. Cross did not ask and was not told what happened to Highsmith. RT 2276.

"....[30] When arrested by Greenville police on the California warrant, Cross was held four days before California detectives arrived. RT 2278-2279. Oakland police detectives did not advise Cross of his rights before interviewing him over thirty to forty minutes. RT 2280-2281. Detectives read Cross his rights only before the first taped statement. RT 2280. Cross signed the waiver form because he believed it stated that he refused to make a statement and did not read it. RT 2281, 2426-2428. After the first taping, detectives accused Cross of lying. RT 2282. Cross did not lie in the first taped statement, Cross just refused to volunteer specifics. RT 2283. Detectives left Cross in the interview room where Cross tried to sleep on a couch. RT 2284. One and a half hours later, detectives returned and reported that Cooper had confessed, that fingerprints had been developed inside the Oldsmobile trunk, that CoCo was still missing, and threatened Cross with the death penalty. RT 2284-2286, 2437. Cross continued to state that he did not wish to talk and asked for a lawyer. RT 2286, 2430. The detectives suggested that Cross report that Cross and Kingdom put the victim in the trunk and Cross

---

30/ Redacted in accordance with ruling at 4-RT 801.

went along as suggested. RT 2287-2288, 2432. Cross explained that in the South it was best to follow along with suggested answers. RT 2288.

"The unedited versions of Cross's first and second taped statements were played for the jury. RT 2422-2424. Cross lied when he reported that he and Kingdom put the victim into the trunk. RT 2441. Cross agreed to meet the victim on Cooper's insistence. RT 2487, 2489. Cross had no intent to kidnap the victim, take the Corvette, or murder the victim. RT 2485. Cross abandoned Kingdom and Cooper at MacArthur following the kidnapping because he had no intent to harm the victim. RT 2485.

"On cross-examination, Cross reported that Cooper was upset at news that Cross's car was stolen. RT 2324. Cooper had reported past violent acts .... RT 2326.[31] Cross knew of Cooper's reputation for violence. RT 2326. At the time of the kidnapping, Cooper wore gloves and had a nine millimeter handgun. RT 2329, 2343. Cross earned money by 'hustling' drugs and gambling. RT 2360. Cross lied to police to cover for Cooper and Kingdom. RT 2490."

2. Cross's Statements to Police in Mississippi.

Exhibits 42 and 43 represented Mr. Cross's August, 1995 statements to police in Mississippi. Those tapes were played at the 2004 retrial. 5-RT 825-827. The same statements were summarized, in redacted versions, at pages 14 through 16 of RB-A073986. Those summaries, with modifications to cure the redactions and to incorporate record references to the Clerk's Transcript in the present appeal, were as follows:

---

31/ Redacted in accordance with ruling at 4-RT 801.

a. The First Statement.

"Cross stated that his blue IROC car was stolen the previous Sunday, while Cross was visiting a girlfriend in Emeryville. 3-CT 726-728. The car contained $6,700 in cash and Cross's clothes. 3-CT 727-728. Cross traveled to West Oakland looking for his stolen car and found a 'youngster' who reported that 'some fools' from 'Ghost Town' were riding around in the blue IROC by 34th Avenue. 3-CT 729-730. Someone mentioned that a 'CoCo' who had two gold teeth was driving the car. 3-CT 730-731. On Tuesday, Cross was driving Kingdom's blue Oldsmobile around West Oakland. 3-CT 730. A girl told Cross that she had earlier seen CoCo in a blue IROC. 3-CT 7332-733. Cross left his pager number with someone in West Oakland and received a call from CoCo the next day. 3-CT 733-735. CoCo agreed to meet Cross at 12th and Market Streets. 3-CT 736. [Cross went with Mr. Kingdom and Mr. Cross to 12th and Market Streets, where] Cross asked people about the store whether they were CoCo. 3-CT 736-737. As Cross turned, some-one approached identifying himself as CoCo. 3-CT 737-738. Cross saw a red Corvette parked nearby. 3-CT 738. CoCo explained that he sold cars, then walked away and drove off. 3-CT 738-739. Cross denied kidnapping CoCo. 3-CT 740. Cross took a flight to Memphis that night. 3-CT 738."

b. The Second Statement.

"Cross drove Kingdom's Oldsmobile to 12th and Market Streets. 3-CT 742. Kingdom was in the front passenger seat[, Mr. Cooper was in the rear, and all three men had nine millimeter handguns]. 3-CT 742-743. [They] got out of the car when the red Corvette pulled up, [Mr/ Cross] leaving his nine millimeter handgun in the car. 3-CT 743-745.

Cross and Kingdom walked CoCo to the back of the Oldsmobile, then put him into the trunk. 3-CT 744. Since CoCo was lying about Cross's car, 'shit just happened.' 3-CT 763. CoCo did not fight about getting into the trunk, since guns were drawn. 3-CT 759. CoCo may have been shot before being put into the trunk. 3-CT 759-760. Kingdom was shooting his nine millimeter gun as Cross entered the Oldsmobile. 3-CT 745. [Mr. Cooper took the Corvette. 3-CT 745.] Cross drove toward East Oakland with Kingdom in the front passenger seat. 3-CT 746-747. At 109th and Voltaire, the Corvette was abandoned[, and Mr. Cooper got in the car with Mr. Cross and Mr. Kingdom.]. 3-CT 746. Cross drove to the E-Z 8 motel with Kingdom [and Mr. Cooper]. 3-CT 747-748. Cross left the nine millimeter handgun in the car. 3-CT 748. Cross and Kingdom went to the room to pack [while Mr. Cooper remained in the car; Cross and Kingdom] returned to the car forty minutes to an hour later. 3-CT 747-748. Kingdom drove the Oldsmobile to 100th and Voltaire to drop the car off. 3-CT 747-749. Cross and Kingdom did not look in the trunk or hear noises from the trunk. 3-CT 750. Cross got out of the car and walked up to MacArthur. 3-CT 749-750. Cross's friend Jay pulled up, and Cross and Kingdom entered Jay's car. 3-CT 749-751. Cross and Kingdom were dropped off at the motel and went to sleep. 3-CT 751. The next morning, Cross and Kingdom took a cab to the airport. 3-CT 751-752. Cross did not know where CoCo was. 3-CT 763."

N. Other Evidence.

When the red Corvette was towed, it was damp. 4-RT 630, 636. An evidence technician recovered latent prints from the Corvette's exterior windshield, exterior passenger's door, and exterior rear window.

4-RT 540-541. There was a stipulation that one matched Coco, one matched K.K. Parker, and the last was unidentifiable. 4-RT 541. There were no identifying documents in the car. 4-RT 564.

Sergeant Krupp testified that Goodie Walton told him she had seen Mr. Cooper with a gun, and seen Coco in handcuffs being forced into the trunk. 4-RT 639-640. Mr. Kingdom got in the front passenger seat, and Mr. Cross got in the driver's seat. 4-RT 640. Mr. Cooper got into the Corvette. 4-RT 640. [Sergeant Krupp later learned Ms. Walton was somewhere else at 4:08 p.m. that afternoon. 4-RT 640.] Ms. Walton also said she had arrived home at 9:45 p.m., finding the Oldsmobile Delta 88 already there. 4-RT 641.

Coco Highsmith's father testified that the day or so after his son was abducted, people were angry at Goodie Walton. They accused her of having pointed out Coco to the men in the cars. 5-RT 832-833.

Sergeant Krupp did a check on the 1983 Iroc, finding it registered to a Mr. Map. The car appeared to be associated with Mr. Cross. 4-RT 642-643.

On November 6, Sergeant Krupp was notified that Mr. Kingdom had been arrested in Mississippi. 4-RT 629-630. He discovered that Mr. Cross and Mr. Kingdom were first cousins, from Greenville, Mississippi. 4-RT 644.

Inspector Moschetti testified that Mr. Kingdom and Mr. Cooper were both six feet tall. Mr. Cross was six-four or six-five. 4-RT 813-814.

There were stipulations that Mr. Cooper was in custody from July 26, 1994 until May 31, 1995 (4-RT 810); that Mr. Cross was convicted in December, 2004 of an unrelated murder and of being an ex-felon in

possession of a firearm (4-RT 812); and that Mr. Kingdom was tried in 1997 and 1998, being convicted of first degree murder and with a kidnapping special circumstance. 5-RT 824.

Substantial other items were found in the car in which Mr. Cooper was arrested. These included cassette tapes on the front seat, sandals, a helmet, an aqua bag, blue jeans, a skull cap, and several department store bags. 4-RT 600-601.

PART ONE: ISSUES RELATING TO INSUFFICIENT EVIDENCE.

This case presents one predictable claim of federal constitutional error -- insufficient evidence -- but with an unusual twist. The case also presents other claims of error which are themselves unusual: collateral estoppel and law of the case.

The "unusual twist" -- also the source of the two unusual issues -- relates to the fact that Mr. Cooper's case has been before the United States District Court on habeas corpus. A United States District Court Judge had reviewed the sufficiency of the evidence introduced at Mr. Cooper's first trial in 1995 -- exclusive of improperly admitted evidence not introduced at the retrial -- and concluded that the legally admissible evidence at the 1995 trial was insufficient to sustain a jury verdict of guilty of murder.

With the District Judge's opinion as a guide, Mr. Cooper will contend in Argument I that the evidence at the retrial was insufficient to satisfy the Fourteenth Amendment Due Process Clause, as interpreted in *Jackson* v. *Virginia* (1969) 443 U.S. 307. He will contend in Arguments II and III that the District Judge's decision in the habeas proceeding precluded Mr. Cooper's conviction under the collateral estoppel doctrine (Argument II) and the law of the case doctrine (Argument III), which are components of Fifth Amendment double jeopardy.

I

THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF MURDER.

A. Introduction to the Argument.

A claim of "insufficient evidence" is difficult to win, even after *Jackson* v. *Virginia*, *supra*, 443 U.S. 307 slightly reduced the odds against an appellant. Yet it is an argument Mr. Cooper must make in this case, for two reasons.

First, the evidence of his guilt of murder was marginal and speculative, on its face. Second, a United States District Court Judge found the same evidence to be insufficient to satisfy the Fourteenth Amendment Due Process Clause.

B. The Legal Framework, Generally.

In *Jackson* v. *Virginia*, *supra*, 443 U.S. 307, the United States Supreme Court "announced a new, constitutionally mandated rule for review of the sufficiency of the evidence supporting a state criminal conviction challenged in a federal habeas corpus proceeding." *People* v. *Johnson* (1980) 26 Cal.3d 557, 576. The California Supreme Court in *Johnson* held that the California standard complied with *Jackson*.

In *Jackson* v. *Virginia*, *supra*, the United States Supreme Court stated: "... [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.*, at 318. "... [T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead the

relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, at 318-319; emphasis in original.

The evidence must do more than raise a suspicion of guilt. "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility and this is not sufficient basis for an inference of fact." *People* v. *Redmond* (1969) 71 Cal.2d 745, 755.

Finally, "speculation" is no substitute for proof. In *People* v. *Morris* (1988) 46 Cal.3d 1, a jury had found a robbery-murder special circumstance to be true and, by logical implication, deemed the underlying offense to have been a robbery-murder.[32] The Supreme Court acknowledged the general principles set forth in *Jackson* and *Johnson*, and recognized that the sufficiency of evidence of a robbery was necessary to the jury's special circumstances finding in that case.

> We may *speculate* about any number of scenarios that may have occurred on the morning in question. A reasonable inference, however, "may not be based on suspicion alone, or on *imagination, speculation, supposition, surmise, conjecture, or guess work.* ... A finding of fact must be an inference drawn from evidence rather than

---

[32]/ The significant facts were that the defendant had stated an intention to "go out there and make money, you know, with these homosexuals, you know, dates -- he had to kill one." The homicide victim, wearing only shoes and socks, was found shot twice in the restroom of a public bath house. The victim's clothes were somewhere in the bath house, the defendant was identified as a person seen fleeing after the shots were fired, and the defendant later had a credit card possessed by the victim. *Id.*, at 19-20.

> ... a mere speculation as to probabilities without evidence." [Citations].
>
> *People* v. *Morris*, *supra*, 46 Cal.3d at 21; first emphasis in original; second emphasis added.

C. The United States District Court's View of the 1995 Evidence.

Mr. Cooper acknowledges the difficulty of analyzing the sufficiency of the evidence, for the reason that it involves "proving a negative." However, the analysis in Mr. Cooper's case is rendered easier by the United States District Court's view of the 1995 evidence, which is logically indistinguishable from the 2004 evidence.

This Court, in its July 6, 2000 opinion in *People* v. *Cooper*, A073986, concluded that a Confrontation Clause error had occurred at Mr. Cooper's 1996 trial, when hearsay statements by Mr. Kingdom were admitted. However, the Court found the error harmless as to Mr. Cooper under the standard set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 24. 1-CT 26.

Thereafter, Mr. Cooper pursued habeas petitions in the Alameda County Superior Court, in this Court, and in the California Supreme Court. In those petitions, he alleged insufficient evidence to convict under the Fourteenth Amendment, when the erroneously admitted hearsay was excluded from the evidentiary calculus.[33]

When Mr. Cooper filed his *pro se* habeas petition in the United States District Court, his claims for relief included a Confrontation

---

[33]/ See, pages 2 and 3, above.

Clause violation. His claims also included a due process violation based on the insufficiency of the evidence.[34]

In the District Court's consideration of the Confrontation Clause issue, the California Attorney General "essentially concede[d] the Confrontation Clause violation but urge[d] that it was harmless error." 2-CT 462. The District Court found the error prejudicial, even under the deferential standard required by the Antiterrorism and Effective Death Penalty Act. 28 U.S.C. § 2254(d). 2-CT 465-472.

The District Court also addressed Mr. Cooper's "sufficiency of evidence" contention, citing *Wright* v. *West* (1992) 505 U.S. 277, *Jackson* v. *Virginia* (1979) 443 U.S. 307, and *In re Winship* (1970) 397 U.S. 358. The District Court's central conclusions were, as follows:

> *The evidence was sufficient to support the kidnapping, carjacking and weapon possession convictions but not the murder conviction.* The state court's presumed rejection of the claim was an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.
>
> 2-CT 476; footnote omitted; emphasis added.

With regard to the kidnapping and carjacking convictions, the District Court viewed the evidence as follows:

> Evidence connected Cooper with Cross and Kingdom at the EZ-8 motel. And Cooper had a motive to harm Coco, because Coco reportedly had stolen Cross' car that contained a large amount of drugs paid for in part by Cooper. Cooper had been with Cross the day before the abduction

[34]/ See, Request for Judicial Notice, at pages 19-21, 24-30.

> searching for the drug-laden car and used threatening words regarding the stolen drugs and car. Cooper was identified as being present with Cross and Kingdom in the blue Delta 88 by Goodie Walton, Zanetta Hodges, and co-defendant Cross. Rodney Love could not identify any of the three assailants but did see that Coco involuntarily entered the trunk of the blue Delta 88 forced by one or more of the three men in the Delta 88. Cross' testimony supports the inference that Coco was put in the trunk of the car involuntarily, even if one believed that Cross was sitting in the front seat when it actually happened. Evidence from Cross showed that Cooper participated in putting Coco in the trunk at gunpoint. Evidence was presented that once the victim was put in the trunk of the car, the car drove away and Cross stated the car was driven to various locations around Oakland. Parker testified that he did not give anyone permission to take the red Corvette he drove to the site from which Coco was abducted and his car was taken. Cross testified Cooper had a gun that day.
>
> The foregoing was sufficient evidence to support the kidnapping, carjacking and weapon possession convictions.
>
> 2-CT 477.

As to the murder conviction, however, the District Court concluded otherwise:

> Even applying the very deferential standard of review appropriate for a sufficiency of the evidence claim, the evidence was not sufficient to support the murder conviction. No rational trier of fact could have found that the prosecution proved that Cooper had murdered Coco viewing the evidence in the light most favorable to the prosecution. Accepting that the victim was last seen alive being stuffed in the trunk of a car at gunpoint by three men including Cooper and that his dead body was found two weeks later, the two were not adequately connected. No properly admitted evidence put Cooper at the scene of the

> murder. That gap in evidence would have caused any rational trier of fact to find that Cooper's guilt was not proven beyond a reasonable doubt.
>
> 2-CT 478.

The District Court was unpersuaded by the "several pieces of evidence" identified by the Attorney General "that purportedly connected Cooper to the killing." As for the evidence asserted to establish there had been more than one person at the homicide scene, the District Court concluded:

> While this may have suggested multiple perpetrators at the murder scene, it does nothing to show that one of those perpetrators was Cooper. Also, the evidence was speculative with respect to showing three perpetrators: none of the things done to the body actually required more than one person and one person (especially one person with a gun to compel compliance) could have done all.
>
> 2-CT 479.

The District Court was unpersuaded by the "Corvette on the bridge" evidence,[35] the activity surrounding the Delta 88 and Corvette,[36] and gunshot residue evidence.[37] The District Court also noted

---

35/ "This requires speculation that the airborne rectangle package seen fleetingly by an observant bystander contained a gun and that gun had been used to kill Coco. *See Walters* v. *Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (mere suspicion and speculation do not support logical inferences)." 2-CT 479.

36/ "That participants were still 'active' after the kidnapping and shooting proves nothing about what they were actively doing." *Ibid.*

the following: (1) the inability to fix a time of death; (ii) a short "window of opportunity" based on an abduction at 4:00 p.m., a Corvette on a bridge at 7:00 p.m., and Mr. Cooper's arrest at 11:00 p.m.; (iii) the lack of ballistic or other forensic evidence; and (iv) the lack of an eyewitness. 2-CT 480.

The District Court ultimately concluded, as follows:

> .... [A] jury must find proof of guilt beyond a reasonable doubt. A rational jury could not have done so here. At the simplest level, proof that (1) a person was abducted at gunpoint and (2) his murdered body turned up two weeks later in another part of town would not be proof beyond a reasonable doubt that the abductor was the murderer. One must look for other evidence to allow one to connect the abductor to the murder. Here, there just was not enough. Cooper's right to due process was violated because the evidence was insufficient to support the murder conviction. He is entitled to the writ on this claim.
>
> 2-CT 481.

Mr. Cooper submits that the District Court's reasoning is compelling, and he urges this Court to reach the identical conclusion. The evidence presented at the 2004 trial -- like that presented in 1995 when considered without reference to Mr. Kingdom's statements -- was insufficient to satisfy the Fourteenth Amendment Due Process Clause. Reversal should be ordered.

---

[37](...continued)

[37]/ "The criminalist admitted the gunshot residue could not determine *when* gunshot residue was deposited ... and could not determine *whether* it was deposited on the surface by transference .... The usefulness of the jacket and glove evidence also was limited by poor collection efforts .... The connection between Cooper and the jacket was weak ...." 2-CT 479,

D. There May Be No Retrial in the Event of Reversal.

A determination on appeal of insufficient evidence bars a retrial under federal twice-in-jeopardy principles. United States Constitution, Amendment Five; *Burks* v. *United States* (1978) 437 U.S. 1; *Greene* v. *Massey* (1978) 437 U.S. 19; *In re Johnny G.* (1979) 25 Cal.3d 543, 546; and *People* v. *Pierce* (1979) 24 Cal.3d 199, 209-210.

## II

## IT VIOLATED THE COLLATERAL ESTOPPEL DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY TO HAVE CONVICTED MR. COOPER ON EVIDENCE PREVIOUSLY DETERMINED BY A FEDERAL COURT ON HABEAS TO HAVE BEEN INSUFFICIENT.

### A. Introduction to the Issue.

As explained, above, the United States District Court examined the evidence presented in 1995 -- exclusive of the erroneously admitted hearsay from Miltonous Kingdom -- and found it insufficient under the Fourteenth Amendment. However, the unusual nature of that ruling -- based not on all of the evidence but on the admissible evidence -- took the case outside the usual "twice-in-jeopardy" bar against a retrial.

The question thus becomes the effect of the District Court's finding of insufficient evidence, where the evidence at the 2004 retrial did not significantly differ from the 1995 evidence found by the District Court to be insufficient. Mr. Cooper now submits that the effect of the District Court's order was to bar his conviction on substantially the same evidence, under either or both of the "collateral estoppel" or "law of the case" doctrines.

Mr. Cooper will begin by reviewing the proceedings in the lower court, when these issues were raised prior to trial, during the motions *in limine*, and at the conclusion of the prosecution's case. He will then discuss the collateral estoppel effect of the United States District Court's decision, after which he was address -- in Argument III -- the law of the case effect of the United States District Court's decision. He will show

that, under one doctrine or the other, the case against him should have been dismissed.

B. The Proceedings in the Lower Court.

1. The Pretrial Rulings.

On June 28, 2004, the case was called before Judge Reardon on the defense's motion to dismiss the case. The court noted that the defense had filed supplemental points and authorities referring to the Double Jeopardy claim and collateral estoppel doctrine, that the prosecution had filed opposition, and that the defense had filed a response. RT (6/28/04) 1. See, also, 2-CT 538, 563, 565; 3-CT 572.

Judge Reardon began by rejecting the defense's "twice in jeopardy" argument. The court deemed the "authorities [to be] clear that reversal because evidence is improperly admitted does not bar retrial." Cited were *Lockhart* v. *Nelson* (1988) 488 U.S. 33, 40; *People* v. *Otto* (1992) 2 Cal.4th 1088, 1115-1116; and *People* v. *Shirley* (1982) 31 Cal.3d 18, 71-72 RT (6/28/04) 11-13.

Turning to collateral estoppel, Judge Reardon correctly phrased the issue as follows: "The question is whether the Federal Court having found that in the absence of Mr. Kingdom's statement there was otherwise insufficient evidence to sustain a conviction on the murder collaterally estops the People from trying to obtain a conviction on the murder on the state of the evidence." RT (6/28/04) 13. After noting that the cases "dance around the issue of whether ... collateral estoppel in a criminal context is applicable in a prosecution of the same case" (RT (6/28/04) 14), the court observed that collateral estoppel requires litigation to a "final judgment." RT (6/28/04) 15. The court concluded that

res judicata and collateral estoppel principles did not apply. RT (6/28/04) 16.

Judge Reardon deemed "the more interesting question" to concern law of the case. RT (6/28/04) 15. However, the court noted that an appellate court's determination "control[led] the outcome only if the evidence on retrial ... is ... substantially the same." RT (6/28/04) 16.

The court then queried the prosecutor whether there "is additional evidence besides what was presented at the first trial that would be substantially different ...." RT (6/28/04) 16. The prosecutor's response was that he "expect[ed] there to be different evidence." RT (6/28/04) 17.

The prosecutor conceded that, "if we present the exact same thing the exact same way, we're going to be bound by the Federal Court's ruling." RT (6/28/04) 17. When Judge Reardon observed that "law of the case prevents you from presenting the same evidence you presented, leaving aside Kingdom's statement, presenting all the other same evidence and nothing else," the prosecutor agreed. RT (6/28/04) 17-18.

Judge Reardon correctly noted that one would need to compare "evidence presented at trial one with evidence presented at trial two." RT (6/28/04) 18. Thereafter, Judge Reardon denied the motion to dismiss on all bases. RT (6/28/04) 31. It reserved the law of the case issue for the trial court. RT (6/28/04) 34.

2. Proceedings in the Trial Court.

a. The *In Limine* Rulings.

i. September 30, 2004.

On September 30, 2004, the defense appeared before the trial judge and again sought dismissal of the murder count based on the determination by the federal court that, stripped of the statement of Mr.

Kingdom, the evidence was insufficient to support the verdict. 1-RT 19-20. Defense counsel asked the trial court to inquire of the prosecutor whether there was additional evidence to present on the homicide. 1-RT 20.

The trial court's response was that the motion had been denied by Judge Reardon. 1-RT 21-22. Defense counsel offered in response Judge Reardon's belief that the defenses's only remedy was under the law of the case doctrine. 1-RT 22. The trial court refused to hear the motion, for the reason that another judge had ruled on it. 1-RT 23.

ii. October 4, 2004.

On October 4, 2004, the defense filed "Additional Proposed Defense In Limine Motions." The defense endeavored to clarify Judge Reardon's ruling, again urging that no new evidence would be presented at the retrial. 3-CT 646-647.

The trial court acknowledged the arguments in the new pleading. However, the court held that its "ruling stands." 1-RT 38-39.

b. The November 2, 2004 Ruling, at the Conclusion of the Prosecution's Case.

On November 2, 2004, the defense filed its "Motion to Dismiss Count One under Two Theories." The first theory was Penal Code section 1118.1, and the second was "law of the case." 3-CT 721-723.

When the matter was considered by the trial court, the court memorialized that it had read the United States District Court's opinion. 5-RT 851-852. After the section 11181.1 motion had been denied (5-RT 856), the trial court turned to the law of the case issue. 5-RT 858.

The trial court deemed "law of the case" not to be "jurisdictional," instead being a policy doctrine applicable only to "appellate courts." 5-RT 862. The trial court viewed the United States District Court on federal habeas not to be a court whose determinations would bind a state trial court. 5-RT 863-864. The trial court also concluded that law of the case applied only to a determination made in "the same case." 5-RT 864. The trial court's ruling was that the District Court's decision did not constitute the law of the case (5-RT 865), and the motion to dismiss was denied. 5-RT 867.

Mr. Cooper now submits that error occurred in these rulings.

C. Collateral Estoppel, Generally.

The doctrine of res judicata gives a binding effect to a former judgment in subsequent litigation involving the same controversy. *See People* v. *Damon* (1996) 51 Cal.App.4th 958, 968. Its purpose is to prevent multiple litigation causing vexation and expense to the parties, and wasted expense and efforts in judicial administration. *Ibid.* As explained by the California Supreme Court in *People* v. *Barragan* (2004) 32 Cal.4th 236, 252: "As generally understood, '[t]he doctrine of *res judicata* gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same controversy.' (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 280, p. 820.)" Emphasis in original.

The doctrine has a "double aspect." *Todhunter* v. *Smith* (1934) 219 Cal. 690, 695. In its primary or "claim preclusion" aspect, the doctrine bars a second suit between the same parties on the same cause of action. *See People* v. *Barragan*, *supra*, 32 Cal.4th at 252; *Clark* v. *Lesher* (1956) 46 Cal.2d 874, 880; and *People* v. *Damon*, *supra*, 51 Cal.App.4th at 968. "[I]n a new action on the same cause of action, a

prior judgment for the defendant is a complete bar superseding his claim by a right of action on the judgment." *People* v. *Damon*, *supra*, 51 Cal.App.4th at 968.

In its secondary or "issue preclusion" aspect (usually referred to as "collateral estoppel"), the doctrine does not bar a second action, but prevents a party from relitigating in a second proceeding matters litigated and determined in a prior proceeding. *See People* v. *Sims* (1982) 32 Cal.3d 468, 477 [superseded by statute as explained in *People* v. *Preston* (1996) 43 Cal.App.4th 450, 456]; and *People* v. *Damon*, *supra*, 51 Cal.App.4th at 968. "'In its secondary aspect,' commonly known as collateral estoppel, '[t]he prior judgment ... "operates"' in 'a second suit ... based on a different cause of action ... "as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action." [Citation.]' [*Clark* v. *Lesher*, *supra*, 46 Cal.2d at 880]." *People* v. *Barragan*, *supra*, 32 Cal.4th at 252-253

California courts look to the Restatement Second of Judgments in deriving the law on collateral estoppel. *See*, *e.g.*, *County of Santa Clara* v. *Deputy Sheriffs' Assn.* (1992) 3 Cal.4th 873, 879 n. 7; *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 n. 3; and *Barker* v. *Hall* (1987) 191 Cal.App.3d 221, 226. Section 13 of the Restatement Second of Judgments provides:

> The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

The Restatement Second of Judgments provides further, in § 27, as follows:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

As explained by the California Supreme Court in *People* v. *Barragan* (2004) 32 Cal.4th 236:

> "The prerequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. [Citations.]" (*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 556 [ ].)
>
> *People* v. *Barragan*, *supra*, 32 Cal.4th at 252-253.

*See*, *also*, *People* v. *Sims*, *supra*, 32 Cal.3d at 484;[38] and *Younan* v. *Caruso* (1996) 51 Cal.App.4th 401, 406-407.

Moreover, our High Court has deemed it "a fundamental precept of common law adjudication ... that an issue once determined by a competent court is conclusive. [Citations.]" *Arizona* v. *California* (1983) 460 U.S. 605, 619 [citing *Montana* v. *United States* (1979) 440 U.S. 147, 153; *Federated Department Shores* v. *Moitie* (1981) 452 U.S. 394, 398; and *Cromwell* v. *County of Sac.* (1877) 94 U.S. 351, 352-313].[39]

More importantly, the United States Supreme Court determined in *Ashe* v. *Swenson* (1970) 397 U.S. 436 that issue preclusion principles are a component of the Fifth Amendment guarantee against double jeopardy. This holding has had a profound effect on the application of issue preclusion principles in state courts.

> The question is ... whether [collateral estoppel] is a part of the Fifth Amendment's guarantee against double jeopardy. And if collateral estoppel is embodied in that guarantee,

---

38/ In *People* v. *Sims*, *supra*, 32 Cal.3d 468, the Supreme Court held that collateral estoppel barred the prosecution of the defendant for welfare fraud after she had been exonerated in a Department of Social Services hearing. *Id.*, at 489. The DSS action was a judicial decision resolving disputed issues of fact properly before it, which the parties had a sufficient opportunity to litigate. *Id.*, at 490-490. The Supreme Court held that the District Attorney's Office was in privity with the DSS because both represent the government and jointly investigated and controlled welfare fraud. *Id.*, at 487.

39/ "'To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *Montana* v. *United States*, *supra*, at 153-154 ...." *Arizona* v. *California*, *supra*, 460 U.S. at 619.

> then its applicability in a particular case is no longer a matter to be left for state court determination within the broad bounds of "fundamental fairness," but a matter of constitutional fact we must decide through an examination of the entire record.
>
> *Id.*, at 442-443.

The Supreme Court in *Ashe* noted the significance of issue preclusion in American jurisprudence:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in United States v Oppenheimer [(1916)] 242 US 85 .... As Mr. Justice Holmes put the matter in that case, "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." 242 US, at 87 ....
>
> *Ashe* v. *Swenson*, *supra*, 397 U.S. at 443.

The Court's unequivocal resolution of the question was as follows:

> The ultimate question to be determined, then, ... is whether this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy. We do not hesitate to hold that it is.
>
> *Id.*, at 445.

*See*, *also*, *Bradley* v. *Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098 [deeming a state court's failure to apply issue preclusion principles to be a potential violation of the Fourteenth Amendment Due Process Clause].

D. Application of That Law Here.

Mr. Cooper has reviewed the ruling of the United States District Court on federal habeas that the 1995 evidence -- exclusive of the erroneously admitted statements of Mr. Kingdom -- was insufficient to convict under the Fourteenth Amendment Due Process Clause. However, the District Court in its order added the following, to address the twice-in-jeopardy implications of its ruling:

> When, as here, the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation, the remedy is affected. In such a case, retrial rather than acquittal is the remedy. "[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction." *Lockhart* v. *Nelson* [(1988)] 488 U.S. 33, 40 ....
>
> 2-CT 481.

In *Lockhart* v. *Nelson*, a Arkansas defendant had asserted that there had been insufficient evidence on which to adjudicate him a "habitual offender," because one of his prior convictions had been set aside by pardon. After the District Court and Eighth Circuit concluded the Double Jeopardy Clause barred relitigation of the issue, the United States Supreme Court held that the Double Jeopardy Clause did not bar a retrial if

all of the evidence admitted -- admissible and inadmissible -- was
sufficient under the Fourteenth Amendment, and it was only when the
inadmissible evidence was excised that the remaining evidence failed to
satisfy the Fourteenth Amendment. *Id.*, at 38-42.

The question thus becomes whether the United States District
Court's ruling on the Fourteenth Amendment issue precluded Mr.
Cooper's 2004 conviction on the *same* evidence found constitutionally
deficient. Mr. Cooper submits that this question must be answered yes,
because collateral estoppel is a component of Fifth Amendment double
jeopardy. While the Fifth Amendment might have allowed Mr. Cooper's
reconviction on substantially different evidence (under *Lockhart* v.
*Nelson*), it did not permit his reconviction on the same evidence.

Respondent might quibble over one aspect or another of the
collateral estoppel doctrine, such as by asserting that the federal habeas
proceeding was in the "same case" as the criminal prosecution. Indeed,
Judge Reardon raised this issue in his consideration of the question. See,
RT (6/28/04) 14. However, respondent will not be able to have it both
ways, as did the lower court.

Judge Reardon apparently considered the federal habeas proceeding
part of the "same case." However, the trial judge ruled against Mr.
Cooper, in part, because the law of the case doctrine only operates within
the "same case," taking the view that the federal habeas proceeding was
"another case."

Mr. Cooper will not seek further to guess arguments respondent
may adopt. Mr. Cooper will rest on his arguments thus far. In summary,
the United States District Court's decision satisfied all elements of the
collateral estoppel doctrine, and the case should have been dismissed.

III

IT VIOLATED THE LAW OF THE CASE DOCTRINE, WHICH MUST ALSO BE SEEN AS A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY, TO HAVE RECONVICTED ON EVIDENCE PREVIOUSLY DETERMINED BY THE UNITED STATES DISTRICT COURT TO HAVE BEEN INSUFFICIENT.

A. Introduction to the Issue.

The background for this issue is set forth in Arguments I and II, above. Judge Reardon correctly concluded that -- in the absence of substantially greater evidence at retrial -- reconviction of Mr. Cooper would be barred by the law of the case doctrine. Moreover, the prosecutor appearing before Judge Reardon agreed.

The trial court, however, was unpersuaded. It found various theories on which to avoid the effect of the United States District Court's decision, in effect taking the position that a United States District Court's ruling on an issue of federal constitutional law would not bind a California trial court. If correct, this view would permit California trial courts to admit evidence, or give instructions, or take other action, after a United States District Court had found federal constitution error in the state court's having done so at an earlier trial.

With deference, the trial court here misinterpreted the roles of a United States District Court, on the one hand, and a state trial court, on the other, in terms of resolution of federal constitutional issues. While one might debate the hypothetical, law of the case effect of a federal court ruling on matters not covered by the United States Constitution, a federal court ruling on a issue of federal constitutional law clearly binds state trial courts. Error occurred.

B. The Law of the Case Doctrine.

Under the law of the case doctrine:

> .... [W]hen an appellate court "'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the trial court and upon subsequent appeal ....'" (*Kowis* v. *Howard* (1992) 3 Cal.4th 888, 893 [ ].) Absent an applicable exception, the doctrine "requir[es] both trial and appellate courts to follow the rules laid down upon former appeal whether such rules are right or wrong." (*Estate of Baird* (1924) 193 Cal. 225, 234 [ ].)
>
> *People* v. *Barragan* (2004) 32 Cal.4th 236, 246.

The law of the case doctrine was discussed further by the California Supreme Court in *People* v. *Monge* (1997) 16 Cal.4th 826. In *Monge*, the Supreme Court "conclude[d] that the state and federal double jeopardy protections do not apply to the trial of [a] prior conviction allegation ...." *Id.*, at 845. However:

> .... [T]his conclusion raises numerous secondary issues. For example, the Court of Appeal's determination that the evidence was insufficient to prove defendant's prior conviction was of a serious felony is, at the very least, the law of this case. Thus, the prosecution would have to present additional evidence at a retrial of the prior conviction allegation in order to obtain a different result. *People* v. *Monge* (1997) 16 Cal.4th 826, 845.
>
> *Ibid.*

The law of the case doctrine does not, of course, limit the evidence that might be relied upon in such a retrial. ".... [N]othing in the

law of the case doctrine itself limits the additional evidence that a party may introduce on retrial to that which 'could have been presented at the first trial through the exercise of due diligence.'" *People* v. *Barragan*, *supra*, 32 Cal.4th 247. Moreover: "The law-of-the-case doctrine ... controls the outcome only if the evidence on retrial ... of an issue is substantially the same as that upon which the appellate ruling was made. [Citations]." *People* v. *Mattson* (1990) 50 Cal.3d 826, 850.

It is often said that the law of the case doctrine only operates within "the same case." *See Davies* v. *Krasna* (1975) 14 Cal.4d 502, 507; and *Wilder* v. *Whittaker Corp.* (1985) 169 Cal.App.3d 969, 972. However, a pretrial writ decision has law of the case effect, if the issue was fully briefed and decided. *See Kowis* v. *Howard* (1992) 3 Cal.4th 888, 894; *Palma* v. *U.S Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 182; and *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 267 n. 5. Moreover, an order denying a motion to dismiss an appeal also has law of the case effect. *Pigeon Point Ranch* v. *Perot* (1963) 59 Cal.2d 227, 230-233. *See*, *also*, *People* v. *Silva* (1981) 114 Cal.App.3d 538, 549.

It is also said on occasion that the law of the case doctrine is "merely a rule of procedure," which "does not go to the power of the court," and "which will not be adhered to where its application will result in an unjust decision." *Clemente* v. *State of California* (1985) 40 Cal.3d 202, 212. However, the "principle ground for making an exception to the doctrine of law of the case is an intervening or contemporaneous change in the law. [Citations.]" *Ibid.*

Federal courts also recognize the importance of law of the case, as a complement to collateral estoppel.

> Although we have been reluctant to import wholesale law-of-the-case principles into original actions, Arizona v California, 460 US 605, 618-619, ..., prior rulings in such cases "should be subject to the general principles of finality and repose, absent changed circumstances or unforeseen issues not previously litigated." Id., at 619. ....
>
> *Wyoming* v. *Oklahoma* (1992) 502 U.S. 437, 446.

Federal courts, like California, recognize limited circumstances under which law of the case might apply, such as where substantially different evidence is produced on retrial:

> Although "law of the case" is not an "inexorable command," prior decision of legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous and would result in injustice. [Citations.]
>
> *Handi Investment Company* v. *Mobil* (9th Cir. 1981) 613 F.2d 391, 392.

In Mr. Cooper's view, collateral estoppel and law of the case are each issue preclusion doctrines. If collateral estoppel is a component of double jeopardy barring retrial on substantially the same evidence found legally deficient in a different case, so too must law of the case be a component of double jeopardy barring retrial on substantially the same evidence.

C. Application of That Law Here.

The trial court ultimately took the view that the Federal habeas proceeding was not in the "same case," could be ignored on policy grounds, and could be ignored because not issued by a court whose decisions were binding on California trial courts.

As for the "same case" question, Mr. Cooper need take no position on this point. If the federal habeas proceeding was not the "same case," collateral estoppel barred his reconviction. If it was the "same case," law of the case barred his reconviction. Under one "issue preclusion" doctrine or the other, he is entitled to relief.

As for the other aspects of the trial court's reasoning, however, Mr. Cooper respectfully submits that the trial court was in error.

As noted more than a half-century ago by Justice Frankfurter:

> Congress could have left the enforcement of federal constitutional rights governing the administration of criminal justice in the States exclusively to the State courts. These tribunals are under the same duty as the federal courts to respect rights under the United States Constitution. [Citations.] .... It was not until the Act of 1867 that the power to issue the writ was extended to an applicant under sentence of a State court. It is not for us to determine whether this power should have been vested in the federal courts. As Mr. Justice Bradley, with his usual acuteness, commented not long after the passage of that Act, "although it may appear unseemly that a prisoner, after conviction in a state court, should be set at liberty by a single judge on *habeas corpus*, there seems to be no escape from the law." *Ex parte Bridges, 2 Woods (5th Cir.) 428, 432.*
>
> *Brown* v. *Allen* (1953) 344 U.S. 443, 499.

As explained further by Justice Frankfurter, an issue which "calls for interpretation of the legal significance of [historical] facts" is resolved by a District Judge: "Thus, so called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." *Id.*, at 507. Finally, Justice Frankfurter had the following to say about the respective roles of a United States District Court, on the one hand, and state courts, on the other:

> Insofar as [habeas] jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law. It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law. The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted.
>
> *Id.*, at 510.

Accordingly, a United States District Court decision on an issue of federal constitutional law cannot be ignored by a state trial court -- by any other state court -- in the "same case," or in a different case involving the same issue and parties.

Finally, the trial court was correct that law of the case has exceptions. However, there was no "substantially different evidence" at the retrial, there had been no change in the law, and the trial court's disagreement with the United States District Court did not transform the

United States District Court's view into "injustice."  *See Tally* v. *Ganaht*
(1907) 151 Cal. 418, 421 ["law of the case" applies even though the court
"may be clearly of the opinion that the former decision is erroneous ...."].

In short, the law of the case doctrine, as an issue preclusion
component of double jeopardy, or as an independent state doctrine, barred
reconviction on the same evidence.  Mr. Cooper's conviction of murder
should be reversed.

PART TWO: THE *FARETTA* AND *MARSDEN* ISSUES.

From the day trial counsel was to be appointed, until commencement of trial, Mr. Cooper struggled to rid himself of his appointed attorney. There was an objection prior to the appointment of the attorney; there were *Marsden* motions seeking to replace the attorney; and there were *Faretta* motions seeking self-representation as a mechanism for avoiding representation by the attorney. All of Mr. Cooper's efforts to replace and/or jettison counsel were unsuccessful.

In Part Two of this brief, Mr. Cooper will present two broad claims of error. The first, presented in Argument IV, below, will be that the lower court erred in denying his *Faretta* motions. The second claim of error, presented in Argument V, below, will be that it was error to have denied his *Marsden* motions.

In Argument IV, Mr. Cooper will review in detail the procedural course of the case from appointment of counsel to trial, noting in the process the denials of Mr. Cooper's *Marsden* motions. However, he will not address the specifics of the *Marsden* hearings until Argument V. His reasons for this approach are two-fold: (1) the judge who denied the *Faretta* motions knew nothing about the specifics of the *Marsden* motions; and (2) the judge in denying the *Faretta* motions disclaimed reliance on the fact of the *Marsden* motions as a basis for denial of the *Faretta* motions.

IV

IT WAS ERROR TO HAVE DENIAL MR. COOPER'S MOTIONS FOR SELF-REPRESENTATION BROUGHT UNDER *FARETTA* V. *CALIFORNIA*.

A. The Right of Self-Representation, in Broad Strokes.

1. In General.

In *Faretta* v. *California* the United States Supreme Court held that a criminal defendant has a right to represent himself if he so desires, a right guaranteed by the Sixth and Fourteenth Amendments to the Constitution. *Faretta* v. *California* (1975) 422 U.S. 806 (hereinafter, "*Faretta*"). The Court found, even though "in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," that the right to defend oneself in the face of criminal charges was fundamental to Anglo-American jurisprudence. *Id.*, at 834.

> "When the administration of the criminal law ... is hedged about as it is by the constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards ... is to imprison a man in his privileges and call it the Constitution."
>
> *Id.*, at 815, quoting *Adams* v. *United States ex rel. McCann* (1942) 317 U.S. 269, 279.

As the Supreme Court analyzed the issue further:

> The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant -- not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To

> thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.
>
> *Faretta*, *supra*, 422 U.S. at 820.

As expressed powerfully by Presiding Justice Puglia of the Third District in *People* v. *Nauton* (1994) 29 Cal.App.4th 976, 981:

> Respect for the dignity and autonomy of the individual is a value universally celebrated in free societies and uniformly repressed in totalitarian and authoritarian societies. Out of fidelity to that value defendant's choice must be honored even if he opts foolishly to go to hell in a handbasket. At least, if the worst happens, he can descend to the netherworld with his head held high. It's called, "Doing It My Way."

2. A Request for Self-Representation Must Be Unequivocal.

This requirement, established by *Faretta* itself (*Faretta*, *supra*, 422 U.S. at 835), prevents defendants from waiving their right to counsel inadvertently or impulsively, and it precludes manipulation of the mutually-exclusive rights to counsel and self-representation. *United States* v. *Hernandez* (9th Cir. 2000) 203 F.3d 614, 621. The requirement of an unequivocal request resolves these problems by forcing the defendant to make an explicit choice. *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441, 1444.

A request for self-representation is equivocal if it reflects an immediate, impulsive and emotional reaction to, or expression of frustration at, a court's denial of a motion for a different attorney. *Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882, 888-889; *Reese* v. *Nix* (8th Cir. 1991)

942 F.2d 1276, 1278-1279, 1281. Such requests are viewed as a result of "momentary caprice" or "thinking out loud." *Jackson* v. *Ylst*, *supra*, 921 F.2d at 888.

However, there is a substantial difference between a "equivocal" request for self-representation and a "conditional" one. Indeed, defendants who seek leave to represent themselves fall broadly into two categories. There is the smaller category, in which the defendants wish to represent themselves "unconditionally" and would refuse representation from any attorney. There is also the larger category, in which the defendants elect self-representation "conditionally," because prior requests for new counsel were denied, leaving self-representation as the only alternative to representation by the unwanted attorney.

A request for self-representation is not equivocal when the defendant makes the request separate from, and after, an unsuccessful *Marsden* motion, where denial of the *Marsden* motion left self-representation as the only means of avoiding representation by an attorney the defendant did not want. A request for self-representation is not equivocal where "the defendant was not seeking to waive his [right to counsel] in a thoughtless manner," where the trial court engaged him in a discussion about the dangers of self-representation, and where the request for self-representation did not appear to be "a momentary caprice or the result of thinking out loud." *United States* v. *Robinson* (9th Cir. 1990) 913 F.2d 712, 714, *cert. denied*, 498 U.S. 1104. Nor is a request for self-representation viewed as equivocal where the defendant's decision did not constitute "a mere whim or caprice." *Ibid.*

3. <u>A Request for Self-Representation Must Be Timely</u>.

In *Faretta*, the request to represent himself was made by Mr. Faretta "[w]ell before the date of trial ... "(*Faretta*, *supra*, 422 U.S. at 807), which we know only to have been "weeks before trial." *Id.*, at 835, 808. The majority opinion in *Faretta* said nothing more about time or timing, although Justice Burger in his dissent noted that assertions of self-representation would doubtless slow the judicial process,[40] and Justice Blackmun in his dissent listed the timing question as one likely to create problems.[41]

In construing the right to self-representation the Ninth Circuit has held that a defendant's request to represent himself must be granted if it is knowing and intelligent, unequivocal, and timely asserted. *Armant* v. *Marquez* (9th Cir. 1985) 772 F.2d 552, 555, *cert. denied sub nom. Bunnell* v. *Armant* (1986) 475 U.S. 1099; *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441, 1442. In the Ninth Circuit, a request for self-

---

[40]/ .... [C]ourts at all levels are already handicapped by the unsupplied demand for competent advocates, with the result that it often takes far longer to complete a given case than experienced counsel would require. If we were to assume that there will be widespread exercise of the newly discovered constitutional right to self-representation, it would almost certainly follow that there will be added congestion in the courts ...." *Faretta*, *supra*, 422 U.S. at 845 (Burger, J., dissenting).

[41]/ "Must every defendant be advised of his right to proceed pro se? If so, when must that notice be given? Since the right to assistance of counsel and the right to self-representation are mutually exclusive, how is the waiver of each right to be measured? If a defendant has elected to exercise his right to proceed pro se, does he still have a constitutional right to assistance of standby counsel? How soon in the criminal proceeding must a defendant decide between proceeding by counsel or pro se? Must he be allowed to switch in midtrial?" *Faretta*, *supra*, 422 U.S. at 852 (Blackmun, J., dissenting).

representation is timely as a matter of law if it is made before the jury is empaneled, unless it is shown to be a tactic to secure delay. *Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782; *Armant* v. *Marquez*, 772 F.2d at 555; *Maxwell* v. *Sumner* (9th Cir. 1982) 673 F.2d 1031, 1036, *cert. denied*, 459 U.S. 976 (request made prior to jury selection was "not made for the purpose of delay" and thus "was timely as a matter of law").

California courts applying the *Faretta* principles have drawn the line less clearly with regard to the "point beyond which the defendant forfeits the unqualified right to defend pro se." The rule articulated in California is that the defendant must assert the right "*within a reasonable time* prior to the commencement of trial. [Citations]." *People* v. *Bradford* (1997) 15 Cal.4th 1229, 1365; emphasis added. If this condition is not satisfied, "self-representation is no longer a matter of right but is subject to the trial court's discretion." *Ibid.*

B. Proceedings in the Lower Court, From Appointment of Counsel Through the Unsuccessful *Faretta* Motions.

1. The First Hearing on Remand: May 13, 2004.

On remand from the United States District Court, the case was first called before Judge Reardon. Mr. Giller appeared as head of the Alameda County court-appointed panel, and Mr. Giller agreed to ask the panel to contact attorneys. The court noted that Mr. Cooper did not intend to waive time. RT (May, 2004) 1.[42]

---

[42]/ Reporter's Transcript of proceedings on May 13, May, 14 and May 18, 2004, consisting of 29 pages in one volume.

2. The Second and Third Hearings: May 14 and 18, 2004.

On the following day, the court observed that seven panel attorneys had indicated unwillingness to accept the case, given Mr. Cooper's determination not to waive time. RT (May, 2004) 10-11. On May 18, 2004, it was noted further that an eighth attorney had refused the case and that Mr. Giller had again been contacted. RT (May, 2004) 15.

3. May 19, 2004: Appointment of Counsel Over Mr. Cooper's Objection.

Ms. Levy was among the seven counsel who had initially refused the case. RT (May, 2004) 11. However, Ms. Levy appeared on May 19, 2004, and she agreed to "make every effort to be prepared to try [the] case within 60 days," even though there were three boxes of transcripts, two boxes of documents, and many witnesses. RT (5/19/04) 1.[43]

At this point, Mr. Copper asserted:

> I was talking with Ms. Levy a few times. She told me that she is not going to take my case; she don't want my case. [¶] .... It was like antagonistic debate going on. And she says she is not going to take my case; she don't want my case. ... [¶] She has also divulged she'd broken the attorney/client privilege by divulging my intentions to the court which is what she admitted to me. ... [¶] When she talked to me, she stormed off at least three times. ... "I don't even want your case," like that.
>
> RT (5/19/04) 2.

---

43/ Reporter's Transcript of proceedings on May 19, 2004, consisting of 14 pages in one volume.

When Ms. Levy was asked to state "her position," she conceded that when she and Mr. Cooper "first met things did get not very pleasant. And Mr. Cooper would tell me he didn't want me, and I would respond, well, then, I am not going to take the case. But ... I am here today to pick up Mr. Cooper's case within the time constraints." RT (5/19/04) 3.

Mr. Cooper asserted that he had not told Ms. Levy he did not want her. ".... [S]he told me, 'I don't want your case.'" RT (5/19/04) 3. Mr. Cooper asserted further, as follows:

> I am not willing to accept her as my attorney. I am not willing to accept Ms. Levy as my attorney because she have [sic] already broken the attorney/client privilege. She already told me ... she does not want me.... [T]here's no way I can confident in her handling anything for me. ... I can't feel confident in her diligently representing me. I do not want Ms. Levy as my attorney. [¶] It makes no sense so I do not want Miss Levy as my attorney.
>
> RT (5/19/04) 4.

The lower court responded, "[b]ased upon the fact that you've known each other about an hour, ... I don't see any reason to discharge Ms. Levy." RT (5/19/04) 4. To this Mr. Cooper replied: "She was already antagonistic towards me. ... [¶] I do not want Ms. Levy as my attorney." RT (5/19/04) 5.

Nonetheless, the lower court stated it was "denying your *Marsden* motion. I see no grounds to discharge her as your lawyer. I am appointing her as your lawyer." RT (5/19/04) 5.

After discussion of Penal Code section 1382 and the commencement of the 60-day statutory period to begin retrial (RT (5/19/04) 6-11), Mr. Cooper again asserted: "She does not represent me. I am not

accepting her as my attorney." RT (5/19/04) 11-12. The court's response was: "I have appointed her." RT (5/19/04) 12.

When Mr. Cooper inquired, "How do I represent myself," the court responded: "If you want to be your own lawyer, you can. But if you want a lawyer it's going to be Ms. Levy because court-appointed went through 30 other people, given your desire to go no time waiver. ..." RT (5/19/04) 12-13.

4.    June 28, 2004: Denial of the Defense Motions to Dismiss.

On June 28, 2004, Judge Reardon denied defense motions based on once-in-jeopardy, issue preclusion, and "law of the case" doctrines, deeming the applicability of the latter doctrine to be a trial issue, based on the quantum of evidence produced on retrial. RT (6/28/04) 1-34.[44] These proceedings have already been addressed, at pages __ through __, above.

5.    Proceedings on July 6, 2004.

a.    The July 6th *Marsden* Motion, Before Judge Goodman.

The matter was assigned to Judge Goodman for a hearing on a *Marsden* motion. 3-CT 591. At that hearing, the details of which are set forth in Argument V, which follows, Judge Goodman denied the motion for substitute counsel.

---

[44]/ Reporter's Transcript of proceedings on June 28, 2004, consisting of 34 pages in one volume.

b. Further Proceedings That Day Before Judge Reardon.

After denial of the *Marsden* motion by Judge Goodman, the matter was again called before Judge Reardon. Ms. Levy advised Judge Reardon of her discussions with Mr. Cooper of his various options: a motion for reconsideration of the June 28th ruling; an extraordinary writ to challenge the June 28th ruling; going to trial "on a no-time-waiver basis"; and a time waiver to permit Mr. Cooper's family to retain other counsel, in view of "his wish for different counsel." RT (7/6/04) 3.

Ms. Levy represented that Mr. Cooper had "said he wanted to go to trial" but had "asked for some information" she did not have, in relation to the issues raised by Miltonous Kingdom in his appeal after conviction for the same homicide. RT (7/6/04) 3-4. When the trial court explained that a courtroom was available to try the case, Mr. Cooper stated: "I'll go to trial." RT (7/6/04) 5. This led to the following exchange:

> THE COURT: With Ms. Levy as your lawyer?
>
> THE DEFENDANT: For right now.
>
> THE COURT: What does that --
>
> THE DEFENDANT: I want to go pro per. So for right now, yeah.
>
> RT (7/6/04) 5.

Thereafter, Mr. Cooper began to question the court about the import of its rulings on June 28th, and particularly about how the issue of "law of the case" would be addressed at trial. *Ibid.* This prompted Ms. Levy to suggest that Mr. Cooper was represented and should not be

addressing the court directly, and to concede that "Mr. Cooper has a lot of questions." *Ibid.* To this, Mr. Cooper asserted that "[s]he wouldn't answer" his questions. RT (7/6/04) 6.

After a further exchange between Mr. Cooper and the court regarding the "law of the case" issue, Mr. Cooper stated as follows, apparently in reference to a possible "motion for reconsideration": "That motion you put in for me, I'm not honoring that. That was never called." *Ibid.* When Ms. Levy again objected to Mr. Cooper addressing the court directly ("I'm his mouthpiece"), Mr. Cooper stated: "I'm going to have to hire a new lawyer, Ms. Levy," and, "They haven't been honoring the Court order for me to call my attorney." RT (7/6/04) 6-7. Thereafter, the matter was assigned to Judge Rolefson for trial. RT (7/6/04) 7.

6. <u>July 7 and 8, 2004, Before Judge Rolefson</u>.

The first appearance before Judge Rolefson was a brief one, on July 7, 2004. 1 RT 1-9. On the following day, July 8, 2004, Judge Rolefson confirmed with Mr. Cooper that he desired to waive time for trial in order that Ms. Levy could pursue a writ. RT (7/8/04) 1.[45] The matter was "transferred back" to Judge Reardon's department "to set," which "takes it out of the trial department." RT (7/8/04) 1-2. [When the matter was before Judge Reardon on July 8th, a trial setting conference was scheduled for August 24th. RST 1.[46]]

---

[45]/ Reporter's Transcript of proceedings before Judge Rolefson on July 8, 2004, consisting of 2 pages in one volume.

[46]/ Reporter's Supplemental Transcript on Augmentation, including proceedings on July 8, July 13, August 11, September 21, September 22, September 23, and September 29, 2004, consisting of 29 pages in one volume.

7. Proceedings on September 21, 2004.

a. Before Judge Reardon.

On September 21, 2004, the matter was before Judge Reardon to be assigned for trial, but the court was advised of Mr. Cooper's desire to present a *Marsden* motion. The court determined to refer the matter to another court to hear the *Marsden* motion, before sending the matter out for trial. RST 12.

b. The September 21st *Marsden* Motion, Before Judge Horner.

A *Marsden* motion was heard on September 21, 2004, before Judge Horner. At that hearing, the details of which also appear in Argument V, below, Judge Horner denied Mr. Cooper's motion for substitute counsel.

c. Further September 21st Proceedings Before Judge Reardon.

When the case was again before Judge Reardon on September 21st, the court was alerted that Mr. Cooper had indicated a wish to represent himself, which Mr. Cooper confirmed. When the court advised Mr. Cooper, "You know, I'm not going to give you a continuance," Mr. Cooper asserted, he "would like to go to trial," but he "need[ed] to get my records from [counsel]." When the court inquired whether Mr. Cooper was "ready" if he received everything today," Mr. Cooper answered: "Yeah." RST 13.

The court advised Mr. Cooper that there was a form he needed to "read over and understand the risks...." and that Mr. Cooper "need[ed] to

do it in writing...." The matter was continued to the following day, when "Ms. Levy would bring you all your boxes and everything." *Ibid.*

Before the hearing ended, the court reminded Mr. Cooper "there is a courtroom waiting ...," and he was told, "You won't get a continuance." Mr. Cooper's final comment was: "Ms. Levy and I don't get along." RST 14.

8. Proceedings Before Judge Reardon on September 22, 2004.

When the matter was called on September 22, 2004, the "*Faretta* form" had been completed. RST 15. When Mr. Cooper was asked if he still wished to represent himself, his response was: "Some of the discovery ... is missing." *Ibid.* This prompted Ms. Levy to explain that she had to review two boxes or materials to "redact about 900 pages of the police report," which would take her until Monday. RST 16. She also said she could provide a Walkman in order that Mr. Cooper could review audiotapes. *Ibid.*

When the court began to review the *Faretta* form, Mr. Cooper stated: "One of the reasons I was going pro per is so I can appeal that [*Marsden*] motion." RST 17. When advised by the court he could "appeal that whether you are pro per or not," Mr. Cooper stated: "He denied me getting a new attorney. I want to appeal that. It wasn't my first choice to want to go pro per. The only reason I wanted to get rid of the lady, she cursed me out." *Ibid.*

When Mr. Cooper explained that what he had meant was not appeal of the *Marsden* denial but a writ (RST 17-18), the court observed: "It sounds like an equivocal request. It doesn't sound to me like you really want to represent yourself." RST 18. When Mr. Cooper stated, "That's the only option I have," the court agreed that, "if she is not

willing to file a writ in regard to the denial of the *Marsden* motion, then you're right." *Ibid.*

Mr. Cooper next added: "The reason why I would jettison this lawyer is because the lawyer cussed me out." *Ibid.* He also stated: "That is the reason I wanted to jettison this lawyer. I never received any new discovery on my case at all." RST 18-19.

Thereafter, the following exchange occurred:

> THE COURT: You can bring a writ. Are you ready to go to trial?
>
> THE DEFENDANT: I'm ready to do the writ first.
>
> THE COURT: You can do the writ at the same time you are in trial.
>
> THE DEFENDANT: I need all my discovery. I also need to read the Kingdom transcript. I didn't read any of that.
>
> THE COURT: It doesn't sound like you're ready to go.
>
> THE DEFENDANT: I need to read that paperwork. I need to read it.
>
> *THE COURT: Are you ready to go to trial?*
>
> *THE DEFENDANT: I need to read my paperwork.*
> *THE COURT: Is that a "no"?*
>
> *THE DEFENDANT: That's a "no."*
>
> *THE COURT: Your motion is denied as untimely.*
>
> THE DEFENDANT: I have a time waiver anyway. What to you mean? I have a time waiver in right now.

THE COURT: But your motion to represent yourself is untimely.

THE DEFENDANT: How is it, if I have a time waiver in?

THE COURT: This matter has been on my trial calendar since --

MS. LEVY: Last Monday.

MR. JACOBSON: September 13th.

THE COURT: And you're raising this with me yesterday afternoon. *And being unprepared to go means it's untimely.*

THE DEFENDANT: I told my lawyer that I wanted to fire her last Monday because of the issue that we had.

THE COURT: Okay.

THE DEFENDANT: She didn't bring it up to you. *This is my only option is to get rid of this attorney.* This attorney is not working with me on this case.

THE COURT: Well, your motion is denied. So I'm ready to sent the matter out for trial.

RST 19-20; emphasis added.

When there was an attempt to assign the case to "Department 2," defense counsel was sworn and interposed a Code of Civil Procedure section 170.6 challenge, which was allowed. RST 20-21. The matter was left on a standby basis. RST 21.

9. Proceedings Before Judge Reardon on September 23, 2004.

On September 23, 2004, Ms. Levy asked the court to reconsider Mr. Cooper's *Faretta* motion "on two bases": (i) Mr. Cooper had indicated he was missing the part of the trial which related to Mr. Kingdom ("another co-responsible"), which was in a box counsel had available to give to Mr. Cooper; and (ii) Mr. Cooper did not have information relating to Rodney Love, which counsel could redact and provide to Mr. Cooper. RST 23.

The court responded that the *Faretta* motion had been denied as untimely. RST 23-24. However, the court agreed to consider the matter anew, since there would be no trial court available to try the case until Wednesday, September 29th. RST 25.

When Mr. Cooper was asked if he would be prepared to represent himself by that time, Mr. Cooper responded: "Depends on how many pages the Kingdom transcript is." After the prosecutor reported that there were "between 1500 and 2000 pages," Mr. Cooper stated he did not know if he would "be ready on the 29th." He asserted "at least two weeks would be reasonable to allow me to read the transcript." RST 25-26.

Mr. Cooper asked if the court were considering the fact of his earlier *Marsden* motions, and the court stated that it was not. RST 26. The colloquy continued, as follows:

> THE DEFENDANT: I think it would be reasonable to consider the fact that the relationship with my counselor is irreconcilable. She says she hates me. She cursed me out. And its just irreconcilable. I think it would be reasonable to allow me the opportunity, more than four days. And if I'm done, I'm done, before the date you set.

> THE COURT: I'm not considering that because they're two separate issues.
>
> RST 26-27.

After Mr. Cooper stated that it was not his "first choice to go pro per," the trial court and Mr. Cooper concluded the hearing as follows:

> [THE COURT]: Given the comments you made this morning, I would not allow you to represent yourself. *You indicated to me,* in front of me and a hundred people, *you want to have a lawyer represent you. To me, that is an equivocal statement of a desire to represent yourself,* so --
>
> *THE DEFENDANT: But the thing is, I would prefer to have counsel represent myself. As the situation presents itself right now, I have to represent myself based on the deterioration of the relationship that can't be repaired between me and the counselor right now. That's what I'm saying. It's preferable for me to have counsel.*
>
> THE COURT: And the Court has found that you have competent counsel and for whom there is no reason to discharge her.
>
> RST 27.

The parties were instructed to appear next on September 29, 2004. RST 28.

10. <u>September 29, 2004: Assignment for Trial</u>.

On September 29th, the matter was again assigned to Judge Rolefson for trial. Mr. Cooper was not present when the assignment was made. RST 29. [It appears that counsel appeared in Judge Rolefson's

court on September 29th, with the first formal proceedings being held on September 30th. 1-RT 10, *et seq.*]

C. Application of That Law to This Case.

The first critical question is whether Mr. Cooper's September 23, 2004 motion for self-representation was "equivocal," as the lower court concluded in denying it. A collateral question is whether Mr. Cooper's motions were properly denied as "untimely."

1. Mr. Cooper's Assertion of His Right of Self-Representation Was "Unequivocal."

The law draws a distinction between "equivocal" and "conditional" requests for self-representation. A "conditional" request is one in which the defendant seeks to represent himself because he absolutely does not want his current attorney but has be unable to persuade the court to appoint another attorney. The request is "conditional" because the defendant desires to represent himself if the only alternative is representation by the unwanted attorney. *Adams* v. *Carroll*, *supra*, 875 F.2d at 1445.

Conditional requests for self-representation are common. For example, in *People* v. *Michaels* (2002) 28 Cal.4th 486, the California Supreme Court was presented with an unusual claim of error. In *Michaels*, the appellant argued that the trial court had erred in *granting* a *Faretta* motion. The appellant had moved unsuccessfully in the lower court to replace his lead counsel in a capital prosecution. After that motion had been denied, the lower court suggested that "second counsel" take over as lead counsel. At this juncture, the appellant stated that he would rather represent himself, which request was granted. *Id.*, at 522.

On appeal, it was alleged that appellant's "request to represent himself was not unequivocal, because he made it clear that he only wanted to represent himself if the court refused to remove [lead counsel] as his attorney." *Id.*, at 524. In rejecting the claim of error, the Supreme Court explained there is a substantial difference between a "conditional" request for self-representation, and an "equivocal" request.

> Defendant confuses an "equivocal" request with a "conditional" request. There is nothing equivocal in a request that counsel be removed and, if not removed, that the defendant wants to represent himself. Once the court has decided not to remove counsel, the defendant has the choice of going ahead with existing counsel or representing himself. There is nothing improper in putting the defendant to this choice, so long as the court did not err in refusing to remove counsel. [Citations.] If, under these circumstances, the defendant elects to represent himself, he need not show that he would have made the same decision if offered other counsel.

*Ibid.*

Indeed, the defendant in *Faretta*, in addition to requesting self-representation, urged he was entitled to counsel of his choice and made three unsuccessful motions for appointment of a new attorney. *Faretta* v. *California*, 422 U.S. at 810 n. 5. In one Ninth Circuit case, the defendant made it clear that he desired to represent himself only if the alternative was representation by the attorney he had unsuccessfully sought to replace; in that situation, the request for self-representation, while condi-

tional, was deemed unequivocal. *Adams* v. *Carroll*, *supra*, 875 F.2d at 1445.[47]

In a Second Circuit case, the trial court held a hearing on the defendant's request to discharge appointed counsel and proceed *pro se*. *Williams* v. *Bartlett* (2d Cir. 1994) 44 F.3d 95, 100. At the hearing, the defendant stated he would represent himself because he could not afford a private attorney. *Ibid.* The Second Circuit concluded that although the request for self-representation was conditional: "A defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative, simultaneously requests the appointment of new counsel, or uses it as a threat to obtain private counsel." *Ibid.*[48]

As the Third Circuit observed in *Buhl* v. *Cooksey* (2d Cir. 2000) 233 F.3d 783:

> Common sense suggests (and experience confirms) that nearly every request to proceed *pro se* will be based upon a defendant's dissatisfaction with counsel. It is the rare defendant who will ask to proceed *pro se* even though he/she is thoroughly delighted with counsel's representation, ability, and preparation.
>
> *Id.*, at 794.

---

47/ In another Ninth Circuit case, the defendant stated he wanted to represent himself if he could not change his attorney. *United States* v. *Hernandez*, *supra*, 203 F.3d at 621. The Ninth Circuit held that the request for self-representation, even if conditional, was unequivocal. *Id.* at pp. 621-622.

48/ "A request to proceed *pro se* is not equivocal merely because it is an alternative position, advanced as a fall back to a primary request for different counsel." *Johnstone* v. *Kelly* (2d Cir. 1986) 808 F.2d 214, 216, n. 2, *cert. denied* (1987) 482 U.S. 928.

Under these authorities -- and particularly *Michaels* -- Mr. Cooper's assertion of his right to self-representation was "conditional" but not "equivocal." It was error to have denied the motion on that basis.

2. Mr. Cooper's Assertion of His Right of Self-Representation Was Not Untimely.

Mr. Cooper presents this argument with some reluctance, because the motion for self-representation on September 23rd was not denied on "timeliness" grounds. However, it is a question worth addressing, because of the trial court's erroneous view, as expressed on September 22, 2004, that "being unprepared to go means it's untimely."

The California Supreme Court explained in *Windham*:

> *Our imposition of a "reasonable time" requirement* should not be and, indeed, *must not be used* as a means of limiting a defendant's constitutional right of self-representation. *We intend only* that a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. For example, a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial *without some showing of reasonable cause for the lateness of the request. In such a case* the motion for self-representation is addressed to the sound discretion of the trial court ....
>
> *People* v. *Windham* (1977) 19 Cal.3d 121, 128 n. 5; original emphasis omitted; other emphasis added.

As Mr. Cooper reads this language, the constitutional right to self-representation remains intact, even when asserted on the day set for trial,

so long as trial has not commenced and there is a "showing of reasonable cause for the lateness of the request." The correctness of this reading is confirmed by the language immediately following in *Windham*, in which the Court gives examples of reasonable explanations for the delay, such as the defendant's disagreement with defense counsel's "desire for a continuance." The Court then stated in *Windham*:

> *When the lateness* of the request and even the necessity of a continuance *can be reasonably justified the request should be granted.* When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation *without any ability to test the request by a reasonable standard.*
>
> *Ibid.*; emphasis added.

This articulates clearly that a defendant who advances a "reasonable" justification for the timing of a pre-trial motion -- even on the day set for trial -- has not forfeited the constitutional right of self-representation. It is only when a lower court confronts such a motion unaccompanied by a "reasonable" justification for its timing that the lower court needs a "reasonable standard" under which to exercise its "discretion."

As the Supreme Court has made clear, the intent underlying a *Faretta* motion is highly significant. *See People* v. *Windham*, *supra*, 19 Cal.3d at 128 n. 5. If the defendant has no reasonable explanation for the delay, a purpose to delay might be inferred, and the motion might validly be denied on that basis. *Ibid.*

As further explained by the Supreme Court, in *People* v. *Burton* (1989) 48 Cal.3d 843, 852: "The 'reasonable time' requirement is intended to prevent the defendant from misusing the motion to unjustifi-

ably delay trial or obstruct the orderly administration of justice." The Court continued in *Burton* by contrasting the California rule with the federal rule, where the latter allows a United Stated District Court to deny a pre-empanelment *Faretta* motion if it finds a purpose to delay. *Id.*, at 854. "This differs little as a practical matter from the standard we set out in *Windham* ..., except that we place the burden on the defendant to explain his delay when he makes the motion as late as defendant did here.

In short, the trial court here made no "finding" of an intent to delay. For this reason, there had been no forfeiture of the right of self-representation.

Mr. Cooper will belabor the issue no further. It was error to have denied Mr. Cooper's *Faretta* motion.

D. The Error Requires Reversal of the Judgment.

The erroneous denial of a request for self-representation requires reversal *per se*. *McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 177 n. 8; and *People* v. *Joseph* (1983) 34 Cal.3d 936, 948. More recently, the United States Supreme Court characterized such error as structural error not subject to harmless error analysis. *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 310; accord, *Neder* v. *United States* (1999) 527 U.S. 1, 8. For these reasons, reversal should be ordered.

V

IT WAS ERROR TO HAVE DENIED MR. COOPER'S *MARSDEN* MOTIONS, BECAUSE HIS RELATIONSHIP WITH COUNSEL WAS SO IRREVOCABLY IMPAIRED THAT INEFFECTIVE REPRESENTATION WAS A LIKELY RESULT.

A. The *Marsden* Motions on July 6 and September 21, 2004.

As noted in Argument IV, there was arguably a "*Marsden* motion" when Mr. Cooper objected on May 19, 2004 to the original appointment of counsel. Judge Reardon deemed the motion premature, since Mr. Cooper and counsel had limited exposure to one another. Unfortunately, matters did not improve.

There was a full-blown *Marsden* motion before Judge Goodman on July 6, 2004, and another before Judge Horner on September 21, 2004. By these dates, the relationship between Mr. Cooper and his counsel had become impossible.

Mr. Cooper focuses now on the July 6th and September 21st motions, by which time his relations with his counsel had deteriorated beyond repair. He submits that it was error to have denied either or both of the motions.

1. The July 6th Motion, Before Judge Goodman.

After Mr. Cooper had been invited by Judge Goodman to "[t]ell me everything you want to tell me," Mr. Cooper explained that, when counsel had been appointed, she had "said she did not want the case" and had "told the judge and D.A. my strategy and my interpretation of the case, which I felt violated the attorney-client privilege." Mr. Cooper

explained further that counsel had "visited [him] with the investigator I think on June 2nd" and that he had not "seen an investigator since that time. ..." RT (*Marsden*-I) 2-3.[49] Mr. Cooper had "asked the investigator back so [he] could give her the name of witnesses" and he had not "seen her since," even though trial was set to commence. RT (*Marsden*-I) 3.

Mr. Cooper also complained of counsel's "skills" at earlier hearings, which he deemed "sub par," in that she had not "counter[ed]" prosecution arguments, allowing "the D.A. and the judge .... to misquote the law." RT (*Marsden*-I) 3-4. Mr. Cooper also complained that counsel had failed to "request the judge to make the D.A. give an offer of proof because [counsel] knows ... the D.A. does not have new evidence ...." RT (*Marsden*-I) 4-5.

In addition, Mr. Cooper asserted that counsel had not "conferred with [him] on her defense strategy." He disputed that counsel had a strategy, and expressed a lack of confidence in counsel's "skills." "Her whole defense for me is the D.A. does not have a case. ... I have witnesses that testify toward my alibi which are uncontroverted witnesses. She is refusing to call them." RT (*Marsden*-I) 5-6.

Mr. Cooper continued by explaining:

> Every time we talk, we can't see eye to eye. She is arguing, cutting me off. I am cutting her off. And we cannot operate in a conducive fashion at all. She does not want to explain the law to me. And my interpretation of the law is always wrong. It -- there is just no way we can work together. ...
>
> RT (*Marsden*-I) 6-7.

---

49/ Reporter's Transcript of the *Marsden* hearing on July 6, 2004.

Thereafter, the court asked counsel to recite her "background as a criminal defense attorney." RT (*Marsden*-I) 7-8. Counsel confirmed that she had told Mr. Cooper at the outset that she "did not want the case." RT (*Marsden*-I) 8. However, she denied having violated confidentiality. RT (*Marsden*-I) 9.

Counsel explained that Mr. Cooper had not seen the investigator for a month because she had been "out in the streets trying to locate some of these witnesses from this 1995 homicide." *Ibid.* Counsel denied she had allowed the court to misstate the law at hearings. *Ibid.* She conceded she had failed to ask that the prosecutor make an offer of proof because it was premature. RT (*Marsden*-I) 10.

Counsel continued: "From the minute I met Mr. Cooper, one of our problems has been Mr. Cooper told me that I am supposed to file and do whatever he wants. I have also told Mr. Cooper that his ... alibi defense was terrible." RT (*Marsden*-I) 14. Counsel conceded that "we do not see eye to eye." RT (*Marsden*-I) 15.

Mr. Cooper continued his explanation, as follows:

> The witness she said her investigator talked to, we cannot even use. I am here on ... a writ I did pro per. I got myself back ... for her to fight me tooth and nail on every issue and then say my alibi witnesses are liars, in essence, is saying she does not believe me because my alibi witnesses are saying where I was at the time of the crime. [¶] If she does not believe my alibi witnesses, she does not believe me. And I cannot have confidence in her cross-examining any witness ...
>
> RT (*Marsden*-I) 16-17.

When the court explained that it was common to hear "lots of *Marsden* motions ... because it gets tense close to trial," and that "conflicts arise," Mr. Cooper responded: "Our conflict started day one." RT (*Marsden*-I) 20. Thereafter, Mr. Cooper's *Marsden* motion was denied. RT (*Marsden*-I) 25.

2. The September 21st Motion, Before Judge Horner.

Mr. Cooper began by informing the court of the earlier *Marsden* motion. However, the court explained that it would have to rely on "whatever you tell me." RT (*Marsden*-II) 4.[50]

Mr. Cooper thereafter asserted that on September 7th he had attempted to explain to counsel his "concern about the case." "I immediately got blew up on and cursed out." Counsel had "told [him] she hates [him] and called [him] an asshole." This had not been "first time we had a run-in." RT (*Marsden*-II) 4-5.

> We continued to have run-ins from day one ... I do not feel comfortable with her anymore. Every time I bring up an issue, it is argued down. It is always negative. When she cursed me out ... and said she hates me and called me an asshole, that was the last straw.
>
> RT (*Marsden*-II) 5.

Mr. Cooper repeatedly described the "relationship" as "irreconcilable." He could not discuss the case or strategy with counsel "without her blowing up on me." RT (*Marsden*-II) 6.

---

[50]/ Reporter's Transcript of the *Marsden* hearing on September 21, 2004.

Counsel reviewed the history of her involvement, including the "first *Marsden* hearing about 20 minutes after we met." RT (*Marsden*-II) 6. She explained that she had accepted the appointment only after being told that Judge Reardon believed the case, "by law," "would not go for 60 days even in a no time-waiver status." RT (*Marsden*-II) 6-7.

Counsel confirmed having been angry with Mr. Cooper because he wanted to "argue the law." She admitted she "blew up" but denied having told him she hated him or having called him "an asshole" [she admitted having used "other words"]. She also admitted having been "very aggravated" and having "walked out," but she alleged she had subsequently apologized. She added: "I am convinced we can work together." RT (*Marsden*-II) 7-9.

Mr. Cooper continued by asserting: "Every time she and I talk, there's always a blowup." RT (*Marsden*-II) 9.

> We just cannot talk about the case, period. I cannot get anything through to her. Right now, as of today, we have not even talked about trial strategy at all. None whatsoever.
>
> RT (*Marsden*-II) 9-10.

Counsel again recited her experience for the court. RT (*Marsden*-II) 10-11. When asked if she believed she could "work with Mr. Cooper during the preparation for this trial and during the trial," counsel expressed "no doubts." When asked if she had "sufficient resources to devote to the trial, she again expressed "no doubts." RT (*Marsden*-II) 13.

Mr. Cooper again asserted: "She always stalks off." RT (*Marsden*-II) 13. He asserted they were not "getting along" and had "irreconcilable differences." RT (*Marsden*-II) 14. Mr. Cooper explained that,

"[e]very time I make a little comment," counsel would respond sarcastically: "I'm glad you're a lawyer." RT (*Marsden*-II) 15.

Mr. Cooper and counsel had "not talked about strategy or particulars, or the defense of my case at all." Counsel told him she "hated" him and called him a "fucking asshole." RT (*Marsden*-II) 17.

Counsel then made a striking concession, given the pendency of the trial. Mr. Cooper had asked about her "opening argument," and her answer had been: ".... I don't have it yet. I don't know." RT (*Marsden*-II) 18.

The trial court viewed California law to be that a lack of trust, or inability to get along with an attorney, was not sufficient. RT (*Marsden*-II) 20. The court did not "feel that the concern expressed by Mr. Cooper" was sufficient under the case law. RT (*Marsden*-II) 21. The motion was accordingly denied. RT (*Marsden*-II) 21-22.

B. The Controlling Law.

California law recognizes the functional relationship between trust and communication, on the one hand, and effective representation, on the other. Refusal to appoint substitute counsel upon a defendant's request violates his Sixth Amendment right to the assistance of counsel "if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel 'have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" *People* v. *Welch* (1999) 20 Cal.4th 701, 728, citing *People* v. *Smith* (1993) 6 Cal.4th 684, 691-694. The circumstances here implicated the latter prong of this disjunctive test.

> Effective advocacy involves more than vigor, experience and familiarity with the law. The attorney-client relationship contemplates trust and mutual cooperation, particularly when the attorney is defending the client's liberty.
>
> *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 938, citing *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 561.

See, also, *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66.

> We know that trust and cooperation between client and counsel are essential, that without them even competent counsel may not be able to present an effective case. Thus, "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."
>
> *People* v. *Stankewitz* (1970) 32 Cal.3d 80, 94, conc. opn. of Broussard, J., citing *Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, 1170.

Mr. Cooper's distrust of, and alienation from, counsel was neither formulaic nor manufactured. On the contrary, this is the rare case where the record demonstrates an irreconcilable conflict between client and counsel.

Federal cases recognize that a breakdown in the attorney-client relationship requires the trial judge to substitute counsel on request. *Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882, 888. In *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258, 1259-1261, the Ninth Circuit

held that defendant's repeated motions for substitution of attorney should have been granted because "a strong showing was made" of the "state of disagreement, bad relationship, and lack of communication ... between [appellant] ... and his lawyer in regard to the preparation of a defense," so that "denial of appellant's motion for change of appointed counsel ... deprived [him] of his constitutionally guaranteed right to have the effective assistance of counsel at his trial." *Id.*, at 1260.

Similarly, in *United States* v. *Walker* (9th Cir. 1990) 915 F.2d 480, the Ninth Circuit found improper denial of the defendant's request for substitute counsel. *Id.*, at 481. In *Walker*, the defendant's "lack of confidence in his attorney arose out of a disagreement over trial preparation and potential witnesses, rather than any general unreasonableness or manufactured discontent." *Id.*, at 484. The Ninth Circuit found reversal to be required because "to compel one charged with (a) grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *United States* v. *Walker*, *supra*, 915 F.2d at 483, citing *Brown* v. *Craven*, *supra*, 424 F.2d at 1170.

Here, as in *Walker*, appellant's "lack of confidence in his attorney arose out of a disagreement over trial preparation and potential witnesses, rather than any general unreasonableness or manufactured discontent." Mr. Cooper raised a multitude of concerns, which were growing worse with the passage of time.

A defendant's lack of trust in his counsel, when based on legitimate reasons, is grounds for substitution of counsel. *See United States* v. *Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, 779, citing *McKee* v. *Harris* (2nd Cir. 1981) 649 F.2d 927, 932 ["While loss of trust is certain-

ly a factor in assessing good cause, a defendant seeking substitution of assigned counsel must nevertheless afford the court with legitimate reasons for the lack of confidence."]. Thus in *United States* v. *Adelzo-Gonzalez*, *supra*, the Ninth Circuit found that the defendant held "little if any trust in his attorney" for objective reasons. *Ibid.*

As in *Adelzo-Gonzalez*, and in *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258, 1260, Mr. Cooper's counsel's responses "tended to confirm that the course of the client-attorney relationship had been a stormy one, with quarrels, bad language, threats, and counter threats." *Adelzo-Gonzalez*, *supra*, 268 F.3d at 777. Moreover, counsel's concession of having no idea as to an opening statement -- on the eve of trial -- was compelling evidence of the absence of a strategy and a reason for distrust of counsel.

Under these circumstances, the denial of Mr. Cooper's request to substitute attorneys, where the relationship was "antagonistic, lacking in trust, and quarrelsome," was erroneous. *Id.*, at 780. Reversal should be ordered.

> to proven or not proven by evidence presented in this courtroom.
>
> And the fact that Mr. Cooper is in custody during the course of this trial is not evidence, is not to be considered by you as such.
>
> 1-RT 141-142.

On the following court day, defense counsel articulated Mr. Cooper's complaint that "the court [had] informed the jurors that Mr. Cooper is in custody," which Mr. Cooper "felt was prejudicial." 1-RT 147. The trial court thereafter conceded its error.

> [THE COURT]: .... [B]asically, I messed up yesterday. I have, for the last couple weeks, or so, just about the time that everybody has been in here, I have floated the idea of disclosing, during the jury selection process, Mr. Cooper's custody status and dismissing it and explaining to the jury at the outset that it's not relevant to the outcome of this case. It's not to be considered by them, and I gave them -- and then I gave them an explanation: It just means he can't afford -- he can't make bail. And I told you, let me know before we actually start the jury selection yesterday whether you wanted me to do that, and if you did, I would do it. If you didn't, I wouldn't. And I forgot that I hadn't -- I hadn't gotten a definitive answer from you. And as the words were coming out of my mouth to the jury panel yesterday, I realized it, and, at that point, I was committed.
>
> 1-RT 147.

However, the court granted no relief, explaining as follows:

> [THE COURT]: ... I can appreciate the request at this point, but for the same reasons that I told the jurors, I

> am absolutely convinced that they would know by the end of the trial that he is in custody, and they always figure that out. You just can't hide it. And this afforded a way to tell them that they cannot consider that, because, otherwise, they would never ever have been told that if they weren't. Just up-front it to them, and for that reason, while I apologize for having done it and acknowledge I did it without having been authorized to do it, I do not think it really has prejudiced Mr. Cooper. As a matter of fact, it probably operates to his benefit, so I'll deny the motion, at this time, not because I didn't mess up, but, really, because I don't think it was prejudicial to Mr. Cooper, which was the reason that I floated the idea in the first place.
>
> 1-RT 147-148.

Mr. Cooper now submits that the trial court was correct in conceding its error. He submits further that the error was prejudicial, that the trial court was wrong to deny relief, and that this Court should grant relief on appeal.

B. The Controlling Law.

There does not appear to be a California case squarely on point. However, the defendant in *People* v. *Taylor* (1982) 31 Cal.3d 488 had been convicted of voluntary manslaughter. Because of a combination of local administrative rules on the handling of civilian clothing, defense counsel's failure to comply with those rules, and rigid trial court adherence to the rules, the defendant had been tried in jail clothing. *Id.*, at 491-492. The California Supreme Court concluded that "the refusal to allow him to wear civilian clothing at trial violated his rights to due process and equal protection. *Id.*, at 491; *see*, *also*, *id.*, at 493.

The Supreme Court in *Taylor* relied heavily on the United States Superior Court's opinion in *Estelle* v. *Williams* (1976) 425 U.S. 501.

That case appeared before the High Court on a writ of certiorari, in a habeas proceeding brought by a Texas state prisoner.

The California Supreme Court in *Taylor* reasoned as follows, in reference to the due process issue:

> There are substantial reasons for the rule that a criminal defendant is entitled to be tried in ordinary clothing. Foremost is the rationale that compelling a defendant to go to trial in jail clothing could impair the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt. (*Estelle* v. *Williams*, *supra*, 425 U.S. at p. 504 ....) To implement and protect the presumption of innocence, "courts must be alert to factors that may undermine the fairness of the factfinding process." (*Estelle*, *supra*, 425 U.S. at p. 503 ....)
>
> *People* v. *Taylor*, *supra*, 31 Cal.3d at 494.

The *Taylor* court reasoned further, in reference to the equal protection issue:

> Apart from the violation of due process inherent in requiring a defendant to attend trial attired in jail clothing, the practice also impinges on the tenets of equal protection. The Supreme Court has noted that the practice "operates usually against only those who cannot post bail prior to trial. Persons who can secure release are not subjected to this condition. To impose the condition on one category of defendants, over objection, would be repugnant to the concept of equal justice embodied in the Fourteenth Amendment. *Griffin* v. *Illinois*, 351 U.S. 12 (1956)." (*Estelle* v. *Williams*, *supra*, 425 U.S. at pp. 505-506 ....)
>
> *Taylor*, *supra*, at 495.

C. The Error.

Mr. Cooper recognizes, of course, that there is a "quantitative" difference between that which occurred here and that which occurred in *Taylor*. It is not inevitably true that a jury's awareness of the defendant's custodial status offends the Fourteenth Amendment, such as where one of the counts requires proof of custodial status, and/or where the jury will hear evidence of custodial status as bearing on "consciousness of guilt." *See*, *e.g.*, *People* v. *Valdez* (2004) 32 Cal.4th 73, 121 [no Fourteenth Amendment violation in joinder of an escape court with other courts, where escape bore on "consciousness of guilt"]. *See*, *also*, *People* v. *Bradford* (1997) 15 Cal.4th 1229, 1335 [no constitutional violation where a prosecutor's question to a witness might potentially have led the jury to conclude the defendant was in custody].

However, there is no "qualitative" defense between the wearing of jail clothing, and the trial court's revelation at the outset of Mr. Cooper's custody status. As noted by the trial court in its statement to Mr. Cooper's jury, the jurors were never going to see Mr. Cooper "in the elevator or on the first floor, [or] out on the street, [or] walking up to the building ...." Every time the jurors arrived in court to find Mr. Cooper present with the bailiff, they would be reminded of his custodial status. As a result, Mr. Cooper's Fourteenth Amendment due process and equal protection rights were violated on a daily basis.

D. The Error Was Prejudicial.

Respondent can point to the trial court's instruction that the jury should not weigh Mr. Cooper's custodial status against him. However, the California Supreme Court stated the matter succinctly and wisely in another context in *People* v. *Anderson* (1987) 43 Cal.3d 1104: "....

[J]urors should not be permitted to be influenced by evidence that as a matter of law they cannot consider but as a matter of fact they cannot ignore." *Id.*, at 1121. As expressed differently in *People* v. *Fletcher* (1996) 13 Cal.4th 451, 455: ".... [I]t may be psychologically impossible for jurors to put the [evidence] out of their minds when determining [guilt] ...."

In sum, "jurors of ordinary lay persons" have psychological limits with respect to what we can expect of them. One such limit is that they should not have been expected to ignore Mr. Cooper's custodial status in deciding Mr. Cooper's guilt.

Further bearing on the issue of prejudice is the fact that the evidence against Mr. Cooper was strikingly speculative and thin. In that regard, the elephant in the living room on prejudice is the United States District Court's conclusion that the evidence heard by the 1995 jury -- indistinguishable from the evidence heard by the 2004 jury -- was insufficient to permit conviction of murder under the Due Process Clause.

Also bearing on the issue of prejudice is the fact that Mr. Cooper's jury *deliberated over the course of five days* before reaching its verdicts, where the issues were few. Under this objective measure, this was a "close case."[51]

Furthermore, the prejudicial effect of an error must be considered not only in reference to its *independent* effect, but in reference to its *cumulative* effect when considered with other errors. *See*, *People* v. *Holt* (1984) 37 Cal.3d 436, 459; *People* v. *Zerillo* (1950) 36 Cal.2d 222, 233;

---

[51]/ *See People* v. *Rucker* (1980) 26 Cal.3d 368, 391 (deliberations over nine hours); *People* v. *Woodard* (1979) 23 Cal.3d 329, 341 (six hours); and *People* v. *Collins* (1968) 68 Cal.2d 319, 332 (eight hours).

and *People* v. *Pitts* (1990) 223 Cal.App.3d 606, 815. This "cumulative error" rule also applies to federal constitutional errors. *See Derden* v. *McNeel* (5th Cir. 1991) 938 F.2d 605, 610: "Several errors taken together can ... violate a petitioner's right to due process and cause the trial to be fundamentally unfair." *See, also, Thomas* v. *Hubbard* (9th Cir. 2002) 273 F.3d 1164, 1179-1180 [federal constitutional error].

Mr. Cooper will belabor the issue of prejudice no further. Respondent will be unable to satisfy its burden of demonstrating beyond a reasonable doubt that the error did not contribute to the verdict. *See Chapman* v. *California* (1967) 386 U.S. 18, 24. The error requires reversal of the judgment.

VII

# THE TRIAL COURT ERRED IN ITS COMMENTS TO THE JURY ON THE LAST DAY OF DELIBERATIONS.

## A. Introduction to the Issue.

This is not the usual argument with regard to "judicial comment during deliberations," which involves an allegation of improper comments to a "deadlocked" jury to compel a verdict. However, the trial court in this case made comments to the jury on its last of five days of deliberations, which exceeded that permissible under the Sixth and Fourteenth Amendment. Prejudicial error occurred.

## B. The Limits on Judicial Comment to a Jury.

As explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 772:

> As we have suggested, "a trial court that chooses to comment to the jury must be extremely careful to exercise its power 'with wisdom and restraint and with a view to protecting the rights of the defendant.' [Citations.] The court's comments must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. [Citation.]" ([*People* v.] *Cook* [(1983)] Cal.3d [400,] 408.)
>
> *People* v. *Rodriguez*, *supra*, 42 Cal.3d at 772.

There is no absolute bar against judicial comment on the evidence or witnesses, even with a deliberating jury. The rule in that context is as follows:

> ... [A]ppellate courts ... must evaluate the propriety of judicial comment on a case-by-case basis, noting whether

> the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury. (E.g., *People* v. *Scott* (1960) 53 Cal.2d 558, 564 [ ]; [*People* v.] *Flores* [(1971)] 17 Cal.App.3d [579,] 585.) Certainly we would not take the risk that one or more members of a deadlocked jury were influenced to reconsider their views or abandon reasonable doubts by judicial comments which had not been "rigorously scrutinize[d]" for "scrupulous" fairness. (See [*People* v.] *Cook* [(1983)] 33 Cal.3d [400,] 415 [dis. opn. of Richardson, J.].)
>
> *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 770; footnote omitted.

As explained by the Court in *People* v. *Monterroso* (2004) 34 Cal.4th 743, 780:

> The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power.'" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1218 [120 Cal.Rptr.2d 477, 47 P.3d 262]; accord, *Patton v. United States* (1930) 281 U.S. 276, 288 ....

In the framework of this set of legal principles, Mr. Cooper turns now to the events during his jury's deliberations.

C. Events During the Jury's Deliberations.

On November 9, 2004, the jury's fourth day of deliberations, the jury asked for re-reading of the testimony of Mr. Archambeau, which was read. 5-RT 1009; 3-CT 797. After further deliberations, the jury sent three notes to the trial court.

The first note, with a time noted of 3:35 p.m., read: "Please explain reasonable doubt? Please talk about how to treat accomplice testimony." The second note, with a time noted of 3:40 p.m., read in part: "We need help. Some jurors are having difficulty putting weight on the credibility of Goodie, Zanetta, and Fred Cross." 3-CT 795.

As for question one in the 3:35 p.m. note, the trial court declined to provide further explanation of the concept of reasonable doubt. 5-RT 1011, 1013. As for the remaining questions in the two notes, the court informed the jury it needed to know "more specifically what the question is that you're asking ...." 5-RT 1012

This prompted a further note from the jury, with a time noted of 4:00 p.m., which read as follows: "Please clarify the following with some examples: Circumstantial evidence. Corroboration evidence." 3-CT 794. At that point, the November 9th proceedings were adjourned for the day.

On November 10, 2004, the fifth and last day of the jury's deliberations, the trial court returned to the pending questions. 5-RT 1017. The court had identified three subissues within the jury's questions which it intended to address. 5-RT 1018, The first was how the jury would determine whether a witness was an accomplice, which the trial court explained was "easy" as to Mr. Cross, since he was an accomplice as a matter of law, and a matter for the jury to resolve as to Goodie Walton. 5-RT 1018-1021.

This brought the trial court to its "question number two": "Once you determine that somebody is an accomplice, ... now what about this thing 'corroboration'? How do you determine whether there's evidence

that sufficiently corroborates that person? So what's required?" 5-RT 1021.

In addressing that question, the jury was again read CALJIC 3.12.[52] The trial court next turned to a discussion of the potential, corroborating evidence in the case, and this is the point at which Mr. Cooper submits the trial court crossed the line into improper comment.

> [The Court]: Well, what about looking at the testimony of Ms. Walton? Goodie Walton? So you look at her testimony, but the first question you ask yourself is, you have to resolve is, has she been shown to us by preponderance of the evidence to be an accomplice, also? Because if she has, we can't consider that in corroborating Mr. Cross. You cannot corroborate one accomplice with another, so you have to look elsewhere.
>
> But if you you've decided, no, it hasn't been proven to us that she is an accomplice, yes, you can look at her testimony to see if there's anything in there tending to connect Mr. Cooper with the commission of any of these crimes. And more specifically, for example, Mr. Cross has testified that Aaron Cooper was one of the three people with him and Mr. Kingdom in the blue Oldsmobile over there at 12th and Market. You can look at her testimony to see if there's any evidence in her testimony which you believe that shows that Mr. Cooper was one of the three people in that car.

---

[52]/ "To corroborate the testimony of an accomplice, there must be evidence of some act or fact related to the crime, which, if believed by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. "[¶] However, it's not necessary that the evidence of corroboration, that the corroborating evidence be sufficient in itself to establish every element of the crime charged, or that it corroborate every fact to which the accomplice testified."

Well, let's say that either gentleman use her testimony because to corroborate -- because you've decided she's an accomplice as well, or let's say that there was nothing in her testimony that you believe which tends to connect Mr. Cooper, you look elsewhere. An obvious next place to look would be Ms. Hodges. Zanetta Hodges I believe was her name ....

The Court: There's no allegation that she's an accomplice, so you don't have to worry about one accomplice corroborating another. You look at her testimony to see, is there anything there which we believe in her testimony which tends to connect Mr. Cooper, *or tends to show that he was one of these three men?* If you were to find that there was not, and if you decide there is, then you may have -- you know, *if you decide that you found a thing tended to connect the defendant with the commission of these crimes, and her testimony which you believe, done.* You have now corroborated ... mr. Cross, and if you decided that Goodie Walton is also an accomplice, you've corroborated her sufficiently, because you found corroborating evidence tended to connect the defendant with the commission of these crimes if that's what you found.

If you didn't find it in Ms. Hodges's testimony, you look elsewhere throughout the testimony you've been presented to see if there's any other evidence you may find which may tend to connect this defendant, Mr. Cooper, with the commission of any of these crimes. So you basically go through step-by-step with each witness, if you would like, or each group of evidence, but *as soon as you found one thing which you believe tends to connect the defendant on its face with the commission of these crimes, that's what's needed for corroboration, and now you can bring back in, the testimony and consider it in its entirety.*

5-RT 1023-1025; emphasis added.

After the jury had been excused for further deliberations, defense counsel raised the following objection to what had occurred:

> [Defense counsel]: .... I believe the Court on more than one time, explained about: If you find anything, it's corroborated. I'm concerned that the jurors may think you're expressing an opinion about that. ... Also, Mr. Cooper would like me to note that he felt that, in essence, by focusing on Zanetta and Juanita, you were directing the jury to certain evidence, ...."
>
> 5-RT 1029.

This ultimately led the trial court to recall the jury to give the following additional instruction:

> [The Court]: I want to emphasize something. All remarks that I made when you were down here a little while ago, please do not conclude from anything I said that I think that corroboration exists in any particular witness's testimony or in any particular evidence, that I expressed any opinion about what specific evidence might constitute corroboration, or that I think there is or isn't corroboration that exists, or that I believe that Goodie Walton is or isn't an accomplice. Nothing I said was intended to express any opinion that I might have about any of those things.
>
> What I was doing was talking to try to aid you in your analysis of the evidence, but please do not take anything I said as any kind of opinion on my part or any indication of the conclusion on my part that any requirements or any kind are or are not satisfied, or that the existence of corroboration may be found in any particular evidence. I don't want you to have that impression. ... I hope that you understood that, but it's very important that I make it clear on this record that you keep all that in mind.
>
> 5-RT 1035.

D. Prejudicial Error Occurred.

Mr. Cooper does not anticipate a contention from respondent that the trial court did not go too far in explaining to the jury how it could find corroboration on this record. With deference to the trial court, the explanation to the jury regarding corroboration with Zanetta's and/or Goodie's testimony read like a prosecutor's closing argument to the jury.

However, Mr. Cooper does expect respondent to argue that the trial court's admonition cured the error. In that regard, Mr. Cooper has noted in Argument VI the California Supreme Court's acknowledgment of the limited utility of admonitions to a jury, particularly where the admonition is to "ignore" something.

Moreover, the issue of corroboration was particularly acute in this case, where Mr. Cross's testimony lay at the core of the prosecutor's evidence. In addition, this Court should be mindful of the timing of the trial court's comments, coming on the fifth and final day of lengthy deliberations.

For all of these reasons, prejudicial error should be found. Whether considered alone, or in terms of its cumulative effect with other errors, the State cannot satisfy its burden under *Chapman*. Reversal should be ordered.

## CONCLUSION

For the reason set forth above, the judgment must be reversed as to the murder count, with no opportunity to retry that count. As to the other counts, the judgment should also be reversed.

Dated: February 27, 2006

Respectfully submitted,

KYLE GEE

Attorney for Appellant
AARON LYDELL COOPER

CERTIFICATE OF WORD COUNT

IN COMPLIANCE WITH RULE 33, SUBDIVISION (B)

I hereby certify, pursuant to Rule 33, subdivision (b), California Rules of Court, that the attached brief contains 26,827 words. In this certificate, I am relying on the word count produced by Wordperfect 5.1.

Dated: February 27, 2006

KYLE GEE

Attorney for Appellant
AARON LYDELL COOPER

PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On February 27, 2006, I served the within OPENING BRIEF OF APPELLANT on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-3664

Hon. Jon R. Rolefson, Judge
c/o Superior Court Clerk
Alameda County
1225 Fallon Street
Oakland, CA 94612-4293

FDAP
730 Harrison St., #201
San Francisco, CA 94107

District Attorney
1225 Fallon St., Rm. 900
Oakland, CA 94612

Aaron Cooper
E-28703
CSATF/S.P. C7-211
P.O. Box 5246
Corcoran, CA 93212

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on February 27, 2006 at Oakland, California.

Lauren Osher

Lauren Osher

# EXHIBIT – F

# CHANGE OF COUNSEL LETTERS

Aaron L. Cooper E28703
C.S.P. Sac 4 New Folsom
P.O. Box 290066
Represa, CA 95677-0066

May 3, 2005

Honorable William McGuiness
California Court of Appeal
350 McAllister Street
San Francisco, CA 94102

Dear Judge McGuiness:

**RE: CHANGE OF COUNSEL**

I am petitioning this court requesting a change in counsel. This court along with the First District Appellate Project assigned attorney Kyle Gee to my appeal's case. I am inmate Aaron L. Cooper E-28703, housed at California State Prison, New Folsom, Represa, California. My reasons for requesting a change in counsel is due to attorney Gee's serious lack of communication with me as his client.

I have written Mr. Gee on several occasions, and as of today's date, I have not received any response to my concerns. I want to inform you that I have attempted to resolve this situation through the First Appellate Project; however, the situation remains unchanged. My request has fallen on deaf ear. If attorney Gee is to represent me before your court, then at the least, he should be in constant communication with me, he should advocate for my cause, he should inform me of any progress in my case, he should demonstrate loyalty to me, he should AVOID CONFLICT, he should keep me informed of important decisions and/or developments, he should conduct factual and legal investigation or make a reasonable decision that makes particular investigation unnecessary, and bring to bear the necessary skills and knowledge to do the best job he can do to shed light on the injustice done to me in my case. Attorney Gee leaves me clueless as to the status of my case. Communication between attorney and client is essential to presenting the best case.

Failure of this court to allow attorney Gee to believe he is above reproach is a failure of this court to recognize an injustice brought on by counsel. This court should not allow attorney Gee to feel that he is beyond reprimand. Justice is bound in the commitment of attorney/client communication. Justice can only rise when an assiduous attorney enigma facts and properly connects each intricate parts to reveal the truth.

Last, it is in my opinion, that attorney Gee has lost his direction. He did not become a lawyer to be indifferent with his client(s), nor did he become a lawyer to believe that he is omniscient. I believe he went to law school and entered into an agreement with the Appeal Courts and the First Appellate Project because he wanted to fight for injustice. All I ask is that he follows the protocol. It is clear that I am in jail illegally and that the rules were not followed at either of my trials.

I pray that this count will grant my request for change in counsel.


Sincerely,


Aaron L. Cooper
E29703

Aaron L. Cooper E28703
C.S.A.T.F/ S.P. C-7-211
P.O. Box 5246
Corcoran, CA 93212

February 8, 2006

Honorable William McGuiness
California Court of Appeal
350 McAllister Street
San Francisco, CA 94102

Dear Judge McGuiness:

**RE: CHANGE OF COUNSEL**

I am once again petitioning your court to request a Change in Counsel. In 2005, this court along with the First District Appellate Project assigned attorney Kyle Gee to my appeal's case. I am inmate Aaron L. Cooper E-28703, housed at California State Prison Corcoran, Corcoran, California. It should be clear to this court that attorney Gee is overwhelmed with cases and can not be affective in my quest to justice He as applied for fourteen extensions with this court in my case along a clear sign that he is overwhelmed. I am not convinced these request are made to put on the best defense. Attorney Gee state the requests are due to his working on other cases as well as personal business.

In my letter dated May 5, 2005, I address the issue where there was a serious lack of communication between attorney Gee and myself, and as of today's date, I have not received any response to any of my concerns to attorney Gee in the past two. In fact, attorney Gee is not aware of my location. He continues to send my copy of filed documents (specially filed extensions) to Folsom State Prison. Once again, I have attempted to compromise with the First District Appellate Project whose response read like the chief over his lieutenant wrong doing. How can I convey to this court the injustice at work? The First Appellate Project views attorney Gee's failure rate as a success.

If attorney Gee is to represent me before your court, then at the least, he should be in constant communication with me, he should advocate for my cause, he should inform me of any progress in my case, he should demonstrate loyalty to me, he should AVOID CONFLICT, he should keep me informed of important decisions and/or developments, he should conduct factual and legal investigation or make a reasonable decision that makes particular investigation unnecessary, and bring to bear the necessary skills and knowledge to do the best job he can do to shed light on the injustice done to me in my case. The First project states that I will be impressed with Attorney Gee work once he has

filed the brief. I can assure that I will not. Attorney neither had the time case, nor a committed effort to do the best job he can for his client.

I ask this court to not allow Attorney Gee to file any brief on my behalf, but rather remove him from my case.

I pray that this count will grant my request for change in counsel.

Sincerely,

Aaron L. Cooper
E29703

AARON L. COOPER (E28703)
C.S.A.T.F./ SP C7-211
P.O. BOX 5246
CORCORAN, CA 93212

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

AARON L. COOPER (E28703), Appellant.

ATTORNEY KYLE GEE, ESQ. Appointed Counsel.

CASE NO.: A108723

MOTION TO REQUEST CHANGE OF COUNSEL

FILED
MAR 2 8 2006
Court of Appeal - First App. Dist.
DIANA HERBERT
By_______________
DEPUTY

Honorable Justice Marchiano:

I once again petition this court with my third request for a Change of Counsel. Attorney Gee petition your court numerous times with Motion and Declaration of Good Cause for Extension of Time to File Brief. With each extension request, counsel stated a specific reason "why" your court should grant his extension. Yet, the very reason counsel petitioned your court for an extension of time is not inclusive in appellant's Opening Brief. Mr. Gee under Penalty of Perjury was dishonest with your court. Mr. Gee deceived your court and appellant to believe each request for an extension of time was for the purpose of including those issues (he petitioned your court for and his petitions were granted by your court) in appellant's opening brief. Mr. Gee did not include those issues in appellant's opening brief. Mr. Gee's request for the extensions was to show good cause for the extension to your court. The Motion and Declaration of Good Cause for Extension of Time to File Brief "Criminal" is the attorney's proof to your court and to appellant that he is investigating a claim. The court grants counsel's motion to give him extra time needed to fully investigate and include those clams. That is not the case here. Below, I have outlined how Mr. Gee perjured himself to your court:

**On March 21, 2005**, Mr. Gee petition your court and appellant under penalty of perjury in his motion before your court requesting Argument of Record. On page 13 line 12 and page 14 line 20 Mr. Gee stated he would present Ineffective Assistance of Counsel in appellant's Opening Brief. Ineffective Assistance of Counsel is not included in appellant's opening brief.

**On July 29, 2005,** Attorney Gee petitions your court for an extension of time. In counsel's petition, he stated, "Although the request relates primarily to other factors, Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Coopers retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-case, issue and claim preclusion, and the like

**August 29, 2005**, Mr. Gee petition your court under penalty of perjury and in his petition before your court he requested and Extension of Time. In his motion, Mr. Gee states, "Although the request relates primarily to other factors, Mr. Cooper's appeal presents a wide range of issues. There are multiple issues relating to the significance at Mr. Coopers retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice-in-jeopardy, law-of-case, issue and claim preclusion, and the like.

**On October 27, 2005**, Counsel petitioned your court under penalty of perjury for an extension of time. In that request, counsel stated, "There are multiple issues relating to the significance at Mr. Cooper's retrial of the United State's District Court's order reversing his conviction on habeas corpus, including twice in-jeopardy, law-of-the-case, issue and claim preclusion, and the like. There are multiple issues to counsel, including an objection to the appointment of counsel originally, and a set of Marsden and Faretta motion.

**On December 28, 2005**, Mr. Gee again petition your court with yet another request for extension. In this request, Mr. Gee said he needed time due to the number of issues. (Note he only filed 5 claims) and on page 3 line 1 though 4, he mention that there were multiple trial issues such as : Prosecution Misconduct, Ineffective Assistant, Errors in the Evidentiary Rulings, and mis-instructions of Jury, and this case has a VERY LARGE Number of Potential Issues. None of those claims is mention in appellant's opening brief.

**On January 30, 2006**, Mr. Gee again petition your court for an extension of time. In this request, counsel states (Statement of Facts) "That he need to conduct a comparison of the evidence at the first trial to the evidence in the second trail to show that there was no meaningful difference.

**On February24, 2006**, Attorney Gee again petitioned your court. Counsel said he needed time due to complexity and number of issues and that he was going to present the following issues; ling 10 Error of Court to allow Jury to learn that key prosecution witness refused to testify despite being granted immunity, and admission of some EVIDENCE

4). Attorney Gee intentionally mislead your court and lied to appellant, which are Perjurious acts committed by Mr. Gee. lying to your court has denied the court the opportunity to review appellant's claims and has denied appellant the opportunity to present of all reversible claims on appeal in my opening brief.

5). It is clear that Mr. Gee was over burdened by his caseload, which caused him to perjure himself to your court, and deny appellant his right to a fully briefed opening brief. In his haste, counsel neglected Meritorious Claims due to time restrains. Mr. Gee pledge to your court under penalty of perjury that he would present these claim stated about.

6). Appellant requests that this court remedy Mr. Gee's Perjurious conduct either by:

1. Change of Counsel immediately

2. Pause proceedings and order counsel to have a conference by phone or a physical visit with appellant so appellant can submit a supplemental brief to include those claims, counsel pledged he would present in appellant opening brief.

Dated this 28th day of March, 2006

Aaron L. Cooper
AARON L. COOPER
(E28703)

# EXHIBIT – G

# CALIFORNIA COURT OF APPEAL TYPE OPINION NOVEMBER 1998

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

COPY
FILED
Court of Appeal - First App. Dist.
NOV - 9 1998
RON D. BARROW, CLERK
By ____________
DEPUTY

THE PEOPLE,

Plaintiff and Respondent,

v.

AARON LYNDALE COOPER et al.,

Defendants and Appellants.

A073986

(Alameda County
Super. Ct. No. 125227)

In two consolidated appeals, Aaron Lyndale Cooper and Fredrick Cross appeal lengthy prison sentences based in principal part on their joint conviction of first degree murder. We affirm.

PROCEDURAL BACKGROUND

Following a lengthy trial, the jury found both defendants guilty as charged. Cooper was convicted of first degree murder (Pen. Code, § 187), carjacking (Pen. Code, § 215), felon in possession of a firearm (Pen. Code, § 12021), and kidnapping (Pen. Code, § 207). The jury found that he was armed with a firearm in the commission of the murder, carjacking and kidnapping offenses (Pen. Code, § 12022, subd. (a)), and in separate bifurcated proceedings, the trial court found that he had served a prison term for prior conviction of a felony (Pen. Code, § 12021) and that he had been convicted of a serious felony (Pen. Code, § 211), qualifying as a prior strike under Penal Code section 667, subdivision (e)(1).

On March 14, 1996, the trial court sentenced Cooper to a total term of 71 years to life, based in part on a sentence of 25 years to life for the murder conviction, which was

doubled as a second strike pursuant to Penal Code section 667, subdivision (e)(1). With respect to other charges, the trial court imposed consecutive sentences of five years for carjacking, two years for felon in possession of firearm and four years for kidnapping, which were also doubled as a second strike. The sentence for kidnapping was stayed pursuant to Penal Code section 654. The trial court imposed a one-year sentence as an arming enhancement to the carjacking conviction but stayed the arming enhancement with respect to the murder and kidnapping convictions. In addition, the court imposed a one-year enhancement for prior service of a prison term (Pen. Code, § 667.5, subd. (b)) and a five-year enhancement for prior conviction of a serious felony (Pen. Code, § 667, subd. (a)).

The jury convicted Cross of first degree murder, carjacking and kidnapping and found the arming enhancements for each offense to be true. At a hearing on April 18, 1996, the court imposed a total sentence of 32 years to life, consisting of a sentence of 25 years to life on the murder conviction and consecutive sentences of five years on the carjacking conviction and a two-year sentence for the arming enhancement to the carjacking conviction. The court stayed the sentences on the kidnapping conviction pursuant to Penal Code section 654, and also stayed the arming enhancement to the murder and kidnapping convictions.

FACTUAL BACKGROUND

At approximately 4 p.m. on August 3, 1995, the victim, William Highsmith known by the nickname "Coco," rode as the passenger in a red Corvette driven by Kevin or "K.K." Parker to a location in front of a liquor store on the corner of 12th and Market Streets in Oakland, California. Minutes later he was abducted. Parker testified that he borrowed the red Corvette from his girlfriend, Tisha Williams, and picked up the victim earlier that afternoon to look at car auctions. Afterwards, they returned to West Oakland and he parked the Corvette in front of the liquor store. The victim got out of the car and began talking to someone in a group of people. Parker was then "grabbed from behind"

and told to leave the area. He could not identify the defendants or other people at the scene. Immediately after the incident, an Oakland Police Officer, Michael McArthur, took a statement from Parker containing certain further details. Parker then said he parked behind a blue Oldsmobile with three men inside and entered the liquor store, leaving the victim in the Corvette. As he was leaving the store, he heard gunshots from where he parked the car and saw the Corvette being driven away by a single occupant. The night before, the victim had told him that "some men with guns" were looking for him because they thought he had stolen a Chevrolet IROC.

Parker's girlfriend, Tisha Williams, confirmed that, earlier that day, she had allowed Parker to drive her red Corvette, license number 2YQK292. The victim's sister, Raynetta Thomas, testified that she saw him between 3:30 and 4 p.m. at her mother's home a few blocks away from the crime scene. He arrived as the passenger of a red Corvette driven by Parker and stayed 10 to 15 minutes. He was dressed in an Adidas sweatsuit with matching tennis shoes. The parties stipulated that the red Corvette contained fingerprints of the victim and Parker.

A bystander, Rodney Love, provided a detailed account of the kidnapping, though he could not identify the perpetrators. While he was eating a snack outside the liquor store at 12th and Market Streets, a man approached him from an area where a blue 1989 Oldsmobile Cutlass was parked and asked if he was "Coco." He inferred that the man was carrying a revolver in his belt because his coat was "puffed out." He told him that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. Two of the three occupants of the Oldsmobile wore black jackets and gloves.

According to Love, Parker soon drove up in a red Corvette, with the victim in the passenger seat, and parked behind the Oldsmobile. Parker and the victim got out of the car and began talking to the men in the blue Oldsmobile. One of the three men briefly grabbed Parker by the neck but then let him go, allowing him to run into the store. The

three men then "pushed" the victim into the trunk of the blue Oldsmobile and closed the trunk. One of the three people got into the Corvette. Love heard gunshots from the vicinity of the car and then both the Oldsmobile and the Corvette drove off in the same direction.

Other witnesses observed fragments of the same events. A liquor store employee, Musa Hussein, took a quick look at the street when he heard sounds resembling gunshots. He saw Parker outside the store and four men standing between a red Corvette and a blue or gray car. One of the men was a little taller than the others, maybe six feet four or five inches tall. (Defendant Cross is six feet five inches tall.) He also observed one of the men with what appeared to be a gun.

Lauren Tallerico heard four or five gunshots at about 4:15 p.m. as she drove along Market Street toward 12th Street. The shots came from the vicinity of a blue car, an older model Cadillac or Oldsmobile, containing two Black males, which she observed turn onto Market Street ahead of her and then speed off down 13th Street toward downtown Oakland.

Douglas Wright, an inspector for the district attorney, was driving home on 12th Street at about 4:10 p.m., when he heard two gunshots and saw a man standing behind a red Corvette parked about 50 feet from the intersection with Market Street. The man came quickly around the car, jumped in, and drove off down Market Street at a high speed. Wright thought the license number of the Corvette was 2YOK933. The man appeared to be in his middle twenties, about 5 feet, 11 inches tall, and weighed about 170 to 180 pounds. After observing defendant Cooper at trial, Wright testified that there was nothing inconsistent with his height and weight and appearance from the person he saw enter the Corvette. (Cooper is 6 feet tall, and 190 pounds, and was 26 years of age at the time of trial.)

At approximately 7 p.m. on the evening of the same day, a motorist, George Archambeau, driving west on the San Mateo Bridge saw a red Corvette stopped in the

.t hand lane. A Black man of average height, who appeared to come from the passenger seat of the car, was engaged in throwing a package the size of a grocery bag over the side of the bridge into the water. A second African-American male remained in the driver's seat. Archambeau drove around the Corvette but the car soon passed him driving at a high speed. He noted that the license number was 2YQK292.

At 9 p.m. that evening, Moamer Mohamed, an employee of the liquor store at 12th and Market Streets, saw a red Corvette left with the engine running in the entrance to the store's parking lot. When he went to investigate, he saw a tall, skinny Black man, wearing a checked shirt and gloves, running from the parking lot. He associated the Corvette with Kevin Parker. Upon being notified by police, Parker's girlfriend, Tisha Williams, reclaimed the car later in the evening.

Later, at 11 p.m., a late-1970's blue Oldsmobile Cutlass, which Oakland police associated with the kidnapping, was found in East Oakland near 100th Street and Voltaire eet parked in front of the residence of Juanita Walton, a critical prosecution witness. An evidence technician found vehicle registration and miscellaneous papers, which identified Miltonous Q. Kingdom, a cousin of defendant Cross nicknamed "Q," as the owner of the car.

Three employees of the E-Z 8 Motel near the Oakland Coliseum testified that defendant Cross and another man registered in room 331 on July 23, 1995, and checked out around 9 or 10 a.m. on August 4, 1995. The on-site manager, Robert Britton, identified Kevin Parker as a motel guest to whom he once advanced some money to receive a U.P.S. package and testified that he had also seen defendant Cooper on occasions at the motel. The motel's registration form, introduced as a business record, identified Cross's car as a blue IROC. Another motel employee, Henry Reel, saw defendants Cross and Cooper staying in room 331. The occupants of that room used a blue IROC, and he observed them put their belongings into this car when they vacated the om on the morning of August 4, 1995. He also saw a red Corvette parked in the motel

lot 10 or 15 times during the period that Cross resided there. When shown a photograph of Kevin Parker, he identified him as a person who had stayed in room 310 of the motel at that time.

On August 16, 1995, a partially decomposed body was found in a wooded area in the Oakland hills accessible by a service road. The body was identified by the Adidas sportswear and personal belongings in a pocket as that of the victim, William Highsmith. A portion of the shirt had been torn away and a cloth gag tied over the mouth. A scissors lay a few feet away on the ground. An autopsy revealed that the victim had died of a bullet wound to the head. A criminalist examined the slug extracted from the victim's brain and three shell casings found at the kidnapping scene. He determined that the casings were from a 9 millimeter firearm but that the slug was fired from a separate .40-caliber gun.

A separate line of evidence served to establish a plausible connection between the defendant Cooper and a jacket and gloves with gunshot residue. At 11:30 p.m. on the evening of the kidnapping, an Oakland Police Officer, Darrin Downum, stopped a car driven by one Carl Anderson on 99th Avenue in East Oakland for having expired registration tags. The defendant Cooper sat in the front passenger seat, wearing a plaid shirt. When Cooper got out of the car, Officer Downum observed a pair of gloves on his seat and a jacket in the back seat. Both Anderson and Cooper were arrested, and the car taken to a storage facility.

Anderson's mother picked up the car the next day and drove it to her back yard where she locked it. A couple days later a police detective asked her about the jacket in the car and she said it did not belong to her son, but at trial she would say only that it was not familiar. She never saw her son wear gloves, though he had once been given a pair. Anderson's father similarly testified that the jacket was unfamiliar and that his son did not wear gloves. In contrast, when called as a witness for the defense, Anderson testified that the jacket was in fact his and that the gloves were in the car when he bought it. A

criminalist testified that he found gunshot residue on both gloves and on the left cuff of the jacket.

The prosecution's case on the issue of identification of the defendants Cooper and Cross rested chiefly on the testimony of two women, Zanetta Hodges and Juanita Walton known by the nickname "Goodie," and on an out-of-court statement of Miltonous Q. Kingdom. At approximately 4 p.m., on the afternoon of the crime, Hodges drove down 12th Street with Walton in the passenger seat. Upon stopping at the intersection of 12th and Market Streets, Hodges heard someone call her name and backed up a car length to come even with a blue Oldsmobile parked near the corner. There were three people in the car. Sitting in the back seat was defendant Cooper, whom she had met before at Walton's home and on another occasion. He wore a dark jacket and black gloves. Defendant Cross sat in the driver's seat. She had seen him once before near Walton's home driving a blue IROC automobile. She knew the third man by the name "Q."

Pointing to a group of youths standing outside the liquor store, Cooper asked Walton if one of "those guys was Coco." Walton replied in the negative. Defendant Cross then said, "That nigger took my car, Goodie." Walton expressed disbelief, saying that Highsmith was "not trying to get his shoes dirty." At that point a red Corvette pulled up behind the blue Oldsmobile. Defendant Cooper said "bye" to the two girls, and they drove off to a Grand Street store about six blocks away where Walton obtained food stamps.

As they left the intersection, Hodges saw Parker and Highsmith, both of whom she knew, leave the red Corvette and meet the three men in the Oldsmobile, who also got out of their car. After obtaining the food stamps, the girls returned to the intersection of 12th and Market Streets and found police officers and a crowd of people. It was stipulated that the records of the Grand Street store revealed that Walton bought food stamps at 4:09 p.m. and that police records disclosed that the first telephone call reporting the kidnapping occurred at 4:08 p.m.

The prosecution introduced into evidence the preliminary hearing testimony of Walton after the trial court ruled that she was unavailable for testimony. Walton testified that she had known Parker and Highsmith for years and saw defendants Cross and Cooper as well as Cross's cousin, "Q," on a "daily" basis before the incident. She recognized the blue Oldsmobile parked at the corner of 12th and Market Streets as "Q's" car. After she and Hodges returned to the scene, she represented to police that she had been an eyewitness of the kidnapping. Later, she identified defendant Cooper in police custody as the man, who had sat in the back seat of the car. She recalled that Cooper was wearing gloves and a T-shirt at the time of the incident; she later saw him wearing a checkered Pendleton shirt at the police station. Walton gave police two somewhat inconsistent, tape-recorded statements, which were both played to the jury. At the preliminary hearing, she conceded that she was not an eyewitness and retracted many of her previous statements. Nevertheless, her varying accounts of the incident contained evidence corroborating every relevant point in Hodge's trial testimony, except her description of Cooper wearing a dark jacket.

An Oakland Police Officer, Larry Krupp, presented a redacted transcript of a statement that Miltonous Kingdom gave when contacted in a Mississippi jail. On November 8, 1995, after learning that Kingdom was under arrest, Krupp and another officer traveled to Greenville, Mississippi, to take custody of him on arrest warrants for Highsmith's kidnapping and murder. When he met Kingdom in the local jail and explained his purpose, Kingdom responded. "I'm not guilty" and initially denied any involvement in the kidnapping. Krupp played a brief excerpt from a tape-recorded statement of defendant Cross. Kingdom then gave a statement providing a complete account of the kidnapping and murder. At trial, Krupp read to the jury a transcript of selected portions of the statement.

Before the incident, Kingdom had been staying with his cousin, defendant Cross, in a motel in Oakland. That day, he drove in his blue Oldsmobile to 100th Avenue and

MacArthur in East Oakland "to hook up with" defendants Cross and Cooper. Cross drove the car to a store at the intersection of 12th and Market Streets in West Oakland as he sat in the front passenger seat and Cooper in the back seat. There, they talked to a girl named Goodie until a red Corvette drove up and parked behind them. He and the two defendants got out of their car and talked on the sidewalk to two men in the Corvette. Defendant Cross spoke to the men about "the car." Defendant Cooper then drew a 9 millimeter automatic handgun and ordered one of the men to get into the trunk of his Oldsmobile. The man complied.

Defendant Cooper entered the red Corvette while Kingdom and defendant Cross got back into the Oldsmobile. They went to the Oakland hills and stopped on a dirt road in the woods. All three men "went to the trunk." A portion of Highsmith's clothes was torn off and tied to his mouth. Defendant Cooper pulled down the man's pants. The man was then shot in the face and fell to the ground.

Testifying in his own behalf, defendant Cooper presented an alibi defense in which he denied being at the crime scene or seeing defendant Cross or Kingdom on the day of the crime. He claimed that he drove his wife to California State University at Hayward in the morning. He later took his Eagle Talon car to Mission carwash in Hayward and picked his wife up at approximately 3 p.m. They paid accounts at a Nordstrom store, returned to their apartment, and watched a video. Around 9 p.m., he left their apartment to go to a card game in East Oakland. He ran into Carl Anderson and rode around in his car until he was arrested later in the evening. Cooper's wife took the stand to support the defense. In addition, an employee of Mission carwash testified that he had record of washing an Eagle Talon on August 3, 1995, and remembered seeing Cooper on that date.

In contrast, defendant Cross presented a defense that conceded much of the prosecution's case, disclaiming only personal responsibility for the kidnapping and murder. He testified that he owned a blue Chevrolet IROC which he intended to take to Greenville, Mississippi. His plans were frustrated when the car was stolen on July 30,

1995, while loaded with thousands of dollars of drugs. Defendant Cooper had contributed over $2000 to the purchase of the drugs stolen with the car. He began searching for the car in West Oakland and was told that a person named Coco was driving the blue IROC around the neighborhood and trying to sell it. He gave a person he met on the street his pager number and a message to have Coco call him.

In the afternoon of August 3, 1995, Cross and his cousin, Kingdom, joined defendant Cooper at 100th and MacArthur. While they were together, Cross received a call from Coco on his pager and made arrangements to meet him at the liquor store on 12th and Market Streets. Cross drove Kingdom and Cooper to this location in Kingdom's blue Oldsmobile. He got out of the car and asked people near the store if they were Coco. He did not see Juanita Walton and did not know Zanetta Hodges.

At this point, a red Corvette drove up. Stepping out of the car, a man introduced himself as Coco and denied taking the IROC. Cooper then grabbed him and threatened him with a gun. For his part, Cross walked back to the Oldsmobile and entered the car. As Cross sat in the passenger seat of the car, Kingdom got the car keys and opened the trunk. From his position inside the car, Cross did not see the man being put in the truck but he heard the trunk close.

Running to the passenger side of the car, Kingdom told Cross to move to the driver's side and take off. Cooper got in the red Corvette. Cross drove to 100th and Voltaire where Cooper joined them in the red Corvette. Cooper and Kingdom then drove away in the two cars, but he did not go with them. About two minutes later, they returned in the Oldsmobile. Cross reentered the car and drove to his motel. Later, Cooper drove them to 100th and MacArthur but said nothing about the person they had abducted. Cross stayed at this location while Cooper and Kingdom drove off again in the Oldsmobile. The next day, he took a plane to Mississippi. He did not ask and was not told what happened to the man in the trunk.

As impeachment, the prosecution played taped statements in which Cross said that he and Kingdom helped put the victim in the trunk. Cross insisted that he was not truthful in making the statement and never had any intention to kidnap or murder the victim.

DISCUSSION

A. Statement Against Penal Interest

As a first assignment of error, both Cooper and Cross argue that the trial court erred in admitting portions of the out-of-court statement of Miltonous Kingdom to the Oakland police officers, who interviewed him in the Mississippi jail. When the prosecution called Kingdom as a witness at trial, he asserted the privilege against self-incrimination. The trial court then heard arguments on the question whether portions of the statement could be admitted as a declaration against penal interest under Evidence Code section 1230. Ultimately, the court admitted a redacted transcript of Kingdom's statement, which included only those portions that, in the court's view, tended to inculpate Kingdom himself as an accessory to the crime. The redacted statement, as we have noted, identified both Cooper and Cross as active participants in the kidnapping and murder.

Raising both evidentiary and constitutional issues, the defendants claim that the declaration-against-penal-interest exception does not apply and that admission of the redacted statement under the exception violated their constitutional right to confrontation of witnesses against them. We will review the hearsay exception and the relevant constitutional principles and then address the facts of the case.

In *People* v. *Spriggs* (1964) 60 Cal.2d 868, the California Supreme Court reversed an earlier decision and joined a minority of states holding statements against penal interest to be admissible as an exception to the hearsay rule. The decision noted that the majority rule excluding such statements was based in a venerable English decision that had been subjected to extensive scholarly criticism. The *Spriggs* decision was codified in Evidence Code section 1230, which now provides in pertinent part: "Evidence of a

statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

A subsequent decision, *People* v. *Leach* (1975) 15 Cal.3d 419, 441, restricted the scope of the exception by holding that collateral assertions within a declaration against penal interest, such as statements in which the declarant seeks to shift blame to others, are not admissible under Evidence Code section 1230. The court construed section 1230 "to be inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People* v. *Leach, supra,* at p. 441, fn. omitted.)

The courts have analyzed Evidence Code section 1230 as imposing three requirements: "A party who maintains that an out-of-court statement is admissible under this exception as a declaration against *penal* interest must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 607.) The unavailability requirement is satisfied by the declarant's assertion of the privilege against self-incrimination. (*People* v. *Leach, supra,* 15 Cal.3d at p. 438.) With respect to the other two requirements, the courts have said that the declaration "must be 'distinctly' against the declarant's penal interest and must be 'clothed with indicia of reliability.' [Citation.]" (*People* v. *Jackson* (1991) 235 Cal.App.3d 1670, 1677-1678.) "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. . . . A reviewing court may overturn the

trial court's finding regarding trustworthiness only if there is an abuse of discretion." (*People* v. *Frierson* (1991) 53 Cal.3d 730, 745.)

The relationship between the confrontation clause of the United States Constitution and the hearsay exception has been the subject of an evolving area of jurisprudence since the United States Supreme Court first held in *Pointer* v. *Texas* (1965) 380 U.S. 400 that the Sixth Amendment guarantee of confrontation and cross-examination applies to the states under the due process clause of the Fourteenth Amendment. (E.g. *California* v. *Green* (1970) 399 U.S. 149; *Dutton* v. *Evans* (1970) 400 U.S. 74; *Bourjaily* v. *United States* (1987) 483 U.S. 171, 182-183; *White* v. *Illinois* (1992) 502 U.S. 346.) While article I, section 15, of the California Constitution presents independent issues that cannot necessarily be resolved by federal precedents, the California courts have closely followed the precedents of the United States Supreme Court in this area. (E.g. *People* v. *Zapien* (1993) 4 Cal.4th 929, 955-957; *People* v. *Rios* (1985) 163 Cal.App.3d 852, 865-866; *People* v. *Coble* (1976) 65 Cal.App.3d 187, 193-195.)

The Supreme Court decision, *Idaho* v. *Wright* (1990) 497 U.S. 805 provides an authoritative exposition of this body of federal law. The *Wright* court noted that, while the confrontation clause ordinarily permits the admission of hearsay statements coming within an exception to the hearsay rule, the rules of evidence do not necessarily foreclose confrontation clause issues. "Although we have recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values, we have also been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. [Citations.] The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." (*Id.* at p. 814.)

The court employed " 'a general approach' for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. . . . First, '. . . [i]n the usual case . . . , the prosecution must

either produce or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' [Citations.] Second, once a witness is shown to be unavailable, 'his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' [Citations.]" (*Idaho* v. *Wright, supra,* 497 U.S. at pp. 814-815.)

The question whether evidence possesses adequate indicia of reliability turns on whether it demands testing by cross-examination. The *Wright* court explained, "Our precedents have recognized that statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testing would add little to their reliability. [Citations.] Because evidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception, [citation], we think that evidence admitted under the former requirement must similarly be so trustworthy that adversarial testing would add little to its reliability." (*Idaho* v. *Wright, supra,* 497 U.S. at pp. 820-821.)

In the case at bar, the record supports the admission of the redacted statement under Evidence Code section 1230. The trial court properly found that the declarant was unavailable after having asserted the privilege against self-incrimination. Moreover, the statement was clearly against the declarant's penal interests. In effect, Kingdom admitted active participation in the kidnapping and murder: he allowed Cooper and Cross to use his car to meet certain individuals in West Oakland; he accompanied then to the meeting place and left the car with them when the victim arrived; he was present when Cooper drew a gun and forced the victim into the trunk; he then reentered the car and traveled with Cooper and Cross to a wooded area of the Oakland hills; all three men went together to the trunk to retrieve the victim; and he was present when the victim was shot and fell on his face.

We consider that the trial court acted within its discretion in ruling that the declaration was sufficiently trustworthy to be admissible. The circumstances in which Kingdom gave the statement, immediately after hearing a tape recording of Cross's statement, suggests that he wished to admit what he could not deny. Nothing in the record suggests a possible motivation to falsely incriminate himself. Though he may have desired to minimize his responsibility, the trial court excised from the statement all statements seeking to shift blame to the other defendants.

We also conclude that the statement satisfied the requirements of the confrontation clause as summarized in the *Idaho* v. *Wright* decision. We do not rely on the theory that declarations against penal interest represent a "firmly rooted hearsay exception." The exception is in fact a relatively recent legal development in California, which represented a minority view, conflicting with older precedents, when it was first adopted by our high court. (Compare *People* v. *Wilson* (1993) 17 Cal.App.4th 271, 278; *U.S.* v. *Matthews* (2d Cir. 1994) 20 F.3d 538, 545.) Moreover, to the extent that the exception rests on a determination of trustworthiness, the exercise of the trial court's discretion in making this determination presents issues that still cannot be regarded as clearly settled.

We find rather that the statement at issue here displayed the sort of particularized guarantees of trustworthiness that satisfy the demands of the confrontation clause. We note, first, "that the very fact that a statement is genuinely self-inculpatory . . . is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." (*Williamson* v. *United States* (1994) 512 U.S. 594, 605; see also *People* v. *Greenberger* (1997) 58 Cal.App.4th 298, 329-330.)

More importantly, the statement did not present issues that demanded cross-examination of the declarant; it was free of ambiguities requiring clarification by cross-examination, and it contained details establishing the declarant as a witness to the murder that effectively eliminated the need to test the sources of his knowledge by cross-examination. The statement (including portions excised by the court) referred to aspects

of the murder revealed in testimony relating to the autopsy and the discovery of the body that could only be known by a person present when it was perpetrated. The trial court alluded particularly to the declarant's statements regarding "the cutting of the garments of clothing, putting a gag in the mouth of the person, pants pulled down, scissors present, and shot in the head . . . ." Under these circumstances, cross-examination of the declarant was reduced to a matter of "marginal utility" for the defense, thereby obviating confrontation clause problems. (*Idaho* v. *Wright, supra,* 497 U.S. at p. 823.)

The defendants object, however, that the admission of the redacted statement conflicts with *Douglas* v. *Alabama* (1965) 380 U.S. 415 and its progeny. In the *Douglas* decision, the Supreme Court held that the admission of the confession of a non-testifying codefendant violated the defendant's right of cross-examination guaranteed by the Sixth Amendment. Later decisions have forbidden the use of such a confession even where the trial court redacted the confession to delete the defendant's name (*Gray* v. *Maryland* (1998) 523 U.S. ____, 140 L.Ed 2d 294) or gave a limiting instruction telling the jury that it should consider the confession as evidence only against the confessing codefendant (*Bruton* v. *United States* (1968) 391 U.S. 123).

The simple answer to the objection is that the *Douglas/Bruton* line of authority concerns the admission of confessions of a codefendant that are not otherwise admissible against the defendant under a hearsay exception. (*U.S.* v. *Sasso* (2d Cir. 1995) 59 F.3d 341, 348-350; *U.S.* v. *Hamilton* (7th Cir. 1994) 19 F.3d 350, 354-357.) As stated in *People* v. *Greenberger, supra,* 58 Cal.App.4th at pp. 331-332, "[a] careful reading of *Bruton* and its progeny reflects a body of law which has dealt with the use of limiting instructions to prevent inadmissible and highly prejudicial evidence from infecting the case of the jointly tried codefendant. *Bruton* does not stand for the proposition that all statements of one defendant that implicate another may not be introduced against all defendants in a joint trial. The *Bruton* opinion itself stated that the offending hearsay statement in that case was clearly admissible against the nondeclarant under traditional

rules of evidence, and that there was no recognized exception to the hearsay rule for its admission."

In the case at bar, the redacted statement is not governed by the *Douglas/Bruton* precedents because it was otherwise admissible as satisfying both the requirements of Evidence Code section 1230 and the confrontation clause. Nevertheless, this line of authority serves to remind us of a consideration highly relevant to the exercise of the court's discretion under Evidence Code section 1230. The arrest "statements of a codefendant have traditionally been viewed with special suspicion. [Citations.] Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." (*Bruton* v. *United States, supra,* 391 U.S. at p. 141.)

Under this authority, the admission of the confession of a codefendant may present an issue of abuse of discretion unless the ordinary reasons for regarding a codefendant's confession with suspicion are not present or the confession has been redacted to remove all statements tending to exculpate the declarant or to shift blame to others. In the present case, we are satisfied that the trial court properly redacted the confession so as to leave only statements offering the assurance of reliability recognized by Evidence Code section 1230.

B. <u>Prosecutorial Misconduct</u>

Cooper points to three instances where the prosecution sought to elicit inadmissible and prejudicial evidence. In each case, the trial court sustained certain defense objections but overruled others, allowing the prosecution to get the testimony before the jury. Cooper predicates error chiefly on a claim of prosecutorial misconduct. "Although the typical instances of misconduct of the prosecutor occur in argument . . . , it is also misconduct to deliberately offer inadmissible evidence or to ask questions calling for inadmissible and prejudicial answers. Such misconduct is frequently held to be reversible error." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2889, p.

3528; *People* v. *Hudson* (1981) 126 Cal.App.3d 733, 741; *People* v. *Matlock* (1970) 11 Cal.App.3d 453, 460-461.)

The first instance occurred in the cross-examination of Cooper's wife, Deborah Cooper. After receiving testimony that she had married the defendant in September 1993 in Vacaville, the prosecutor pursued several lines of questions with the apparent intent of eliciting the fact that Cooper was then in prison. He asked, for example, where she went after the marriage, where he went, and when they began living together. The trial court initially sustained a defense objection for relevance, but when the prosecutor persisted in a related line of questioning, the court allowed the questions to clarify previous answers, overruling a further defense objection "based upon the last two answers." The prosecution ultimately elicited answers allowing the jury to infer that Cooper was imprisoned at the time of the marriage.

A prosecutor "may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be thereafter contradicted." (*People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 461.) Here, it was not material to Cooper's guilt that he had been imprisoned at the time of his marriage. Just as it would be improper to offer such evidence directly, it was improper for the prosecutor to question a witness about activities after the marriage for the purpose of eliciting testimony that could be contradicted with evidence of the defendant's imprisonment.

The second instance of asserted prosecutorial misconduct followed Cooper's admission on direct examination that he had been convicted of robbery and felon in possession of a firearm. To explore the underlying details of these crimes, the prosecution questioned him about his knowledge of guns, past ownership of guns, the use of particular weapons resulting in the robbery and possession charges, and his presentation of testimony about guns in the robbery trial. Again, the trial court initially sustained a defense objection, but then allowed the prosecution to pursue the line of the

questions by overruling two further objections before finally ending the examination by sustaining a fourth defense objection.

Evidence of prior felony convictions offered for purposes of impeachment is restricted to the name or type of the crime and the date and place of conviction. (*People* v. *Johnson* (1991) 233 Cal.App.3d 425, 459-463; *People* v. *Terry* (1974) 38 Cal.App.3d 432, 446, disapproved on other grounds in *People* v. *Gainer* (1977) 19 Cal.3d 835, 846; *People* v. *Hall* (1970) 5 Cal.App.3d 116, 126.) Our high court has said that " 'the courts will be zealous to insure that the prosecuting attorney is not permitted to delve into the details and circumstances of the prior crime . . . .' [Citation.]" (*People* v. *McClellan* (1969) 71 Cal.2d 793, 809.) The prosecutor here went beyond the proper scope of cross-examination on prior convictions in an attempt to portray Cooper as being experienced and sophisticated in the use of guns.

Finally, during the cross-examination of defendant Cross, the prosecutor asked if Cooper had "a certain reputation." When the trial court sustained a defense objection, the prosecutor turned to Cross's personal acquaintance with Cooper. He asked if Cooper had talked to him "about violence," if he knew Cooper "had shot at people before." Then, the prosecutor returned to the subject of Cooper's reputation, asking the same question for which the defense objection had been sustained. The court sustained an additional defense objection but overruled another, allowing the prosecution to introduce testimony regarding Cooper's reputation for violence and Cross's knowledge of his violent use of guns in the past.

The questioning of Cross on the subject of Cooper's reputation and past violent acts was prohibited by Evidence Code section 1101 which bars "evidence of a person's character or a trait of his or her character (whether in the form of . . . evidence of reputation, or evidence of specific instances of his or her conduct) . . . ." The prosecution did not claim that the testimony was relevant to prove some fact, such as intent, plan or

knowledge, and did not lay any foundation for presentation of the testimony on such ground.[1]

" 'As the representative of the government a public prosecutor is not only obligated to fight earnestly and vigorously to convict the guilty, but also to uphold the orderly administration of justice as a servant and representative of the law. . . . ". . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones. . . ." . . .' " (*People* v. *Daggett* (1990) 225 Cal.App.3d 751, 759, citations omitted.) Nevertheless, claims of prosecutorial misconduct are subject to limited review on appeal in the absence of a contemporaneous objection raising the issue. " 'It is . . . the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People* v. *Clair* (1992) 2 Cal.4th 629, 662.) Citing authority regarding the admission of an involuntary confession (e.g. *People* v. *Hinds* (1989) 154 Cal.App.3d 222), Cooper argues that the absence of an objection may not bar appellate review where the error involves a denial of due process. We do not consider, however, that the prosecutorial tactic at issue here can be regarded as having such an inflammatory and prejudicial impact.

Similarly, the defendant cannot assign error on appeal to the admission of evidence in the absence of a proper objection to the particular evidence on which error is predicated. (*People* v. *Green* (1980) 27 Cal.3d 1, 34.) Confining our review to the evidence which was improperly admitted over defense objection, we do not find "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836.) The testimony of Juanita Walton and Zanetta Hodges effectively destroyed Cooper's alibi

---

1 In final argument, the prosecutor suggested that the evidence was relevant to Cross's guilt, but the testimony was presented to the jury as evidence of the guilt of both defendants.

d nse and established that he was a participant in the crime. His guilt was corroborated by Kingdom's detailed and persuasive statement and, to some extent, by evidence of his checkered shirt and gunpowder residue on the gloves and jacket found in the car he was riding when arrested.

C. Felony-Murder Instruction

Both defendants assign error to the instructions on the element of intent for first degree murder under the felony-murder doctrine. Pursuant to CALJIC No. 8.21, the court instructed on felony murder arising from commission of kidnapping. (See Pen. Code, § 189.) Following *People* v. *Sears* (1965) 62 Cal.2d 737, overruled on other grounds in *People* v. *Cahill* (1993) 5 Cal.4th 478, 409-510, the instruction stated that the killing of a human being in the commission of kidnapping constitutes first degree murder "when the perpetrator had the specific intent to commit such crime." (See also *People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1249-1250; *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1085, overruled on other grounds in *People* v. *Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 346; *People* v. *Mosher* (1969) 1 Cal.3d 379, 392.) Specific intent was defined pursuant to CALJIC No. 3.31, which states that "[t]he specific intent required [for the charge of murder] is included in the definitions of the crimes or allegations set forth elsewhere in these instructions." But, as we have noted, the felony-murder instruction referred only to the specific intent to commit the crime, without defining specific intent, and the instruction on kidnapping provided no assistance; pursuant to CALJIC No. 9.50, it defined kidnapping as a crime requiring general intent (see *People* v. *Thornton* (1974) 11 Cal.3d 738, 765) and said nothing defining specific intent to commit the crime.

Defendants maintain that the effect of the instructions was to instruct the jury that it could convict on the theory of a kidnap felony murder if the defendant "merely had the general intent to commit a kidnap." We do not think that they have shown a reasonable likelihood that the jury could have understood the instruction in this sense. (*People* v.

*Clair, supra,* 2 Cal.4th at p. 663.) The felony murder instruction clearly called for specific intent and elsewhere the court explained that crimes fall into two categories: those requiring specific intent and those requiring general intent. Since the instructions identified the terms "specific intent" and "general intent" as entailing separate requirements, the jury could not have reasonably concluded that specific intent to commit the predicate felony for felony murder was the general intent for kidnapping.

With some justification, defendants complain that the instruction was confusing and inadequate. The court made no attempt to define the specific intent required under the felony-murder doctrine in the commission of a general intent crime, and CALJIC No. 3.31 promised a definition of specific intent elsewhere in the instructions, which was in fact not given. In this admittedly confused context, the jury was left to derive the meaning from the term "specific intent" which was denoted by the words themselves in the felony-murder instruction. The phrase, however, is not unduly obscure. We think that, in the absence of a definition, the jury is likely to have understood it as denoting purposeful conduct having the objective of committing the crime. This sense appears to be what the court meant in *People* v. *Sears, supra,* 62 Cal.2d 737 when it required a specific intent to commit the general intent crime of mayhem. Holding that the record did not support a finding of specific intent, the *Sears* court found that the evidence indicated that the defendant engaged in an "indiscriminate attack," lacking any purpose to maim the victim.

In any event, we note that the defendants did not request any clarifying instructions on specific intent or object to the use of CALJIC No. 3.31 in connection with CALJIC No. 8.21 and CALJIC No. 9.50. The trial court gave them an opportunity to do so by informing them in advance which instructions it intended to give. Under these circumstances, we conclude that the case is governed by the rule that "[o]rdinarily, '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate

arifying or amplifying language.' [Citation.]" (*People* v. *Sanders* (1995) 11 Cal.4th 475, 533.)

D. Inconsistent Prosecution Theories

With no citation of authority, the defendants advance the novel theory that their right to due process was violated because the People secured a conviction of carjacking after the prosecutor "repeatedly state[d] on the record a substantial doubt as to whether such crime was even committed." Whatever may be the legal merits of the theory, it is not supported by the record. For the purpose of impeaching Kevin ("K.K.") Parker, the prosecution introduced evidence that he associated with the defendants at the E-Z 8 Motel and resided in a room of the motel. The prosecution then argued to the jury that Parker lied when he failed to identify Cooper and Cross and speculated that his unreliability as a witness was due to the fact that he was in complicity with the defendants: "Whether or not KK was part of it, I can't tell you. There's some evidence that KK Parker may have delivered him to that scene. . . . I don't think that I have given those facts to you enough that I can argue that to you. It is possible that KK Parker had prior knowledge and delivered him up. He certainly was a poor witness here. Every time I asked him what happened, he gave me a different story."

The prosecution never suggested, however, that Parker willingly relinquished the red Corvette to the defendants at 12th and Market Streets but rather insisted that the defendants took the car with "force and fear" as required by Penal Code section 215. In our view, the possibility that Parker acted with some unknown degree of complicity with the defendants is not inconsistent with the contention that the defendants took his car with force or fear at the kidnapping scene. Thus, it is not accurate to say that the prosecution expressed doubt that the carjacking occurred or even that it advanced inconsistent theories of Parker's role in the event.

E. Lesser Included Offense

In their opening briefs, Cooper and Cross argue that the trial court erred in failing to instruct on grand auto theft (Pen. Code, §§ 484 and 487, subd. (d)) as a lesser included offense to carjacking (Pen. Code, § 215).[2] " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. . . . The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present . . . ." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715.) " 'The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.' [Citations.]" (*People* v. *Pearson* (1986) 42 Cal.3d 351, 355.)

The offense of auto grand theft is defined by Penal Code section 484, subdivision (a), and section 487, subdivision (d). The former statute, which defines theft generally, provides in part: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft." The latter statute defines grand theft as theft committed in enumerated cases, including: "(d) When the property taken is an automobile . . . ." Like other forms of theft, auto grand theft "requires a specific intent to *permanently* deprive the owner of his or her property." (*People* v. *Barrick* (1982) 33 Cal.3d 115, 128, fn. omitted.)

In contrast, the *temporary* taking of an automobile in the possession of another may constitute carjacking. Penal Code section 215, subdivision (a), provides:

---

[2] We do not address the related issue of whether Vehicle Code section 10851 is a lesser-included offense of carjacking because it was raised for the first time in the reply brief of defendant Cross. It is well settled that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.

'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to *either* permanently *or temporarily* deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (Emphasis added.) It follows that the offense of carjacking can be committed without committing auto grand theft if the offender does not intend to permanently deprive the victim of the vehicle. (Cf. *People* v. *Dominguez* (1995) 38 Cal.App.4th 410, 418-419.)

F. Hearsay Error

The defendants next base a claim of error on the introduction of hearsay evidence in the direct examination of Michael McArthur, the police officer who was first to arrive at the kidnapping scene. McArthur testified that Kevin Parker approached him while he was interviewing witnesses. He wrote a handwritten summary of the ensuing interview, which Parker approved but refused to sign. The prosecutor questioned McArthur about the contents of the statement in a direct examination ending with the following questions: "Q. Did he tell you that he knew about people who were looking for William Highsmith? [¶] A. Yes. He said that Mr. Highsmith had told him that the night before, some men with guns were looking for him at that location, at 12th and Market. [¶] Q. And did he tell you what the nature of the dispute was? [¶] A. Yes. He said it was a dispute over an IROC car. [¶] Q. And what supposedly happened? [¶] A. That they believed—the men with the guns believed that he had stolen the car from them."

The record reveals no objection to the prosecutor's questions, but Cross's counsel chose to cross-examine McArthur at considerable length on this point and caused him to acknowledge the hearsay origin of Parker's statement. After trial, Cross's counsel moved for a mistrial based on the admission of this testimony, claiming that he had asked the court to strike the questions and answers. The matter arose again when the jury asked to have McArthur's testimony about his interview of Parker read back to them. Cross's

counsel moved to strike the hearsay testimony at issue from the transcript to be read to the jury, again insisting that he had a "distinct recollection" of having moved to strike the testimony. However, when the court gave him an opportunity to search the record with the assistance of the court reporter, he was forced to concede that he could not find any record of an earlier motion to strike. The trial court then denied the motions and asked the court reporter to read back the requested portion of McArthur's testimony.

The testimony constitutes double hearsay, i.e. an out-of-court statement by Parker to McArthur concerning a second statement by Highsmith to Parker. To the extent that Highsmith may have derived his information from an unnamed third source, it becomes triple hearsay. While it was plainly subject to objection, the defendants waived any claim of error in the initial testimony by failing to raise a hearsay objection. (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2012, p. 1971.) It is true that Cross's counsel did move to strike the testimony before it was read back to the jury, but defendants can point to no authority allowing evidentiary objections to be raised for the first time or relitigated at this stage of the proceedings. Such belated objections would present an obvious potential for undue consumption of time and confusion of the jury.

The defendants also claim prejudicial error on the ground of prosecutorial misconduct in eliciting inadmissible testimony. In part B of this opinion, we earlier considered three similar instances in which the prosecutor elicited inadmissible evidence. For the reasons expressed there, we think the claim of error fails both for the absence of an objection and for harmless error.

Alternatively, the defendants claim to have received ineffective assistance of counsel because of their failure to object to the testimony. We do not think, however, that the record shows counsel's performance to be deficient. "Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 621.) In any event, as explained

in part B, we do not regard the record as presenting the close issue of guilt that would support a claim of prejudice. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 217-218.)

G. Denial of Separate Trials

Cooper contends that the trial court abused its discretion in denying his pretrial motion to sever his trial from that of codefendant Cross. The record reveals that Cooper moved for a separate trial or, in the alternative, for the redaction of the transcripts of Cross's statements to police so as to eliminate references to him. Implicitly denying the motion for severance, the trial court directed counsel to prepare the redacted transcripts. At the time of making the ruling, the court was apprised that Cooper would present an alibi defense inconsistent with Cross's defense which admitted his presence with Cooper and Kingdom at the kidnapping scene. Ultimately, the court allowed a prosecution witness to read a redacted transcript of Cross's statement and instructed the jury that the statement should be considered only as evidence against Cross.

Penal Code section 1098 states a general preference for joint trials: "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. . . ." "The Supreme Court has characterized a trial in which the defendants are charged with common crimes against common victims as the classic situation for joint trials." (*People* v. *Greenberger, supra,* 58 Cal.App.4th at p. 344; *People* v. *Hardy* (1992) 2 Cal.4th 86, 168.)

"The matter of granting separate trials nevertheless remains largely within the discretion of the trial court [citation], guided by the principles set out in *People* v. *Massie* (1967) 66 Cal.2d 899. The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' (*People* v. *Massie,*

*supra,* 66 Cal.2d at p. 917, fns. omitted.)" (*People* v. *Turner* (1984) 37 Cal.3d 302, 312, overruled on other grounds in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1115.)

The trial court greatly mitigated the potential prejudice to defendant Cooper resulting from a joint trial by redacting Cross's pretrial statements to eliminate any reference to Cooper and by admonishing the jury that the statements applied only to the defendant Cross. Cooper now premises his claim of prejudice solely on the existence of inconsistent and conflicting defenses.

" 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.] [¶] Moreover, . . . the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.]" (*People* v. *Hardy, supra,* 2 Cal.4th at p. 168.)

In reviewing the trial court's exercise of discretion on the motion to sever, we place great weight on the fact that this was a trial involving common action against the same victim falling squarely within the policy of Penal Code section 1098 favoring joint trials. With the redaction of Cross's statements, the only prejudice to Cooper related to his alibi defense. We have found no authority indicating that an alibi defense entitles a defendant to a separate trial to shield the alibi defense from conflicting evidence of a codefendant. The present case does not differ significantly from the common case involving alibi defense. If Cooper were entitled to severance, the policy favoring joint

is would be significantly undermined. Furthermore, we note that, while Cross's defense conflicted with Cooper's alibi defense, it did not necessarily incriminate Cooper. Cross did not directly accuse Cooper of the crime. Instead, he denied witnessing the act of forcing the victim into the trunk and denied being present at the murder.

H. Denial of Motion for New Trial

Cooper next claims that the trial court abused its discretion in denying his motion for new trial based on newly discovered evidence. The motion was supported by a declaration of Cooper's counsel stating that he had received an undated note, bearing the signature of Miltonous Kingdom, which stated that Kingdom would testify in court that he lied to protect his cousin in making his statement in the Mississippi jail to arresting officers. With regard to Kingdom's availability as a witness in a new trial, counsel declared: "In discussions with the public defender, the public defender has no intention of allowing Mr. Kingdom to testify that any statements he made were lies and would vise him to again invoke the fifth amendment as was done in the prior proceedings."

The motion is procedurally defective because it is not supported by "the affidavits of the witnesses by whom such [new] evidence is expected to be given" as required by Penal Code section 1181, subdivision 8. For this reason alone, it was properly denied. In any event, the motion fell far short of making a showing of new evidence "such as to render a different result probable on a retrial . . ." (*People* v. *Beeler* (1995) 9 Cal.4th 953, 1004.) It provided no assurance that Kingdom would actually testify as represented, but even if it he were to do so, it is exceedingly unlikely that the jury would be swayed by such a vague and unexplained recantation.

I. Accomplice Instruction

Cooper also claims that the trial court erred in failing to instruct sua sponte pursuant to CALJIC No. 3.16 that Kingdom and Cross were accomplices as a matter of

law.[3] The record discloses that, without objection from Cooper's counsel, the trial court delivered a series of five instructions on accomplice testimony—CALJIC No. 3.10 defining an accomplice; CALJIC Nos. 3.11, 3.12 and 3.13 concerning the corroboration of an accomplice's testimony; and CALJIC No. 3.18 cautioning that the testimony of an accomplice is to be viewed with distrust. The court was not requested to give, and did not give, CALJIC No. 3.16.

As Cooper points out, it has been held to be reversible error for the court to fail sua sponte to identify a witness as an accomplice as a matter of law pursuant to CALJIC No. 3.16 where the effect is to deprive the defendant of the full benefit of the rule requiring the corroboration of an accomplice's testimony. (*People* v. *Robinson* (1964) 61 Cal.2d 373, 394-395; *People* v. *Dailey* (1960) 179 Cal.App.2d 482, 485-486.) The present case, however, presents a more complicated situation that did not allow the trial court to identify accomplice testimony without making a finding of fact within the jury's province. Cross denied active participation in the kidnapping or any involvement in the murder; the court could not identify him as an accomplice without determining an issue of guilt to be submitted to the jury. (*People* v. *Terry* (1970) 2 Cal.3d 362, 398-399.) Kingdom admitted some degree of participation in the kidnapping and the crime in his statement to police, but his account conflicted with the defense of both Cross and Cooper; the court could not determine that he was an accomplice of either or both of these defendants without rejecting their defense at trial. Under these circumstances, we think that it would be confusing to the jury and potentially prejudicial to the defendants to attempt to identify the accomplice to which the accomplice instructions applied.

We see no merit in Cooper's argument that, by failing to give CALJIC No. 3.16, the trial court encouraged the jury to view him as an accomplice whose testimony on his

---

3 As adapted to the present case, CALJIC No. 3.16 would read: "If the crime charged in counts 1, 2, and 4 were committed by anyone, the witnesses Miltonous Kingdom and Fred Cross were accomplices as a matter of law and their testimony is subject to the rule requiring corroboration."

alibi defense ought to be distrusted. In context of related jury instructions, the instruction plainly referred to testimony offered by the prosecution tending to prove the defendant's guilt. We see no " 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.]" (*People* v. *Kelly* (1992) 1 Cal.4th 495, 525.)

J. Admission of Prior Testimony

Cooper next maintains that the trial court erred in admitting the transcript of Juanita Walton's preliminary hearing testimony under Evidence Code section 1291, subdivision (a)(2) on the ground that she was "unavailable as a witness." As defined in Evidence Code section 240, subdivision (a)(5), a person is "unavailable as a witness" if she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." "The proponent of the evidence, here the People, has the burden of establishing unavailability by competent evidence." (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1296.)

During her preliminary hearing testimony on September 7, 8, and 11, Walton mentioned that she had been the subject of threats, and upon the prosecution's request, the court declared her to be a hostile witness. Cooper was arraigned on September 27, and the trial was then set for November 15, 1995. After the jury was sworn, the prosecution moved to offer Walton's preliminary hearing testimony into evidence on the ground that she was unavailable as a witness. The court conducted a hearing on the matter, extending over two days, in which the district attorney's investigator, Brian Lerche, chronicled his intensive efforts to serve Walton beginning on October 30, 1995. The court found that the prosecution had exercised due diligence in an attempt to serve Walton and ruled that the preliminary hearing testimony could be admitted.

We have undertaken an independent review of the record in light of the division of authority on the appropriate standard of review. (*People* v. *Wise* (1994) 25 Cal.App.4th 339, 343.) Without attempting to summarize Lerche's testimony, it suffices to say that he

was actively engaged for about a month in efforts to serve Walton or learn her whereabouts. Cooper faults him for not beginning the search earlier and for making repeated, futile attempts to contact her at a Voltaire Street address, neglecting efforts to trace her receipt of food stamps. Despite these criticisms, we find that the People exercised due diligence to locate Walton. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness. They did." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1298, fn. omitted.)

K. Incompetence of Counsel

Cooper also seeks to base a claim of incompetence of counsel on two errors of his trial counsel. While cross-examining Douglas Wright concerning the man who drove away from the kidnapping scene in the red Corvette, Cross's counsel inadvertently referred to the man three times as "Mr. Cooper" or "Cooper." The third time, Cross's counsel caught himself in the error and rephrased his question to refer to "the person by the red Corvette"—a phrase consistent with his earlier questioning of this witness. Cooper's trial counsel failed to raise an objection even though Wright had never identified the man as Cooper. The second alleged error concerned the impeachment of Cooper with a prior felony conviction. When the trial court indicated that it would allow such impeachment, defense counsel reasonably sought to blunt the impact of the testimony during direct examination by asking Cooper to acknowledge that he had been convicted of several felonies—felon in possession of a firearm, possession of narcotics, robbery, and escape. One of these felonies, possession of narcotics, "does not necessarily involve moral turpitude" (*People* v. *Castro* (1985) 38 Cal.3d 301, 317), and the trial court had not specifically ruled that it could be used for impeachment purposes.

"To establish constitutionally inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation

jected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1057-1058.) Although the record provides no explanation for counsel's actions, it does not follow that counsel's representation was deficient in light of the entire record. In a lengthy trial, the most competent of defense counsel is likely to be vulnerable to certain lapses in attention or judgment. In any event, we see no reasonable probability that the result of the trial would have been different in the absence of the errors. Both errors were relatively trivial. Cross's counsel made no deliberate attempt to identify the person by the red Corvette as Cooper and in fact corrected himself after realizing he had inadvertently made this association. The conviction for possession of narcotics added only marginally to the prejudicial effect of Cooper's prior convictions, which included the much more damaging conviction of robbery.

Eyewitness Identification

Cooper also complains that the trial court erred in allowing Douglas Wright to testify that there was nothing "inconsistent' in Cooper's physical appearance from that of the person he saw get into the red Corvette. Wright earlier gave a general description of the man's height, weight, age, and race that matched Cooper's but did not make a specific identification, explaining that he had merely glanced in the man's direction while passing by and then observed him in the rearview mirror. Cooper argues that, since Wright could not identify him, his testimony was irrelevant and prejudicial. We see relevance, however, in the fact that Wright could say that the man resembled Cooper. Though his testimony did not have the probative value of a personal identification, it still had some "tendency in reason" to prove Cooper's presence at the kidnapping scene. (Evid. Code, § 210.)

M. Penal Code Section 654

Attacking his 71-year sentence, Cooper first claims that Penal Code section 654 barred the separate sentences imposed for his convictions of carjacking (Pen. Code, § 215) and felon in possession of a firearm (Pen. Code, § 12021). As worded at the time of sentencing, section 654 provided: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 19.)

The standard for determining whether section 654 allows separate sentences where the defendant was convicted both of a crime involving use of a firearm and of being a felon in possession of a firearm is found in *People* v. *Bradford* (1976) 17 Cal.3d 8. Citing *People* v. *Venegas* (1970) 10 Cal.App.3d 814, 821, the *Bradford* court stated: "Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense." (*People* v. *Bradford, supra,* 17 Cal.3d at p. 22.)

The record reveals that the eyewitnesses to the kidnapping and its aftermath reported hearing gunshots from the vicinity of the red Corvette and blue Oldsmobile near the corner of 12th and Market Streets. The testimony of Hodges and Walton identified

Cooper as arriving at the crime scene in the Oldsmobile, and the police investigation later found two 9 millimeter shells at the scene. Three hours later, Archambeau saw a black male throwing a gun-sized package off the San Mateo Bridge while standing by the red Corvette, which, by other accounts, Cooper drove from the kidnapping scene. Gunshot residue was found on gloves and jacket, which Cooper was likely to have worn at the time of the kidnapping and murder.

Apart from this circumstantial evidence, the testimony of Kingdom and Cross directly linked Cooper with the possession and use of a firearm. Kingdom testified that Cooper drew a 9 millimeter automatic handgun and forced the victim to enter the trunk of the Oldsmobile. Then he followed his companions to the Oakland hills where the victim was shot. After taking the stand in his defense, Cross also testified on direct examination that Cooper held a gun in his right hand and forced the victim to go to the Oldsmobile. On cross-examination, he stated that Cooper carried a gun when he rode in the back seat of the Oldsmobile to the intersection of 12th and Market Streets. He thought the gun was a 9 millimeter. In testimony consistent with that of several other witnesses, he added that Cooper wore gloves when he arrived at the kidnapping scene, suggesting preparation to use a firearm.

We conclude that Cross's testimony on cross-examination that Cooper carried a gun as he was driven to the encounter with the victim, corroborated by evidence that he wore gloves and later used a 9 millimeter weapon to effect the kidnapping, provided substantial evidence of " 'a possession distinctly antecedent and separate from the primary offense,' " which permitted a separate sentence for the conviction of felon in possession. (*People* v. *Bradford, supra,* 17 Cal.3d at p. 22, citation omitted.)

N. <u>Restitution Fine</u>

We see no merit in Cross's contention that the trial court abused its discretion in imposing a restitution fine of $3500 pursuant to Penal Code section 1202.4. Referring to the father of the victim, William Highsmith, the probation officer's report stated: "Victim

compensation office worker Barbara (X26180) reports that William [Hightower, Sr.'s] claim was approved in part for $3,500.00 and disbursed." At the sentencing hearing, the trial court accepted this statement as evidence of economic loss resulting from the crime but it gave Cross the opportunity to file an accounting within two weeks showing that actual costs to the victim's father resulting from the victim's murder were less than $3500. The record does not reflect any petition seeking reduction of the fine. After receiving notice through the probation report of the amount of restitution claim, Cross was afforded an adequate opportunity to challenge the accuracy of the claim. (*People* v. *Blankenship* (1989) 213 Cal.App.3d 992, 997.)

O. Consecutive Sentencing

Cooper next contends that the trial court failed to exercise its discretion to impose concurrent or consecutive sentences for the three current felonies for which sentences were imposed—murder, carjacking, and felon in possession of a firearm. The record indeed reveals that the court did not consider the option of concurrent sentences because it considered that consecutive sentences were required by law.

The issue turns on the interpretation of Penal Code section 667, subdivision (c)(6) and (c)(7), in light of the recent Supreme Court decisions in *People* v. *Hendrix* (1997) 16 Cal.4th 508, 512, and *People* v. *Deloza* (1998) 18 Cal.4th 585.[4] Subdivision (c) provides in general terms that, if a defendant is subject to the sentencing provisions of the three strikes law, the court "shall adhere to each of the following: . . . (6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e). [¶] (7) If there is a current conviction for more than one serious or violent felony as described in paragraph (6), the

---

[4] Since subdivisions (c)(6) and (c)(7) are virtually identical to Penal Code section 1170.12, subdivision (a)(6) and (a)(7), we refer herein to the former so as to avoid duplicate citations. (See *Deloza, supra,* at p. 589, fn. 3.)

court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law."

The present case falls within subdivision (c)(7) because Cooper was convicted of the serious and violent felonies of murder, kidnapping and carjacking. As clarified in *People* v. *Hendrix, supra,* 16 Cal.4th at p. 513, the reference to paragraph (6) in this subdivision is to subdivision (c)(6). "So construed, 'more than one serious or violent felony as described in paragraph (6)' refers to multiple current convictions for serious or violent felonies 'not committed on the same occasion, and not arising from the same set of operative facts.' [Citation.]" (*People* v. *Hendrix, supra,* at p. 513.)

When a defendant is convicted of two or more serious or violent felonies "not committed on the same occasion, and not arising from the same set of operative facts," the court must impose consecutive sentences as provided by subdivision (c)(7). "By implication, consecutive sentences are not mandated under subdivision (c)(7) if all of the serious or violent current felony convictions are 'committed on the same occasion' or 'aris[e] from the same set of operative facts.' " (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 513.)

In *People* v. *Deloza, supra,* 18 Cal.4th at pp. 594-595, the court held that the key language in these subdivisions, "on the same occasion" and "arising from the same set of operative facts" calls for an analysis different from that required by Penal Code section 654. "We conclude the analysis for determining whether subdivision (a)(6) and (a)(7) requires consecutive sentencing is not coextensive with the analysis for determining whether 654 permits multiple punishment. Rather, the term 'same occasion' refers at least to a close temporal and spatial proximity between the acts underlying the current convictions." (*People* v. *Deloza, supra,* at p. 595.)

Cooper here was convicted of first degree felony murder based on an unlawful killing during the commission of kidnapping. Since the verdict entails a finding that the

murder was committed during the kidnapping, the two offenses clearly possess "a close temporal and spatial proximity" and therefore should be regarded as being committed on the "same occasion" and on "the same set of operative facts." It is immaterial that the court subsequently stayed the sentence for the kidnapping conviction and sentenced him for carjacking pursuant to Penal Code section 654. The carjacking sentence was imposed in lieu of a sentence for kidnapping and therefore should be subject to the same disposition as the kidnapping conviction under Penal Code section 667, subdivision (b)(6) and (b)(7).

In light of the *Hendrix* and *Deloza* decisions, we conclude that the trial court erred in failing to exercise its discretion to impose consecutive or concurrent sentences for Cooper's convictions of first degree murder and carjacking because these felonies were "committed on the same occasion" and "aris[e] from the same operative facts."[5] Our analysis does not apply to the additional conviction for felon in possession of a firearm. As we have noted, this conviction was based on acts antecedent to and separate from the kidnapping and murder and thus was not committed "on the same occasion" as the latter offenses.

P. Sentencing Errors

As the People concede, the abstract of judgment for Cooper's prison commitment reflects two errors in sentencing. First, the abstract of judgment for the indeterminate sentence states: "Defendant [is] to serve a minimum fifty (50) years." Since there is no statutory authorization for a judgment setting a minimum prison term, the words "a minimum" should be deleted. Second, the abstract of judgment for the determinate sentence erroneously doubled the midterm for counts 3 and 4 rather than doubling one-third the midterm as required by Penal Code section 1170.1, subdivision (a), and section 667, subdivision (e)(1). The judgment should reflect a consecutive 16-month sentence for

---

[5] We note that the trial court sentenced Cooper before the *Hendrix* and *Deloza* decisions were rendered and the applicable law was not clear at the time of the sentencing hearing.

ınt 3 (felon in possession of firearm) and a consecutive 32-month sentence for count 4 (kidnapping), stayed pursuant to Penal Code section 654.

The abstract of judgment for Cross's prison commitment also reflects two errors in sentencing. First, as in the case of Cooper's judgment, the abstract of judgment for the indeterminate term erroneously sets a minimum prison term. The language "Defendant to serve a minimum twenty-five (25) years" should be modified by deleting the words "a minimum." Second, the abstract of judgment for the determinate term erroneously sets a two-year arming enhancement pursuant to Penal Code section 12022, subdivision (a), which in fact authorizes a one-year enhancement. The judgment should reflect a one-year enhancement to count 2 pursuant to Penal Code section 12022, subdivision (a).

The convictions of both Cooper and Cross are affirmed. Cooper's case is remanded to the superior court to exercise its discretion to impose consecutive or concurrent sentences for his convictions of first degree murder and carjacking[6] and to ɔdify the abstract of judgment pursuant to this opinion. The clerk of the superior court is ordered to modify Cross's abstract of judgment pursuant to this opinion and, in all other respects, Cross's judgment is affirmed.

---

[6] We express no opinion as to how the court's discretion should be exercised.

Swager, J.

We concur:

Strankman, P.J.

Stein, J.

People v. Cooper and Cross, A073986

# EXHIBIT – H

# JURORS ANSWERS TO INVESTIGATORS AFTER VERDICT

# SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

**Case Name:** **People v. Aaron Cooper**

**Juror Contacted:** #5

**Date of Contact:** **11/28/04**

**Investigator:** **Notty Bumbo**

My name is Notty Bumbo. I am a private investigator. I have been retained by Attorney Deborah Levy who has been appointed to represent Aaron Cooper. She has obtained permission of the judge in this case to contact you about your experience on the jury. You do not have to talk to me, however, I would appreciate just a few minutes of your time.

1. What was your general impression of the case? (as presented by the prosecution?)

   a. **Good.**

2. As presented by the defense attorney?

   a. **Not so good, not a strong defense.**

3. Who's testimony did you believe? Why?

   a. **Love and Hussein – their testimony hadn't changed over nine years.**

4. Whose testimony did you not believe? Why?

   a. **Walton and Cross, because he (Cross) was involved.**

5. How were you able to determine that Mr. Cooper did not have a gun, but were still able to find him guilty of what Cross, Walton, and Hodges said?

   a. **Just by the fact that he was there, at the scene of the crime, so by association.**

6. Would it have made a difference in your deliberations if you had heard from the defendant?

   a. **Hard to say, it could have worked either way.**

*510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271*
*license pi 11539 ≈ tax id 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 ≈ e mail franciek@pac.bell.net*

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

7. How much importance did you place on the issue of the jacket?

   a. **I believed they were his, because they matched the description of the clothing seen by Hussein and others at the scene.**

8. Once you found Cross' testimony corroborated, did you believe it all? Partly? What parts?

   a. **The part that put Cooper at the scene, but not what he said they all did afterward. I thought then he was just trying to minimize his involvement.**

9. You sent a note to the judge and asked about how much weight to give the closing arguments during deliberations. Which closing argument were you asking about - - The Defense, or the Prosecutions?

   a. **Both – we wanted to know what impact that should have along with all the other evidence.**

10. You sent a note to the judge asking what happened to Aaron Cooper in the 1995 trial (if he was convicted of murder). The judge did not give further information. Was there speculation about what happened with the 1995 verdict? How did that influence the decision?

    a. **Yes, some people wanted to know if there was a tie-in, but we dropped all consideration after the judge instructed us.**

11. What changed from Tuesday afternoon, when you asked about the accomplice testimony, to Wednesday afternoon when you reached your verdict?

    a. **I don't really know.**

12. What part of the judges clarification about accomplice testimony helped you the most?

    a. **If someone was at the scene, and knew what was going to happen.**

13. What was your general impression of the following:

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pac.bell.net

SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

a. Judge – **Fair, and he let us make the decision.**

b. DA – **Thought he was thorough, and fair.**

c. Witnesses – lay witnesses as well as police witnesses – **Mostly telling the truth.**

d. Defense Counsel – **She tried to discredit Walton, but her closing argument didn't hold much weight regarding the accomplice issue; I felt that she didn't have enough to work with.**

e. Defendant – **Impartial, no other impression.**

14. What were the discussions that led to the notes that went to the judge?

a. **The question about accomplices, the closing arguments issue, circumstantial evidence.**

15. Was there any conflict in the jury room?

a. **No, everyone had a chance to speak.**

16. What process did the jury follow to reach a verdict? Review evidence, discuss among yourselves, take multiple votes - - other??

a. **All of those things, plus the charts we made to break down each issue.**

17. What was the breakdown of each vote taken?

a. **The first vote was 8 to 4 for guilt, then the final one was unanimous for guilt.**

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pac bell net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

Additional comments from this juror:

**"The foreperson was initially frustrated with several people on the jury". "Juror # 3 was also confused about the accomplice issue".**

This juror also kept her notebooks from the trial.

| Thank you very much for your time. If you think of anything further, please do not hesitate to contact me at 415 305-9685. |
|---|

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e mail franciek@poc.bell.net

SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

**Case Name:** **People v. Aaron Cooper**

**Juror Contacted:** **#11**

**Date of Contact:** **11/25/04**

**Investigator:** **Notty Bumbo**

My name is Notty Bumbo. I am a private investigator. I have been retained by Attorney Deborah Levy who has been appointed to represent Aaron Cooper. She has obtained permission of the judge in this case to contact you about your experience on the jury. You do not have to talk to me, however, I would appreciate just a few minutes of your time.

1. What was your general impression of the case? (as presented by the prosecution?)

   **a. It was well presented, but I felt that a lot was left out.**

2. As presented by the defense attorney?

   **a. She did not present any character witnesses or alibis, she just focused on countering the witnesses.**

3. Who's testimony did you believe? Why?

   **a. The police investigators. It seemed like they knew their job and did not have a bias one way or the other.**

4. Whose testimony did you not believe? Why?

   **a. Walton and Hodges. I don't know why.**

5. How were you able to determine that Mr. Cooper did not have a gun, but were still able to find him guilty of what Cross, Walton, and Hodges said?

   **a. Just by the fact that he was there.**

6. Would it have made a difference in your deliberations if you had heard from the defendant?

*510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271*
*license pi 11539 ≈ tax id 571 54.2455 ≈ e-mail franciek@pac.bell.net*

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

a. **Either him or someone on his behalf. There seemed to be no positive (affirmative) defense.**

7. How much importance did you place on the issue of the jacket?

a. **I believed they were his.**

8. Once you found Cross' testimony corroborated, did you believe it all? Partly? What parts?

a. **It was hard not to believe it, but I thought someone had got to him, because he refused to appear in person.**

9. You sent a note to the judge and asked about how much weight to give the closing arguments during deliberations. Which closing argument were you asking about - - The Defense, or the Prosecutions?

a. **The prosecution – I felt he gave an excellent closing.**

10. You sent a note to the judge asking what happened to Aaron Cooper in the 1995 trial (if he was convicted of murder). The judge did not give further information. Was there speculation about what happened with the 1995 verdict? How did that influence the decision?

a. **Yes, but it had no influence on me.**

11. What changed from Tuesday afternoon, when you asked about the accomplice testimony, to Wednesday afternoon when you reached your verdict?

a. **Three jurors were being very thorough, especially regarding the accomplice issue. They just wanted more clarification.**

12. What part of the judges clarification about accomplice testimony helped you the most?

a. **That if someone was present at the crime, they could be considered accomplices.**

13. What was your general impression of the following:

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pac.bell.net

SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

a. Judge – **Excellent, he kept us informed about each issue.**

b. DA – **Thought he was thorough, and clear.**

c. Witnesses – lay witnesses as well as police witnesses – **no opinion.**

d. Defense Counsel – **Not too good, didn't seem too competent, she showed poor follow-through.**

e. Defendant – **Demeanor was good, no other impression.**

14. What were the discussions that led to the notes that went to the judge?

a. **Just to gain clarification, some jurors had confusion on the issue of circumstantial evidence.**

15. Was there any conflict in the jury room?

a. **No.**

16. What process did the jury follow to reach a verdict? Review evidence, discuss among yourselves, take multiple votes - - other??

a. **We broke down each issue. Discussions on who could be believed. Felt that Hodges and Walton put Cooper at the scene, that the food stamp connection, and the first call to the police gave validity to their testimony.**

17. What was the breakdown of each vote taken?

a. **The first vote was 8 to 4 for guilt, then the final one was unanimous for guilt.**

*510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271*
*license pi 11359 ≈ tax id 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 ≈ e-mail franciek@pac.bell.net*

# SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

Additional comments from this juror:

**"I felt that the foreperson really helped to move the process along, making sure that everyone had a chance to say what they thought". "I thought that there was nothing presented that did not put Cooper there".**

Thank you very much for your time. If you think of anything further, please do not hesitate to contact me at 415 305-9685.

*510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271*
*license pi 11539 ≈ tax id 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 ≈ e-mail franciak@pac.bell.net*

# SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

**Case Name:** **People v. Aaron Cooper**

**Juror Contacted:** **#10**

**Date of Contact:** **11/26/04**

**Investigator:** **Notty Bumbo**

My name is Notty Bumbo. I am a private investigator. I have been retained by Attorney Deborah Levy who has been appointed to represent Aaron Cooper. She has obtained permission of the judge in this case to contact you about your experience on the jury. You do not have to talk to me, however, I would appreciate just a few minutes of your time.

1. What was your general impression of the case? (as presented by the prosecution?)

   a. **I expected more definition. There were witnesses missing, like KK Parker, as it seemed as though his role was somehow key to the entire event.**

2. As presented by the defense attorney?

   a. **She didn't have much to work with, but she seemed effective in discrediting the various witnesses.**

3. Who's testimony did you believe? Why?

   a. **Hodges, Walton, Cross, because of the mention of Cooper in Q and Cross' interrogation video. We collaborated all their statements.**

4. Whose testimony did you not believe? Why?

   a. **Most, including most of Cross'. But Walton accused them the evening of the crime, and that seemed important to me.**

5. How were you able to determine that Mr. Cooper did not have a gun, but were still able to find him guilty of what Cross, Walton, and Hodges said?

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

a. **We inferred, based on Love and the store owner putting Cooper at the scene, especially when Love said "I think they had 9s" referring to 9mm firearms. But Cooper could not be seen as actually holding a gun beyond a reasonable doubt.**

6. Would it have made a difference in your deliberations if you had heard from the defendant?

   a. **I can't say what would be different.**

7. How much importance did you place on the issue of the jacket?

   a. **Very little. I believed it belonged to Cooper, but it was clearly circumstantial.**

8. Once you found Cross' testimony corroborated, did you believe it all? Partly? What parts?

   a. **I believed his ID of the other people involved, but I think he tried to shade his part in the event, like the placement of the gun in the front seat of the car.**

9. You sent a note to the judge and asked about how much weight to give the closing arguments during deliberations. Which closing argument were you asking about - - The Defense, or the Prosecutions?

   a. **Both. Other jurors wanted to know, I can't remember which ones.**

10. You sent a note to the judge asking what happened to Aaron Cooper in the 1995 trial (if he was convicted of murder). The judge did not give further information. Was there speculation about what happened with the 1995 verdict? How did that influence the decision?

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pac bell.net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

a. **It did not influence me. One other juror wanted to know, speculated "I wonder what happened", but we didn't give it any more consideration.**

11. What changed from Tuesday afternoon, when you asked about the accomplice testimony, to Wednesday afternoon when you reached your verdict?

a. **Because Levy did an excellent job discrediting witnesses.**

12. What part of the judges clarification about accomplice testimony helped you the most?

a. **When he broke down the three principals to qualify what made someone an accomplice.**

13. What was your general impression of the following:

a. Judge – **Good.**

b. DA – **Worked professionally, especially with the defense counsel.**

c. Witnesses – lay witnesses as well as police witnesses – **no opinion.**

d. Defense Counsel – **Excellent**

e. Defendant – **I avoided looking at him, I concentrated on the testimony.**

14. What were the discussions that led to the notes that went to the judge?

a. **Just to gain clarification, some confusion on the issue of circumstantial evidence.**

15. Was there any conflict in the jury room?

a. **No, except on the accomplice question.**

16. What process did the jury follow to reach a verdict? Review evidence, discuss among yourselves, take multiple votes - - other??

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pacbell.net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

a. **We broke down each issue.**

17. What was the breakdown of each vote taken?

a. **The first vote was 8 to 4 for guilt, then the final one was unanimous for guilt.**

Thank you very much for your time. If you think of anything further, please do not hesitate to contact me at 415 305-9685.

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciak@pac bell.net

# SPECIAL CIRCUMSTANCES

≈ *Criminal Defense Specialists* ≈

**Case Name:** **People v. Aaron Cooper**

**Juror Contacted:** **#6 - Foreperson**

**Date of Contact:** **11/28/04**

**Investigator:** **Notty Bumbo**

My name is Notty Bumbo. I am a private investigator. I have been retained by Attorney Deborah Levy who has been appointed to represent Aaron Cooper. She has obtained permission of the judge in this case to contact you about your experience on the jury. You do not have to talk to me, however, I would appreciate just a few minutes of your time.

1. What was your general impression of the case? (as presented by the prosecution?)

   a. **He built the case witness by witness, but there seemed to be much left out. I wonder what would have happened if Q had testified.**

2. As presented by the defense attorney?

   a. **She didn't have much to work with, but she left me with doubt about Cross' testimony.**

3. Who's testimony did you believe? Why?

   a. **Hodges was credible, because she didn't have to come forward, and it did not seem as though she had any particular axe to grind. I believed a combination of a bit of everyone, but the hardest (to believe) was Walton, as an accomplice or not.**

4. Whose testimony did you not believe? Why?

   a. **No one particularly – there seemed to be some truth in what everyone said.**

*510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271*
*license pi 11559 ≈ tax id 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 ≈ e-mail franclek@pac.bell.net*

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

5. How were you able to determine that Mr. Cooper did not have a gun, but were still able to find him guilty of what Cross, Walton, and Hodges said?

   a. **Because no guns were found, and no witness could state that they definitely saw him with a gun. But his presence there was clear, and therefore aiding and abetting was clear.**

6. Would it have made a difference in your deliberations if you had heard from the defendant?

   a. **I don't know.**

7. How much importance did you place on the issue of the jacket?

   a. **I gave it a lot of weight, because he was sitting on the jacket, but if it had not been used as evidence, I don't think it would have made a difference.**

8. Once you found Cross' testimony corroborated, did you believe it all? Partly? What parts?

   a. **I felt that truth and lies were interwoven; his insistence in the early interrogations to "just talk about me", not the others; his actions after the crime.**

9. You sent a note to the judge and asked about how much weight to give the closing arguments during deliberations. Which closing argument were you asking about - - The Defense, or the Prosecutions?

   a. **Both. We had questions about Love's actions after the incident, so we needed to know how much weight to give to the closings in general. We also had some questions about why the jacket did not appear to**

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 571 54.2455 ≈ e-mail franciek@pac.bell.net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

**have any blood, and how much weight to give to Walton and Hodges testimony.**

10. You sent a note to the judge asking what happened to Aaron Cooper in the 1995 trial (if he was convicted of murder). The judge did not give further information. Was there speculation about what happened with the 1995 verdict? How did that influence the decision?

    a. **None, we didn't consider it, as there was no evidence presented.**

11. What changed from Tuesday afternoon, when you asked about the accomplice testimony, to Wednesday afternoon when you reached your verdict?

    a. **We were able to determine that Walton was not an accomplice, just a gossip.**

12. What part of the judges clarification about accomplice testimony helped you the most?

    a. **All of it – 2 other jurors were having confusion about that element, and the clarification helped clear it up.**

13. What was your general impression of the following:

    a. Judge – **Impartial, fair, thorough.**

    b. DA – **Passionate, believed in his position, meticulous in his presentation.**

    c. Witnesses – lay witnesses as well as police witnesses – **did the best they could.**

    d. Defense Counsel – **Poor, needs to clean up her act. She had an impossible case. She seemed to get mixed up, asked a question as if**

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11539 ≈ tax id 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 ≈ e-mail franciak@pac bell net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

**Cooper was in the car with the other defendants. (See below for more).**

e. Defendant – **Seemed to be a perfect gentleman.**

14. What were the discussions that led to the notes that went to the judge?

a. **Just to gain clarification for two jurors who felt confused.**

15. Was there any conflict in the jury room?

a. **No, except on the accomplice question.**

16. What process did the jury follow to reach a verdict? Review evidence, discuss among yourselves, take multiple votes - - other??

a. **All of those plus using the poster pages. We wrote down what each witness said, based on each juror's notes, to compare.**

17. What was the breakdown of each vote taken?

a. **The first vote was taken Friday afternoon, split 8 to 4 for guilt, due to the questions several jurors had. The final vote was 12 for acquittal on the gun charge, 12 for guilt on the kidnap, and 12 for guilt on felony murder.**

Additional notes from other comments made by juror:

This juror kept her trial notebooks, and showed them to the investigator. She had written statements, during the course of the trial, that appeared to be judgments on the defense counsel. Examples include, **"No score, Levy", No points, Levy", "Redundant, silly"**

**"She was grabbing at nothing". "She was very argumentative when it was unnecessary". "She made a big thing about the park worker who smelled the body before he saw it, like that made a difference". The juror remembered something about Cooper buying a hot dog for "her" (didn't say whose daughter) at a shopping center, and then "Levy repeated it during her cross like it meant something". "She**

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1371
license pi 11539 ≈ tax id 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 ≈ e-mail franciek@pac.bell.net

SPECIAL CIRCUMSTANCES

≈ Criminal Defense Specialists ≈

**needs HRT (hormone replacement therapy). She kept fanning herself. And why does she dress like that, can't she be more professional"?**

This juror also kept attempting to convince the investigator that she wasn't prejudiced, that she had dated a black man for a while, as though it was important that this be known.

Thank you very much for your time. If you think of anything further, please do not hesitate to contact me at 415 305-9685.

510 third street, suite 102 . oakland ca 94607 ≈ 510.987.8114 fax 510.223-1271
license pi 11530 ≈ tax id 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 ≈ e-mail franciek@pac.bell.net

# EXHIBIT – I

# CALIFORNIA COURT OF APPEAL LOG SHOWING TIME REQUEST FOR EXTENSION BY ATTORNEY GEE

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOR THE FIRST APPELLATE DISTRICT
DIVISION 1

THE PEOPLE,
Plaintiff and Respondent,
v.
AARON LYNDALL COOPER,
Defendant and Appellant.

| | |
|---|---|
| CASE NUMBER: | A108723 |
| NOA/PET DATE: | 12/06/04 |
| STATUS: | Active |
| PRIORITY: | |
| CAUSE: | Appeal |
| CASE TYPE: | Criminal |
| DISP DATE: | |
| FINAL DISP: | |
| ORIGIN: | Received from superior court |
| CATEGORY: | crdt Jury trial conviction |

OTHER CASE NUMBER(S): A073986
A078141
A089112
A096123
A108934

TRIAL COURT INFORMATION

| | |
|---|---|
| Case No.: | C125227 |
| County: | Alameda |
| Court: | Alameda County Superior Court |
| Judge: | Rolefson, Jon |
| Jud. Date: | 12/03/04 |

ATTORNEY - PARTY

Office of the Attorney General
455 Golden Gate Avenue - Suite 1100
San Francisco, CA 94102

Bar No. SAGSFR-01

Plaintiff-respondent
The People

James Kyle Gee
2626 Harrison Street
Oakland, CA 94612

Bar No. 00065895

Defendant-appellant
Aaron Lyndall Cooper
E28703
C.S.A.T.F./S.P. C-7-211
P.O. Box 5246
Corcoran, CA 93212

First District Appellate Project
730 Harrison Street - Suite 201
San Francisco, CA 94107

Bar No. FDAP-0001

Defendant-appellant
Aaron Lyndall Cooper
E28703
C.S.A.T.F./S.P. C-7-211
P.O. Box 5246
Corcoran, CA 93212

DOCKET ENTRIES

12/27/04
Notice of appeal lodged/received (criminal).

01/21/05
Counsel appointment order filed.
Kyle Gee / ind / 40

02/10/05
Notice of record completion received.

02/10/05
Record on appeal filed.
c-3-r-5

02/10/05
Probation report filed.
(1)

02/10/05
Marsden transcript filed.
r-2 (proceedings dated 7/6/2004 & 9/21/2004)

02/10/05
Marsden transcript sent to appellant (FDCA Rule 4).
to independant attorney

03/22/05
Motion/application to augment record filed.
by aplt; & eot; tct.

03/23/05
Augmentation granted. (See order.)
aob 30

04/22/05
Telephone conversation with:
Marie of superior court, re augment request: waiting for few more
transcripts from 2 reporters; Marie to follow-up again today.

04/22/05
Notice to reporter to prepare transcript.
endorsed-filed 4/20/05 in superior court

04/25/05
Telephone conversation with:
Marie @ superior court/augment going out in mail todsy

04/26/05
Filed document entitled:
SEALED unredacted juror & alternate juror questionnaires, and juror
key

04/26/05
Augmented record filed.
c-1; r-10; copy of people's exhibit 41 (court's copy)

04/26/05
Certificate filed of:
reporter Linda Harris/two dates for augment 7-13-04 and 9-20-04 were
not placed on the record and not reporter by her and are therefore
not part of the reporter's augmentation

04/28/05
Received copy of:
letter from atty Gee to Superior Court re clarification on 3 of the
augment materials

04/28/05
Telephone conversation with:
Marie @ superior court/she will take care of items 2,3 of atty Gee's
letter and advise him that 1DCA is retrieving prior appeal from
storage to deal with item 1 of his letter (see atty Gee's letter
rec'd 4-28-05)

05/10/05
Record in box.

05/16/05
Note:
A073986 returned from storage/at D-1 clerk's desk

05/24/05
Filed letter from:
appellant Cooper re requests change of counsel

05/26/05
Filed letter from:
FDAP, dated 5/26/05: FDAP takes no position on appellant's request
for appointment of new counsel.

06/01/05
Order filed.
Appellant's request to replace his court-appointed appellate counsel,
dated 5/3/05 and received by this court on 5/24/05, is denied.

06/01/05
Default sent to court appointed counsel.

06/02/05
Supplemental record/transcript filed.
Exhibit 41-testimony of Fred Cross (court's copy); corrected
reporter's certificate re record on augmentation from CSR Harris
re two dates not reported were 7/23/04 and 9/20/04--the prior
prior certificate erroneously states date as 7/13/04 and 9/20/04;
certificate of clerk re part (iii) of appellant attorney's letter
regarding "the questionnaires of jurors no excused for hardship,
appropriately redacted as to the trial jurors and alternates..." were
not maintained by the court or the trial attorneys

07/01/05
Requested - extension of time.
Attorney: Gee, James
☐    Party: Cooper, Aaron

07/01/05
Granted - extension of time.
Attorney: Gee, James
☐    Party: Cooper, Aaron

08/01/05
Requested - extension of time.
Attorney: Gee, James
☐    Party: Cooper, Aaron

08/02/05
Granted - extension of time.
Attorney: Gee, James
☐    Party: Cooper, Aaron

08/16/05
Filed letter from:
Deborah Cooper; dated 7/19; re appellant's change of address

08/30/05
Requested - extension of time.
Party: Cooper, Aaron
aob to 9/30/05

08/30/05
Granted - extension of time.
Party: Cooper, Aaron
aob to 9/30/05

09/30/05
Requested - extension of time.
Attorney: Gee, James
☐   Party: Cooper, Aaron

10/03/05
Granted - extension of time.
Attorney: Gee, James
☐   Party: Cooper, Aaron

10/28/05
Requested - extension of time.
Party: Cooper, Aaron
aob to 11/30/05

10/28/05
Granted - extension of time.
Party: Cooper, Aaron
aob to 11/30/05

11/30/05
Requested - extension of time.
Party: Cooper, Aaron
aob to 12/30/05

12/01/05
Granted - extension of time.
Party: Cooper, Aaron
aob to 12/30/05

12/28/05
Requested - extension of time.
Attorney: Gee, James
☐   Party: Cooper, Aaron

12/29/05
Granted - extension of time.
Attorney: Gee, James    (7 EOTs is the outer limit)
☐   Party: Cooper, Aaron

01/30/06
Requested - extension of time.
Party: Cooper, Aaron
aob to 2/14/06

01/31/06
Granted - extension of time.
Party: Cooper, Aaron
aob to 2/14/06

02/14/06
Requested - extension of time.
Party: Cooper, Aaron
aob to 2/24/06

02/14/06
Request filed to:
change counsel; from appellant Cooper

02/14/06
Granted - extension of time.
Party: Cooper, Aaron
aob to 2/24/06

02/24/06
Requested - extension of time.
Party: Cooper, Aaron
aob to 2/27/06

02/24/06
Granted - extension of time.
Party: Cooper, Aaron
aob to 2/27/06

02/28/06
Application filed to:
file oversized brief; by appellant; aob rec'd

02/28/06
Request for judicial notice filed.
by appellant

COURT REPORTER INFORMATION

| | |
|---|---|
| Name: | Lisa Carmen Hodges (Imus) |
| CSR No.: | 7195 |
| Trial Court Case No.: | C125227 |
| Estimated Compl. Date: | 01/25/05 |
| Filed Date: | N/A |
| Number of Extensions: | 0 |

| | |
|---|---|
| Name: | Linda D Thissell |
| CSR No.: | 5912 |
| Trial Court Case No.: | C125227 |
| Estimated Compl. Date: | 01/25/05 |
| Filed Date: | N/A |
| Number of Extensions: | 0 |

| | |
|---|---|
| Name: | Sandi Petrisch |
| CSR No.: | 11684 |
| Trial Court Case No.: | C125227 |
| Estimated Compl. Date: | 01/25/05 |
| Filed Date: | N/A |
| Number of Extensions: | 0 |

SCHEDULED ACTIONS

Due Date:
Action: Appellant's opening brief.
Notes: Attorney: Gee, James
□ Party: Cooper, Aaron

Due Date:
Action: Replace appointed counsel. (re: dfc notice)
Notes: Attorney: Gee, James
□ Party: Cooper, Aaron

Due Date: 02/28/06
Action: To court.
Notes: request to change counsel

Due Date: 03/10/06
Action: Order on motion filed.
Notes: aob/rjn

END OF DOCKET SHEET

# EXHIBIT – J

# MOTION DISTRICT ATTORNET FILED AND GOT GRANTED TO ENHANCE KIDNAP CHARGE TO A LIFE TOPS KIDNAP

THOMAS J. ORLOFF
District Attorney
900 Courthouse
1225 Fallon Street
Oakland, CA 94612-4292
(510) 272-6222

MORRIS D. JACOBSON
Deputy District Attorney
State Bar #126814

ENDORSED
FILED
ALAMEDA COUNTY

JUN 1 0 2004

CLERK OF THE SUPERIOR COURT
By JANET SCHOENEMANN Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF ALAMEDA**
**RENE C. DAVIDSON COURTHOUSE**

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA<br><br>v.<br><br>**AARON COOPER**<br><br>Defendant. | NO. 125227<br>AMENDED INFORMATION<br><br>PFN: ARU598 CEN: 5175512 |

The District Attorney of the County of Alameda by this Amended Information hereby accuses AARON COOPER of a Felony, to wit: FIRST DEGREE MURDER, a violation of section 187(a) of the PENAL CODE of California, in that on or about August 3, 1995, in the County of Alameda, State of California, said defendant did unlawfully, and with malice aforethought, murder WILLIAM HIGHSMITH, a human being.

"NOTICE: The above offense is a serious felony within the meaning of Penal Code section 1192.7(c) and a violent felony within the meaning of Penal Code section 667.5(c)."

"NOTICE: Conviction of this offense will require you to provide specimens and samples pursuant to Penal Code section 296. Willful refusal to provide the specimens and samples is a crime."

"NOTICE: Conviction of this offense will require you to provide specimens and samples pursuant to Penal Code section 296. Willful refusal to provide the specimens and samples is a crime."

**ARMED WITH FIREARM CLAUSE AS TO DEFENDANT COOPER**

It is further alleged as against defendant AARON COOPER that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm, said arming not being an element of the above offense, within the meaning of Penal Code section 12022(a)(1) and 12022(d).

**USE OF FIREARM (12022.5 & 1203.06) CLAUSE AS TO DEFENDANT COOPER**

It is further alleged as to count two, that in the commission and attempted commission of the above offense, the said defendant AARON COOPER, personally used a firearm within the meaning of Penal Code sections 1203.06(a)(1) and 12022.5(a) also causing the above offense to become a serious felony pursuant to Penal Code section 1192.7(c)(8) and a violent felony within the meaning of Penal Code section 667.5(c)(8).

**THIRD COUNT**

And the said AARON COOPER is further accused by the District Attorney of the County of Alameda, by the third count of this Amended Information, of a Felony, to wit: POSSESSION OF FIREARM BY A FELON - PRIOR, a violation of section 12021(a)(1) of the PENAL CODE of California, in that on or about August 3, 1995, in the County of Alameda, State of California, said defendant did unlawfully own, possess and have custody and control of a firearm, the said defendant having theretofore been duly and legally convicted of a felony, to wit:

11/2/13

| Case Number | Offense | Conviction Date | County | State | Court Type |
|---|---|---|---|---|---|
| 96880 | 211 | 6/21/89 | Alameda | CA | Superior |

**FIRST PRIOR CONVICTION AS TO DEFENDANT COOPER**

The District Attorney of the County of Alameda further charges that before the commission of the offense specified above, said defendant AARON COOPER, on or about June 21, 1989, was convicted in the Superior Court of the State of California, in and for the County of ALAMEDA, of the crime of a Felony, to wit: ROBBERY, a violation of section 211 of the PENAL CODE of California, separately brought and tried, and served a separate prison term therefor.

**SECOND PRIOR CONVICTION AS TO DEFENDANT COOPER**

The District Attorney of the County of Alameda further charges that before the commission of the offense specified above, said defendant AARON COOPER, on or about June 22, 1988, was convicted in the Superior Court of the State of California, in and for the County of ALAMEDA, of the crime of a Felony, to wit: ESCAPE, a violation of section 4532(b)(1) of the PENAL CODE of California, and received a sentence of probation therefor.

**THIRD PRIOR CONVICTION AS TO DEFENDANT COOPER**

The District Attorney of the County of Alameda further charges that before the commission of the offense specified above, said defendant AARON COOPER, on or about January 6, 1993, was convicted in the Superior Court of the State of California, in and for the County of ALAMEDA, of the crime of a Felony, to wit: POSSESSION OF FIREARM BY A FELON - PRIOR, a violation of section 12021(a)(1) of the PENAL CODE of California, and received a separate prison term therefor.

Office of the District Attorney Alameda County, California

**FOURTH PRIOR CONVICTION AS TO DEFENDANT COOPER**

The District Attorney of the County of Alameda further charges that before the commission of the offense specified above, said defendant AARON COOPER, on or about March 4, 1988, was convicted in the Superior Court of the State of California, in and for the County of ALAMEDA, of the crime of a FELONY, to wit: POSSESSION OF A CONTROLLED SUBSTANCE, a violation of section 11350(a) of the HEALTH AND SAFETY CODE of California, and received a sentence of probation therefor.

Pursuant to Penal Code Section 1054(b), the People are hereby informally requesting that defendant's counsel provide discovery to the People as required by Penal Code Section 1054.3.

THOMAS J.ORLOFF
District Attorney

By: MORRIS D. JACOBSON
Deputy District Attorney

# EXHIBIT - K

California Court of Appeals
Typed Opinion dated 4-06-07

Filed 4/6/2007

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

COPY

APR 06 2007

| THE PEOPLE, Plaintiff and Respondent, v. AARON LYNDALL COOPER, Defendant and Appellant. | A108723 (Alameda County Super. Ct. No. C125227) |
|---|---|

This case has managed to wind its way back to us for the third time as a result of an order of the United States District Court which granted defendant's petition for writ of habeas corpus, followed by a retrial of the action and jury verdict that for a second time found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and kidnapping (§ 207, subd. (a)).[2] Defendant complains in this appeal that the federal district court's decision in the writ of habeas corpus proceeding is binding under principles of collateral estoppel or law of the case, and precludes the murder conviction. He also argues that he was improperly denied his rights to substitute his appointed counsel and to represent himself, the trial court gave prejudicial instructions concerning his custody status, gave erroneous instructions concerning accomplice testimony, and

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was found not guilty by the jury of a charge of possession of a firearm by a felon (§ 12021, subd. (a)(1)). After the jury verdict, defendant admitted that he suffered prior violent and serious felony convictions and served prior prison terms as alleged in the information. (§§ 667, subd. (e)(1); 667.5, subd. (b); 1170.12, subd. (c)(1).)

finally that his murder conviction is not supported by substantial evidence. We conclude that neither collateral estoppel nor law of the case principles apply in the present case, defendant's motions to discharge his appointed attorney and represent himself were properly denied, no prejudicial instructional errors were committed, and the murder conviction is supported by the evidence. We therefore affirm the judgment.

## PROCEDURAL HISTORY

The lengthy, protracted path of the case began with a joint jury trial of defendant Aaron Cooper (defendant or Cooper) and his codefendant Fredrick Cross, after which Cooper was convicted of the first degree murder of William Highsmith (§ 187), carjacking (§ 215), felon in possession of a firearm (§ 12021), and kidnapping (§ 207). The jury also found that defendant was armed with a firearm in the commission of the murder, carjacking and kidnapping offenses (§ 12022, subd. (a)). In a separate bifurcated proceeding the trial court found that Cooper had served a prison term for prior conviction of a felony (§ 12021) and that he had been convicted of a serious felony (§ 211) which qualified as a prior strike under section 667, subdivision (e)(1). On March 14, 1996, the trial court sentenced Cooper to a total term of 71 years to life. The jury convicted codefendant Cross of first degree murder, carjacking and kidnapping, and found arming enhancements for each offense to be true. At a hearing on April 18, 1996, Cross was sentenced to a total sentence of 32 years to life.

In the first, consolidated appeal of their convictions, Cooper and Cross challenged the admission into evidence portions of an out-of-court statement of Miltonous Kingdom made to Oakland police officers while he was incarcerated in a Mississippi jail. When the prosecution called Kingdom as a witness at trial, he asserted the privilege against self-incrimination. The trial court admitted a redacted transcript of Kingdom's statement, which identified both Cooper and Cross as active participants in the kidnapping and murder of Highsmith, but also tended to inculpate Kingdom himself as an accessory to

the crimes.[3] The defendants claimed that Kingdom's statement did not fall within the declaration-against-penal-interest exception to the hearsay rule, and that admission of the redacted statement violated their confrontation rights. We affirmed the convictions for kidnapping and first degree murder in an opinion filed on November 9, 1998. We found that the trial court did not abuse its discretion by finding that the statement as redacted was sufficiently trustworthy to be admissible under Evidence Code section 1230.

After the California Supreme Court denied the defendants' petition for review, on October 4, 1999, the United States Supreme Court granted a petition for writ of certiorari, vacated the judgment, and remanded the case to us "for further consideration" of the admissibility of Kingdom's statement in light of *Lilly v. Virginia* (1999) 527 U.S.116 [144 L.Ed.2d 117, 119 S.Ct. 1887] (*Lilly*). In our second opinion in this case filed on July 6, 2000, we found "two significant differences from the *Lilly* decision" that provided a "measure of reliability" of Kingdom's statement, but nevertheless concluded that the statement was inadmissible under the *Lilly* guidelines, and therefore the trial court erred by admitting it. We proceeded to "examine the record to determine if the error was harmless under the reasonable doubt test of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], which governs federal constitutional error." Upon review of the record, we concluded that the murder conviction of Cross must be reversed, but "that the error was harmless beyond a reasonable doubt in the conviction of defendant Cooper for murder."[4] Our conclusion of harmless error as to Cooper was based upon our examination of the "direct and circumstantial evidence" against him that demonstrated "to us beyond a reasonable doubt that the error did not contribute to the verdict."

---

[3] In a separate trial Kingdom was subsequently convicted of the first degree murder of Highsmith committed during a kidnapping (§§ 187, subd. (a); 189; 190.2, subd. (a)(17)(B)), and sentenced to state prison for life without the possibility of parole. The judgment against Kingdom was affirmed on appeal. (*People v. Kingdom* (Sept. 13, 1999, A082911) [nonpub. opn.].)

[4] Due to the state of the evidence presented at trial we undertook a "harmless error analysis under *Chapman*" that was "distinct as to each defendant."

The California Supreme Court subsequently denied Cooper's second petition for review, and the United States Supreme Court denied his second petition for writ of certiorari. This court thereafter denied his petition for writ relief.

Cooper then filed an action for writ of habeas corpus in the United States District Court in November of 2002. In a decision filed on April 14, 2004, the district court examined numerous claims of error made by Cooper, but for purposes of this appeal the primary inquiry was again directed at the conceded "Confrontation Clause violation" in the admission of Kingdom's statement, and the prejudice associated with the error. The district court found that the "admission of Kingdom's statement to police had a substantial and injurious effect on the jury's verdict against Cooper," not only "with respect to the murder conviction," but also as "to the kidnapping and carjacking convictions." The court observed that "[a]lthough the sufficiency of the evidence is not the standard for determining whether an error resulted in prejudice, [citation], the fact that there was insufficient evidence without the improperly admitted evidence shows how powerfully if affected the jury's verdict of guilt on the murder count." On the erroneous admission of Kingdom's statement, the district court ruled: "Because the Confrontation Clause violation had a substantial and injurious affect on the jury's verdict and the state court's finding of harmless error was an unreasonable application of clearly established federal law, Cooper is entitled to a retrial on all of the charges against him."

The district court also resolved the claim of "a due process violation based on the insufficiency of the evidence." "In determining the sufficiency of the evidence" to support the jury verdict, the court excluded "the improperly admitted statement of Kingdom which should not have been admitted at trial because Cooper was unable to confront him." The district court then embarked upon a wholesale, adverse assessment of the credibility of the witnesses at trial and the inferences drawn by the jury.[5] The court

---

[5] " 'When reviewing convictions for sufficiency of the evidence,' " the district court " 'must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*United States v. Rodriquez* (9th Cir. 2006) 464 F.3d 1072, 1078–1079,

found that a "rational jury could not have" found "proof beyond a reasonable doubt" when the "improperly admitted evidence" was "excluded from the equation." Therefore, in addition to the prejudicial "Confrontation Clause violation," the court "determined" that "Cooper's right to due process was violated because there was insufficient evidence to support the murder conviction – a determination which shows that [the Confrontation Clause violation] was not harmless error." "In such a case," the court declared, "retrial rather than acquittal is the remedy. '[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction.' [Citation.] In other words, the Clause 'does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the conviction.' [Citations.]"[6] (*Cooper v. McGrath* (N.D. Cal. 2004) 314 F.Supp.2d 967, 998–999.)

The case thus returned to the superior court for retrial as ordered. Cooper's motions to dismiss the murder charge on grounds of double jeopardy, collateral estoppel, and law of the case were denied both before and during retrial. Following the

---

italics omitted.) The factual determinations made in the state court must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." (28 U.S.C. § 2254(e)(1); *Purkett v. Elem* (1995) 514 U.S. 765 [131 L.Ed.2d 834, 115 S.Ct. 1769]; see also *Thompson v. Keohane* (1995) 516 U.S. 99, 108–109 [133 L.Ed.2d 383, 116 S.Ct. 457]; *Langford v. Day* (9th Cir. 1997) 110 F.3d 1380, 1388.) In conducting the inquiry, the federal court must remain mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." (*Wright v. West* (1992) 505 U.S. 277, 296 [120 L.Ed.2d 225, 112 S.Ct. 2482] (plur. opn.); cf. *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663–664 [158 L.Ed.2d 938; 124 S.Ct. 2140, 2149]; *Herrera v. Collins* (1993) 506 U.S. 390, 400 [122 L.Ed.2d 203, 113 S.Ct. 853]; *Engle v. Isaac* (1982) 456 U.S. 107, 128 [71 L.Ed.2d 783, 102 S.Ct. 1558].)

The reviewing court must not only examine the evidence "in the light most favorable to the prosecution," but also accept "all reasonable inferences that may be drawn from this evidence." (*Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1276.)

[6] "The claims concerning the sufficiency of the evidence on the kidnapping and carjacking convictions" were "rejected."

presentation of evidence, the jury convicted Cooper of first degree murder and kidnapping. Now, over 10 years after the first trial of this action, we have a third appeal before us.

## STATEMENT OF FACTS

On August 16, 1995, the "very decomposed" body of William Highsmith, known by the nickname "Coco,"[7] was discovered in a wooded area of the Oakland hills near Skyline Reservoir. The "bottom part" of the victim's short-sleeve T-shirt had been torn away. A piece of cloth, apparently from the T-shirt, had been tied around his face and mouth so that it separated his teeth; a cloth gag had also been pushed into his mouth. The victim's jacket had been pulled down in the back and around his wrists to restrict the movement of his arms. His pants and boxer shorts had been pulled down to the level of his thighs. Scissors were found a few feet away from the body on the ground.

An autopsy revealed that the victim had died from "a gunshot wound to the head." The bullet entered through the left cheekbone of the victim, passed through the skull, and lodged between the right side of the skull and the scalp behind the ear. The "extensive fracturing of the skull" suggested a "contact wound," although no gunshot residue or splitting of the skin was detected. Due to the advanced state of decomposition of the body, a forensic pathologist offered the opinion that Highsmith had died "very near the time that he was last seen alive," nearly two weeks before on August 3, 1995, perhaps "the same day."

Witnesses had observed the abduction of Highsmith by three men at the intersection of 12th and Market Streets in Oakland on August 3, 1995. That morning, Zanetta Hodges talked with Highsmith, whom she had known most of her life, in the common area behind her residence in West Oakland. Highsmith told Hodges that he intended to "beat up the person" who had accused him of stealing a car. Highsmith

[7] We will sometimes refer to the victim William Highsmith as Coco, as was often done during trial.

added that he "was going to meet" with people "at the store" to discuss the stolen car accusation.

After speaking with Highsmith, Hodges went to East Oakland with her close friend Juanita "Goodie" Walton to get a food stamp card. As they returned to the area of 12th and Market Streets on their way to pick up "food stamps in West Oakland," Walton saw "people she knew" sitting in a blue Oldsmobile Delta 88 parked at the side of the Mingleton Temple church. At Walton's request, Hodges backed up her car and stopped across the street in front of Bottles Liquors to talk to the three men seated in the Oldsmobile: the driver Cross, the front seat passenger Miltonous Kingdom, and the rear seat passenger defendant. Hodges was acquainted with defendant and Cooper, but had not met Kingdom before. Hodges testified that defendant was wearing black leather gloves, and Walton noticed black gloves on all three of the occupants of the Oldsmobile. They were also wearing "black hoody" jackets.

Walton walked up to the Oldsmobile and asked the men inside, "what were they doing out here" in West Oakland. Defendant said "they were coming to look for someone who stole their drugs" and car, specifically Highsmith. Hodges heard Cross say, referring to Highsmith, "That nigger stole my car, Goodie." When asked by defendant, "what type of nigger was Coco," Walton replied: "That nigger, Coco, he ain't stealing no car. He the type of nigger, he don't get his shoes dirty. He don't steal cars. He sells cars."

A red Corvette driven by K. K. Parker,[8] with Highsmith in the passenger seat, then pulled up and parked on the street near the driveway of the church behind the Oldsmobile. Defendant said, "All right then," and Walton was told to "get away from the car." Walton returned to Hodges's car, whereupon Hodges drove away as the men in the Oldsmobile left that car and met in the parking lot by the church. As she drove away, in the rear view mirror Hodges observed defendant touch Highsmith "on the shoulder."

[8] The red Corvette was owned by Parker's girlfriend Tisha Williams, but was often driven by Parker.

Rodney Love was also present at the scene of the abduction.[9] While Love was standing outside the Bottles Liquor store at 12th and Market Streets, a tall Black man about 20 years old – whom he neither knew nor identified – got out of a "blue four door Delta," approached him, and asked if he was "Coco."[10] Love saw a large revolver "pokin' out" of the man's shirt. Love said that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. The occupants of the Oldsmobile wore black "puffy" jackets, and at least two of them wore gloves. Love thought they all had guns. According to Love, soon thereafter K. K. Parker drove up in a red Corvette, with Highsmith in the passenger seat, and parked behind the Oldsmobile. Love unsuccessfully attempted to "motion" to his friend Highsmith to warn him. Parker and Highsmith got out of the Corvette and began talking to the men from the blue Oldsmobile, one of whom briefly grabbed Parker by the neck but then released him. Parker ran into the liquor store. After Highsmith admitted to the men that he was "Coco," they "pull[ed] the guns out," five or six shots were fired, and they forcibly pushed the victim into the trunk of the blue Oldsmobile. One of the three men from the Oldsmobile got into the red Corvette, then both the Oldsmobile and the Corvette were driven off in the same direction.

An employee at Bottles Liquor store, Musa Hussein, testified that at about 4:00 p.m. on August 3, 1995, he saw Highsmith outside the store engaged in an argument or heated conversation with three other men across the street by the church. Highsmith was a regular customer of the liquor store, but the other three men were not known to Hussein and he could not identify them, although he gave descriptions of them to the police. Hussein also noticed two vehicles, an "old American" car and a red Corvette, parked near

---

[9] At trial, Love testified that he did not have "any memory at all" of the details of the events he witnessed on August 3, 1995. An "hour or two after the event," however, Love gave a statement which was an accurate recitation of his observations. A tape of Love's statement to the police was admitted in evidence at trial and played for the jury, as was a portion of his consistent testimony at the first trial in 1995.

[10] Love was acquainted with Coco.

the men. According to Hussein's statement given to the police immediately after the kidnapping, which was read to the jury, one of the men arguing with Highsmith "had a long gun." Another man opened the trunk of the vehicle, while a third man grabbed Highsmith. Hussein then ran back into the store to call the police, but heard "gunshots" outside. Customers yelled, "they're putting him in the trunk."

Douglas Wright, an investigator for the Alameda County District Attorney's Office, testified that at around 4:00 p.m. on August 3, 1995, he was driving on 12th Street, approaching Market, when he heard what he "thought were two gunshots ahead" of him. He then observed a red Corvette parked on the right side of the road facing the same direction Wright was traveling. A man was standing behind the Corvette who was described by Wright as "male Black, about 5' 11" in his mid-20's, 170 to 180 pounds." Wright was unable to identify the man, but testified that he was "consistent" in size and build with defendant. As Wright drove by, the man quickly ran to the driver's side of the Corvette, jumped in, "took off, squealed and accelerated around the corner." Wright "got a partial plate" on the Corvette, YOK953, but the last three numbers were incorrect. Across the street, Wright noticed people "ducking down" behind a parked car as if they were "trying to get out of the way." To his left, in the Bottles Liquor store parking lot, Wright saw an "Arabic looking gentleman" who was staring in the direction of the fleeing Corvette, and a "male Black" who was "hustling into the store." Wright "knew something was wrong," so he asked a man in a car "what had happened." The man, who looked "nervous and scared," said that "there had been a shooting and a kidnapping." Wright reported the crime through the "District Attorney's channel," and asked "them to call the police."

Raynetta Thomas, the victim's sister, testified that on the afternoon of August 3, 1995, she visited briefly with "Coco" and K. K. Parker at her mother's apartment before they left in a red Corvette about 3:45 or 4:00 p.m. A "few minutes" later she heard that a kidnapping had occurred at 12th and Market.

Oakland Police Officer Michael McArthur received a call of "a shooting" at 12th and Market at 4:08 p.m., and arrived there within two minutes. As Officer McArthur

spoke with Musa Hussein, K. K. Parker interrupted and began to "talk over him." Parker "seemed to be eager" to tell Officer McArthur "what had happened." During the conversation, however, Parker's attitude changed; he "decided he didn't want to talk" or "cooperate anymore." Parker refused to sign his statement to the officer, and "started to walk away." Parker was then arrested on outstanding warrants and taken into custody.

After Hodges and Walton procured their food stamps at 4:09 p.m., they returned directly to 12th and Market Streets. Police officers were "all over the place." People on the street were quite agitated and concerned over the abduction of Highsmith, as he was a well-liked figure in the West Oakland neighborhood. After speaking with the police, Hodges and Walton, along with "various people," searched for Highsmith, defendant, Cross and Kingdom for hours without success.

About 7:00 on the night of the abduction of Highsmith, George Archambeau was driving westbound across the San Mateo bridge toward Foster City when he observed a "small, blue car" that was stopped with a red Corvette in front of it. As Archambeau passed the two cars, he noticed an African-American man standing outside the red Corvette, and another in the driver's seat. The man standing outside the Corvette threw an object that appeared to be a "folded over" grocery bag over the bridge into the bay. Archambeau drove on, but the Corvette "came driving by" him "extremely fast" with two occupants in the vehicle, both African-American men. As the Corvette "got caught in the traffic" ahead, Archambeau "wrote down the license plate," 2YQK292, along with the notation "red 'vette," and contacted the highway patrol.

At around 9:00 the same night, Moamer Mohamed was working at the Bottles Liquor store. As he was leaving the store he observed a red Corvette in front of the parking lot that blocked his exit. The engine of the Corvette was running and the window was open, but no one was inside. Mohamed saw an African-American man wearing a checkered shirt and dark gloves running away from the parking lot toward downtown Oakland. Mohamed moved the Corvette and called the police. The only identifiable fingerprints found on the red Corvette belonged to K. K. Parker or the victim.

When Walton returned to her residence later that night with Hodges, Kingdom's blue Oldsmobile Cutlass was parked on the street in front of the house. She was frightened, and did not look in the car or immediately contact the police. The vehicle was located by the police, however, in front of Walton's house at 9962 Voltaire in East Oakland at about 10:00 that night.

Walton was then taken into custody and transported to the Oakland Police Department for questioning. She testified at trial that she fallaciously told investigating officers that she saw defendant, Kingdom and Cross force Highsmith into the car trunk. Walton admitted that she told "lies" to the officers, but testified that she did so to try to help her friend Highsmith. Walton also testified that she received a telephone call from defendant from jail during which he said to her, "Don't go to court." Defendant offered her money not to testify. Walton also received "death threats" from other people unknown to her.[11]

Defendant was arrested about an hour after Walton was taken into custody. He was a passenger in a blue 1985 Oldsmobile Royale driven by Carl Anderson that was detained around 11:00 p.m. for expired registration tags.[12] Anderson was taken into custody on a "no-bail misdemeanor warrant," and after defendant was identified he was arrested in connection with the carjacking and kidnapping of Highsmith that afternoon. Defendant was wearing a green plaid shirt – like the one Mohamed had seen earlier that evening worn by the man who ran away from the red Corvette – and green pants; his "hair was in corn rows." Black leather gloves were found on the right front passenger seat which had been occupied by defendant, and a black leather jacket was left in the back seat of the vehicle. Both of the gloves subsequently tested positive for gunshot

---

[11] Walton testified at the preliminary hearing before the first trial, and at Kingdom's trial, but did not testify at defendant's first trial.

[12] The 1985 Oldsmobile Royale driven by Anderson in which defendant was arrested is not the same vehicle as the blue Oldsmobile Delta Cutlass registered to Kingdom that was observed at the scene of the kidnapping of Highsmith and seized from in front of Walton's residence.

residue, as did the left sleeve of the jacket. No blood was detected on the jacket or gloves. No gunshot residue was found on defendant's hands.

During the interview of Walton very early the next morning, defendant was confined in a locked interview room nearby. When Walton saw defendant in the hallway she identified him as one of the men in the blue Oldsmobile at 12th and Market just before the abduction of Highsmith. She subsequently identified photographs of Cross and Kingdom from a lineup as the other two men.

The blue Oldsmobile registered to Kingdom was processed for evidence and photographed on August 5, 1995. The exterior was clean, and did not appear to have been driven on a dirt road. The top side of the muffler in the trunk was shiny and clean, and had wipe marks on it, but the bottom side was dirty. The trunk did not have indications, such as hair, blood, or fingerprints, that a person had been transported in it. No identifiable fingerprints were found anywhere on the car.

At the scene of the kidnapping at 12th and Market, three spent shell casings were recovered: two were brass nine-millimeter "Lugar caliber" casings fired from the same weapon, "an S.W.D.-type firearm;" the other, apparently of older vintage, was a brass .45-caliber semi-automatic cartridge fired from another type of weapon. A criminalist also examined the bullet extracted from the victim's head, and determined that it was fired from one of two similar size firearm calibers: a .40-caliber Smith and Wesson, or a 10-millimeter auto caliber.[13]

Warrants were issued for the arrest of Cross and Kingdom after they were identified by investigating officers as the other two men associated with the abduction of Highsmith. The Oakland Police Department was notified on August 10, 1995, that Cross had been arrested in Mississippi. Two taped statements were subsequently taken from him by investigating officers of the Oakland Police Department early the next morning. Kingdom was arrested on November 6, 1995, in Mississippi. Two days later when he

---

[13] Probably the former, which, the criminalist observed, is a more popular weapon.

was confronted with the statements made by Cross, he gave a statement to an Oakland police officer which was found inadmissible in the second appeal before this court and the federal habeas corpus proceeding.

Both taped statements made by Cross, and his testimony given at the first trial, were admitted in evidence and read to the jury at the second trial.[14] In his first statement Cross told the officers that he moved to California in 1992, and lived with his aunt on 55th Avenue in Oakland until a few months before his arrest, when he stayed in motels in Oakland. He stated that Kingdom is his cousin, and he met defendant through one of his drug selling partners after he began living in Oakland.

Cross reported that the Sunday before the abduction of Highsmith his 1988 "blue Iroc" Chevrolet, which contained cash in the amount of $6,700, clothing, and other valuables, was stolen in Emeryville while he was visiting a girlfriend. He and a companion "drove around" West Oakland looking for the car. Youngsters told Cross that they had seen "some fool from Ghost Town" driving his Iroc around, so he continued to look for the car in the Ghost Town area of Oakland. Someone else told Cross that "Coco," a man with two gold teeth who lived on Adeline and "steals cars," was the one who was seen driving the Iroc around. The next day, Cross and Kingdom drove through West Oakland in the blue Oldsmobile looking for the Iroc. They heard that Coco was on 12th and Market, so they drove there. When a man named "Lon" said that he knew Coco, Cross gave him his pager number for Coco to call him.

The following day between noon and 2:00 p.m., Cross heard from Coco, who denied that he stole the Iroc. They agreed to meet at 12th and Market to discuss the matter further. With Cross driving, he, Kingdom and Cooper went to 12th and Market in the blue Oldsmobile. Cross did not find Coco among the people on the street, then

---

[14] Cross refused to testify at the second trial and was found unavailable as a witness. The jury was aware that he was serving a life term for an unrelated murder. The jury also heard through stipulation that Kingdom was convicted after trial in 1998 for the first degree murder of Highsmith with a special circumstance of kidnapping, and was serving a sentence of life without parole.

walked back to the Oldsmobile. As he did, two men approached the car and one of them said, "I'm Coco." After Coco said, "I don't take cars," Cross began to "walk off." He returned to the Oldsmobile, and they drove away. He took a flight to Memphis later that night. Cross denied that they kidnapped Coco.

In his second statement taken a few hours later, Cross admitted that when he, defendant and Kingdom arrived at 12th and Market in the blue Oldsmobile, they all had nine-millimeter handguns, although he denied that he owned any of the guns or had one in his immediate possession at the scene. Cross said he was outside the car when Coco appeared with another man in a red Corvette. While he and Coco were "talking" on the sidewalk, "everything jumped off." Suddenly, Kingdom and Cooper, with guns drawn, escorted Coco to the rear of the car and forced him into the trunk. Someone fired shots, but Cross claimed it was not him.

Cross and Kingdom then got in the Oldsmobile, while defendant jumped into the red Corvette. They drove both cars to East Oakland, around 109th and Foothill, where defendant left the red Corvette and got back in the blue Oldsmobile with them. Coco was still in the trunk. They "drove around" for a while, then returned to the E-Z 8 motel, where Cross was staying. Cross and Kingdom went into the motel room, but defendant drove away with Coco. Cross claimed that Coco was alive in the trunk when he and Kingdom left the Oldsmobile for the hotel room. Cross was in the motel room for 40 minutes to an hour packing his clothes until defendant returned in the car. Cross and Kingdom then joined defendant, and with Kingdom driving they returned to the location at 109th and Foothill where they previously parked the red Corvette. Defendant left the Oldsmobile and returned to the Corvette. Defendant drove off in the Corvette, and Cross did not see him thereafter. He and Kingdom drove the Oldsmobile to Voltaire and 100th, where they parked it. While Cross was in the Oldsmobile, he did not hear any noise or look inside the trunk.

When they left the car at Voltaire and 100th, Cross thought Coco was still alive in the trunk, and someone would find him later, although he acknowledged the "possibility" that the victim had been shot during his abduction. Cross and Kingdom also left the guns

in the car and began to walk back toward MacArthur when a friend drove by and gave them a ride to the E-Z 8 motel. Cross said he traveled to Memphis the next morning. He did not know Coco was still missing until later, and "didn't think it was that serious." Cross also told the officers he did not know where Coco was.[15]

In his testimony at the first trial, Cross added details to his second statement and changed some of his account of the events. Cross testified that his blue Iroc was stolen on July 30, 1995. Taken with the car were its contents: $600 to $700 in cash,[16] large amounts of marijuana and powder cocaine that were worth thousands of dollars if sold on the street, jewelry and clothes. The drugs had been purchased the same day from defendant's friend at 100th and MacArthur. Cross financed a small portion of the drug purchase, but defendant contributed much more, between $2,000 and $4,000. Cross had intended to drive the Iroc to Greenville, Mississippi to visit his mother and sell the drugs. The theft of the car altered those plans. Defendant was "upset" when he learned the car and drugs had been stolen. He accompanied Cross and Kingdom when they searched in West Oakland for the Iroc the day before the abduction of Highsmith. Defendant used "threatening words" to someone they encountered in a green station wagon.

Cross testified that he accepted Coco's word by telephone on August 3, 1995, that he "didn't have" the car, but defendant was insistent upon going to 12th and Market Streets to meet Coco. Defendant said: "Let's go out there," so Cross agreed. Cross drove the blue Oldsmobile to 12th and Market Streets, Kingdom sat in the front seat, and defendant was in the rear passenger seat. They parked across the street from the liquor store, near the church. Cross testified that he got out of the Oldsmobile to talk to people on the street in an effort to locate Coco, but left his gun on the front seat of the car. He claimed that he did not see or talk to Walton and Hodges. As he "was walking toward the car," a red Corvette driven by K. K. Parker drove up and parked behind the Oldsmobile. Parker went to the liquor store, and the other man in the Corvette walked up

[15] At that time Highsmith's body had not yet been found.

[16] Not $6,700 as was mistakenly reported in his prior statement to the police.

to Cross on the sidewalk and said, "I'm Coco." Coco said, "I don't take cars," and claimed he had not seen the Iroc. While holding a gun in one hand, defendant then grabbed Coco from behind and backed him into the trunk of the Oldsmobile. Cross got in the front passenger seat of the car as defendant told Kingdom to get the keys from the ignition and open the trunk. Cross "heard shots" from behind the car, probably "about six," and ducked down. He did not know if Coco was shot, but thought it was "a possibility." The trunk was then shut and Kingdom ran to the front passenger side of the Oldsmobile. Cross "scooted" into the driver's seat, took the keys from Kingdom, and drove away after Kingdom exclaimed, "be out." Defendant drove off in the red Corvette.

When they reached 100th and Voltaire Streets, the red Corvette was abandoned. They drove in the Oldsmobile to the E-Z 8 motel, where Cross and Kingdom left the car. Cross went to his room to pack for his planned trip to Mississippi. Defendant returned to the motel and they all drove to 100th and MacArthur. Cross did not know if Highsmith was still in the trunk of the car. Cross exited the car there before defendant and Kingdom "drove off" without him. After a few minutes, one of Cross's partners named Jay "pulled up" in a blue Toyota. Cross and Jay "drove around" and smoked some joints for a while before they returned to 100th and MacArthur and saw Oakland police officers "all over the place." Cross asked Jay to take him back to the E-Z 8 motel. Kingdom arrived later at the motel room without his car. They did not discuss the fate of Highsmith or events that occurred earlier that day. Cross left the next morning for Mississippi, where he was arrested a few days later. He testified that he "wasn't being truthful" entirely in his two statements to the police to "cover" for defendant and Kingdom.

## DISCUSSION

### *I. The Effect of the Federal District Court's Ruling upon the Retrial of Defendant for Murder.*

We first confront defendant's claim that the federal district court's decision in the writ proceeding precludes the present murder conviction. Defendant claims that the effect of the district court's finding of insufficient evidence to support the conviction – without Kingdom's inadmissible statement – is "to bar his conviction on substantially the

same evidence, under either or both of the 'collateral estoppel' or 'law of the case' doctrines." He maintains that the trial court in the present proceeding erred by failing to grant his motions to dismiss the case, and that the judgment must now be reversed. We therefore proceed to an examination of the collateral estoppel and law of the case doctrines as related to the federal district court's order granting defendant's petition for writ of habeas corpus.

Missing after D.A. Rested and it was known or seen that evidence was same as 1st trial

***A. Collateral Estoppel.***

"In criminal cases, the doctrine of collateral estoppel is derived from the double jeopardy clause in the Fifth Amendment." (*In re Cruz* (2003) 104 Cal.App.4th 1339, 1344 [129 Cal.Rptr.2d 31].) "The bar of collateral estoppel prevents relitigation of an issue actually and necessarily decided in a previous civil or criminal action. [Citations.] The principles of res judicata and collateral estoppel provide ' "that a final judgment on the merits bars the parties or those in privity with them from litigating the same cause of action in a subsequent proceeding and collaterally estops parties or those in privity with them from litigating in a subsequent proceeding on a different cause of action any issue actually litigated and determined in the former proceeding. . . . [Citations.]" [Citation.]' [Citations.]" (*People v. Howie* (1995) 41 Cal.App.4th 729, 736 [48 Cal.Rptr.2d 505]; see also *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144 [87 Cal.Rptr.2d 95]; *People v. Meredith* (1992) 11 Cal.App.4th 1548, 1556 [15 Cal.Rptr.2d 285].) "[F]ive threshold requirements" must be established for collateral estoppel to bar relitigation of an issue: "1) the issue to be precluded must be identical to that decided in the prior proceeding; 2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party against whom preclusion is sought must be in privity with the party to the former proceeding." (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077 [48 Cal.Rptr.3d 75, 141 P.3d 197]; *People v. Vogel* (2007) 148 Cal.App.4th 131, 136 [55 Cal.Rptr.3d 403].) The purposes of the collateral estoppel doctrine have been identified "as promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments that undermine the integrity of the judicial system, and

providing repose by preventing a person from being harassed by vexatious litigation." (*People v. Lawley* (2002) 27 Cal.4th 102, 163 [115 Cal.Rptr.2d 614, 38 P.3d 461]; see also *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 878 [128 Cal.Rptr.2d 808].)

The United States Supreme Court has "stated that 'the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." [Fn. omitted.] The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." [Citation.]' [Citation.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 912 [35 Cal.Rptr.2d 624, 884 P.2d 81], quoting from *Ashe v. Swenson* (1970) 397 U.S. 436, 444 [25 L.Ed.2d 469, 90 S.Ct. 1189].) "In deciding whether the doctrine is applicable in a particular situation a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." (*Gutierrez v. Superior Court* (1994) 24 Cal.App.4th 153, 158 [29 Cal.Rptr.2d 376].) "A criminal defendant who asserts 'constitutional collateral estoppel' has the 'burden of establishing the factual predicate for the application of the doctrine . . . .' [Citation.]" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1187 [5 Cal.Rptr.3d 615].)

Like the California Supreme Court, we express grave doubts that the collateral estoppel doctrine even has application to the retrial of defendant in the *same proceeding* following a reversal of his conviction and the order for a retrial. (*People v. Barragan* (2004) 32 Cal.4th 236, 253 [9 Cal.Rptr.3d 76, 83 P.3d 480].) While the issue has not been definitively resolved, the "high court has never suggested the doctrine applies to the same proceeding. Indeed, it has consistently stated it applies to 'successive prosecutions.' [Citation.] In *Ohio* v. *Johnson* (1984) 467 U.S. 493, 500, footnote 9 [81

L.Ed.2d 425, 434, 104 S.Ct. 2536], the court specifically stated, 'Moreover, in a case such as this, where the State has made no effort to prosecute the charges seriatim, the considerations of double jeopardy protection implicit in the application of collateral estoppel are inapplicable.' In *United States* v. *Dixon* (1993) 509 U.S. [688] [125 L.Ed.2d 556, 113 S.Ct. 2849], a case involving successive prosecutions, the high court, although expressly not deciding the collateral estoppel question in that case because the lower courts had not ruled on it [citation], noted at page [705] [125 L.Ed.2d at pp. 572-573, 113 S.Ct. at p. 2860] that '[t]he collateral-estoppel effect attributed to the Double Jeopardy Clause, [citation], may bar a *later prosecution* for a separate offense where the Government has *lost* an earlier prosecution involving the same facts.' (First italics in original, second italics added.) Most recently, the court has stated, 'Where . . . there is "no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." [Citation.] Thus, our cases establish that the primary evil to be guarded against is successive prosecutions: "[T]he prohibition against multiple trials is the controlling constitutional principle." [Citation.]' [Citation.]" (*People v. Santamaria, supra,* 8 Cal.4th 903, 913; see also *Schiro v. Farley* (1994) 510 U.S. 222, 229-230 [127 L.Ed.2d 47, 56-57, 114 S.Ct. 783, 789]; *People v. Memro* (1995) 11 Cal.4th 786, 821 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Morales, supra*, 112 Cal.App.4th 1176, 1186; *Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1185–1186 [59 Cal.Rptr.2d 602].)

But also like the California Supreme Court, we need not resolve this threshold issue, as we conclude that defendant's collateral estoppel claim fails for another reason: the lack of a final adjudication and decision on the merits that the murder conviction is precluded by lack of evidence. (See *People v. Barragan, supra,* 32 Cal.4th 236, 253–254.) Finality is "a cornerstone" of the collateral estoppel doctrine. (*People v. Scott* (2000) 85 Cal.App.4th 905, 918 [102 Cal.Rptr.2d 622], citing *People v. Mitchell* (2000) 81 Cal.App.4th 132, 143–148, 155 [96 Cal.Rptr.2d 401], disapproved on other grounds in *Barragan, supra*, at p. 252.) Principles of double jeopardy do not attach "until there has been a final determination on the merits, which does not occur simply because a finding

was made in an ongoing proceeding." (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1260 [131 Cal.Rptr.2d 628].) "[C]ollateral estoppel applies only when it is shown that a factual issue which is identical to an issue in the current case was actually litigated and necessarily determined in a prior, final adjudication." (*Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 456 [15 Cal.Rptr.3d 507]; see also *People v. Barragan, supra*, at pp. 252-255; *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1522 [42 Cal.Rptr.3d 370].) "Thus, in order for res judicata or collateral estoppel to apply there must be a *final* judgment or determination of an issue; that is, a judgment or determination that is final in the sense that *no further judicial act remains to be done to end the litigation*. [Citation.] These principles apply in criminal proceedings as well as civil." (*People v. Scott, supra*, at p. 919, first italics in original, second italics added; see also *Yeboah v. Progeny Ventures, Inc.* (2005) 128 Cal.App.4th 443, 448 [27 Cal.Rptr.3d 150].)

We do not consider the federal district court's decision a final judgment within the meaning of the collateral estoppel doctrine. For purposes of issue preclusion, " ' "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.' [Citations.]" (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1564 [49 Cal.Rptr.3d 259], italics omitted.) " '[A] "final judgment" is defined as one that is "free from direct attack." [Citation.] Stated differently, "To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment." [Citations.]' " (*People v. Santamaria, supra,* 8 Cal.4th 903, 942, appen. to conc. & dis. opn. of Mosk, J.; see also *id.* at p. 929, fn. 1.) It is " 'the substance and effect of the court's order or judgment and not the label' which determines" whether it is final. (*Pazderka v. Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th 658, 666 [73 Cal.Rptr.2d 242]; see also *Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101 [39 Cal.Rptr.2d 737].) When " 'no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties,' " it is not. (*Griset v. Fair*

*Political Practices Com.* (2001) 25 Cal.4th 688, 698 [107 Cal.Rptr.2d 149, 23 P.3d 43] citing *Lyons v. Goss* (1942) 19 Cal.2d 659, 670 [123 P.2d 11]; see also *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1410 [132 Cal.Rptr.2d 81]; *People v. Scott, supra*, 85 Cal.App.4th 905, 919; *Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1070 [54 Cal.Rptr.2d 385].) And where, as here, collateral estoppel is "asserted in the same proceeding, the question of 'finality' is obviously a predicate inquiry. While the proceeding or action still continues, the required finality is necessarily absent." (*People v. Scott, supra*, at p. 919.)

Neither the intent nor the substance of the federal court's decision is indicative of a *final* determination on the sufficiency of the evidence to support the murder charge. First, the court did not determine that the jury verdict was unsupported by the evidence presented at trial. To the contrary, the court concluded that the evidence was "sufficient when the improperly admitted evidence" of Kingdom's statement was considered – as it was at trial – and only "insufficient when the improperly admitted evidence [was] excluded from the equation." The proper remedy in "such a case," the federal court declared is "retrial rather than acquittal." Rather than reverse and finally set aside the murder conviction for lack of supporting evidence, the court expressly remanded the case for retrial to grant the People the opportunity to present the case against defendant anew. Thus, the court did not intend that its decision have any preclusive effect or prevent the retrial of defendant. (See *People v. Scott, supra*, 85 Cal.App.4th 905, 919–921.) The federal court's disposition of the case was effectively "an order for a new trial, placing the parties in the same position as if the cause had never been tried." (*People v. Moore* (2006) 39 Cal.4th 168, 174 [45 Cal.Rptr.3d 784, 137 P.3d 959].) "Absent a contrary direction from the appellate court, a general reversal of a criminal judgment is deemed to be an order for a new trial." (*Scott, supra*, at p. 921, italics omitted.) Collateral estoppel precludes retrial only if "no further judicial act remains to be done to end the litigation" of an issue. (*Id.* at p. 919.) A " 'conclusive carry-over effect should not be accorded a judgment which is considered merely tentative in the very action in which it was rendered. On the contrary, the judgment must ordinarily be a firm and stable one, the

"last word" of the rendering court—a "final" judgment.' [Citations.]" (*Id.* at pp. 919–920, italics omitted.) The judgment before us clearly contemplated and mandated the very retrial which occurred, not an end to the case. (*Id.* at p. 923.)

The federal court's remand order was in accord with the rule that double jeopardy and collateral estoppel principles do not bar retrial upon reversal for error in the proceedings below. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 42 [102 L.Ed.2d 265, 109 S.Ct. 285]; *United States v. Scott* (1978) 437 U.S. 82, 90–91 [57 L.Ed.2d 65, 98 S.Ct. 2187]; *People v. Hernandez* (2003) 30 Cal.4th 1, 7 [131 Cal.Rptr.2d 514, 64 P.3d 800]; *People v. Hatch* (2000) 22 Cal.4th 260, 271–274 [92 Cal.Rptr.2d 80, 991 P.2d 165]; *People v. Superior Court* (*Marks*) (1991) 1 Cal.4th 56, 72 [2 Cal.Rptr.2d 389, 820 P.2d 613].) Only reversals based on the legal insufficiency of the evidence at trial may prevent the People from retrying a defendant whose conviction is set aside through direct appeal or collateral attack. (See *Lockhart v. Nelson, supra*, at p. 38; *People v. Seel* (2004) 34 Cal.4th 535, 544 [21 Cal.Rptr.3d 179, 100 P.3d 870]; *People v. Santamaria, supra*, 8 Cal.4th 903, 910–911; *In re Cruz, supra,* 104 Cal.App.4th 1339, 1348–1349.) And even "where an appellate court finds that 'the evidence is insufficient to support the verdict,' the 'normal rule' is that the losing party on appeal is 'entitled to a retrial.' [Citation.]" (*People v. Barragan, supra*, 32 Cal.4th 236, 250.) "As a general rule, when there is a conviction, rather than an acquittal or a mistrial, and the judgment of conviction is reversed on appeal or vacated in habeas corpus proceedings due to error in the trial, retrial is permitted. . . . When a writ of habeas corpus vacates a judgment, the parties are placed in the same position as if the first trial had never occurred, and defendant is not in jeopardy until the retrial jury is sworn." (*Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 118 [22 Cal.Rptr.3d 647].) "The Supreme Court has held that the double jeopardy clause bars retrial 'for the defendant who obtains an appellate determination that the trial court should have entered a judgment of acquittal' based on insufficiency of the evidence. [Citations.] The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the

conviction." (*United States v. Chu Kong Yin* (9th Cir. 1991) 935 F.2d 990, 1001, italics omitted; see also *In re Anthony C., supra,* 138 Cal.App.4th 1493, 1509–1510.)

The federal court's decision was not functionally equivalent to an acquittal based upon failure of proof at trial for double jeopardy or collateral estoppel purposes – the evidence presented at trial was found sufficient to support the conviction – but rather a determination that defendant was convicted through a judicial process which was fundamentally defective due to improper receipt of evidence. (Cf. *Lockhart v. Nelson, supra,* 488 U.S. 33, 41; *People v. Hatch, supra,* 22 Cal.4th 260, 271–272; *People v. McCann* (2006) 141 Cal.App.4th 347, 354–355 [45 Cal.Rptr.3d 868].) The federal court's finding "compels a retrial; it does not bar one." (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1347–1348.) The very order that defendant asks us now to accord "preclusive effect was clearly interlocutory in nature. A remand was ordered to provide the People with the opportunity to present additional evidence" on the charges. (*People v. Scott, supra,* 85 Cal.App.4th 905, 919, italics omitted.) "Clearly, this was not a final order." (*Ibid.*, italics omitted.) The retrial order " 'simply "affords the defendant a second opportunity to seek a favorable judgment" and does not violate the constitutional prohibition against double jeopardy' " or the collateral estoppel doctrine. (*People v. Hernandez, supra,* 30 Cal.4th 1, 7, quoting from *People v. Hatch, supra,* at p. 274.)

Lie

Further, affording finality to the federal court's decision would be inconsistent with the nature and purpose of the writ of habeas corpus in the present case. We acknowledge that " '[t]he writ of habeas corpus affords an efficacious means of vindicating an individual's fundamental rights. [Citation.] . . . A final order or judgment granting relief to a petitioner on habeas corpus is a conclusive determination . . . [;] it is res judicata of all issues of law and fact necessarily involved in that result. [Citations.]' [Citation.]" (*People v. Mitchell, supra,* 81 Cal.App.4th 132, 146–147, citing *In re Crow* (1971) 4 Cal.3d 613, 622–623 [94 Cal.Rptr. 254, 483 P.2d 1206], disapproved on other grounds in *People v. Barragan, supra,* 32 Cal.4th 236, 252.) But here, the habeas corpus proceeding "is not a trial of guilt or innocence and the findings of the habeas corpus court do not constitute an acquittal. The scope of a writ of habeas corpus is broad, but in this

case, as in most cases, it is designed to correct an erroneous conviction. It achieves that purpose by invalidating the conviction and restoring the defendant to the position she or he would be in if there had been no trial and conviction. [Citations.] [¶] Thus, the conviction is set aside but the prosecution is not ended." (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1347.)

Prohibiting retrial of the murder charge would also contravene the People's right to a jury trial and conflict with the strong public policy considerations that favor determination of guilt or innocence in a trial. (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1347.) The first jury, having heard and considered all of the evidence, convicted defendant of murder. Reversal of the conviction for the erroneous admission of Kingdom's statement, a due process violation according to the federal court's decision, did not transform the conviction into an effective acquittal. The second jury was given the opportunity by the federal court to assess the evidence presented and ultimately reach the same conclusion on his guilt of the murder of Highsmith. (See *People v. Santamaria, supra*, 8 Cal.4th 903, 925–926.) Declining to apply collateral estoppel principles after appellate reversal of the jury's finding neither created the risk of inconsistent verdicts nor resulted in the sort of harassment of multiple trials that the doctrine seeks to avoid. (*People v. Barragan, supra*, 32 Cal.4th 236, 256–257; *People v. Santamaria, supra*, at p. 914.) The murder conviction by the second jury was consistent, not inconsistent, with the verdict after the first trial, and did not constitute vexatious litigation. (*People v. Taylor* (1974) 12 Cal.3d 686, 695 [117 Cal.Rptr. 70, 527 P.2d 622].) We therefore find that the federal court's decision was not a final judgment for purposes of prohibiting a retrial of defendant under collateral estoppel principles. (*People v. Monge* (1997) 16 Cal.4th 826, 844–845 [66 Cal.Rptr.2d 853, 941 P.2d 1121]; *People v. Bueno* (2006) 143 Cal.App.4th 1503, 1510 [50 Cal.Rptr.3d 161]; *People v. Sotello* (2002) 94 Cal.App.4th 1349, 1356 [115 Cal.Rptr.2d 118]; *People v. Scott, supra*, 85 Cal.App.4th 905, 914, 921.)

***B. The Law of the Case Doctrine.***

We turn our attention the related doctrine of law of the case. "The law of the case doctrine holds that when an appellate opinion states a principle or rule of law necessary

to the decision, that principle or rule becomes the law of the case and must be adhered to through its subsequent progress in the lower court and upon subsequent appeal. [Citations.] For the doctrine to apply, ' " 'the point of law involved must have been necessary to the prior decision, . . . the matter must have been actually presented and determined by the court, and . . . application of the doctrine will not result in an unjust decision.' [Citations.]" [Citation.]' [Citation.]" (*People v. Superior Court* (*Plascencia*) (2002) 103 Cal.App.4th 409, 432 [126 Cal.Rptr.2d 793].) " 'The principal reason for the doctrine is judicial economy. "Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding." ' [Citations.] The law of the case doctrine applies in criminal cases [citation] . . . ." (*People v. Gray* (2005) 37 Cal.4th 168, 196–197 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

The "doctrine of law of the case does not prevent retrial of an issue, although it does require that the same conclusion be reached if that matter is retried on the same evidence." (*People v. Burbine, supra*, 106 Cal.App.4th 1250, 1261.) "Thus, the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441 [42 Cal.Rptr.3d 677, 133 P.3d 581].) "The doctrine will not be applied, however, when such application leads to an unjust result. Because the law of the case doctrine 'is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation]. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination.' [Citation.]" (*People v. Gray, supra,* 37 Cal.4th 168, 197; see also *People v. Martinez* (2003) 31 Cal.4th 673, 683 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

As with the collateral estoppel doctrine, we are persuaded that law of the case principles do not govern the retrial of defendant in the present case, for several reasons. First, no finding has ever been made that the evidence presented during the first trial failed to support the murder conviction. The first jury, two opinions from this court, and even the federal district court, ruled otherwise. The conclusion of the federal court, which we find rather confusing, was that defendant's "right to due process was violated" by the insufficient "evidence to support the murder conviction" adduced at a hypothetical trial–that is, one without evidence of Kingdom's statement. The court's finding was made in the context of its determination that the admission of Kingdom's statement was "not harmless error," and that the cumulative impact of prosecutorial misconduct, improper admission of evidence, and the due process violation, "considered together, prejudiced Cooper so much that his conviction [*sic*] on all counts must be set aside." We have great difficulty imposing upon the second jury the federal court's evaluation of the evidence as "insufficient," when the "evidence" referred to by the court was not that offered at the first trial. We perceive in the application of the law of the case doctrine here a manifest injustice to the prosecution, which did not have the benefit of a prior definitive ruling on the admissibility of Kingdom's statement and the opportunity to present additional evidence at the first trial in light of its ultimate exclusion. We therefore do not consider the issue of the sufficiency of the evidence to support the jury verdict on the murder charge to have been actually adjudicated and finally determined by the federal court for purposes of imposition of the law of the case doctrine.[17]

Fed. Order did Rule it was insuff.

Lie

This was Law of Case is for Jury

Evidence was same that was offered at trial. Cal. App. is creating to support error

Here the D.A. did Not complain at trial or on any Appeal Cal. App is 1st to do so and it is a Trial Error No fault of Mines

Second, the federal court's finding of insufficient evidence to support the murder conviction is, at best, only marginally a statement of a rule of law in the case. We acknowledge that law of the case principles may attach to a written resolution of a writ of habeas corpus petition, and further that legal sufficiency of the evidence may be an issue of law that invokes adherence to a reviewing court's statement of decision. (*Kowis v.*

---

[17] And to the extent it was determined, it was adverse to defendant.

*Howard* (1992) 3 Cal.4th 888, 894 [12 Cal.Rptr.2d 728, 838 P.2d 250]; *In re Crow, supra,* 4 Cal.3d 613, 622–623; *People v. Pacini* (1981) 120 Cal.App.3d 877, 887 [174 Cal.Rptr. 820].) "[A]n appellate court's determination 'that the evidence is insufficient to justify a finding or a judgment is necessarily a decision upon a question of law.' ([*Estate of Baird* (1924) 193 Cal. 225,] 238 [223 P. 974].) Such a determination 'establishe[s] as the law of the case that all the evidence adduced at the previous trial was insufficient as a matter of law to establish' the finding or judgment. (*Id.* at p. 234; see also *People v. Shuey* (1975) 13 Cal.3d 835, 842 [120 Cal.Rptr. 83, 533 P.2d 211] [doctrine applies to finding of evidence's 'legal sufficiency'].)" (*People v. Barragan, supra*, 32 Cal.4th 236, 246.) "With regard to the question of the legal sufficiency of evidence, the general rule is that '[w]here the sufficiency of the evidence to sustain the judgment depends on the probative value or effect of the evidence itself (*as distinguished from the credibility of witnesses*), and there is no substantial difference in the evidence in the retrial, the former decision is law of the case. [Citations.]' [Citation.]" (*People v. Mitchell, supra*, 81 Cal.App.4th 132, 149, italics added, disapproved on other grounds in *People v. Barragan, supra*, at p. 250.)

The credibility of the witnesses was the evidence in this case there was no physical evidence linking me to case only witnesses

However, "[T]he law-of-the-case doctrine governs only the *principles of law* laid down by an appellate court, as applicable to a retrial of fact, and it controls the outcome on retrial only to the extent the evidence is substantially the same." (*People v. Boyer, supra,* 38 Cal.4th 412, 442.) The doctrine is subject to an important limitation: it " 'does not embrace the facts themselves . . . .' [Citation.]" (*People v. Barragan, supra*, 32 Cal.4th 236, 246.) Here, the federal court's finding of the insufficiency of the evidence to sustain the judgment did not depend solely upon an assessment of the probative value of the evidence, but, as we read the decision, was primarily based upon evaluations of the credibility of prosecution witnesses and inferences drawn by the court that were contrary to those of the first jury. We do not interpret the federal court's decision as a final declaration of a principle of law in the case. (See *People v. Scott, supra*, 85 Cal.App.4th 905, 919.)

Lie

Finally, and of most significance to us, the second jury was presented with different evidence to assess. In a criminal case, law of the case principles only come into play if upon remand the People attempt to prove an allegation "using only the evidence presented at the first trial." (*People v. Scott, supra*, 85 Cal.App.4th 905, 924.) The law of the case doctrine does not prevent a retrial, does not preclude the presentation of new evidence upon remand, does not limit the new evidence a party may introduce at a retrial, and only compels the same result if the People attempt on remand to prove the charge using the substantially same evidence. (*People v. Boyer, supra,* 38 Cal.4th 412, 442; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 816 [44 Cal.Rptr.3d 788]; *People v. Franz* (2001) 88 Cal.App.4th 1426, 1456 [106 Cal.Rptr.2d 773]; *People v. Scott, supra*, at p. 924.) "Even where the appellate court reverses based on 'the "sufficiency of the evidence", the rule of the law of the case may not be extended to be an estoppel when new material facts, or evidence, or explanation of previous evidence appears in the subsequent trial. [Citations.]' [Citation.]" (*People v. Barragan, supra*, 32 Cal.4th 236, 246–247; see also *People v. Monge, supra,* 16 Cal.4th 826, 845.)

IT was LESS

Upon comparison of the first and second trials, we find that the evidence presented was not the same. Kingdom's statement had been excluded, so it was of course not considered in the second trial.[18] Critical testimony from Juanita Walton was received at the second trial, rather than read from her prior statements or abbreviated preliminary hearing testimony as it had been at the first trial. Walton corroborated the testimony of Hodges that identified defendant and placed him at the scene of the kidnapping of Highsmith only moments before the crime occurred. Walton's testimony also provided corroborated testimony from Cross that Highsmith was confronted and abducted because defendant, along with Cross and Kingdom, believed he had stolen a vehicle containing

Lie She said the same as her Pre-lim testimony which was Read to 1st Jury

[18] Favorable to the prosecution or not, the exclusion of Kingdom's statement certainly made the evidence substantially different in the second trial.

Love & Hussein their tapes were played so it to was same as 1st trial Cal. App. is creating Hodges same as 1st trial nothing different

their drugs—thereby providing a motive for the abduction and killing.[19] The accounts of the kidnapping given by Hodges, Rodney Love and Musa Hussein varied from the first trial, although not materially so. The defense evidence at the second trial also did not include alibi testimony from defendant or his wife. Given the context of the federal court's finding of insufficiency of the evidence and upon our review of the record, we conclude that a retrial of defendant was not precluded and the jury was not estopped by law of the case principles from convicting defendant of the murder of Highsmith. (*McCutchen v. City of Montclair, supra,* 73 Cal.App.4th 1138, 1148.)

***II. The Denial of Defendant's Motions for Substitution of Counsel.***

Defendant challenges the trial court's denial of his *Marsden* motions, and his subsequent *Faretta* motion to represent himself.[20] We deal first with the court's refusal to appoint new counsel for defendant.

The record shows that immediately after defendant received an appointed attorney on May 19, 2004, he advised the court that "antagonism" had developed with counsel. He claimed counsel had "broken the attorney/client privilege" in communications with the court, and had expressed that she did not want the case. Counsel advised the court that although her relationship with defendant was not "pleasant," she was willing take the case despite the "time constraints" associated with defendant's refusal to waive time. Defendant reiterated that he lacked confidence in counsel and was "not willing to accept her" as his attorney. The court found no grounds to discharge counsel and denied the *Marsden* motion.

Defendant renewed his *Marsden* motion at a hearing on July 6, 2004. He again expressed concern with counsel's violation of the attorney-client privilege by disclosing the "strategy" of the case, mentioned counsel's "sub-par" performance by failing to

---

[19] Walton testified that defendant asked if Highsmith was the "type of nigger" who would steal a car.

[20] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] *(Faretta).*

respond to misstatements of law by the prosecutor and court at a prior hearing, and complained of counsel's failure to confer with him "on her defense strategy" or call his alibi witnesses. Defendant stated: "There is just no way we can work together." Counsel was asked to respond. She denied any violation of the attorney-client privilege or failure to contest misstatements of law during a pretrial motion. Counsel also explained that upon her inquiry she concluded defendant's proposed alibi defense evidence was "terrible" and actually harmful to his case. Counsel clarified for the court that the investigator was busy seeking witnesses to the homicide rather than meeting with defendant. Counsel acknowledged that she told defendant, "I don't want the case" when she was first appointed, and that her relationship with defendant was strained due to his insistence that she "file and do whatever he wants." Defendant then claimed that counsel did not believe him or his witnesses; as a result, defendant stated, he had no "confidence in her cross-examining any witness" or being an advocate for him. He reiterated that they had a "conflict" from "day one." Defendant also offered to waive time to obtain a new attorney. The court found no "breakdown in the relationship" or other reason to substitute counsel, and the motion was again denied.

Another *Marsden* motion was presented to the court on September 21, 2004. Defendant repeated his conflicts with counsel and asserted that "the relationship is irreconcilable." He stated that counsel "cursed" him "out" and declared "she hates" him. Defendant also complained that counsel repeatedly "blows up" and "stalks off" when they "have run ins." Defendant added that he and counsel "can't see eye to eye" on the trial strategy, and she refuses to consider his input in the case. Counsel agreed that she was "very angry with him," "blew up," and "walked out" at a meeting the week before due to defendant's insistence upon arguing "the law" with her. Counsel said she later apologized to defendant, however, and denied that she expressed hatred for him. Counsel agreed that she and defendant continually clashed over his directive that she "do what I tell you to do." She nevertheless expressed her conviction that they could "work together," and felt she "could represent him completely" and competently. Counsel further indicated she was prepared and ready to proceed to trial. The court accepted

counsel's representations and found that the necessary grounds to relieve counsel had not been presented. The motion was once more denied.

Defendant now argues that he demonstrated a "lack of trust" in his attorney and "an irreconcilable conflict between client and counsel" that justified substitution of counsel under *Marsden*. He also submits that counsel's admission to him that she had not yet formulated an opening argument "on the eve of trial" indicates her lack of adequate preparation. He claims that "[u]nder these circumstances" the denial of his request to substitute attorneys was erroneous.

" '[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney.' [Citation.]" (*People v. Leonard* (2000) 78 Cal.App.4th 776, 786 [93 Cal.Rptr.2d 180].) The court is not obligated to appoint independent counsel absent adequate proof of need by the defendant. (*People v. Memro, supra,* 11 Cal.4th 786, 858–859; *People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192]; *People v. Sharp* (1994) 29 Cal.App.4th 1772, 1786 [36 Cal.Rptr.2d 117], overruled on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452 [45 Cal.Rptr.2d 905, 903 P.2d 1037].) "The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing." (*People v. Smith, supra,* at p. 696; *Ng v. Superior Court* (1997) 52 Cal.App.4th 1010, 1022–1023 [61 Cal.Rptr.2d 49].) Appointment of substitute counsel is necessary, "when, and only when, . . . under the *Marsden* standard, . . . in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*People v. Smith, supra,* at p. 696; see also *People v. Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423]; *People v.*

*Leonard, supra,* at p. 786.) "This is true *whenever* the motion for substitute counsel is made." (*People v. Smith, supra,* at p. 696.)

"When a criminal defendant seeks substitution of counsel on the ground that appointed counsel is providing inadequate representation, a trial court must give the defendant an opportunity to explain the reasons for the request." (*People v. Mendoza* (2000) 24 Cal.4th 130, 156–157 [99 Cal.Rptr.2d 485, 6 P.3d 150].) " 'A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention "is lacking in all the attributes of a judicial determination." [Citation.]' [Citation.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1244 [131 Cal.Rptr.2d 468, 64 P.3d 762].) " '[T]he trial court cannot thoughtfully exercise its discretion in this matter without listening to [the defendant's] reasons for requesting a change of attorneys.' [Citation.] Accordingly, 'When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. . . .' [Citation.]" (*People v. Smith, supra,* 6 Cal.4th 684, 690–691.) " '[T]he inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the future. But the decision must always be based on what has happened in the past.' [Citation.]" (*People v. Sharp, supra,* 29 Cal.App.4th 1772, 1787, italics omitted.) " 'Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' [Citation.]" (*People v. Smith, supra,* at pp. 690–691.)

We conclude that before denying the motion the trial court properly granted defendant the opportunity to thoroughly articulate the specific reasons for seeking substitution of counsel, and defendant does not argue otherwise. (*People v. Lucky* (1988) 45 Cal.3d 259, 281 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People v. Lewis* (1978) 20 Cal.3d 496, 497 [143 Cal.Rptr. 138, 573 P.2d 40]; *People v. Sharp, supra*, 29 Cal.App.4th 1772, 1786.) Defendant presented all of his complaints with counsel's performance and the

grounds for his dissatisfaction with the attorney-client relationship. Counsel's rebuttal to defendant's complaints was also heard by the trial court.

We further find no error in the denial of the *Marsden* motion. Defendant's primary grievance is that counsel did not proceed with the case in the manner he requested. His claims fall within the category of disagreement over strategy that does not compel substitution of counsel. We cannot find fault with counsel's resolve to retain control over tactical matters. Often repeated is the rule that " '[t]here is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant. [Citations.] Nor does a disagreement between defendant and appointed counsel concerning trial tactics necessarily compel the appointment of another attorney. [Citations.]' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 927 [47 Cal.Rptr.2d 426, 906 P.2d 388]; see also *People v. Lara* (2001) 86 Cal.App.4th 139, 151 [103 Cal.Rptr.2d 201]; *Ng v. Superior Court, supra,* 52 Cal.App.4th 1010, 1022.) "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Further, defendant "was not entitled to claim that an irreconcilable conflict had arisen merely because he could not veto" his attorney's "reasonable tactical decisions." (*People v. Memro, supra,* 11 Cal.4th 786, 858.)

I had NO DEFENSE

Nor do we find that the attorney-client relationship had so deteriorated that substitution of counsel was necessary. "[A] 'conflict' regarding tactical matters neither justifies substitution of counsel nor signals a fundamental breakdown in the attorney-client relationship." (*People v. Nakahara* (2003) 30 Cal.4th 705, 719 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) " 'A disagreement concerning tactics is . . . insufficient to compel the discharge of appointed counsel, unless it signals a complete breakdown in the attorney-client relationship.' " (*People v. Hart* (1999) 20 Cal.4th 546, 604 [85

Cal.Rptr.2d 132, 976 P.2d 683], quoting from *People v. Crandell, supra,* 46 Cal.3d 833, 859–860.) Although defendant asserted the relationship with counsel had declined to the extent that it was "irreconcilable," counsel acknowledged the conflict but advised the court that she and defendant were capable of cooperating to a degree that competent representation would result. Moreover, defendant did not in any way establish that ineffective representation was likely to occur. " 'To the extent there was a credibility question between defendant and counsel at the hearing, the court was "entitled to accept counsel's explanation." [Citation.]' [Citation.] If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." *(People v. Jones, supra,* 29 Cal.4th 1229, 1245–1246.) We conclude that the trial court did not abuse its discretion by denying defendant's motions for substitution of counsel. *(People v. Smith* (2003) 30 Cal.4th 581, 607–608 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

***III. The Denial of Defendant's Motions to Represent Himself.***

We proceed to the claim that defendant was improperly denied the right to represent himself. Defendant insists that he unequivocally and timely exercised his right of self-representation under *Faretta, supra,* 422 U.S. 806, 820. Therefore, he maintains that the trial court's refusal to recognize his constitutional right to self-representation "requires reversal *per se.*"

"*Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request." (*People v. Dunkle* (2005) 36 Cal.4th 861, 908 [32 Cal.Rptr.3d 23, 116 P.3d 494].) "[T]he Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself without counsel." (*United States v. Erskine* (9th Cir. 2004) 355 F.3d 1161, 1167, italics omitted; see also *People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Williams* (2003) 110 Cal.App.4th

1577, 1585 [2 Cal.Rptr.3d 890].) And, "*Faretta* error is reversible per se." (*People v. Valdez* (2004) 32 Cal.4th 73, 98 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

"The right, however, is not absolute. 'To invoke the constitutional right to self-representation, a criminal defendant must make an *unequivocal* assertion of that right in a timely manner. [Citation.] "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." [Citation.] . . .' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 683 [27 Cal.Rptr.3d 360, 110 P.3d 289].) "[T]he waiver of counsel must be *knowing and voluntary*—that is, the defendant must 'actually . . . understand the significance and consequences' of the decision, and the decision must be 'uncoerced' [citations]." (*People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].) "The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver." (*People v. Dunkle, supra,* 36 Cal.4th 861, 908; see also *Brewer v. Williams* (1977) 430 U.S. 387, 391, 404 [51 L.Ed.2d 424, 97 S.Ct. 1232].)

We review the proceedings to determine whether defendant's assertion of the right to self-representation was both timely and unequivocal. The first mention of self-representation was at the hearing on May 19, 2004, when following the court's pronouncement that appointed defense counsel would not be discharged defendant queried, "How do I represent myself?" The court disclosed to defendant that he had the right to represent himself, but reiterated that appointed counsel would not be removed. No further request for self-representation was then made.

On September 21, 2004, with the case set for trial, at the conclusion of the *Marsden* hearing defendant declared: "I would like to go pro per and get a copy of this

transcript." After denial of the *Marsden* motion defendant again indicated that he wanted to represent himself, and asked for a return of the records from counsel. The court directed defendant to read the "*Faretta* form" to "understand all the risks" he was taking, and put the matter over until the next day. Defendant was warned that a further continuance of the trial would not be granted. The following day, defendant appeared with the completed *Faretta* form. Defendant complained that his "first choice" was not "to want to go pro per," but he had been denied the right to substitute counsel and wanted to "appeal" that decision. In response to the trial court's statement that the request seemed "equivocal," defendant indicated that self-representation was "the only option I have at my disposal now." Defendant then said that he wanted to "jettison this lawyer . . . because the lawyer cussed me out." Defendant was advised that a courtroom was ready for trial. He proclaimed that he was unprepared and needed to "bring a writ" on the *Marsden* motion denial and study the discovery in the case. The *Faretta* motion was then denied as "untimely."

Counsel asked the court to reconsider the *Faretta* motion the next day. Defendant was asked if he could be ready for trial in six days – on September 29, 2004 – if the trial was continued to that date. Defendant replied that he needed "at least two weeks" to prepare for trial. He again complained that counsel "hates me" and "cursed me out." The court advised defendant that the *Marsden* motion had been denied and would not be revisited. Defendant again stated, "This isn't my first choice to go pro per. I want counsel." He repeatedly mentioned that he would "prefer to have counsel to represent" him. The court then found that defendant made "an equivocal statement of a desire to represent" himself, and the *Faretta* motion was denied.

We agree with the trial court that defendant's request for self-representation was both untimely and equivocal. "*Faretta's* emphasis 'on the defendant's knowing, voluntary, unequivocal, and competent invocation of the right suggests that an insincere request or one made under the cloud of emotion may be denied.' [Citation.] '[A] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation.'

[Citations.]" (*People v. Danks* (2004) 32 Cal.4th 269, 295–296 [8 Cal.Rptr.3d 767, 82 P.3d 1249].) The requirement of an unequivocal *Faretta* request " 'is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation.' [Citation.]" (*People v. Roldan, supra,* 35 Cal.4th 646, 683.)

We realize, as pointed out by defendant, that a distinction is drawn between "an 'equivocal' request" and a " 'conditional' request. There is nothing equivocal in a request that counsel be removed and, if not removed, that the defendant wants to represent himself. Once the court has decided not to remove counsel, the defendant has the choice of going ahead with existing counsel or representing himself. There is nothing improper in putting the defendant to this choice, so long as the court did not err in refusing to remove counsel. [Citations.] If, under these circumstances, the defendant elects to represent himself, he need not show that he would make the same decision if offered other counsel." (*People v. Michaels* (2002) 28 Cal.4th 486, 524 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

Here, however, the record strongly suggests to us that defendant sought self-representation out of the annoyance or frustration associated with the denial of his requests to discharge his appointed attorney, not as a voluntary waiver of the right to counsel. (See *People v. Danks, supra,* 32 Cal.4th 269, 295–296.) Defendant moved to represent himself only after denial of his *Marsden* motions, and obviously with great reluctance. He expressed on numerous occasions to the trial court that his "first choice" was not "to go pro per," but he felt compelled to do so due to the conflict with his appointed attorney. Even after defendant completed the *Faretta* form which advised him of the consequences of self-representation, he continued to emphasize to the court that he preferred to "have counsel."

" 'The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-

representation may support the court's decision to deny the defendant's motion. . . .' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1087 [74 Cal.Rptr.2d 121, 954 P.2d 384].) "*Faretta's* emphasis 'on the defendant's knowing, voluntary, unequivocal, and competent invocation of the right suggests that an insincere request or one made under the cloud of emotion may be denied.' [Citation.]" (*People v. Danks, supra,* 32 Cal.4th 269, 295.) Our reading of the record convinces us that defendant was obviously seeking to impress upon the court just how dissatisfied he was with his present counsel, more than he was voluntarily invoking the right to self-representation. (*People v. Skaggs* (1996) 44 Cal.App.4th 1, 5–6 [51 Cal.Rptr.2d 376].) We agree with the trial court that under the circumstances presented defendant's request to represent himself was neither voluntary nor unequivocal. (See *Jackson v. Ylst* (9th Cir.1990) 921 F.2d 882, 888; *People v. Danks, supra,* at p. 296; *People v. Williams, supra,* 110 Cal.App.4th 1577, 1586–1587; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205 [111 Cal.Rptr.2d 318]; *People v. Skaggs, supra,* at pp. 5–6.)

Finally, the factors of the length and stage of the trial and the disruption and delay that would result from granting self-representation also strongly support the trial court's denial of the *Faretta* motion. (*People v. Roldan, supra,* 35 Cal.4th 646, 684.) Defendant's case had dragged on for many years. He had made multiple, unsuccessful *Marsden* motions, and his second *Faretta* motion came on the eve of the scheduled trial. Defendant affirmed that he would need a continuance to prepare for trial if permitted to represent himself at that late date. The trial court was justified in finding that further disruption and delay would result from granting a *Faretta* motion that was equivocal in nature and founded upon a conflict with counsel that did not warrant substitution. (*People v. Roldan, supra,* at p. 684.) The *Faretta* motions were properly denied.

Case had just been Reversed and Was on trial calendar for maybe two Months

***IV. The Instruction on Defendant's Custodial Status.***

Defendant objects to the trial court's *sua sponte* instruction at the commencement of trial that advised the jury of his custodial status. The court essentially advised the jury that the fact defendant was in custody only "means one thing, and that is, he's unable to make bail," and was "totally irrelevant to the question of his guilt." The instruction

further admonished the jurors that his custodial status was not to be considered as evidence of guilt.[21] The next day, defense counsel complained that the custody instruction was prejudicial to defendant. The court acknowledged that the instruction may have been ill advised, but maintained that it was not prejudicial to defendant. Defendant now claims that the instruction, along with his custodial status, violated his "due process and equal protection rights."

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585 [102 Cal.Rptr.2d 254]; see also *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 514 [61 L.Ed.2d 39, 99 S.Ct. 2450]; *People v. Warren* (1988) 45 Cal.3d

---

[21] In full, the instruction was as follows: "I'm going to throw something else at you that you're not to consider as part of your decision-making process. I seem to be talking a lot about that, but that's kind of what we end up doing. If you haven't noticed already, you will eventually, while you might see the attorneys in the elevator or on the first floor, out on the street, walking up to the building, you're not going to encounter Mr. Cooper. Why? Because Mr. Cooper is in custody. He's going to be coming into the courtroom by a different route than you will, and you're not to speculate about that. You're not to think, 'Ahh, there must be a reason why he's in custody.' And you're not to think, 'Well, if he's in custody, it's probably an indication that he's somehow guilty.' [¶] Number one, that doesn't necessarily mean that at all. Here is basically what it means. It means one thing, and, that is, he's unable to make bail, and I'm sure you would all agree how fundamentally unfair it would be to find somebody guilty of a crime, in whole or in part, because he can't make bail. So his being in custody is totally irrelevant to the question of guilt or whether—whether you're guilty or not guilty, and, again, we go back to proven or not proven by evidence presented in this courtroom. [¶] And the fact that Mr. Cooper is in custody during the course of this trial is not evidence, is not to be considered by you as such. It means nothing to the outcome of this trial. Just as the fact that criminal charges were filed against him, it means nothing to the outcome of this trial, except for one thing: they're the thing that got us here. They define what the issues are, and they define or tell us what the decisions are that you need to make, as far as proven or not proven, whether you are to assume because charges are filed here that that means he's guilty? No. Can you think that? No. It's irrelevant. [¶] There'[re] people who seem to think that—going back to the notion that where there's smoke, there's fire, there must be something to this. Well, of course, nobody pulled his name out of a hat. Somebody didn't decide at random, 'Let's pick this guy to file charges against for these things that happened back in 1995.' We all, using our common sense, would expect that [the prosecutor] is here feeling that he's got evidence that he is going to present to you that he has a reasonable expectation is going to convince you of something, but the question is, is that evidence going to prove Mr. Cooper guilty or not? So the fact he's even here is not evidence. The evidence will come in other forms."

471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]; *People v. Smith* (1992) 9 Cal.App.4th 196, 201 [11 Cal.Rptr.2d 645].) "In order to prevail on a claim that the jury instructions are misleading, the claimant must prove a reasonable likelihood that the jury misunderstood the instructions as a whole. [Citation.] ' " 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " ' [Citation.]" (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147 [89 Cal.Rptr.2d 28]; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70–75 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Andrade, supra,* at p. 585.) Further, " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112 [93 Cal.Rptr.2d 433].)

We agree with the trial court's assessment of the custody instruction on both counts: the reference to defendant's custody was unnecessary and best omitted from the charge to the jury, but it also did not result in prejudicial error. The custody instruction was not comparable to imposition of a requirement upon the defendant that he attend trial wearing jail clothing, which has been found to " 'undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor. . . .' [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1336 [65 Cal.Rptr.2d 145, 939 P.2d 259]; cf. *People v. Taylor* (1982) 31 Cal.3d 488, 494 [183 Cal.Rptr. 64, 645 P.2d 115].) Instead, the court expressly directed the jury not to consider defendant's custody to prove guilt. We perceive that the custody instruction was not in substance materially different than CALJIC No. 1.00, which, in pertinent part, advised the jury, "You must not be influenced by pity for or prejudice against a defendant. You must not be biased against a defendant because he has been *arrested for this offense, charged with a crime, or brought to trial.* None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that a defendant is more likely to be guilty than not guilty." (Italics added.) The CALJIC No. 1.00 instruction does not have a tendency to confuse or mislead the jury or to suggest that the prosecution has any burden other than

proof of guilt beyond a reasonable doubt based solely upon the evidence adduced at trial. (See *People v. Jurado* (2006) 38 Cal.4th 72, 127 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820].) "A reasonable juror would understand this instruction as an advisement to disregard the facts that defendant had been arrested, charged, and brought to trial, and to presume the defendant innocent. 'Constitutional jurisprudence has long recognized [instruction on the presumption of innocence] as one way of impressing upon the jury the importance of the right to have one's guilt "determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, *continued custody, or other circumstances not adduced as proof at trial. . . .*" [Citation.]' [Citations.]" (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1492 [46 Cal.Rptr.2d 645], italics added.)

The instruction given here by the trial court merely added the element of custody to the equation, which the trial court explained to the jury was only the result of defendant's inability to post bail, and not indicative of guilt. The jury was also fully and completely instructed on the prosecution's burden to prove guilt beyond a reasonable doubt, and on the evidence to be considered in deciding whether the prosecution met this burden. The custody instruction further advised the jury that the fact of defendant's custody was irrelevant, and his guilt was to be determined upon the admissible "evidence presented in this courtroom." We must presume the jurors followed the court's admonition and did not consider defendant's custody as evidence of his guilt. (*People v. Avila* (2006) 38 Cal.4th 491, 574 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Finally, the prosecutor never referred to the circumstance that defendant was in custody or argued that his guilt should be established by other than the evidence presented. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1335–1336.) We therefore conclude that the custody instruction did not mislead the jurors from their proper deliberative course or otherwise constitute prejudicial error. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 71–73 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People v. Wade, supra,* 39 Cal.App.4th 1487, 1490–1491.)

*V. The Trial Court's Comments to the Jury on Accomplice Testimony.*

Appellant also complains of the trial court's comments in response to a request from the jury during deliberations to "explain accomplice testimony further." In addition to re-reading the standard instructions on the definition of accomplices and corroboration (CALJIC Nos. 3.01, 3.10, 3.11, 3.12, 2.20 and 2.50.2), the court identified Cross as an accomplice as a matter of law, but directed the jury to determine whether a "preponderance of the evidence" established that Walton was an accomplice. For any witness found to be an accomplice, the court stated, independent evidence "which tends to connect the defendant with the commission of the crime" is required to provide corroboration, but the independent corroborating evidence does not "have to be sufficient in and of itself to convict" defendant. If the testimony of an accomplice like Cross was not so corroborated, the court explained, "we treat his testimony like we never heard of it." If "other evidence" believed by the jury tends to connect defendant with the commission of the crimes, then Cross's testimony is brought "back in, and now you can consider it" in the same manner as any other testimony.

The court then advised the jury that if Walton was found to be an accomplice, her testimony could not corroborate Cross unless it was in turn corroborated by another, independent source; "[y]ou cannot corroborate one accomplice with another, so you have to look elsewhere." But if the jury found that Walton was not an accomplice, her testimony could be considered to corroborate Cross — specifically, for example, his testimony that defendant was "one of the three people" in the blue Oldsmobile. The court also explained to the jury that the testimony of Hodges, who was not alleged to be an accomplice, could also corroborate both Cross and Walton. Finally, the court suggested to the jury to "basically go through step-by-step with each witness" or "group of evidence" to determine if it was corroborated, and if so "consider it in its entirety."

Following an objection of defense counsel that the court had expressed "an opinion" on the corroboration of "certain evidence," the jury was admonished: "[P]lease do not conclude from anything I said that I think that corroboration exists in any particular witness's testimony or in any particular evidence, that I expressed any opinion

about what specific evidence might constitute corroboration, or that I think there is or isn't corroboration that exists, or that I believe that Goodie Walton is or isn't an accomplice."

Defendant argues that the trial court exceeded the permissible limits of comment upon the evidence by focusing upon specific accomplice testimony in a manner that "clearly favored" the prosecution's case. He adds that the "issue of corroboration was particularly acute in this case," and thus the error was prejudicial to him.

We begin by first delineating the rule that when the jury requested further elucidation of the law of consideration of accomplice, the court was presented with the statutory obligation "to provide the jury with information the jury desires on points of law." (*People v. Smithey, supra,* 20 Cal.4th 936, 985; see also *People v. Waidla* (2000) 22 Cal.4th 690, 746 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Under Penal Code "section 1138 the court must attempt 'to clear up any instructional confusion expressed by the jury.' [Citation.]" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465 [98 Cal.Rptr.2d 315].) "This means the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the *court has discretion* under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. . . .' [Citation.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015 [109 Cal.Rptr.2d 464], italics added; see also *People v. Smithey, supra,* at p. 985; *People v. Davis* (1995) 10 Cal.4th 463, 522 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Section 1138 does not demand elaboration upon the standard instructions by the trial court when the jury expresses confusion, but rather directs the court to "consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [52 Cal.Rptr.2d 256].)

We also observe that article VI, section 10 of the California Constitution authorizes comment upon the evidence by the trial court; it "provides, in pertinent part: 'The court may make any comment on the evidence and the testimony and credibility of

any witness as in its opinion is necessary for the proper determination of the cause.' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 780 [22 Cal.Rptr.3d 1, 101 P.3d 956].) " 'On its face, the constitutional language imposes no limitations on the content or timing of judicial commentary, deferring entirely to the trial judge's sound discretion. The appellate courts have recognized, however, that this powerful judicial tool may sometimes invade the accused's countervailing right to independent jury determination of the facts bearing on his guilt or innocence. Hence, the decisions admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power.' " (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1218 [120 Cal.Rptr.2d 477, 47 P.3d 262] quoting *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].) "Thus, a trial court has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' [Citation.] 'We determine the propriety of judicial comment on a case-by-case basis.' [Citation.]" (*People v. Monterroso, supra,* at p. 780.)

In our examination of the propriety of the trial court's remarks to the jury, we must ascertain what meaning was conveyed to the jury. "The meaning of instructions is no longer determined under a strict test of whether a 'reasonable juror' could have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276 [107 Cal.Rptr.2d 160], italics omitted.)

We find that the court's explanation of accomplice testimony did not result in a misstatement of the law or constitute a violation of the trial court's obligation to comment fairly and impartially upon the evidence. More importantly, we do not think *the jury* interpreted the court's explanation, when read in its entirety, as any form of endorsement

of the credibility of any of the witnesses or the corroboration of any particular testimony. As we read the entirety of the court's response to the jury, unfair comment upon the evidence was avoided. The court did not advise the jurors that a particular witness's testimony had been corroborated or was worthy of belief. (Cf. *People v. Oliver* (1975) 46 Cal.App.3d 747, 752–754 [120 Cal.Rptr. 368].) Rather, the court merely identified the witnesses who may be accomplices – Cross, as a matter of law, and Walton if so found by the jury – and stated the requirements for corroboration of those witnesses before consideration of their testimony. Merely referring to Walton and Hodges as possible corroborating witnesses was neither partial nor misleading, particularly where the court carefully avoided any evaluation of their testimony and specifically advised the jury that no opinion had been expressed "that corroboration exists in any particular witness's testimony or in any particular evidence." The court properly advised the jury upon the standards for consideration of evidence of corroboration, but left to the jury the task of determining the issue. (See *People v. Jones* (1992) 10 Cal.App.4th 1566, 1573–1574 [14 Cal.Rptr.2d 9].) The court did not distort the record, withdraw material evidence from the jury's consideration, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. (*People v. Slaughter, supra,* 27 Cal.4th 1187, 1217–1218.) Moreover, the court's comments were temperate, and neither exceeded the bounds of fair and impartial judicial comment nor suggested the manner in which the jury should consider the evidence. (*People v. Linwood* (2003) 105 Cal.App.4th 59, 74 [129 Cal.Rptr.2d 73].)

These were the only witness against me so by the Judge focusing on them was in D.A. favor. Judge did not tell Jury if they're having problem that means they are having Reasonable doubt or that the D.A didn't meet his burden. That would've been fair

Judge did direct verdict by commenting how only witnesses against could convict – A fair comment would said also how they could acquit

Finally, the court additionally specifically instructed the jury in the terms of CALJIC No. 17.30 that, "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion." Again, we assume the jurors properly followed and correlated the instructions to understand that they, not the trial court, were vested with the duty to determine whether the accomplice testimony was adequately corroborated. (See *People*

*v. Kraft* (2000) 23 Cal.4th 978, 1077 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Welch, supra,* 20 Cal.4th 701, 767; *People v. Frazier* (2005) 128 Cal.App.4th 807, 818 [27 Cal.Rptr.3d 336]; *People v. Ayers* (2005) 125 Cal.App.4th 988, 997 [23 Cal.Rptr.3d 242].) We therefore conclude that the court did not erroneously advise the jury or overstep the bounds of its constitutional privilege to comment on the evidence.

***VI. The Evidence to Support the Murder Conviction.***

We turn to the final issue to resolve: the sufficiency of the evidence to support the murder conviction. Defendant argues that "the evidence of his guilt of murder was marginal and speculative, on its face." He also submits that the reasoning of the federal court in the decision granting the writ of habeas corpus petition "is compelling," and "urges this Court to reach the identical conclusion," even if we do not grant the district court's decision collateral estoppel or law of the case effect.

In our review of the evidence we will adhere to the considerable constraints of the substantial evidence rule. " 'The legal standard is a familiar one: "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" ' [Citation.] The same rule applies to the review of circumstantial evidence. 'The court must consider the evidence and all logical inferences from that evidence . . . . But it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. [Citations.]' [Citation.] Thus, in evaluating a claim of insufficiency of the evidence, the test is not whether we ourselves are convinced that the evidence proves the defendant guilty beyond a reasonable doubt, but whether sufficient substantial evidence supports the jury's conclusion that it does. [Citation.] Only if it clearly appears 'that upon no hypothesis whatever is there sufficient substantial evidence' to support the verdict may

we reverse. [Citation.]" (*People v. Poindexter* (2006) 144 Cal.App.4th 572, 577 [50 Cal.Rptr.3d 489].) In undertaking our review of "the sufficiency of the evidence, we cannot reweigh the evidence, as the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (*People v. Misa* (2006) 140 Cal.App.4th 837, 842 [44 Cal.Rptr.3d 805].)

In light of our limited reviewing function we have no difficulty in finding that the evidence supports the verdict. As the federal court acknowledged, defendant was convincingly identified as one of the three men who abducted Highsmith at gunpoint, forced him into the rear of the blue Oldsmobile, and sped away. Witnesses testified that the men who kidnapped Highsmith, and specifically defendant, wore black gloves and jackets. Shots were fired during the kidnapping. Contrary to the federal court's finding, persuasive evidence connects defendant to the murder of the victim discovered two weeks later with a fatal bullet wound to the head. The victim was found gagged and somewhat bound when he was killed, which suggests that the murder was part of a forced abduction and subsequent execution by more than one person. The pathologist testified that the victim was probably killed on the day he was kidnapped, not some time later. Nothing suggests that the kidnappers released the victim, as he was not seen alive again. Cross's testimony, corroborated partially by Walton – which we must accept on appeal – not only provides defendant with a strong motive to commit the murder, but also places him in the car with Highsmith after the kidnapping with the opportunity to kill the victim.[22] A few hours after the abduction, a witness observed two men in the red Corvette driven away from the kidnapping scene by defendant engaged in throwing something off the San Mateo-Hayward bridge. Three or four hours later that night, defendant was arrested in a vehicle in which black gloves and a black jacket were found. Gunshot residue was detected on the gloves and one sleeve of the jacket. Defendant was also wearing a checkered shirt similar to the one worn by the man who was seen earlier

Walton does corroborate Motive given by Cross Cal App is creating

[22] We observe that Cross's testimony was completely ignored by the federal court. 2 1 e

running from the red Corvette abandoned at the kidnapping scene.  We conclude that the murder conviction is supported by substantial evidence.

## DISPOSITION

Accordingly, the judgment is affirmed.[23]

---

[23] In his petition for writ of habeas corpus, defendant has repeated and embellished upon some of the issues presented on appeal, claimed that his appellate attorney failed to raise additional claims of error recommended by defendant, and charged his trial counsel with ineffective representation.  We have found no merit to the contentions made by defendant, and therefore have denied the petition for writ of habeas corpus by separate order filed this same date.  (*In re Aaron Cooper on Habeas Corpus* (A114440).)

_______________________
Swager, J.

We concur:

_______________________
Marchiano, P. J.

_______________________
Stein, J.

*People v. Cooper, A108723*

| | |
|---|---|
| Trial Court | Alameda County Superior Court |
| Trial Judge | Honorable Jon Rolefson |
| For Defendant and Appellant | James Kyle Gee, under appointment by the Court of Appeal |
| For Plaintiff and Respondent | Bill Lockyer and Edmund G. Brown, Jr., Attorneys General<br>Mary Jo Graves, Chief Assistant Attorney General<br>Gerald A. Engler, Senior Assistant Attorney General<br>Bruce Ortega, Deputy Attorney General<br>René A. Chacón, Supervising Deputy Attorney General |

# EXHIBIT-L

California Court of Appeals Denial of Petition for Writ of Habeas Corpus case#A114440

Dated - 4-06-07



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

2007

| In re AARON COOPER, on Habeas Corpus. | A114440 (Alameda County Super. Ct. No. C125227) |
|---|---|

By the Court:[1]

The petition for writ of habeas corpus is denied.

This order shall be final when the opinion in People v. Cooper, A108723, filed this date, is final. (Cal. Rules of Court, rule 8.264 (b)(E)(4).)

The Clerk of this Court is directed to file a copy of this order in A108723.

Dated: APR - 3 MARCHIANO, P.J. P.J.

[1] Before Marchiano, P.J., Stein, J., and Swager, J.

# EXHIBIT-M

California Supreme Court Attorney Gee Petition for Review dated 5-11-07

No. 1 Crim. A108723

IN THE SUPREME COURT

OF THE STATE OF CALIFORNIA

---

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, vs. AARON LYNDALL COOPER, Defendant and Appellant. | SUPREME COURT NO: ________ |

---

# APPELLANT'S PETITION FOR REVIEW

---

After Decision in the Court of Appeal
First Appellate District, Division One
Appeal from the Superior Court of Alameda County
Honorable Jon R. Rolefson, Judge

---

KYLE GEE (SBN 065895)
2626 Harrison Street
Oakland, CA 94612
(510) 839-9230

Attorney for Appellant
AARON LYNDALL COOPER

Under Appointment
By the Court of Appeal
Under the First District
Appellate Program's
Unassisted Case System

# TOPICAL INDEX

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . vi

APPELLANT'S PETITION FOR REVIEW . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . 2

ISSUES I, II AND III: THE IMPORT OF THE DECISION BY THE UNITED STATES COURT ON FEDERAL HABEAS.

ISSUE IV AND V: THE *FARETTA* AND *MARSDEN* MOTIONS.

ISSUE VI: ADVISING THE JURY OF CUSTODY STATUS.

ISSUE VII: THE RESPONSE TO A JURY QUESTION.

REASONS REVIEW SHOULD BE GRANTED . . . . . . . . . . . . . . 4

ISSUES IV AND V: THE *FARETTA* AND *MARSDEN* MOTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ISSUE VI: ADVISING THE JURY OF CUSTODY STATUS. 7

ISSUE VII: THE RESPONSE TO A JURY QUESTION. . . 7

BRIEF IN SUPPORT OF PETITION FOR REVIEW . . . . . . . . . . 8

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF MURDER. . . . . . . . . 10

II IT VIOLATED THE COLLATERAL ESTOPPEL DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY TO HAVE CONVICTED MR. COOPER ON EVIDENCE PREVIOUSLY DETERMINED BY A FEDERAL COURT ON HABEAS TO HAVE BEEN INSUFFICIENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . . 12

B. The Proceedings in the Lower Court. . . . . . . . . . . . . . 12

1. The Pretrial Rulings. . . . . . . . . . . . . . . . . . . . . 12

2. Proceedings in the Trial Court. . . . . . . . . . . . . 13

C. Collateral Estoppel, Generally. . . . . . . . . . . . . . . . . . 13

D. Application of That Law Here. . . . . . . . . . . . . . . . . . 14

III IT VIOLATED THE LAW OF THE CASE DOCTRINE, ALSO A COMPONENT OF DOUBLE JEOPARDY, TO HAVE RECONVICTED ON EVIDENCE PREVIOUSLY DETERMINED BY THE UNITED STATES DISTRICT COURT TO HAVE BEEN INSUFFICIENT. . . . . . . . . . . . . 16

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . 16

B. The Law of the Case Doctrine. . . . . . . . . . . . . . . . . . 16

C. Application of That Law Here. . . . . . . . . . . . . . . . . . 18

IV IT WAS ERROR TO HAVE DENIAL MR. COOPER'S MOTIONS FOR SELF-REPRESENTATION BROUGHT UNDER *FARETTA* V. *CALIFORNIA*. . . . . . . . . . . . . . . . . . 21

A. The Right of Self-Representation. . . . . . . . . . . . . . . . 21

B. The Proceedings in the Lower Court, Through the Unsuccessful *Faretta* Motions. . . . . . . . . . . . . . . . 21

1. May through July 2004. . . . . . . . . . . . . . . . . . 21

2. September 21, 2004. . . . . . . . . . . . . . . . . . . . . 22

3. September 22, 2004. . . . . . . . . . . . . . . . . . . . . 22

4. September 23, 2004. . . . . . . . . . . . . . . . . . . . . 24

C. Application of That Law to This Case. . . . . . . . . . . . . . 26

1. Mr. Cooper's Assertion Was "Unequivocal." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. Mr. Cooper's Assertion of His Right of Self-Representation Was Not Untimely. . . . . . . 26

V IT WAS ERROR TO HAVE DENIED MR. COOPER'S *MARSDEN* MOTIONS, BECAUSE HIS RELATIONSHIP WITH COUNSEL WAS SO IRREVOCABLY IMPAIRED THAT INEFFECTIVE REPRESENTATION WAS A LIKELY RESULT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A. The *Marsden* Motions on July 6 and September 21, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. The July 6th Motion, Before Judge Goodman. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2. The September 21st Motion, Before Judge Horner. . . . . . . . . . . . . . . . . . . . . . . . . 29

B. The Controlling Law. . . . . . . . . . . . . . . . . . . . . . . . . 31

VI THE TRIAL COURT VIOLATED THE DUE PROCESS AND EQUAL PROTECTION CLAUSES IN ADVISING MR. COOPER'S JURY OF HIS CUSTODIAL STATUS. . . . 33

A. The Issue in the Trial Court. . . . . . . . . . . . . . . . . . . . . 33

B. The Federal Constitutional Issue. . . . . . . . . . . . . . . . . . 33

VII THE TRIAL COURT ERRED IN ITS COMMENTS TO THE JURY ON THE LAST DAY OF DELIBERATIONS. . . 35

A. Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . . 35

B. The Limits on Judicial Comment to a Jury. . . . . . . . . 35

C. Events During the Jury's Deliberations. . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES CITED

### FEDERAL CASES

| | |
|---|---|
| *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441 | 26 |
| *Arizona* v. *California* (1983) 460 U.S. 605 | 14 |
| *Ashe* v. *Swenson* (1970) 397 U.S. 436 | 14 |
| *Bradley* v. *Duncan* (9th Cir. 2002) 315 F.3d 1091 | 14 |
| *Brown* v. *Allen* (1953) 344 U.S. 443 | 18, 19 |
| *Estelle* v. *Williams* (1976) 425 U.S. 501 | 33 |
| *Faretta* v. *California* (1975) 422 U.S. 806 | 6, 21, 23, 24, 26, 27 |
| *In re Winship* (1970) 397 U.S. 358 | 10 |
| *Jackson* v. *Virginia* (1979) 443 U.S. 307 | 10 |
| *Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882 | 31 |
| *Lockhart* v. *Nelson* (1988) 488 U.S. 33 | 15 |
| *United States* v. *Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772 | 32 |
| *United States* v. *Hernandez* (9th Cir. 2000) 203 F.3d 614 | 26 |
| *United States* v. *Walker* (9th Cir. 1990) 915 F.2d 480 | 31 |
| *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258 | 31, 32 |
| *Wyoming* v. *Oklahoma* (1992) 502 U.S. 437 | 17 |

**CALIFORNIA CASES**

*Clemente* v. *State of California* (1985)
40 Cal.3d 202 17

*Davies* v. *Krasna* (1975) 14 Cal.4th 502 17

*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930 31

*Kowis* v. *Howard* (1992) 3 Cal.4th 888 17

*People* v. *Anderson* (1987) 43 Cal.3d 1104 34

*People* v. *Barragan* (2004) 32 Cal.4th 236 13, 17

*People* v. *Burton* (1989) 48 Cal.3d 843 27

*People* v. *Cooper* (2007) 149 Cal.App.4th 500 1,8

*People* v. *Damon* (1996) 51 Cal.App.4th 958 13

*People* v. *Mattson* (1990) 50 Cal.3d 826 17

*People* v. *Michaels* (2002) 28 Cal.4th 486 26

*People* v. *Monterroso* (2004) 34 Cal.4th 743 35

*People* v. *Munoz* (1974) 41 Cal.App.3d 62 31

*People* v. *Rodriguez* (1986) 42 Cal.3d 730 35

*People* v. *Silva* (1981) 114 Cal.App.3d 538 17

*People* v. *Sims* (1982) 32 Cal.3d 468 13, 14

*People* v. *Taylor* (1982) 31 Cal.3d 488 33, 34

*People* v. *Welch* (1999) 20 Cal.4th 701 31

*People* v. *Windham* (1977) 19 Cal.3d 121 26, 27

*Pigeon Point Ranch* v. *Perot* (1963) 59 Cal.2d 227 17

*Tally* v. *Ganaht* (1907) 151 Cal. 418 20

**FEDERAL CONSTITUTIONAL PROVISIONS**

Article VI 5

Fifth Amendment *passim*

Sixth Amendment 3, 21, 31, 35, 38

Fourteenth Amendment *passim*

**CALIFORNIA RULES OF COURT**

Rule 8.500, subdivision (b)(1) 1

**OTHER AUTHORITIES CITED**

CALJIC 3.12 36

Restatement Second of Judgments, section 13 13

Restatement Second of Judgments, section 27 14

IN THE SUPREME COURT

OF THE

STATE OF CALIFORNIA

---

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) |
| Plaintiff and Respondent, | ) |
| vs. | ) |
| AARON LYDELL COOPER, | ) |
| Defendant and Appellant. | ) |

APPELLANT'S PETITION FOR REVIEW

TO: The Honorable RONALD M. GEORGE, Chief Justice, and to the Honorable Associate Justices of the Supreme Court:

Appellant AARON LYDELL COOPER petitions for review of the partially published opinion of the First District Court of Appeal, Division One, filed on April 6, 2007, a copy of which is appended (*People* v. *Cooper* (2007) 149 Cal.App.4th 500).

It is respectfully submitted that review should be granted to settle significant issues of law and to ensure uniformity of decision (Rule 8.500, subdivision (b)(1), California Rules of Court). The Petition is also necessary to exhaust Mr. Cooper's state remedies.

## ISSUES PRESENTED FOR REVIEW

ISSUES I, II AND III: THE IMPORT OF THE DECISION BY THE UNITED STATES COURT ON FEDERAL HABEAS.

I. WAS THERE SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF MURDER, WHERE THE CONVICTION WAS ON SUBSTANTIALLY THE SAME EVIDENCE PREVIOUSLY DETERMINED TO HAVE BEEN INSUFFICIENT ON FEDERAL HABEAS?

II. DID IT VIOLATE THE COLLATERAL ESTOPPEL DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY, TO HAVE CONVICTED ON EVIDENCE PREVIOUSLY DETERMINED TO HAVE BEEN INSUFFICIENT BY A FEDERAL COURT ON HABEAS CORPUS?

III. DID IT VIOLATE THE LAW OF THE CASE DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY, TO HAVE CONVICTED ON EVIDENCE PREVIOUSLY DETERMINED TO HAVE BEEN INSUFFICIENT BY A FEDERAL COURT ON HABEAS CORPUS?

ISSUES IV AND V: THE *FARETTA* AND *MARSDEN* MOTIONS.

IV. DID THE LOWER COURT ERR IN DENYING MR. COOPER'S MOTIONS FOR SELF-REPRESENTATION BROUGHT UNDER *FARETTA* V. *CALIFORNIA*?

V. WAS IT ERROR TO HAVE DENIED MR. COOPER'S *MARSDEN* MOTIONS, BECAUSE HIS RELATIONSHIP WITH COUNSEL WAS IRREVOCABLY IMPAIRED?

ISSUE VI: ADVISING THE JURY OF CUSTODY STATUS.

VI. DID THE TRIAL COURT VIOLATE THE DUE PROCESS AND EQUAL PROTECTION CLAUSES IN ADVISING THE JURY OF MR. COOPER'S CUSTODIAL STATUS?

ISSUE VII: THE RESPONSE TO A JURY QUESTION.

VII. DID THE TRIAL COURT VIOLATE THE SIXTH AND FOURTEENTH AMENDMENTS IN ITS COMMENTS TO THE JURY ON THE LAST DAY OF DELIBERATIONS?

REASONS REVIEW SHOULD BE GRANTED

ISSUES I, II AND III: THE IMPORT OF THE DECISION BY THE UNITED STATES COURT ON FEDERAL HABEAS.

The case has unusual twists, relating to Mr. Cooper's 1995 conviction and his successful habeas petition before the United States District Court. The District Court reviewed the sufficiency of the evidence introduced at Mr. Cooper's first trial in 1995 -- exclusive of improperly admitted evidence not introduced at the retrial -- and concluded that the legally admissible evidence at the 1995 trial was insufficient to sustain a jury verdict of guilty of murder.

With the District Judge's opinion as a guide, Mr. Cooper contended the evidence at the retrial was insufficient to satisfy the Fourteenth Amendment. Mr. Cooper also contended the District Judge's decision precluded reconviction of murder under the collateral estoppel and law of the case doctrines, which are components of Fifth Amendment double jeopardy.

The Court of Appeal found the evidence to be sufficient to support conviction of murder, notwithstanding the District Court's view. Slip opinion, at pages 46-48.

The Court of Appeal further found the collateral estoppel doctrine not to apply, for two reasons: (1) reconviction of murder was in the "same case" as the federal habeas proceeding (Slip opinion, at pages 18-19), although Mr. Cooper submits it was not; and (ii) the District Court's decision on habeas, from which the State did not take an appeal, was somehow not a "final" adjudication of the issues in the federal habeas proceeding (Slip opinion, at pages 19-24), although Mr. Cooper submits it was.

Finally, the Court of Appeal found the law of the case doctrine not to apply, for three reasons: (i) the District Court assertedly had not deemed the quantum of evidence upon which reconviction was based insufficient (Slip opinion, at 26), even though precisely that conclusion was reached by the District Court; (ii) the District Court's conclusion under the Fourteenth Amendment as to insufficient evidence was somehow not a "legal" conclusion (Slip opinion, at 26-27), although clear it was; and (iii) the evidence at the retrial is alleged to have been "substantially different" from that at the 1995 trial (Slip opinion, at pages 28-29), which clearly it was not in any meaningful way relating to Mr. Cooper's alleged guilt of murder.

With deference, Mr. Cooper submits that each of these determinations by the Court of Appeal are erroneous under both federal and state law. Moreover, they run afoul of the Fifth and Fourteenth Amendments, as well as the Supremacy Clause. United States Constitution, Article VI. Mr. Cooper submits that the District Court's decision mandated reversal of the verdict of reconviction of murder, under one or more of the sufficiency of his evidence, collateral estoppel, and/or law of the case arguments. He predicts further that the Court of Appeal's resolution of the matter will inevitably result in another successful federal habeas petition, with the District Court taking an opposite view of the impact of its habeas decision on the retrial.

For all of these reasons, and to achieve a better reasoned resolution of the issues here presented, Mr. Cooper asks this Court to grant review.

ISSUES IV AND V: THE *FARETTA* AND *MARSDEN* MOTIONS.

From the day trial counsel was to be appointed, until commencement of trial, Mr. Cooper struggled to rid himself of his appointed attorney. There was an objection prior to the appointment of the attorney; there were *Marsden* motions seeking to replace the attorney; and there were *Faretta* motions seeking self-representation as a mechanism for avoiding representation by the attorney. All of Mr. Cooper's efforts to replace and/or jettison counsel were unsuccessful.

Mr. Cooper presented two broad claims of error. The first was that the lower court erred in denying his *Faretta* motions. The second was that it was error to have denied his *Marsden* motions. The Court of Appeal rejected both of this contentions. Slip opinion, at 34-38 (the *Faretta* issue) and 29-34 (the *Marsden* issue).

Mr. Cooper now submits that these determinations were in error. As for the *Faretta* issue, the Court of Appeal deemed a "conditional" assertion of the right to have been "equivocal," even though Mr. Cooper completed a *Faretta* form and asserted his *Faretta* rights at various points over several days; and the Court of Appeal found the assertion of the right to have been untimely, even though made a "reasonable" time before trial and accompanied by a "reasonable" explanation for its timing. As for the *Marsden* issue, the Court of Appeal found no error, even though the attorney-client relationship had degenerated to the point of an "irreconcilable conflict" which precluded "effective representation.

In short, this Court should grant review on both issues.

ISSUE VI: ADVISING THE JURY OF CUSTODY STATUS.

In this case, the trial court erroneously took it upon itself to advise the jury that Mr. Cooper was in custody. Mr. Cooper objected in the trial court and in the Court of Appeal, asserting that the error violated his rights under the Fourteenth Amendment.

The Court of Appeal rejected this argument. Slip opinion, at 38-41. Mr. Cooper now urges that review should be granted.

ISSUE VII: THE RESPONSE TO A JURY QUESTION.

On the fifth and final day of deliberations, the jury had questions of the trial court as to accomplices and accomplices corroboration. In the trial court's free-wheeling response to these questions, the trial court effectively acted as a prosecutor, leading the jury through a search for corroboration of the accomplice testimony. Mr. Cooper submits that the result was a violation of the Fifth and Fourteenth Amendments.

The issue was considered and rejected by the Court of Appeal. Slip opinion, at 42-46. Mr. Cooper now asks that review be granted.

## BRIEF IN SUPPORT OF PETITION FOR REVIEW

## STATEMENT OF THE CASE

Mr. Cooper was convicted by a jury of first degree murder and kidnapping. There were firearm arming findings, and prior convictions were admitted. He is serving an indeterminate term of twenty-five-years-to-life (doubled), enhanced by eight years.

Mr. Cooper was first convicted at a jury trial held in late 1995 and early 1996. See, 1-CT 329. In *People* v. *Cooper*, A073986,[1] the judgment was ultimately affirmed by Opinion filed July 6, 2000. 1-CT 129.[2] This led to a series of unsuccessful *pro se* habeas petitions in the Superior Court (1-CT 30, 45), in the Court of Appeal (*In re Cooper on Habeas Corpus*, A096123), and in this Court (*In re Cooper on Habeas Corpus*, S101365).

There followed a Petition for Writ of Habeas Corpus to the United States District Court for the Northern District of California. The United States District Court on April 14, 2004 issued an order granting the petition. 2-CT 443-444, 489. No appeal was taken by the State.

Mr. Cooper's first appearance on remand was on May 13, 2004. 2-CT 486. The retrial commenced on September 29, 2004. 3-CT 631. The jury's verdicts and finding were returned on November 10th. 3-CT 841, 843. On December 3, 2004, Mr. Cooper was sentenced as above-noted. 3-CT 861, 862. Notice of Appeal was timely filed December 6, 2004. 3-CT 866.

---

1/ The record in A073986 was made a part of the record in the Court of Appeal, by an order of augmentation.

2/ Clerk's Transcript, with the volume number noted.

STATEMENT OF FACTS

For the purposes of this Petition, Mr. Cooper generally refers the Court to the factual summary at pages 6 through 16 of the Slip opinion. A more exhaustive summary of the trial evidence, with comparisons to the 1995 trial evidence, can be found at pages 5-34 of the Opening Brief.

In brief, the prosecutor's position was that William "CoCo" Highsmith was abducted August, 1995, by Miltonous "Q" Kingdom, Fred "Country" Cross, K.K. Parker, and appellant Mr. Cooper. Mr. Highsmith's body was found two weeks later in the Oakland hills.

Fred Cross refused to testify at Mr. Cooper's 2004 retrial, and Mr. Cross's testimony from the 1995 trial was read at the retrial. Other 2004 witnesses included Juanita "Goodie" Walton and Zanetta Hodges, who testified they had seen Mr. Highsmith, Mr. Kingdom, Mr. Cross, Mr. Parker, and Mr. Cooper together just before the alleged abduction. The 2004 jury also heard from two employees at "Bottles Liquors," across the street from the location of the alleged abduction. In addition, the jury at the retrial heard from a witness who saw an object thrown from the San Mateo Bridge, by someone in a Corvette which had been present at the time of the alleged abduction, and which was connected to K.K. Parker.

In addition, there were two blue Oldsmobiles involved in the case. A blue Oldsmobile Delta 88 was registered to Mr. Kingdom, and it was present at the time of the alleged abduction. Mr. Cooper was arrested in a 1985 blue Oldsmobile Royale, not asserted to have been involved.

I

THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF MURDER.

A claim of "insufficient evidence" arises under the Fourteenth Amendment. *See Jackson* v. *Virginia* (1979) 443 U.S. 307; and *In re Winship* (1970) 397 U.S. 358. It is an argument Mr. Cooper makes, for two reasons.

First, the evidence of his guilt of murder was marginal and speculative. Second, a United States District Court Judge found the same evidence insufficient to satisfy the Fourteenth Amendment Due Process Clause.

As noted in the Court of Appeal's Slip opinion, at page 4, Mr. Cooper's federal habeas petition included claims for relief for a Confrontation Clause violation, *as well as* for a Due Process Clause violation based on insufficient evidence.

In the District Court's consideration of the Confrontation Clause issue, it found the error prejudicial. 2-CT 462-472. *Thereafter, and in a separate portion of its decision,* the District Court addressed the "sufficiency of evidence" contention, concluding as follows:

> The evidence was sufficient to support the kidnapping, carjacking and weapon possession convictions but not the murder conviction. The state court's presumed rejection of the claim was an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.
>
> 2-CT 476; footnote omitted.

As to the murder conviction, the District Court concluded further:

> Even applying the very deferential standard of review appropriate for a sufficiency of the evidence claim, the evidence was not sufficient to support the murder conviction. No rational trier of fact could have found that the prosecution proved that Cooper had murdered Coco viewing the evidence in the light most favorable to the prosecution.
>
> 2-CT 478.

The District Court was unpersuaded by the "several pieces of evidence" identified by the Attorney General "that purportedly connected Cooper to the killing." 2-CT 479-481. Mr. Cooper submits the District Court's reasoning was compelling, and this Court should grant review and reach the identical conclusion.

II

IT VIOLATED THE COLLATERAL ESTOPPEL DOCTRINE, A COMPONENT OF FIFTH AMENDMENT DOUBLE JEOPARDY TO HAVE CONVICTED MR. COOPER ON EVIDENCE PREVIOUSLY DETERMINED BY A FEDERAL COURT ON HABEAS TO HAVE BEEN INSUFFICIENT.

A. Introduction to the Issue.

The United States District Court examined the evidence presented in 1995 -- exclusive of erroneously admitted hearsay -- and found it insufficient under the Fourteenth Amendment. The next question becomes the effect of the District Court's finding of insufficient evidence, where the evidence at the 2004 retrial did not significantly differ from the 1995 evidence, notwithstanding the Court of Appeal's assertion to the contrary. Slip opinion, at 28-29. The effect of the District Court's order was to bar conviction on substantially the same evidence, under either or both of the "collateral estoppel" and "law of the case" doctrines.

B. The Proceedings in the Lower Court.

1. The Pretrial Rulings.

On June 28, 2004, the case was before Judge Reardon on the defense's motion to dismiss. RT (6/28/04) 1. As for collateral estoppel, Judge Reardon observed that collateral estoppel requires litigation to a "final judgment." RT (6/28/04) 15-16. Judge Reardon deemed "the more interesting question" to concern law of the case, where an appellate court's determination "control[led] the outcome only if the evidence on retrial ... is ... substantially the same." RT (6/28/04) 15-16. Judge Reardon reserved the law of the case issue for the trial court. RT (6/28/04) 34.

2. Proceedings in the Trial Court.

On November 2, 2004, at the conclusion of the prosecution case, the defense sought dismissal of the murder count on "two theories": section 1118.1 and "law of the case." 3-CT 721-723. After the trial court memorialized that it had read the United States District Court's opinion (5-RT 851-852), and after the section 11181.1 motion had been denied (5-RT 856), the trial court turned to law of the case. 5-RT 858.

The trial court deemed "law of the case" not to be "jurisdictional," being instead a policy doctrine applicable only to "appellate courts." 5-RT 862. The trial court viewed the United States District Court on federal habeas not to be a court whose determinations would bind a state court. 5-RT 863-864. The trial court also concluded that law of the case applied only to a determination made in "the same case," and it determined the District Court's decision not to constitute law of the case. 5-RT 865-867. Error occurred in these rulings.

C. Collateral Estoppel, Generally.

The doctrine of res judicata gives a binding effect to a former judgment in subsequent litigation involving the same controversy. *See People* v. *Barragan* (2004) 32 Cal.4th 236, 252. In its "issue preclusion" aspect ("collateral estoppel"), the doctrine prevents a party from relitigating in a second proceeding matters litigated and determined in a prior proceeding. *See People* v. *Sims* (1982) 32 Cal.3d 468, 477 [superseded by statute as explained in *People* v. *Preston* (1996) 43 Cal.App.4th 450, 456]; and *People* v. *Damon* (1996) 51 Cal.App.4th 958, 968.

Restatement Second of Judgments, section 13 reads: " .... [F]or purposes of issue preclusion (as distinguished from merger and bar), 'final judgment' includes any prior adjudication of an issue in another

action that is determined to be sufficiently firm to be accorded conclusive effect." The Restatement Second of Judgments, section 27 provides: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *See*, *also*, *People* v. *Sims*, *supra*, 32 Cal.3d at 484.

Furthermore, the High Court has deemed it "a fundamental precept of common law adjudication ... that an issue once determined by a competent court is conclusive. [Citations.]" *Arizona* v. *California* (1983) 460 U.S. 605, 619. More importantly, the United States Supreme Court determined in *Ashe* v. *Swenson* (1970) 397 U.S. 436, 445 that issue preclusion principles are a component of the Fifth Amendment guarantee against double jeopardy. *See*, *also*, *Bradley* v. *Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098.

D. Application of That Law Here.

The United States District Court ruled on federal habeas that the 1995 evidence -- exclusive of the erroneously admitted statements of Mr. Kingdom -- was insufficient to convict under the Fourteenth Amendment. However, the District Court in its order added the following: "'[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction.' *Lockhart* v. *Nelson* [(1988)] 488 U.S. 33, 40 ...." 2-CT 481.

The question thus becomes whether the United States District Court's ruling on the Fourteenth Amendment issue precluded Mr.

Cooper's 2004 conviction on the *same* evidence found constitutionally deficient. Mr. Cooper submits that this question must be answered yes, because collateral estoppel is a component of Fifth Amendment double jeopardy. While the Fifth Amendment might have allowed Mr. Cooper's reconviction on substantially different evidence (*Lockhart* v. *Nelson*), it did not permit his reconviction on the same evidence.

The Court of Appeal deemed collateral estoppel not to apply, concluding the California criminal prosecution and federal habeas proceeding were part of the "same case." Slip opinion, at p. 18-19. With deference, Mr. Cooper submits that a state criminal prosecution and a federal habeas proceeding are not the "same case," even though they involve the same parties and same subject matter, any more than civil cases in different counties or states would be the "same case," simply because the parties and subject matter were the same.

The Court of Appeal also deemed the District Court's decision not "final" for purposes of collateral estoppel. However, the District Court's decision was not appealed by the State to the Ninth Circuit. The "finality" of the District Court's decision was clear.

In sum, the United States District Court's decision satisfied all elements of the collateral estoppel doctrine, and reconviction of murder was barred. This Court should grant review and address this unusual issue of criminal and constitutional law.

III

IT VIOLATED THE LAW OF THE CASE DOCTRINE,
ALSO A COMPONENT OF DOUBLE JEOPARDY,
TO HAVE RECONVICTED ON EVIDENCE PREVIOUSLY
DETERMINED BY THE UNITED STATES
DISTRICT COURT TO HAVE BEEN INSUFFICIENT.

A. Introduction to the Issue.

Judge Reardon correctly concluded that -- in the absence of substantially greater evidence at retrial -- reconviction of Mr. Cooper would be barred by the law of the case doctrine. The trial court, however, found various theories on which to avoid the effect of the United States District Court's decision, in effect taking the position that a United States District Court's ruling on an issue of federal constitutional law would not bind a California trial court. With deference, the trial court here misinterpreted the roles of a United States District Court, on the one hand, and a state trial court, on the other, in terms of resolution of federal constitutional issues.

As has been discussed, at pages 4 and 5, above, the Court of Appeal found the law of the case doctrine not to apply for a number of reasons, among them that there was different evidence at the retrial. Mr. Cooper submits -- with deference -- that none of the bases on which the Court of Appeal relied withstands scrutiny.

B. The Law of the Case Doctrine.

Under the law of the case doctrine: ".... [W]hen an appellate court '"states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the trial court and

upon subsequent appeal ....'" [Citation.]" *People* v. *Barragan*, *supra*, 32 Cal.4th at 246. "Absent an applicable exception, the doctrine 're-quir[es] both trial and appellate courts to follow the rules laid down upon former appeal whether such rules are right or wrong.' [Citation." *Ibid.*

The law of the case doctrine does not limit the evidence at a retrial. *Id.*, at 247. "The law-of-the-case doctrine ... controls the out-come only if the evidence on retrial ... of an issue is substantially the same as that upon which the appellate ruling was made. [Citations]." *People* v. *Mattson* (1990) 50 Cal.3d 826, 850.

While it is often said the law of the case doctrine operates only within "the same case" (*Davies* v. *Krasna* (1975) 14 Cal.4th 502, 507), a pretrial writ decision has law of the case effect, if the issue was fully briefed and decided. *See Kowis* v. *Howard* (1992) 3 Cal.4th 888, 894. *Cf. Pigeon Point Ranch* v. *Perot* (1963) 59 Cal.2d 227, 230-233; and *People* v. *Silva* (1981) 114 Cal.App.3d 538, 549.

It is also said that the law of the case doctrine is "merely a rule of procedure," which "does not go to the power of the court," and "which will not be adhered to where its application will result in an unjust decision." *Clemente* v. *State of California* (1985) 40 Cal.3d 202, 212. However, the "principle ground for making an exception to the doctrine of law of the case is an intervening or contemporaneous change in the law. [Citations.]" *Ibid.*[3]

Collateral estoppel and law of the case are each issue preclusion doctrines. Both are components of double jeopardy barring retrial on

---

3/ Federal courts recognize law of the case as a complement to collateral estoppel. *Wyoming* v. *Oklahoma* (1992) 502 U.S. 437, 446.

substantially the same evidence which was previously found legally deficient.

C. Application of That Law Here.

The trial court took the view that the Federal habeas proceeding was not in the "same case," could be ignored on policy grounds, and could be ignored because not issued by a court whose decisions were binding on California trial courts. The Court of Appeal took the view that the District Court had not found the quantum of evidence insufficient, that the District Court's confusion was not a "legal" one, and that the evidence in 2004 was "substantially different."

As for the "same case" question, the federal habeas proceeding was either in the "same case" or it was not. If it was not, collateral estoppel barred his reconviction. If it was, law of the case barred his reconviction. Under one doctrine or the other, Mr. Cooper is entitled to relief.

As for the trial court's conclusion it was free to ignore the District Court's conclusion, Justice Frankfurter observed more than a half-century ago:

> Congress could have left the enforcement of federal constitutional rights governing the administration of criminal justice in the States exclusively to the State courts. ... It is not for us to determine whether this power should have been vested in the federal courts.
>
> *Brown* v. *Allen* (1953) 344 U.S. 443, 499.

As explained further by Justice Frankfurter, an issue which "calls for interpretation of the legal significance of [historical] facts" in the federal constitutional context is resolved by a District Judge. *Id.*, at 507.

"It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law." *Id.*, at 510. Accordingly, a United States District Court decision on an issue of federal constitutional law cannot be ignored by a state court.

Turning to the Court of Appeal's views, it is incorrect that the District Court's decision did not address the "sufficiency of the evidence" (Slip opinion, at 26), as this view ignores the two distinct portions of the District Court's decision. The Confrontation Clause issue was addressed first, at 2-CT 461-475. *However, there was an entirely separate portion of the decision, addressing the sufficiency of the evidence claim. 2-CT 476-481.*

As for the assertion the District Court did not reach a "legal" conclusion (Slip opinion, at 26-27), that is similarly incorrect. While a jury verdict is a "factual" finding, an "insufficient evidence" finding is a legal conclusion: The quantum of evidence adduced at trial did not satisfy the Fourteenth Amendment, for the reason that no reasonable juror could render a verdict of guilt beyond a reasonable doubt on the trial evidence. This is a "constitutional" determination, and not a "factual" determination.

Finally, the Court of Appeal found "substantially different" evidence on four bases: (a) Kingdom's statement was not introduced; (b) Juanita Walton "corroborated" Hodge's testimony that Mr. Cooper was present at the scene of the kidnapping; (c) Juanita Walton "corroborated" Cross's testimony as to the reason for the kidnapping; and (d) Mr. Cooper's alibi witness did not testify at the retrial. Yet none of these elements relates to the shortfall found by the District Court, which was in *the evidence to connect Mr. Cooper with the murder*, with the District

Court accepting the sufficiency of the evidence of kidnapping. Clearly as to the murder count, there was no "substantially different" evidence.

As for the removal of Mr. Kingdom's statement from the evidentiary calculus, that is irrelevant, for the reason that the District Court's evaluation of the sufficiency of the 1995 evidence was without reference to Kingdom's statement. See, 2-CT 476-481. With regard to Ms. Walton's "corroboration" of Hodges's and Cross's testimony, that is also irrelevant, as the District Court accepted the truth of those witnesses' 1995 testimony. *Ibid.* Finally, the omission of alibi witnesses is equally irrelevant, because the District Court's analysis did not even consider the evidence of an alibi. *Ibid.*

In summary, there was no "substantially different evidence" at the retrial. Simply disagreement with the United States District Court did not excuse refusal to credit the United States District Court's conclusions. *See Tally* v. *Ganaht* (1907) 151 Cal. 418, 421. The law of the case doctrine, as an issue preclusion component of double jeopardy, or as an independent state doctrine, barred reconviction on the same evidence. This Court should grant review to address this companion issue of criminal and constitutional law.

IV

## IT WAS ERROR TO HAVE DENIAL MR. COOPER'S MOTIONS FOR SELF-REPRESENTATION BROUGHT UNDER *FARETTA* V. *CALIFORNIA*.

A. The Right of Self-Representation.

In *Faretta* v. *California* (1975) 422 U.S. 806, 834 (hereinafter, "*Faretta*"), the United States Supreme Court held that a criminal defendant has a right to represent himself if he so desires, a right guaranteed by the Sixth and Fourteenth Amendments to the Constitution.

B. The Proceedings in the Lower Court, Through the Unsuccessful *Faretta* Motions.

1. May through July 2004.

The Court of Appeal summarized matters at pages 29-31 and 35-36 of the Slip opinion. A more detailed summary of these events appears at pages 67 through 79 of Mr. Cooper's Opening Brief. For the purposes of this issue, Mr. Cooper notes the following exchange on July 6, 2004, after Judge Reardon had advised Mr. Cooper there was a courtroom available to try the case:

> [THE DEFENDANT]: "I'll go to trial."
>
> THE COURT: With Ms. Levy as your lawyer?
>
> THE DEFENDANT: For right now.
>
> THE COURT: What does that --
>
> THE DEFENDANT: I want to go pro per. So for right now, yeah.
>
> RT (7/6/04) 5.

After further colloquy, the matter was assigned to Judge Rolefson for trial. RT (7/6/04) 7. However, on July 8th, the case was "transferred back" to Judge Reardon's department "to set," which "takes it out of the trial department," RT (7/8/04) 1-2.

2. September 21, 2004.

Judge Reardon referred the matter to another court to hear the *Marsden* motion. RST 12. The *Marsden* motion was heard and denied by Judge Horner. RT (*Marsden*-II) 4-22.[4]

When the case was again before Judge Reardon, the court was alerted that Mr. Cooper wished to represent himself, which Mr. Cooper confirmed. The court advised Mr. Cooper he would not be given a continuance," Mr. Cooper asserted he "would like to go to trial" but "need[ed] to get my records from [counsel]." When asked whether he was "ready" if he received everything today," Mr. Cooper answered: "Yeah." RST 13. The court advised Mr. Cooper he needed to complete a form, and the matter was continued to the following day, when "Ms. Levy would bring you all your boxes and everything." *Ibid.*

3. September 22, 2004.

When the matter was called, the "*Faretta* form" had been completed. RST 15. When asked if he still wished to represent himself, Mr. Cooper's response was: "Some of the discovery ... is missing." *Ibid.* This prompted Ms. Levy to explain she needed until Monday to redact the police report. RST 16.

---

4/ Reporter's Transcript of the *Marsden* hearing on September 21, 2004.

When the court began to review the *Faretta* form, Mr. Cooper stated: "One of the reasons I was going pro per is so I can appeal that [*Marsden*] motion." RST 17. Mr. Cooper stated: "He denied me getting a new attorney. I want to appeal that. It wasn't my first choice to want to go pro per. The only reason I wanted to get rid of the lady, she cursed me out." *Ibid.*

The court observed: "It sounds like an equivocal request. It does-n't sound to me like you really want to represent yourself." RST 18. When Mr. Cooper stated, "That's the only option I have," the court agreed that, "if she is not willing to file a writ in regard to the denial of the *Marsden* motion, then you're right." *Ibid.*

Thereafter, the following exchange occurred:

> THE COURT: You can bring a writ. Are you ready to go to trial?
>
> THE DEFENDANT: I'm ready to do the writ first.
>
> THE COURT: You can do the writ at the same time you are in trial.
>
> THE DEFENDANT: I need all my discovery. I also need to read the Kingdom transcript. I didn't read any of that.
>
> THE COURT: It doesn't sound like you're ready to go.
>
> THE DEFENDANT: I need to read that paperwork. I need to read it.
>
> *THE COURT: Are you ready to go to trial?*
>
> *THE DEFENDANT: I need to read my paperwork.*

*THE COURT: Is that a "no"?*

*THE DEFENDANT: That's a "no."*

*THE COURT: Your motion is denied as untimely.*

* * *

THE COURT: This matter has been on my trial calendar since --

MS. LEVY: Last Monday.

MR. JACOBSON: September 13th.

THE COURT: And you're raising this with me yesterday afternoon. *And being unprepared to go means it's untimely.*

THE DEFENDANT: I told my lawyer that I wanted to fire her last Monday because of the issue that we had.

THE COURT: Okay.

THE DEFENDANT: She didn't bring it up to you. *This is my only option is to get rid of this attorney.* This attorney is not working with me on this case.

THE COURT: Well, your motion is denied.

RST 19-20; emphasis added.

The matter was left on a standby basis. RST 21.

4. <u>September 23, 2004</u>.

The trial court agreed to reconsider Mr. Cooper's *Faretta* motion, because there would be no trial court available until September 29th. RST 23-25. When Mr. Cooper was asked if he would be prepared to

represent himself by that time, Mr. Cooper responded: "Depends on how many pages the Kingdom transcript is." After the prosecutor reported that there were "between 1500 and 2000 pages," Mr. Cooper stated he did not know if he would "be ready on the 29th." He asserted "at least two weeks would be reasonable to allow me to read the transcript." RST 25-26.

After Mr. Cooper stated that it was not his "first choice to go pro per," the trial court and Mr. Cooper concluded the hearing as follows:

> [THE COURT]: Given the comments you made this morning, I would not allow you to represent yourself. *You indicated to me,* in front of me and a hundred people, *you want to have a lawyer represent you. To me, that is an equivocal statement of a desire to represent yourself,* so --
>
> *THE DEFENDANT: But the thing is, I would prefer to have counsel represent myself. As the situation presents itself right now, I have to represent myself based on the deterioration of the relationship that can't be repaired between me and the counselor right now. That's what I'm saying. It's preferable for me to have counsel.*
>
> THE COURT: And the Court has found that you have competent counsel and for whom there is no reason to discharge her.
>
> RST 27; emphasis added.

On September 29th -- in Mr. Cooper's absence -- the matter was again assigned to Judge Rolefson for trial. RST 29.

C. Application of That Law to This Case.

1. Mr. Cooper's Assertion Was "Unequivocal."

The law draws a distinction between "equivocal" and "conditional" requests for self-representation. A "conditional" request is one in which the defendant seeks to represent himself because he absolutely does not want his current attorney but has be unable to persuade the court to appoint another attorney. The request is "conditional" because the defendant desires to represent himself if the only alternative is representation by the unwanted attorney. *See Faretta* v. *California*, 422 U.S. at 810 n. 5; *People* v. *Michaels* (2002) 28 Cal.4th 486, 522-524; *United States* v. *Hernandez* (9th Cir. 2000) 203 F.3d 614, 621; and *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441, 1445.

Mr. Cooper completed a *Faretta* form, and he repeatedly asked to represent himself over the course of several days. His assertion of his right to self-representation was not "equivocal."

2. Mr. Cooper's Assertion of His Right of Self-Representation Was Not Untimely.

The Court explained in *Windham*:

> *Our imposition of a "reasonable time" requirement* should not be and, indeed, *must not be used* as a means of limiting a defendant's constitutional right of self-representation. *We intend only* that a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice.
>
> *People* v. *Windham* (1977) 19 Cal.3d 121, 128 n. 5; original emphasis omitted; other emphasis added.

The Court thereafter stated in *Windham*:

> *When the lateness* of the request and even the necessity of a continuance *can be reasonably justified the request should be granted.* When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation *without any ability to test the request by a reasonable standard.*
>
> *Ibid.*; emphasis added.

As further explained by the Court, in *People* v. *Burton* (1989) 48 Cal.3d 843, 852: "The 'reasonable time' requirement is intended to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." The Court continued in *Burton* by contrasting the California rule with the federal rule, where the latter allows a United Stated District Court to deny a pre-empanelment *Faretta* motion if it finds a purpose to delay. *Id.*, at 854. "This differs little as a practical matter from the standard we set out in *Windham* ..., except that we place the burden on the defendant to explain his delay when he makes the motion as late as defendant did here.

Accordingly, a defendant who advances a "reasonable" justification for the timing of a pre-trial motion has not forfeited the constitutional right of self-representation. It is only a motion unaccompanied by a "reasonable" justification that the lower court needs a "reasonable standard" under which to exercise its "discretion." The trial court here made no "finding" of intent to delay, and there had been no forfeiture of the right of self-representation. Mr. Cooper urges the Court to grant review.

V

# IT WAS ERROR TO HAVE DENIED MR. COOPER'S *MARSDEN* MOTIONS, BECAUSE HIS RELATIONSHIP WITH COUNSEL WAS SO IRREVOCABLY IMPAIRED THAT INEFFECTIVE REPRESENTATION WAS A LIKELY RESULT.

## A. The *Marsden* Motions on July 6 and September 21, 2004.

There was a *Marsden* motion before Judge Goodman on July 6, 2004, and another before Judge Horner on September 21, 2004. Those proceedings are discussed at pages 29 through 31 of the Slip opinion, and discussed in greater detail at pages 85 through 89 of Mr. Cooper's Opening Brief.

### 1. The July 6th Motion, Before Judge Goodman.

Mr. Cooper explained, as follows: When counsel had been appointed, she had "said she did not want the case" and had "told the judge and D.A. my strategy and my interpretation of the case, which I felt violated the attorney-client privilege." He had seen his investigator only once and had wanted to give her the names of witnesses. He complained of counsel's "skills" at earlier hearings. Counsel had not "conferred with [him] on her defense strategy," and he questioned whether counsel had a strategy. Counsel was refusing to call alibi witnesses. RT (*Marsden*-I) 2-6.[5]

> Every time we talk, we can't see eye to eye. She is arguing, cutting me off. I am cutting her off. And we cannot

---

5/ Reporter's Transcript of the *Marsden* hearing on July 6, 2004.

> operate in a conducive fashion at all. She does not want to explain the law to me. And my interpretation of the law is always wrong. It -- there is just no way we can work together. ...
>
> RT (*Marsden*-I) 6-7.

Counsel confirmed that she had told Mr. Cooper at the outset she "did not want the case." Counsel explained Mr. Cooper had not seen the investigator for a month because she had been "out in the streets trying to locate some of these witnesses from this 1995 homicide." Counsel conceded she had failed to ask that the prosecutor make an offer of proof because it was premature. RT (*Marsden*-I) 7-10.

Counsel continued: "From the minute I met Mr. Cooper, one of our problems has been Mr. Cooper told me that I am supposed to file and do whatever he wants. I have also told Mr. Cooper that his ... alibi defense was terrible." Counsel conceded that "we do not see eye to eye." RT (*Marsden*-I) 14-15.

Mr. Cooper replied, as follows:

> .... [F]or her to fight me tooth and nail on every issue and then say my alibi witnesses are liars, in essence, is saying she does not believe me because my alibi witnesses are saying where I was at the time of the crime. [¶] If she does not believe my alibi witnesses, she does not believe me.
>
> RT (*Marsden*-I) 16-17.

The *Marsden* motion was denied. RT (*Marsden*-I) 25.

2. The September 21st Motion, Before Judge Horner.

Mr. Cooper asserted that on September 7th he had attempted to explain to counsel his "concern about the case." "I immediately got blew

up on and cursed out." Counsel had "told [him] she hates [him] and called [him] an asshole." This had not been "first time we had a run-in." "When she cursed me out ... and said she hates me and called me an asshole, that was the last straw." Mr. Cooper repeatedly described the "relationship" as "irreconcilable." He could not discuss the case or strategy with counsel "without her blowing up on me." RT (*Marsden*-II) 4-6.[6]

Counsel confirmed having been angry with Mr. Cooper. She admitted she "blew up" but denied having told him she hated him or having called him "an asshole" [she had used "other words"]. She also admitted having "walked out," but she alleged she had subsequently apologized. "I am convinced we can work together." RT (*Marsden*-II) 7-9.

Mr. Cooper continued by asserting: "Every time she and I talk, there's always a blowup." RT (*Marsden*-II) 9. "Right now, as of today, we have not even talked about trial strategy at all." RT (*Marsden*-II) 9-10.

Counsel expressed "no doubts" that she could "work with Mr. Cooper" and that she had "sufficient resources" to devote to the trial. RT (*Marsden*-II) 13. After Mr. Cooper discussed "irreconcilable differences," counsel's sarcasm, the failure to discuss the defense strategy, and counsel's hatred of him, counsel conceded she did not yet have a opening statement. RT (*Marsden*-II) 14-18.

---

6/ Reporter's Transcript of the *Marsden* hearing on September 21, 2004.

The trial court did not "feel that the concern expressed by Mr. Cooper" was sufficient under the case law. The motion was accordingly denied. RT (*Marsden*-II) 20-22.

B. The Controlling Law.

California recognizes the functional relationship between trust and communication, on the one hand, and effective representation, on the other. Refusal to appoint substitute counsel upon a defendant's request violates his Sixth Amendment right to the assistance of counsel "if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel 'have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" *People* v. *Welch* (1999) 20 Cal.4th 701, 728. The circumstances here implicated the latter prong of this disjunctive test. *See Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 938; and *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66.[7]

Mr. Cooper's distrust of, and alienation from, counsel demonstrates an irreconcilable conflict. As in *Walker*, appellant's "lack of confidence in his attorney arose out of a disagreement over trial preparation and potential witnesses, rather than any general unreasonableness or manufactured discontent." Mr. Cooper raised a multitude of concerns, which were growing worse.

---

[7]/ Federal cases recognize that a breakdown in the attorney-client relationship requires the trial judge to substitute counsel on request. *See Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882, 888; *United States* v. *Walker* (9th Cir. 1990) 915 F.2d 480, 481-483; and *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258, 1259-1261.

A defendant's lack of trust in his counsel, when based on legitimate reasons, is grounds for substitution of counsel. *See United States* v. *Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, 779; and *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258, 1260. Mr. Cooper's counsel's responses "tended to confirm that the course of the client-attorney relationship had been a stormy one, with quarrels, bad language, threats, and counter threats." *Adelzo-Gonzalez*, *supra*, 268 F.3d at 777. Moreover, counsel's concession of having no idea as to an opening statement on the eve of trial was compelling evidence of the absence of a strategy and a reason for distrust of counsel.

Under these circumstances, the denial of Mr. Cooper's request to substitute attorneys, where the relationship was "antagonistic, lacking in trust, and quarrelsome," was erroneous. *Id.*, at 780. Review should be granted to address this issue and further clarity this area of California law.

VI

## THE TRIAL COURT VIOLATED THE DUE PROCESS AND EQUAL PROTECTION CLAUSES IN ADVISING MR. COOPER'S JURY OF HIS CUSTODIAL STATUS.

A. The Issue in the Trial Court.

On October 18, 2004, during preinstructions to the jury, the jury was advised that Mr. Cooper was in custody and that "the fact that Mr. Cooper is in custody . . . is not evidence, is not to be considered by you as such." 1-RT 141-142. On the following court day, defense counsel articulated Mr. Cooper's complaint that "the court [had] informed the jurors that Mr. Cooper is in custody," which Mr. Cooper "felt was prejudicial." 1-RT 147. The trial court conceded its error (1-RT 147) but granted no relief, deeming no prejudice to have resulted because the jury was going to figure out during the trial that he was in custody. 1-RT 147-148.

Mr. Cooper submits that the trial court was correct in conceding error. He submits further that the error was prejudicial.

B. The Federal Constitutional Issue.

There does not appear to be a California case squarely on point. However, the defendant in *People* v. *Taylor* (1982) 31 Cal.3d 488 had been convicted of voluntary manslaughter, after being tried in jail clothing. *Id.*, at 491-492. This Court concluded that "the refusal to allow him to wear civilian clothing at trial violated his rights to due process and equal protection. *Id.*, at 491; *see*, *also*, *id.*, at 493.

*Taylor* relied heavily on *Estelle* v. *Williams* (1976) 425 U.S. 501. "To implement and protect the presumption of innocence, 'courts must be

alert to factors that may undermine the fairness of the factfinding process.' (*Estelle*, *supra*, 425 U.S. at p. 503 ....)" "'To impose the condition on one category of defendants, over objection, would be repugnant to the concept of equal justice embodied in the Fourteenth Amendment. [Citation.]' (*Estelle* v. *Williams*, *supra*, 425 U.S. at pp. 505-506 ....)" *Taylor*, *supra*, at 495.

Mr. Cooper recognizes there is a "quantitative" difference between that which occurred here and that which occurred in *Taylor*. However, there is no "qualitative" defense between wearing of jail clothing, and the trial court's revelation at the outset of custody status. Every time the jurors arrived in court to find Mr. Cooper present with the bailiff, they would be reminded of his custodial status. As a result, Mr. Cooper's Fourteenth Amendment due process and equal protection rights were violated on a daily basis.

The trial court instructed the jury it should not weigh Mr. Cooper's custodial status against him. However: ".... [J]urors should not be permitted to be influenced by evidence that as a matter of law they cannot consider but as a matter of fact they cannot ignore." *People* v. *Anderson* (1987) 43 Cal.3d 1104, at 1121. "Jurors of ordinary lay persons" have psychological limits with respect to what we can expect of them, and one such limit is that they should not have been expected to ignore Mr. Cooper's custodial status in deciding Mr. Cooper's guilt. Mr. Cooper asks this Court to grant review.

VII

THE TRIAL COURT ERRED IN ITS COMMENTS TO THE JURY ON THE LAST DAY OF DELIBERATIONS.

A. Introduction to the Issue.

The trial court in this case made comments to the jury on its last of five days of deliberations, which exceeded that permissible under the Sixth and Fourteenth Amendment. Prejudicial error occurred.

B. The Limits on Judicial Comment to a Jury.

As explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 772: "'The court's comments must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. [Citation.]' [Citation." While there is no absolute bar against judicial comment on the evidence or witnesses with a deliberating jury: "Certainly we would not take the risk that one or more members of a deadlocked jury were influenced to reconsider their views or abandon reasonable doubts by judicial comments which had not been 'rigorously scrutinize[d]' for 'scrupulous' fairness. [Citation.]" *Id.*, at 770; footnote omitted. "'"The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power."' [Citations.]" *People* v. *Monterroso* (2004) 34 Cal.4th 743, 780.

C. Events During the Jury's Deliberations.

On the jury's fourth day of deliberations, the jury sent a series of notes to the trial court, having to do with accomplices and corroboration.

3-CT 795; 5-RT 1011-1013. The last read: "Please clarify the following with some examples: Circumstantial evidence. Corroboration evidence." 3-CT 794.

On the fifth and last day of deliberations, the trial court addressed how the jury would determine whether a witness was an accomplice, which the trial court explained was "easy" as to Mr. Cross (an accomplice as a matter of law) and a matter for the jury to resolve as to Goodie Walton. 5-RT 1018-1021. In addressing corroboration, the jury was again read CALJIC 3.12. The trial court next discussed the potential, corroborating evidence in the case, and at this point the trial court crossed the line into improper comment.

> [THE COURT]: . . . . [T]he first question . . . you have to resolve is, has [Ms. Walton] been shown to us by preponderance of the evidence to be an accomplice, also? Because if she has, we can't consider that in corroborating Mr. Cross. You cannot corroborate one accomplice with another, so you have to look elsewhere.
>
> But if you you've decided, no, it hasn't been proven to us that she is an accomplice, yes, you can look at her testimony to see if there's anything in there tending to connect Mr. Cooper with the commission of any of these crimes. . . . .
>
> Well, let's say that . . . you've decided she's an accomplice as well, or let's say that there was nothing in her testimony that you believe which tends to connect Mr. Cooper, you look elsewhere. An obvious next place to look would be Ms. Hodges. Zanetta Hodges I believe was her name ....
>
> There's no allegation that she's an accomplice, so you don't have to worry about one accomplice corroborating another. You look at her testimony to see, is there

> anything there which we believe in her testimony which tends to connect Mr. Cooper, *or tends to show that he was one of these three men?* If you were to find that there was not, and if you decide there is, then you may have -- you know, *if you decide that you found a thing tended to connect the defendant with the commission of these crimes, and her testimony which you believe, done.* You have now corroborated ... Mr. Cross, and if you decided that Goodie Walton is also an accomplice, you've corroborated her sufficiently, because you found corroborating evidence tended to connect the defendant with the commission of these crimes if that's what you found.
>
> If you didn't find it in Ms. Hodges's testimony, you look elsewhere throughout the testimony you've been presented to see if there's any other evidence you may find which may tend to connect this defendant, Mr. Cooper, with the commission of any of these crimes. So you basically go through step-by-step with each witness, if you would like, or each group of evidence, but *as soon as you found one thing which you believe tends to connect the defendant on its face with the commission of these crimes, that's what's needed for corroboration, and now you can bring back in, the testimony and consider it in its entirety.*
>
> 5-RT 1023-1025; emphasis added.

After the jury had been excused for further deliberations, defense counsel raised objected to what had occurred. 5-RT 1029. This led the trial court to recall the jury to give the following additional instruction:

> [THE COURT]: Nothing I said was intended to express any opinion that I might have about any of those things.
>
> What I was doing was talking to try to aid you in your analysis of the evidence, but please do not take anything I said as any kind of opinion on my part or any indication of the conclusion on my part that any requirements

> or any kind are or are not satisfied, or that the existence of corroboration may be found in any particular evidence.
>
> 5-RT 1035.

With deference to the trial court, the explanation to the jury regarding corroboration with Zanetta's and/or Goodie's testimony read like a prosecutor's closing argument. Moreover, Mr. Cooper has noted this Court's acknowledgment of the limited utility of admonitions to a jury, where the admonition is to "ignore" something. Furthermore, the issue of corroboration was particularly acute in this case, where Mr. Cross's testimony lay at the core of the prosecutor's evidence. In addition, this Court should be mindful of the timing of the trial court's comments, coming on the fifth and final day of lengthy deliberations.

For all of these reasons, the Sixth and Fourteenth Amendment were violated. Review should be granted in this issue.

## CONCLUSION

For the reasons stated, Mr. Cooper respectfully urges that this Court should grant review. On review, the judgment of conviction should be reversed in its entirety.

Dated: May 11, 2007

Respectfully submitted,

KYLE GEE

Attorney for Appellant
AARON LYDELL COOPER

CERTIFICATE OF WORD COUNT

IN COMPLIANCE WITH RULE 33, SUBDIVISION (B)

I hereby certify, pursuant to Rule 33, subdivision (b), California Rules of Court, that the attached brief contains 8375 words. In this certificate, I am relying on the word count produced by Wordperfect 5.1.

Dated: May 11, 2007

KYLE GEE

Attorney for Appellant
AARON LYDELL COOPER

EXHIBIT- N

California Supreme Court Denial of Petition for Review case# S152666 dated July 25, 2007

Court of Appeal, First Appellate District, Div. 1 - No. A108723
**S152666**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

THE PEOPLE, Plaintiff and Respondent,

v.

AARON LYNDALL COOPER, Defendant and Appellant.

---

The petition for review is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JUL 2 5 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

EXHIBIT- O

California Supreme Court Denial of State Petition for Habeas Corpus case# S153965

**S153965**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re AARON L. COOPER on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

JAN 16 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611017167
Cashier ID: almaceh
Transaction Date: 03/19/2008
Payer Name: Phil Angelides, Treasurer

---

WRIT OF HABEAS CORPUS
For: a l cooper
Amount: $5.00

---

CHECK
Check/Money Order Num: 4466
Amt Tendered: $5.00

---

Total Due: $5.00
Total Tendered: $5.00
Change Amt: $0.00

c08-1516 si

Checks and drafts are accepted subject to collections and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.



Mr. Aaron L. Cooper E-28703
K.V.S.P. - ASU2-159
P.O. Box 5102
Delano, Ca. 93216
RECEIVED
MAR 19 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
new case
UNITED STATES POSTAGE
PITNEY BOWES
$ 06.65⁰
02 1A
0004604192
MAR 17 2008
MAILED FROM ZIP CODE 93215
RECEIVED
MAR 19 2008
BY:
To: United States District Court
for the Northern District of California
450 Golden Gate Ave 16th floor
San Francisco, Ca. 94102
Legal Mail
3/16/08