United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON LYNDALE COOPER,

          Petitioner,

    v.

JEANNE S. WOODFORD,

          Respondent.

_____/

No. C 08-1516 SI (pr)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

## INTRODUCTION

This matter is now before the court for consideration of the merits of Aaron Lyndale Cooper's pro se petition for writ of habeas corpus concerning his conviction in the Alameda County Superior Court. For the reasons discussed below, the petition will be denied.

## BACKGROUND

The habeas petition here challenges Cooper's conviction of kidnapping and murder at a 2004 trial. The trial was the second trial for Cooper, and was held after this court granted his habeas petition challenging his conviction after the first trial.

To summarize, the evidence showed that three men (identified by some witnesses as Cooper, Cross and Kingdom) were in a parked blue car near an intersection in Oakland looking for a man named "Coco." A Corvette pulled up with Coco in the passenger seat. Coco exited and talked to the three men briefly and was then put in to the trunk of the blue car at gunpoint. The blue car drove away with Coco in the trunk and the Corvette was driven away by a man (identified by a witness as Cooper). Coco's dead body was found two weeks later in the Oakland

hills.  He had been gagged and shot in the head.  Cooper was arrested in Oakland seven hours after the abduction, Cross was arrested in Mississippi about a week after the abduction and Kingdom was arrested in Mississippi about three months after the abduction.  Cross and Cooper were tried jointly and both were convicted.  Kingdom, who was arrested just about a month before the trial of Cross and Cooper, was tried separately.   Cross' conviction was set aside on direct appeal, and Cooper's conviction was set aside in his federal habeas action.

A.    <u>The Crimes</u>

The California Court of Appeal described in detail the evidence presented at trial.

On August 16, 1995, the "very decomposed" body of William Highsmith, known by the nickname "Coco," FN7 was discovered in a wooded area of the Oakland hills near Skyline Reservoir. The "bottom part" of the victim's short-sleeve T-shirt had been torn away. A piece of cloth, apparently from the T-shirt, had been tied around his face and mouth so that it separated his teeth; a cloth gag had also been pushed into his mouth. The victim's jacket had been pulled down in the back and around his wrists to restrict the movement of his arms. His pants and boxer shorts had been pulled down to the level of his thighs. Scissors were found a few feet away from the body on the ground.

FN7. We will sometimes refer to the victim William Highsmith as Coco, as was often done during trial.

An autopsy revealed that the victim had died from "a gunshot wound to the head." The bullet entered through the left cheekbone of the victim, passed through the skull, and lodged between the right side of the skull and the scalp behind the ear. The "extensive fracturing of the skull" suggested a "contact wound," although no gunshot residue or splitting of the skin was detected. Due to the advanced state of decomposition of the body, a forensic pathologist offered the opinion that Highsmith had died "very near the time that he was last seen alive," nearly two weeks before on August 3, 1995, perhaps "the same day."

Witnesses had observed the abduction of Highsmith by three men at the intersection of 12th and Market Streets in Oakland on August 3, 1995. That morning, Zanetta Hodges talked with Highsmith, whom she had known most of her life, in the common area behind her residence in West Oakland. Highsmith told Hodges that he intended to "beat up the person" who had accused him of stealing a car. Highsmith added that he "was going to meet" with people "at the store" to discuss the stolen car accusation.

After speaking with Highsmith, Hodges went to East Oakland with her close friend Juanita "Goodie" Walton to get a food stamp card. As they returned to the area of 12th and Market Streets on their way to pick up "food stamps in West Oakland," Walton saw "people she knew" sitting in a blue Oldsmobile Delta 88 parked at the side of the Mingleton Temple church. At Walton's request, Hodges backed up her car and stopped across the street in front of Bottles Liquors to talk to the three men seated in the

Oldsmobile: the driver Cross, the front seat passenger Miltonous Kingdom, and the rear seat passenger defendant. Hodges was acquainted with defendant and Cross, but had not met Kingdom before. Hodges testified that defendant was wearing black leather gloves, and Walton noticed black gloves on all three of the occupants of the Oldsmobile. They were also wearing "black hoody" jackets.

Walton walked up to the Oldsmobile and asked the men inside, "what were they doing out here" in West Oakland. Defendant said "they were coming to look for someone who stole their drugs" and car, specifically Highsmith. Hodges heard Cross say, referring to Highsmith, "That nigger stole my car, Goodie." When asked by defendant, "what type of nigger was Coco," Walton replied: "That nigger, Coco, he ain't stealing no car. He the type of nigger, he don't get his shoes dirty. He don't steal cars. He sells cars."

A red Corvette driven by K.K. Parker,FN8 with Highsmith in the passenger seat, then pulled up and parked on the street near the driveway of the church behind the Oldsmobile. Defendant said, "All right then," and Walton was told to "get away from the car." Walton returned to Hodges's car, whereupon Hodges drove away as the men in the Oldsmobile left that car and met in the parking lot by the church. As she drove away, in the rear view mirror Hodges observed defendant touch Highsmith "on the shoulder."

FN8. The red Corvette was owned by Parker's girlfriend Tisha Williams, but was often driven by Parker.

Rodney Love was also present at the scene of the abduction.FN9 While Love was standing outside the Bottles Liquor store at 12th and Market Streets, a tall Black man about 20 years old – whom he neither knew nor identified – got out of a "blue four door Delta," approached him, and asked if he was "Coco." FN10 Love saw a large revolver "pokin' out" of the man's shirt. Love said that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. The occupants of the Oldsmobile wore black "puffy" jackets, and at least two of them wore gloves. Love thought they all had guns. According to Love, soon thereafter K.K. Parker drove up in a red Corvette, with Highsmith in the passenger seat, and parked behind the Oldsmobile. Love unsuccessfully attempted to "motion" to his friend Highsmith to warn him. Parker and Highsmith got out of the Corvette and began talking to the men from the blue Oldsmobile, one of whom briefly grabbed Parker by the neck but then released him. Parker ran into the liquor store. After Highsmith admitted to the men that he was "Coco," they "pull[ed] the guns out," five or six shots were fired, and they forcibly pushed the victim into the trunk of the blue Oldsmobile. One of the three men from the Oldsmobile got into the red Corvette, then both the Oldsmobile and the Corvette were driven off in the same direction.

FN9. At trial, Love testified that he did not have "any memory at all" of the details of the events he witnessed on August 3, 1995. An "hour or two after the event," however, Love gave a statement which was an accurate recitation of his observations. A tape of Love's statement to the police was admitted in evidence at trial and played for the jury, as was a portion of his consistent testimony at the first trial in 1995.

FN10. Love was acquainted with Coco.

An employee at Bottles Liquor store, Musa Hussein, testified that at about 4:00 p.m. on August 3, 1995, he saw Highsmith outside the store engaged in an argument or heated conversation with three other men across the street by the church. Highsmith was a regular customer of the liquor store, but the other three men were not known to Hussein

and he could not identify them, although he gave descriptions of them to the police. Hussein also noticed two vehicles, an "old American" car and a red Corvette, parked near the men. According to Hussein's statement given to the police immediately after the kidnapping, which was read to the jury, one of the men arguing with Highsmith "had a long gun." Another man opened the trunk of the vehicle, while a third man grabbed Highsmith. Hussein then ran back into the store to call the police, but heard "gunshots" outside. Customers yelled, "they're putting him in the trunk."

Douglas Wright, an investigator for the Alameda County District Attorney's Office, testified that at around 4:00 p.m. on August 3, 1995, he was driving on 12th Street, approaching Market, when he heard what he "thought were two gunshots ahead" of him. He then observed a red Corvette parked on the right side of the road facing the same direction Wright was traveling. A man was standing behind the Corvette who was described by Wright as "male Black, about 5' 11" in his mid-20's, 170 to 180 pounds." Wright was unable to identify the man, but testified that he was "consistent" in size and build with defendant. As Wright drove by, the man quickly ran to the driver's side of the Corvette, jumped in, "took off, squealed and accelerated around the corner." Wright "got a partial plate" on the Corvette, YOK953, but the last three numbers were incorrect. Across the street, Wright noticed people "ducking down" behind a parked car as if they were "trying to get out of the way." To his left, in the Bottles Liquor store parking lot, Wright saw an "Arabic looking gentleman" who was staring in the direction of the fleeing Corvette, and a "male Black" who was "hustling into the store." Wright "knew something was wrong," so he asked a man in a car "what had happened." The man, who looked "nervous and scared," said that "there had been a shooting and a kidnapping." Wright reported the crime through the "District Attorney's channel," and asked "them to call the police."

Raynetta Thomas, the victim's sister, testified that on the afternoon of August 3, 1995, she visited briefly with "Coco" and K.K. Parker at her mother's apartment before they left in a red Corvette about 3:45 or 4:00 p.m. A "few minutes" later she heard that a kidnapping had occurred at 12th and Market.

Oakland Police Officer Michael McArthur received a call of "a shooting" at 12th and Market at 4:08 p.m., and arrived there within two minutes. As Officer McArthur spoke with Musa Hussein, K.K. Parker interrupted and began to "talk over him." Parker "seemed to be eager" to tell Officer McArthur "what had happened." During the conversation, however, Parker's attitude changed; he "decided he didn't want to talk" or "cooperate anymore." Parker refused to sign his statement to the officer, and "started to walk away." Parker was then arrested on outstanding warrants and taken into custody.

After Hodges and Walton procured their food stamps at 4:09 p.m., they returned directly to 12th and Market Streets. Police officers were "all over the place." People on the street were quite agitated and concerned over the abduction of Highsmith, as he was a well-liked figure in the West Oakland neighborhood. After speaking with the police, Hodges and Walton, along with "various people," searched for Highsmith, defendant, Cross and Kingdom for hours without success.

About 7:00 on the night of the abduction of Highsmith, George Archambeau was driving westbound across the San Mateo bridge toward Foster City when he observed a "small, blue car" that was stopped with a red Corvette in front of it. As Archambeau passed the two cars, he noticed an African-American man standing outside the red Corvette, and another in the driver's seat. The man standing outside the Corvette threw an object that appeared to be a "folded over" grocery bag over the bridge into the bay. Archambeau drove on, but the Corvette "came driving by" him "extremely fast" with two

4

occupants in the vehicle, both African-American men. As the Corvette "got caught in the traffic" ahead, Archambeau "wrote down the license plate," 2YQK292, along with the notation "red 'vette," and contacted the highway patrol.

At around 9:00 the same night, Moamer Mohamed was working at the Bottles Liquor store. As he was leaving the store he observed a red Corvette in front of the parking lot that blocked his exit. The engine of the Corvette was running and the window was open, but no one was inside. Mohamed saw an African-American man wearing a checkered shirt and dark gloves running away from the parking lot toward downtown Oakland. Mohamed moved the Corvette and called the police. The only identifiable fingerprints found on the red Corvette belonged to K.K. Parker or the victim.

When Walton returned to her residence later that night with Hodges, Kingdom's blue Oldsmobile Cutlass was parked on the street in front of the house. She was frightened, and did not look in the car or immediately contact the police. The vehicle was located by the police, however, in front of Walton's house at 9962 Voltaire in East Oakland at about 10:00 that night.

Walton was then taken into custody and transported to the Oakland Police Department for questioning. She testified at trial that she fallaciously told investigating officers that she saw defendant, Kingdom and Cross force Highsmith into the car trunk. Walton admitted that she told "lies" to the officers, but testified that she did so to try to help her friend Highsmith. Walton also testified that she received a telephone call from defendant from jail during which he said to her, "Don't go to court." Defendant offered her money not to testify. Walton also received "death threats" from other people unknown to her.FN11

> FN11. Walton testified at the preliminary hearing before the first trial, and at Kingdom's trial, but did not testify at defendant's first trial.

Defendant was arrested about an hour after Walton was taken into custody. He was a passenger in a blue 1985 Oldsmobile Royale driven by Carl Anderson that was detained around 11:00 p.m. for expired registration tags.FN12 Anderson was taken into custody on a "no-bail misdemeanor warrant," and after defendant was identified he was arrested in connection with the carjacking and kidnapping of Highsmith that afternoon. Defendant was wearing a green plaid shirt – like the one Mohamed had seen earlier that evening worn by the man who ran away from the red Corvette – and green pants; his "hair was in corn rows." Black leather gloves were found on the right front passenger seat which had been occupied by defendant, and a black leather jacket was left in the back seat of the vehicle. Both of the gloves subsequently tested positive for gunshot residue, as did the left sleeve of the jacket. No blood was detected on the jacket or gloves. No gunshot residue was found on defendant's hands.

> FN12. The 1985 Oldsmobile Royale driven by Anderson in which defendant was arrested is not the same vehicle as the blue Oldsmobile Delta Cutlass registered to Kingdom that was observed at the scene of the kidnapping of Highsmith and seized from in front of Walton's residence.

During the interview of Walton very early the next morning, defendant was confined in a locked interview room nearby. When Walton saw defendant in the hallway she identified him as one of the men in the blue Oldsmobile at 12th and Market just before the abduction of Highsmith. She subsequently identified photographs of Cross and Kingdom from a lineup as the other two men.

The blue Oldsmobile registered to Kingdom was processed for evidence and photographed on August 5, 1995. The exterior was clean, and did not appear to have been driven on a dirt road. The top side of the muffler in the trunk was shiny and clean, and had wipe marks on it, but the bottom side was dirty. The trunk did not have indications, such as hair, blood, or fingerprints, that a person had been transported in it. No identifiable fingerprints were found anywhere on the car.

At the scene of the kidnapping at 12th and Market, three spent shell casings were recovered: two were brass nine-millimeter "Lugar caliber" casings fired from the same weapon, "an S.W.D.-type firearm;" the other, apparently of older vintage, was a brass .45-caliber semi-automatic cartridge fired from another type of weapon. A criminalist also examined the bullet extracted from the victim's head, and determined that it was fired from one of two similar size firearm calibers: a .40-caliber Smith and Wesson, or a 10-millimeter auto caliber.FN13

FN13. Probably the former, which, the criminalist observed, is a more popular weapon.

Warrants were issued for the arrest of Cross and Kingdom after they were identified by investigating officers as the other two men associated with the abduction of Highsmith. The Oakland Police Department was notified on August 10, 1995, that Cross had been arrested in Mississippi. Two taped statements were subsequently taken from him by investigating officers of the Oakland Police Department early the next morning. Kingdom was arrested on November 6, 1995, in Mississippi. Two days later when he was confronted with the statements made by Cross, he gave a statement to an Oakland police officer which was found inadmissible in the second appeal before this court and the federal habeas corpus proceeding.

Both taped statements made by Cross, and his testimony given at the first trial, were admitted in evidence and read to the jury at the second trial. FN14 In his first statement Cross told the officers that he moved to California in 1992, and lived with his aunt on 55th Avenue in Oakland until a few months before his arrest, when he stayed in motels in Oakland. He stated that Kingdom is his cousin, and he met defendant through one of his drug selling partners after he began living in Oakland.

FN14. Cross refused to testify at the second trial and was found unavailable as a witness. The jury was aware that he was serving a life term for an unrelated murder. The jury also heard through stipulation that Kingdom was convicted after trial in 1998 for the first degree murder of Highsmith with a special circumstance of kidnapping, and was serving a sentence of life without parole.

Cross reported that the Sunday before the abduction of Highsmith, his 1988 "blue Iroc" Chevrolet, which contained cash in the amount of $6,700, clothing, and other valuables, was stolen in Emeryville while he was visiting a girlfriend. He and a companion "drove around" West Oakland looking for the car. Youngsters told Cross that they had seen "some fool from Ghost Town" driving his Iroc around, so he continued to look for the car in the Ghost Town area of Oakland. Someone else told Cross that "Coco," a man with two gold teeth who lived on Adeline and "steals cars," was the one who was seen driving the Iroc around. The next day, Cross and Kingdom drove through West Oakland in the blue Oldsmobile looking for the Iroc. They heard that Coco was on 12th and Market, so they drove there. When a man named "Lon" said that he knew Coco, Cross gave him his pager number for Coco to call him.

The following day between noon and 2:00 p.m., Cross heard from Coco, who

United States District Court
For the Northern District of California

denied that he stole the Iroc. They agreed to meet at 12th and Market to discuss the matter further. With Cross driving, he, Kingdom and Cooper went to 12th and Market in the blue Oldsmobile. Cross did not find Coco among the people on the street, then walked back to the Oldsmobile. As he did, two men approached the car and one of them said, "I'm Coco." After Coco said, "I don't take cars," Cross began to "walk off." He returned to the Oldsmobile, and they drove away. He took a flight to Memphis later that night. Cross denied that they kidnapped Coco.

In his second statement taken a few hours later, Cross admitted that when he, defendant and Kingdom arrived at 12th and Market in the blue Oldsmobile, they all had nine-millimeter handguns, although he denied that he owned any of the guns or had one in his immediate possession at the scene. Cross said he was outside the car when Coco appeared with another man in a red Corvette. While he and Coco were "talking" on the sidewalk, "everything jumped off." Suddenly, Kingdom and Cooper, with guns drawn, escorted Coco to the rear of the car and forced him into the trunk. Someone fired shots, but Cross claimed it was not he.

Cross and Kingdom then got in the Oldsmobile, while defendant jumped into the red Corvette. They drove both cars to East Oakland, around 109th and Foothill, where defendant left the red Corvette and got back in the blue Oldsmobile with them. Coco was still in the trunk. They "drove around" for a while, then returned to the E-Z 8 motel, where Cross was staying. Cross and Kingdom went into the motel room, but defendant drove away with Coco. Cross claimed that Coco was alive in the trunk when he and Kingdom left the Oldsmobile for the hotel room. Cross was in the motel room for 40 minutes to an hour packing his clothes until defendant returned in the car. Cross and Kingdom then joined defendant, and with Kingdom driving they returned to the location at 109th and Foothill where they previously parked the red Corvette. Defendant left the Oldsmobile and returned to the Corvette. Defendant drove off in the Corvette, and Cross did not see him thereafter. He and Kingdom drove the Oldsmobile to Voltaire and 100th, where they parked it. While Cross was in the Oldsmobile, he did not hear any noise or look inside the trunk.

When they left the car at Voltaire and 100th, Cross thought Coco was still alive in the trunk, and someone would find him later, although he acknowledged the "possibility" that the victim had been shot during his abduction. Cross and Kingdom also left the guns in the car and began to walk back toward MacArthur when a friend drove by and gave them a ride to the E-Z 8 motel. Cross said he traveled to Memphis the next morning. He did not know Coco was still missing until later, and "didn't think it was that serious." Cross also told the officers he did not know where Coco was.FN15

FN15. At that time Highsmith's body had not yet been found.

In his testimony at the first trial, Cross added details to his second statement and changed some of his account of the events. Cross testified that his blue Iroc was stolen on July 30, 1995. Taken with the car were its contents: $600 to $700 in cash,FN16 large amounts of marijuana and powder cocaine that were worth thousands of dollars if sold on the street, jewelry and clothes. The drugs had been purchased the same day from defendant's friend at 100th and MacArthur. Cross financed a small portion of the drug purchase, but defendant contributed much more, between $2,000 and $4,000. Cross had intended to drive the Iroc to Greenville, Mississippi to visit his mother and sell the drugs. The theft of the car altered those plans. Defendant was "upset" when he learned the car and drugs had been stolen. He accompanied Cross and Kingdom when they searched in West Oakland for the Iroc the day before the abduction of Highsmith. Defendant used "threatening words" to someone they encountered in a green station wagon.

7

FN16. Not $6,700 as was mistakenly reported in his prior statement to the police.

Cross testified that he accepted Coco's word by telephone on August 3, 1995, that he "didn't have" the car, but defendant was insistent upon going to 12th and Market Streets to meet Coco. Defendant said: "Let's go out there," so Cross agreed. Cross drove the blue Oldsmobile to 12th and Market Streets, Kingdom sat in the front seat, and defendant was in the rear passenger seat. They parked across the street from the liquor store, near the church. Cross testified that he got out of the Oldsmobile to talk to people on the street in an effort to locate Coco, but left his gun on the front seat of the car. He claimed that he did not see or talk to Walton and Hodges. As he "was walking toward the car," a red Corvette driven by K.K. Parker drove up and parked behind the Oldsmobile. Parker went to the liquor store, and the other man in the Corvette walked up to Cross on the sidewalk and said, "I'm Coco." Coco said, "I don't take cars," and claimed he had not seen the Iroc. While holding a gun in one hand, defendant then grabbed Coco from behind and backed him into the trunk of the Oldsmobile. Cross got in the front passenger seat of the car as defendant told Kingdom to get the keys from the ignition and open the trunk. Cross "heard shots" from behind the car, probably "about six," and ducked down. He did not know if Coco was shot, but thought it was "a possibility." The trunk was then shut and Kingdom ran to the front passenger side of the Oldsmobile. Cross "scooted" into the driver's seat, took the keys from Kingdom, and drove away after Kingdom exclaimed, "be out." Defendant drove off in the red Corvette.

When they reached 100th and Voltaire Streets, the red Corvette was abandoned. They drove in the Oldsmobile to the E-Z 8 motel, where Cross and Kingdom left the car. Cross went to his room to pack for his planned trip to Mississippi. Defendant returned to the motel and they all drove to 100th and MacArthur. Cross did not know if Highsmith was still in the trunk of the car. Cross exited the car there before defendant and Kingdom "drove off" without him. After a few minutes, one of Cross's partners named Jay "pulled up" in a blue Toyota. Cross and Jay "drove around" and smoked some joints for a while before they returned to 100th and MacArthur and saw Oakland police officers "all over the place." Cross asked Jay to take him back to the E-Z 8 motel. Kingdom arrived later at the motel room without his car. They did not discuss the fate of Highsmith or events that occurred earlier that day. Cross left the next morning for Mississippi, where he was arrested a few days later. He testified that he "wasn't being truthful" entirely in his two statements to the police to "cover" for defendant and Kingdom.

Cal. Ct. App. Opinion, ¶. 6-16.

B.   Procedural History

At the first trial, in 1995, the jury found Cooper guilty. Cooper was convicted of first degree murder, kidnapping, carjacking, and being a felon in possession of a firearm. The jury found true the allegations that Cooper was armed with a firearm in the commission of the murder, carjacking and kidnapping. The trial court found in a separate proceeding that Cooper had served a prison term for a prior conviction and had been convicted of a serious felony that qualified as a prior strike conviction under California's Three Strikes law. Cooper was sentenced

to a total term of 71 years to life. Cooper's conviction was upheld on appeal.

Cooper then filed a federal petition for writ of habeas corpus, which this court granted. In the order granting petition for writ of habeas corpus filed on April 14, 2004 in <u>Cooper v. McGrath</u>, 314 F. Supp. 2d 967 (N. D. Cal. 2004) (the "2004 order"), this court determined that there was a Confrontation Clause violation (i.e., the admission of non-testifying co-perpetrator Kingdom's statement to police) that was not harmless error, that there was a due process violation because there was insufficient evidence to support the murder conviction, and that there was prosecutorial misconduct that was harmless considered alone but contributed to the determination that there was cumulative error.

Cooper was then tried again in late 2004. On November 10, 2004, the jury found Cooper guilty of murder and kidnapping, and found him not guilty on the charge of being a felon in possession of a firearm. Cooper admitted the truth of the prior conviction allegations. On December 3, 2004, Cooper was sentenced to 58 years to life in prison. His conviction was affirmed by the California Court of Appeal and his petition for review was denied by the California Supreme Court in 2007. His state habeas petitions were unsuccessful.

Cooper then filed this action. The court issued an order to show cause on eighteen issues. Respondent filed an answer and Cooper filed a traverse. The case is now ready for review on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

### STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.    Collateral Estoppel and Law Of The Case As Potential Bars
       To The Second Murder Conviction (Claims 12 and 13)

Cooper argues that this court's 2004 order requires a determination that the evidence was insufficient for the murder conviction at the second trial. He argues that he was denied due process, equal protection[1] and a fair trial "when the collateral estoppel doctrine was not adhered to during petitioner's trial and subsequent direct appeal and was double jeopardy violation." Petition, p. 51 (errors in source). He also argues that his constitutional rights were violated "when law of the case doctrine was not adhered to" during his trial and appeal. Id. at 53. The gist of his argument is that, because the evidence was substantially the same at the first and second trials, this court's determination in the 2004 order that the evidence was insufficient at the first trial compelled the same result the second time through state court.

As relevant to these claims, the 2004 order determined that the admission of Kingdom's statement was a Confrontation Clause violation, determined that the Confrontation Clause violation was not harmless error, and determined that the evidence was insufficient to support the murder conviction.[2] This court explained that retrial was permitted. Two important points in the insufficient evidence analysis in the 2004 order lead to the conclusion that the earlier determination did not bar a new trial and did not require a finding as a matter of law that the evidence was insufficient at the second trial. First, the insufficient evidence analysis was done by setting aside the Kingdom statement, consistent with then-controlling Ninth Circuit authority:

In determining the sufficiency of the evidence, the court excludes the improperly admitted statement of Kingdom which should not have been admitted at trial because

---

[1]Cooper asserts, in each of his eighteen claims, that the error violated his rights to equal protection and due process, as though those two protections are inseparably paired. Cooper makes no effort to develop any equal protection violation argument. Except as specifically noted in the text, none of his claims implicate his right to equal protection and the court therefore does not specifically discuss the equal protection claims.

[2]Cooper argues in his traverse that respondent mischaracterized his claims as challenges to the state's power to hold a retrial and urges that his claims are instead challenges to the power to convict him again. For analytic coherence, this court – as did the California Court of Appeal – considers whether the retrial was barred as well as whether the second conviction was barred.

United States District Court
For the Northern District of California

1    Cooper was unable to confront him.  See Wigglesworth v. Oregon, 49 F.3d 578, 582 (9th
2    Cir. 1995).  This piece of evidence is critical because if it was included in the evaluation,
     the court would find that there was sufficient evidence to support the murder conviction.

3    314 F. Supp. 2d at 998.[3]  Second, this court explained that the remedy under the circumstances

4    was retrial and such a retrial was not barred by the Double Jeopardy Clause.

5        When, as here, the evidence is determined to be insufficient when the improperly
         admitted evidence is excluded from the equation but sufficient when the improperly
6        admitted evidence is included in the equation, the remedy is affected.  In such a case,
         retrial rather than acquittal is the remedy.  "[T]he Double Jeopardy Clause allows retrial
7        when a reviewing court determines that a defendant's conviction must be reversed
         because evidence was erroneously admitted against him, and also concludes that without
8        the inadmissible evidence there was insufficient evidence to support a conviction."
         Lockhart v. Nelson, 488 U.S. 33, 40 (1988).  In other words, the Clause "does not bar
9        retrial after a reversal based on the erroneous admission of evidence if the erroneously
         admitted evidence supported the conviction."  United States v. Chu Kong Yin, 935 F.2d
10       990, 1001 (9th Cir. 1991) (citing Lockhart, 488 U.S. at 40); see also Wigglesworth, 49
         F.3d at 582.

11   314 F. Supp. 2d at 998-99.

12       The 2004 order specifically allowed a retrial.  At the retrial, the prosecutor was free to

13   – and apparently did – buttress some evidence to make up for the gap left by the Kingdom

14   statement.  Although this court will not do a line by line comparison of the two trials, there were

15   differences in the evidence presented, as exemplified by a few points.  First, the prosecutor's

16   time-of-death evidence improved.  The forensic pathologist at the first trial was unable to state

17   when Coco was killed, while the same forensic pathologist at the second trial gave testimony

18

---

19
20   [3]It turns out that a recent Supreme Court case has clarified that an insufficient evidence
     claim should be analyzed differently, i.e., by including (rather than excluding) the improperly
21   admitted evidence when deciding whether the evidence was sufficient to support the verdict.
     See McDaniel v. Brown, 130 S. Ct. 665, 672 (2010) ("Respondent therefore correctly concedes
22   that a reviewing court must consider all of the evidence admitted at trial when considering a
     Jackson claim.")  McDaniel reversed a Ninth Circuit decision which, like the 2004 order, had
     excluded evidence in doing the sufficiency of the evidence analysis.

23
24       If the McDaniel decision existed in 2004, this court would have done the sufficiency of
     the evidence analysis including (rather than excluding) Kingdom's statement.  Had Kingdom's
25   statement been in the pile of evidence, the insufficient evidence claim would have been rejected.
     The court made that exact point in the 2004 order: "[t]his piece of evidence is critical because
26   if it was included in the evaluation, the court would find that there was sufficient evidence to
     support the murder conviction."  Cooper, 314 F. Supp. 2d at 998.  Although the insufficient
27   evidence claim would have been rejected, the petition still would have been granted and retrial
     required because of at least the Confrontation Clause violation.  Thus, while McDaniel would
28   have changed the outcome for one claim, it would not have changed the 2004 order's overall
     outcome or remedy.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

indicating that Coco was killed on the day he was abducted.  RT 376 ("I think that he died very near the time that he was last seen alive.")[4]  Second, Rodney Love had acquired a felony conviction and prison term that could be used to impeach him by the time of the second trial.  RT 763-64.[5]  Third, Goodie Walton showed up at the second trial.  Her absence from the first trial deprived that jury of the helpful tool of looking at the demeanor of a witness whose stories had numerous inconsistencies.  In trying to sort out which, if any, of her statements were truthful, her demeanor was an important factor for the jury.  See 3A Wigmore, Evidence § 946 ("the demeanor of the witness on the stand may always be considered by the jury in their estimation of his credibility."); see also id. at § 996 (demeanor not an available tool to evaluate the absent witness) (Chadbourn rev. 1970).  In her testimony at the second trial, Cooper offered a plausible explanation for the inconsistencies in her previous statements: she said she had been present before the abduction, returned to the scene after the abduction at which time she heard what other people said about the abduction, and then told the police some things as though she had been present when in fact she was relaying the story she had heard from others.  Fourth, the evidence was stronger at the second trial about Cooper's motive of wanting redress for his stolen drugs.  Fifth, Walton's testimony that Cooper called her from jail to tell her not to come to court in 1995 suggested his consciousness of guilt.  It also would make more believable her testimony

---

[4]The forensic pathologist was less definite about the time of death at the 1995 trial.  In 1995, Dr. Herman testified the victim's body was "very markedly decomposed" and "had been dead for sometime."  1995 RT 694.  When asked on cross-examination if he could estimate the approximate time of death, Dr. Herman again noted extensive decomposition and said, "I have no idea when the time of death was."  1995 RT 705.

In the 2004 trial, Dr. Herman again testified to the extensive decomposition.  RT 369-70, 365.  When asked his opinion on how long the victim – who was last seen alive on August 3 and whose body had been found on August 16 – had been dead, Dr. Herman testified: "Well, the body was very markedly decomposed.  Frankly, I would have thought he had been dead perhaps even longer, between the time he when he was found and when he was last seen alive, so I think he died very near the time that he was last seen alive."  RT 376-77.  "[I]t certainly could have been the same day."  RT 377.  This increased certainty helped the prosecution because Cooper had only a short window of opportunity on August 3 to take part in the killing before he was arrested late that night.

[5]Love was less impeachable at th 1995 trial, when he had testified that Cooper was not one of the abductors and that Goodie Walton was not present at the scene before or after the abduction.

1    that she saw him in the Oldsmobile at the scene of the abduction, because his request that she

2    not testify suggests that he believed she had harmful testimony to offer.

3        The California Court of Appeal's decision that constitutional collateral estoppel did not

4    require dismissal of the murder count based on this court's 2004 order was clearly correct.  The

5    2004 order was not intended to "have any preclusive effect or prevent the retrial of defendant,"

6    and instead "clearly contemplated and mandated the very retrial which occurred." Cal. Ct. App.

7    Opinion, p. 21, 22.    The constitutional basis for collateral estoppel would be the Double

8    Jeopardy Clause, but that provision does not apply for the reasons explained in the portion of the

9    2004 order quoted above.  See Cooper, 314 F. Supp. 2d at 998-99.

10       The law of the case doctrine also provides no help to Cooper.  It is not clear how he could

11   obtain federal habeas relief under that doctrine because it is not constitutionally based.  In any

12   event, the doctrine would not be of any use to him.  This court determined that the evidence at

13   the first trial was insufficient to support the murder conviction.  This court did not direct that a

14   second jury look at the exact same evidence, and instead determined that a retrial was necessary.

15   Cooper has not proven that the exact same evidence presented at the first trial was presented at

16   the second trial.  In the retrial, the prosecutor was free to present additional evidence and change

17   his emphasis to plug the hole that existed if Kingdom's statement could not be used.  There was

18   a legally required do-over, but a do-over is not usually and was not here an exact replication.

19   Thus, the determination in the 2004 order that the evidence at the first trial was insufficient says

20   nothing about the sufficiency of the evidence at the second trial.

21       As the California Court of Appeal explained in rejecting Cooper's law of the case

22   argument, "of most significance" was the fact that the "second jury was presented with different

23   evidence to assess." Cal. Ct. App. Opinion, p. 28.   Law of the case principles would only

24   impact Cooper's case if, at the second trial, the prosecution attempted prove the same crime

25   "using the substantially same evidence."  Id.  The state appellate court then explained:

26       Upon comparison of the first and second trials, we find that the evidence presented was
         not the same. Kingdom's statement had been excluded, so it was of course not considered
27       in the second trial. . . .  Critical testimony from Juanita Walton was received at the second
         trial, rather than read from her prior statements or abbreviated preliminary hearing
28

                                        14

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

testimony as it had been at the first trial. Walton corroborated the testimony of Hodges that identified defendant and placed him at the scene of the kidnapping of Highsmith only moments before the crime occurred. Walton's testimony also provided corroborated testimony from Cross that Highsmith was confronted and abducted because defendant, along with Cross and Kingdom, believed he had stolen a vehicle containing their drugs – thereby providing a motive for the abduction and killing. . . . The accounts of the kidnapping given by Hodges, Rodney Love and Musa Hussein varied from the first trial, although not materially so. The defense evidence at the second trial also did not include alibi testimony from defendant or his wife. Given the context of the federal court's finding of insufficiency of the evidence and upon our review of the record, we conclude that a retrial of defendant was not precluded and the jury was not estopped by law of the case principles from convicting defendant of the murder of Highsmith.

Cal. Ct. App. Opinion, ¶. 28-29.  The California Court of Appeal's decision that the law of the

case doctrine did not require dismissal based on this court's 2004 order was correct.  Cooper is

not entitled to habeas relief on his claims that collateral estoppel and law of the case doctrines

barred the 2004 trial or conviction.

B.      Sufficiency Of The Evidence (Claims 4 and 11)

        Cooper contends that there was insufficient evidence to support the murder and

kidnapping convictions.

        The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged."  In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally a

state court conviction does not determine whether it is satisfied that the evidence established

guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'"  Jackson v. Virginia, 443 U.S. 307,

319 (1979); see Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Only if no rational trier of

fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See

Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.  The "prosecution need not affirmatively 'rule

out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record

of historical facts that supports conflicting inferences must presume – even if it does not

affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of

United States District Court
For the Northern District of California

1   the prosecution, and must defer to that resolution.'" Wright v. West, 505 U.S. 277, 296-97

2   (1992) (quoting Jackson, 443 U.S. at 326).   The Ninth Circuit has explained that

3   "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a

4   conviction. . . . Nevertheless, 'mere suspicion or speculation cannot be the basis for creation of

5   logical inferences.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  A federal habeas

6   court applies the standards of Jackson with an additional layer of deference under the AEDPA,

7   generally asking whether the state court's decision reflected an unreasonable application of

8   Jackson and Winship to the facts of the case. Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir.

9   2005); see, e.g., McDaniel v. Brown, 130 S. Ct. 665, 673-74 (2010) (per curiam) (finding Ninth

10  Circuit erred by failing to review all of the evidence in light most favorable to the prosecution

11  when it resolved inconsistencies in testimony in favor of petitioner).

12       The California Court of Appeal rejected Cooper's challenge to the sufficiency of the

13  evidence to support the conviction.

14       [D]efendant was convincingly identified as one of the three men who abducted Highsmith
15       at gunpoint, forced him into the rear of the blue Oldsmobile, and sped away.  Witnesses
         testified that the men who kidnapped Highsmith, and specifically defendant, wore black
16       gloves and jackets.  Shots were fired during the kidnapping.  Contrary to the federal
         court's finding, persuasive evidence connects defendant to the murder of the victim
17       discovered two weeks later with a fatal bullet wound to the head.  The victim was found
         gagged and somewhat bound when he was killed, which suggests that the murder was
18       part of a forced abduction and subsequent execution by more than one person.  The
         pathologist testified that the victim was probably killed on the day he was kidnapped, not
19       some time later.  Nothing suggests that the kidnappers released the victim, as he was not
         seen alive again.  Cross' testimony, corroborated partially by Walton – which we must
20       accept on appeal – not only provides defendant with a strong motive to commit the
         murder, but also places him in the car with Highsmith after the kidnapping with the
21       opportunity to kill the victim. . . . A few hours after the abduction, a witness observed two
         men in the red Corvette driven away from the kidnapping scene by defendant engaged
22       in throwing something off the San Mateo-Hayward bridge.  Three or four hours later that
         night, defendant was arrested in a vehicle in which black gloves and a black jacket were
23       found.  Gunshot residue was detected on the gloves and one sleeve of the jacket.
         Defendant was also wearing a checkered shirt similar to the one worn by the man who
24       was seen earlier running from the red Corvette abandoned at the kidnapping scene.  We
         conclude that the murder conviction is supported by substantial evidence.

25  Cal. Ct. App. Opinion, ¶. 47-48.

26       The state appellate court highlighted some of its disagreement with some of this court's

27  reasoning in the 2004 order, most notably disagreeing with this court's determination that there

28

16

was insufficient evidence at the 1995 trial to connect Cooper to the murder.  <u>See</u> Cal. Ct. App. Opinion, p. 47.  Whether there was sufficient evidence at the 1995 trial does not control whether there was sufficient evidence to support the conviction at the 2004 trial.  This court focuses on the part of the California Court of Appeal's opinion that deals with the 2004 trial evidence. Doing so, this court concludes that the California Court of Appeal's rejection of the insufficient evidence claim was not contrary to or an unreasonable application of <u>Jackson v. Virginia</u>.

There was plenty of evidence to support the kidnapping conviction.  Cooper does not dispute that a kidnapping took place, but instead challenges whether there was sufficient evidence that he was one of the kidnappers.  Cooper was identified by Walton, Hodges, and Cross as being in the blue Oldsmobile at the abduction site mere moments before the abduction. There was testimony from Hodges and Walton that Cooper was wearing gloves and had a gun. Walton testified that Cooper told her that they were looking for the man who stole their drugs and Cross' car.  Cooper was identified by Cross as one of the three men who put Coco into the trunk of the blue Oldsmobile at gunpoint.  Shots were fired during the abduction.  The Oldsmobile with Coco in the trunk then sped away.  Cooper left in the red Corvette, according to Cross.  There was evidence that Cooper was driving in coordinated manner with the Oldsmobile in which Coco was in the trunk.  And there was evidence that he later rejoined Cross and Kingdom while Coco was still in the trunk of the car, and later still returned to the Corvette and dumped the Corvette back at the abduction site.  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of a kidnapping by Cooper proven beyond a reasonable doubt.

The evidence connecting Cooper to the murder was hardly overwhelming but was sufficient evidence for a rational trier of fact to conclude that he was guilty of murder.  Cooper does not dispute that a murder occurred, but only whether there was sufficient evidence that he was one of the murderers.  The victim was last seen alive by witnesses when he was shoved into the trunk of a car at gunpoint – dire circumstances by anyone's standard.  As mentioned earlier at pages 13-14, the evidence in favor of the prosecution's case improved in several respects at

the 2004 trial. Most notably, the forensic pathologist gave testimony that would allow a rational trier of fact to conclude that the victim died shortly after he was abducted and therefore was killed at the time when Cooper had the opportunity to participate in the killing. The pathologist's testimony brought together the time of death and Cooper's window of opportunity. Also, Fred Cross' testimony from the earlier trial and his statements to police put Cooper in the car with the victim in the trunk after the abduction. According to Cross, Cooper had driven the Corvette away from the abduction scene and shortly thereafter reunited with Cross and Kingdom and got back into the blue Oldsmobile. This re-connected Cooper with the victim in the trunk of the car. Also, there was testimony from which a reasonable trier of fact could conclude that Cooper was in the red Corvette when someone emerged from that car and threw something off the San Mateo bridge a few hours after Coco was abducted. There also was testimony from which a rational trier of fact could conclude that it was Cooper who later returned the Corvette to the scene of the kidnapping. Cooper was arrested wearing a green plaid shirt like the one the liquor store owner saw on the man who dumped the Corvette near his store earlier that night. There was evidence that Cooper had a motive to harm Coco: Coco was thought to be the man who stole the drugs in Cross' car, and Cooper had paid for a substantial part of those drugs. Cooper was arrested in a car in which he sat on a pair of gloves that had gunshot residue on them. Certainly there was some evidence that pointed away from Cooper being one of the murderers, but this court does not reweigh the evidence. This court concludes that the state court of appeal's determination that there was sufficient evidence was not an unreasonable application of or contrary to <u>Jackson</u> and <u>Winship</u>. Cooper is not entitled to the writ on this claim.

C.    <u>Statute of Limitations And The Kidnapping Count (Claim 10)</u>

Cooper contends that his rights to due process and equal protection were violated when he was charged and convicted of kidnapping because the charge was time-barred. He reasons that, since the kidnapping occurred in 1995, and he was re-charged and convicted in 2004, the prosecution was barred by the statute of limitations.

18

The California Penal Code has two statutes of limitations that could apply to a kidnapping charge, depending on the punishment to which the defendant is exposed.  If the offense is punishable by death or life imprisonment, the prosecution "may be commenced at any time," and if punishable by imprisonment for eight years or more, the prosecution "shall be commenced within six years of the commission of the offense."  Cal. Penal Code §§ 799, 800.  Simple kidnapping is punishable by imprisonment for 3, 5 or 8 years, and aggravated kidnapping is punishable by life imprisonment.  Cal. Penal Code §§ 208, 209.

Assuming arguendo that a time-barred prosecution would violate due process, Cooper's claim may be easily rejected because his prosecution was commenced within weeks of the commission of the kidnapping on August 3, 1995.  The information charging him with kidnapping was filed on September 26, 1995.  The 2004 retrial was not a new prosecution but was instead further activity in the prosecution first commenced in 1995.  The amendment of the information in 2004 did not mean that nine years had lapsed between crime and the commencement of prosecution because both the original and amended charging documents charged Cooper with kidnapping.  See In re Davis, 13 Cal.App.2d 109, 112 (Cal. Ct. App. 1936) (charging document may be amended after the limitations period expires without being time barred as long as it charges the same offense or a lesser-included offense).  Alternatively, if the 2004 proceedings were viewed as a separate prosecution, it would have been timely because the five years[6] during which the first prosecution was pending for the same conduct would not be counted as part of the limitations period.  See Cal. Penal Code § 803(b).  The claim that the kidnapping charge was time-barred is meritless.

Cooper's assertion that counsel was ineffective for failing to make this argument falls with the argument: an attorney does not engage in deficient performance in not making a meritless argument and no prejudice results from a meritless argument not being made.

---

[6]The information was filed on September 26, 1995.  The California Supreme Court denied the petition for review on October 25, 2000.

United States District Court
For the Northern District of California

D.      Inconsistent Verdicts (Claim 2)

Cooper contends that he was denied equal protection of the law by the inconsistent verdicts in his case.  He contends that the acquittal on the felon-in-possession-of-a-firearm charge was inconsistent with the guilty verdicts on murder and kidnapping.  He reasons that this is so because an "[e]x felon in possession of a gun is a necessary element of the theory argued by the prosecutor for the murder and kidnap."  Petition, p. 20.

Cooper errs in suggesting that being a felon-in-possession is an element of either murder or kidnapping.  Neither murder nor kidnapping has such an element.  See Cal. Penal Code §§ 187, 209.  The jury did not need to find that Cooper possessed a gun or fired the fatal shot into the victim for the jury to find him guilty of murder and kidnapping.

The prosecutor's argument included an aiding and abetting theory for the murder and the kidnapping, as well as a felony murder theory for the killing in the course of the kidnapping.  RT 911, 912, 932-935.  The prosecutor plainly conceded that the circumstances of the murder made him unable to explain which of the three men did what to the victim at the murder site.  RT 927, 928.  The instructions given to the jury included instructions on aiding and abetting liability.  RT 893-94.  Based on the evidence presented at trial, Cooper could have been found guilty of murder and kidnapping based on aiding and abetting liability, regardless of whether he had gun in hand.  The guilty verdicts on murder and kidnapping were not inconsistent with the acquittal on the felon-in-possession count.

Even if Cooper could show that the verdicts were inconsistent, that inconsistency alone would not permit habeas relief under § 2254(d) because he does not show that the state court's rejection of his claim was contrary to or an unreasonable application of any clearly established law from the U.S. Supreme Court.   Indeed, the weight of Supreme Court authority is against Cooper, as the Supreme Court has determined that inconsistent verdicts do not make a trial fundamentally unfair.  See Standefer v. United States, 447 U.S. 10, 25-26 (1980); cf. Harris v. Rivera, 454 U.S. 339, 344 (1981) (assuming arguendo that bench trial verdicts were facially inconsistent, "there is no federal requirement that a state trial judge explain his reasons for

United States District Court
For the Northern District of California

acquitting a defendant in a state criminal trial; even if the acquittal rests on an improper ground, that error would not create a constitutional defect in a guilty verdict that is supported by sufficient evidence and is the product of a fair trial").   Inconsistent verdicts may stand when one of the verdicts is a conviction and the other an acquittal.  Ferrizz v. Giurbino, 432 F.3d 990, 992 (9th Cir. 2005) (citing United States v. Powell, 469 U.S. 57, 65 (1984); Dunn v. United States, 284 U.S. 390, 393 (1932)).  The rationale for this rule is that the acquittal may be an exercise of leniency by the jury not necessarily grounded in its view of the evidence.  Id. at 993.  Cooper is not entitled to the writ on this claim.

E.   Lack Of Second Preliminary Hearing (Claim 5)

Cooper contends that he was denied his right to due process when the superior court refused his request for a second preliminary hearing after this court granted his petition for writ of habeas corpus.  The trial judge stated that Cooper already had his preliminary hearing nine years earlier.

Cooper identifies no federal case in support of his claimed right to a second preliminary hearing.  Indeed, the case law is to the contrary: "[T]he preliminary hearing itself is not constitutionally mandated."  Peterson v. State of California, No. 09-15633, slip op. 7033, 7038 (9th Cir. May 17, 2010).  There being no federal constitutional right to one preliminary hearing, it follows that there is no federal constitutional right to two  preliminary hearings.

F.   Admission of Prior Testimony (Claim 3)

Cooper contends that his rights to due process, equal protection and confront witnesses were denied when the trial court admitted the testimony from co-perpetrator Fred Cross from the first trial after Cross refused to testify at the second trial.[7]   Cooper argues that "the prior

_____

[7]Cross' testimony from the first trial, plus his taped statements that had been admitted at the first trial as "part of that testimony," were admitted. RT 792-793.  Defense counsel stated that the defense thought "it's crucial that the jury hear those prior taped statements, so we are definitely in agreement they should come in," RT 792.  That is, the defense was interested in the impeachment value of those taped statements.  RT 792.

testimony must be weighed to find whether it has the particularized guarantees of trustworthiness and reliability," Petition, p. 23, and that Cross' testimony could not have been found to be trustworthy and reliable because it had been impeached.

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford v. Washington, 541 U.S. 36, 51 (2004). Testimony given at an earlier trial is testimonial hearsay and is barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 59.

The admission of Cross' prior testimony did not violate Cooper's Confrontation Clause rights. Cross was unavailable. He was brought to the courtroom and refused to testify even when granted use immunity. RT 781-785. Cross was adamant that he would not testify and did not want to aid the prosecutor to obtain a conviction of Cooper. RT 786. He was serving a life sentence for another conviction. RT 787-88. Based on his persistent refusal to testify even when immunized plus the fact that he was already in prison for life, the court believed there was no meaningful way to compel him to testify and made a finding that the witness was unavailable. RT 789. The trial court reasonably determined that Cross was unavailable.[8]

The second requirement under Crawford also was met: Cooper had a prior opportunity to cross-examine Cross at the first trial. Cooper urges that the requirement that the defense have had an opportunity to cross-examine the witness refers to the "specific lawyer representing his client," Petition, p. 23, and that this criteria for the admission of prior testimony was not met because he was represented by a different attorney at the first trial. He offers no legal authority for this unusual idea that essentially would allow a defendant to create a Confrontation Clause problem by switching attorneys whenever there was testimonial hearsay he wanted to keep out

---

[8]At that time, defense counsel did not object to the finding that Cross was unavailable as a witness. RT 789. When the trial resumed after the weekend break, defense counsel relayed Cooper's objection that the witness was not physically unavailable. RT 798. The court explained to Cooper that the court had not found the witness to be physically unavailable, but instead to be "legally unavailable" in that he refused to testify and that holding him in contempt would be a futile act for a witness like Cross who was already in custody for life. RT 798-799.

United States District Court
For the Northern District of California

1    of trial.  The fact that Cooper was represented by a different lawyer at the second trial is legally

2    irrelevant to the analysis.  The defense had an opportunity to cross-examine Cross at the first

3    trial and did in fact extensively cross-examine him, including examination about the taped

4    statements to police.  See Resp. Exh. J at 2207-2506.

5

6    G.    Evidentiary Rulings (Claim 6)

7         Cooper next complains that several rulings by the court denied him his rights to due

8    process and equal protection.

9         A district court may not collaterally review a state court evidentiary ruling unless it

10   violates federal law, either by violating a specific constitutional provision or by infringing upon

11   the due process right to a fair trial.  Pulley v. Harris, 465 U.S. 37, 41 (1984).  Federal habeas

12   relief is not available for state law errors because the writ only can be issued if there was a

13   violation of the Constitution, laws or treaties of the United States.  See Estelle v. McGuire, 502

14   U.S. 62, 67-68 (1991).  Exclusion of evidence does not contravene due process unless "'it

15   offends some principle of justice so rooted in the traditions and conscience of our people as to

16   be ranked as fundamental.'"  Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (citation omitted).

17   The admission of evidence is not subject to federal habeas review unless a specific constitutional

18   guarantee is violated or the error is of such magnitude that the result is a denial of the

19   fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021, 1031

20   (9th Cir. 1999); but cf. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (Supreme

21   Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

22   evidence constitutes a due process violation sufficient to warrant issuance of the writ").

23   Furthermore, habeas relief for an erroneous evidentiary ruling of constitutional dimension would

24   only be available if the error had a "substantial and injurious effect or influence in determining

25   the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

26        First, Cooper contends that the trial judge made several rulings that were mistaken on the

27   law of the case doctrine.  As explained in section A above and in the California Court of

28

United States District Court
For the Northern District of California

1    Appeal's decision discussing state law on the law of the case doctrine, Cooper's view of the

2    applicability of the doctrine is incorrect.  The trial court did not err, let alone commit a due

3    process violation, in refusing to adopt Cooper's view of the law of the case doctrine.

4         Second, Cooper contends that the trial court erred in allowing Sergeant Krupp to testify

5    to hearsay.  The hearsay elicited from Krupp was inconsequential, i.e., that he had learned from

6    witnesses the number of men involved in the abduction.  RT 605.  Several other witnesses

7    testified that there were three men, so the hearsay statement that some people at the scene told

8    Krupp how many men (and not even the number they told him) certainly did not make the trial

9    fundamentally unfair.

10        Third, Cooper urges that the trial court erred in allowing the district attorney to ask

11   leading questions of Walton.  Cooper has not shown that any of the allegedly leading questions

12   asked of Walton so infected the trial as to make the resulting conviction a denial of due process.

13   See RT 263-264 (sustained objection to question of whether people were "saying things about

14   Coco being put in the trunk of the car?"); RT 271 (after Walton testified that Cooper phoned her

15   from jail and told her not to go to court, court overruled objections when prosecutor asked , "did

16   he offer you anything if you didn't go to court?" and "did he make any comments to you about

17   something what would happen to you if you would go to court?"); RT 274 (sustained objection

18   to question whether Walton hid from the D.A.'s office at the time of the first trial); RT 338

19   (overruled objection to question "are you telling us, now, that you think you were mistaken?"

20   after witness said she was not lying).  Leading questions frequently are simply re-phrased to

21   avoid the leading question problem.  There is no indication here that any of the information

22   elicited was vital and hinged on the prosecutor asking a leading question to obtain the testimony.

23        Fourth, Cooper argues that the trial court failed to instruct the jury that witnesses Walton,

24   Hodges and Cross "were impeached and suffered from moral turpitude."  Petition, p. 30.  Cooper

25   has not shown that he was legally entitled to such an instruction.  The court did properly instruct

26   the jury as to witness credibility.  See CT 811-812.  And evidence was presented that allowed

27   the jury to find the witnesses' credibility impeached, e.g., Walton testified to her criminal

28

United States District Court
For the Northern District of California

conviction, the parties stipulated that Cross had suffered convictions, and the witnesses had given contradictory statements.  The jury had been instructed on the law, and it was up to the jury to apply the instructions to the evidence.

Fifth, Cooper contends that the trial judge erred in ruling Cross unavailable.  As explained in section F above, the ruling was not erroneous.

Sixth, Cooper urges that the trial judge erred in allowing Kingdom to refuse to testify in front of the jury but allowed Cross to refuse to testify outside the presence of the jury.  He does not show how this difference made the trial fundamentally unfair.  Once it is determined that a witness will refuse to testify if called, the defendant cannot call the witness for the sole purpose of compelling the witness to invoke his Fifth Amendment privilege in front of the jury.  See United States v. Licavoli, 604 F.2d 613, 624 (9th Cir. 1979).

Seventh, Cooper claims that the trial judge erred in allowing the prior trial testimony of witnesses Love and Mohammed to be read because they could not remember details of their prior testimony.  Cooper has not shown how this practice made his trial fundamentally unfair.

Seventh, Cooper contends that the trial judge denied his Wheeler motion, but fails to show any place in the record where such a motion was made, let alone erroneously denied.  There was a defense motion challenging the venire of 160 prospective jurors as not being a fair cross-section, but that was not a Wheeler motion.  See People v. Wheeler, 22 Cal. 3d 258, 280 (1978) (party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion).  As to the motion that was made, the court found there was no systematic exclusion of African Americans. Sixteen of the 160 prospective jurors had identified themselves as African American, only 12 African Americans returned following challenges for cause, and apparently three did not show up for further proceedings.  The trial court ruled that there was no basis for dismissing the remaining panel because there was no under- representation due to systematic exclusion of the group. Resp. Exh. G, RT 191-192.  Cooper has not shown any error in the trial court's determination that  under-representation was not due to systematic exclusion of African Americans in the jury

**United States District Court**
For the Northern District of California

selection process.  Thus, a challenge to the court's ruling on the motion fails because systematic exclusion of the group is one of the required elements to establish a violation of the defendant's Sixth Amendment right to have a jury drawn from a fair cross-section of the community. See Duren v. Missouri, 439 U.S. 357, 364 (1979); see also Randolph v. California, 380 F.3d 1133, 1141 (9th Cir. 2004) (disproportionate exclusion "need not be intentional to be unconstitutional, but it must be systematic").

Eighth, Cooper contends that the judge denied defense objections in a "very abrupt and curt way" after a contentious hearing on October 25, 2004 about the law of the case doctrine. Cooper has not shown any erroneous ruling by the court or any way in which the alleged negative attitude of the judge that day denied him a fundamentally fair trial.

H.    References To Cooper's Custodial Status (Claim 16)

Cooper contends that the trial court's comment that he was in custody violated his rights to due process and equal protection.  He argues that the disclosure of this information was very harmful in light of the fact that he went to great lengths to conceal his custodial status from the jury.  He also states that the trial judge admitted that he erred in disclosing to the jury that Cooper was in custody.

During voir dire, and in the course of informing the jury pool of various things it was not to consider in its decision-making, the judge informed prospective jurors that Cooper was in custody and the fact that he was in custody was irrelevant to his guilt or innocence.  The judge explained that Cooper being in custody meant only that he was "unable to make bail," and that his custodial status was "totally irrelevant to the question of guilt" and was not to be considered as evidence of guilt.  RT 141-142.  The next day, defense counsel protested that the instruction was prejudicial.  The judge acknowledged that he had given the instruction without allowing the parties to voice their views whether he should give such an instruction.  RT 147.[9]  Nonetheless,

---

[9]Cooper states that the trial judge conceded he had erred.  This court reads the trial judge's statement that, "basically, I messed up yesterday," RT 147, to be a concession that he had erred in not getting the parties' input on the instruction, as he had earlier indicated he would consult them before

the judge was convinced that his comments caused no harm because he was "absolutely convinced that they would know by the end of the trial that he is in custody, and they always figure that out.  You just can't hide it.  At this afforded a way to tell them that they cannot consider that."  RT 148.

The state court of appeal rejected Cooper's challenge to the instruction.  The court stated that the test was whether there was a reasonable likelihood that the jury understood the instruction in a manner that violated Cooper's rights.  Cal. Ct. App. Opinion, p. 39.  The court agreed with the trial judge's view that the reference to Cooper's "custody was unnecessary and best omitted from the charge to the jury, but it also did not result in prejudicial error.  The custody instruction was not comparable to imposition of a requirement upon the defendant that he attend trial wearing jail clothing, which has been found to "'undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor.'"  Id. at 40.  This was true especially in light of the explicit directive that the jury was not to consider the information in this way.  The appellate court considered the custody instruction to be similar to the pattern instruction CALJIC 1.00, which instructs the jury not to consider evidence that a defendant was arrested, charged with a crime, or brought to trial to be evidence of guilt.  These instructions help to direct the jury to determine guilt based on the evidence presented at trial instead of the various facts related to the prosecution itself.  The state appellate court presumed that the jurors followed the court's admonition and did not consider Cooper's custody as evidence of guilt.  This presumption was strengthened by the fact that the prosecutor never tried to use Cooper's custody as proof of guilt.  The appellate court ultimately "conclude[d] that the custody instruction did not mislead the jurors from their proper deliberative course or otherwise constitute prejudicial error."  Cal. Ct. App. Opinion, p. 41.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

---

giving the instruction.  The trial judge was not conceding  that the substance of his comment was erroneous.

process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The instruction was not an erroneous statement of the law:  the jury is not supposed to consider a defendant's custodial status as evidence of guilt.  The determination that the message was a correct statement of law does not end the matter because Cooper's grievance is not so much the whole of the instruction but more the part of it that let the jury know he was in custody.

To implement the presumption of innocence to which a defendant is entitled, "courts must be alert to factors that may undermine the fairness of the factfinding process."  Estelle v. Williams, 425 U.S. 501, 503 (1976).  In Estelle v. Williams, the Court held that it violates due process to compel a defendant to stand trial while dressed in identifiable jail clothes.  Compelling a defendant to wear jail clothes at trial furthers no essential state policy (unlike the restraints permitted in another case) and may undermine the presumption of innocence in the eyes of the jurors.  See id. at 504-05 ("the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment").   In another case considering extraneous matters which might influence the jury, Holbrook v. Flynn, 475 U.S. 560 (1986), the Court held that a criminal defendant's right to a fair trial was not violated when, at his trial with five co-defendants, the usual security force was supplemented by four uniformed officers sitting in the first row of the gallery.  The noticeable deployment of security personnel is not the "sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  Id. at 568-69.  The extra police presence does not have the same effect as shackling or prison clothing; while the latter "are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable."  Id. at 569.  From Holbrook there is this general rule:  A federal habeas court should "look at the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over."  Id.  at 572.

**United States District Court**
For the Northern District of California

1  The jurors' receipt of information that Cooper was in custody – at the same time they were

2  told not to consider that fact as evidence of guilt – was not so inherently prejudicial as to pose

3  an unacceptable threat to Cooper's right to a fair trial.  See Holbrook, 475 U.S. at 572.  The trial

4  court's approach of identifying the potential problem and specifically instructing the jurors how

5  to handle it was a reasonable one under the circumstances.  In this case, more than others, the

6  jurors likely would wonder what had preceded the trial for which they were impaneled: the crime

7  had been committed about nine years earlier and the use of former testimony would have alerted

8  them that there had been at least one trial before the current one.  See, e.g., RT 1006 (among

9  questions jurors sent to the court during deliberations was a question about the outcome of

10  Cooper's first trial).  Jurors likely would have wondered whether defendant had been in prison.

11  It was not unreasonable for the court to address the issue head-on and tell the jurors to set aside

12  Cooper's custodial status in their deliberations.  See generally Holbrook, 475 U.S. at 567 ("jurors

13  are quite aware that the defendant appearing before them did not arrive there by choice or

14  happenstance").   Unlike the jail clothing in Estelle v. Williams, this one comment before the

15  jury was selected was not a "constant reminder" that Cooper was in custody.  And unlike the

16  situation where a defendant is visibly in shackles, the comment that Cooper was in custody did

17  not send the signal that he was especially dangerous.  Rather, as the trial court explained, his

18  custody meant only that he could not make bail and was not to be considered as evidence of

19  guilt. (Actually, no one would have been able to make bail, as the defendant was held without

20  bail.)  There is no reason to depart from the presumption that jurors have followed the court's

21  instructions and set aside consideration of Cooper's custodial status during their deliberations.

22   See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985); Richardson v. Marsh, 481 U.S. 200, 206

23  (1987) (referring to "the almost invariable assumption of the law that jurors follow their

24  instructions").  Cooper is not entitled to the writ on this claim.

26  I.      Comments On Accomplice Testimony (Claim 17)

27  Cooper asserts that the trial judge's comments to the jury about accomplice testimony

violated his rights to equal protection and due process because they "exceeded what is permissible under the 6th and 14th amendments." Petition, p. 64. He argues that, "because trial judge was not scrupulously fair his comment came through clearly as another prosecutors closing argument." Id. at 65 (errors in source).

After several days of deliberations, the jury sent a note that asked the court to "talk about how to treat accomplice testimony." RT 1010. The court first asked the jurors to clarify what exactly they wanted to know, but the jurors did not narrow the inquiry. The court then commented at length on accomplice testimony. The court repeated several pattern instructions and also spoke extemporaneously about accomplice testimony. The court explained that Fred Cross was an accomplice as a matter of law, that the jury had to decide whether Goodie Walton was an accomplice and that the defense had the burden to prove she was an accomplice by a preponderance of the evidence. RT 1018-1019. The court next addressed the definition of an accomplice and the corroboration of accomplice testimony. The court explained that the jury was to disregard testimony of an accomplice who was not corroborated but that it could consider the testimony of an accomplice (such as Fred Cross) if the jurors decided that there was other independent evidence they believed that tended to connect Cooper with the commission of these crimes.

> The court then advised the jury that if Walton was found to be an accomplice, her testimony could not corroborate Cross unless it was in turn corroborated by another, independent source; "[y]ou cannot corroborate one accomplice with another, so you have to look elsewhere." But if the jury found that Walton was not an accomplice, her testimony could be used to corroborate Cross – specifically, for example, his testimony that defendant was "one of the three people" in the blue Oldsmobile. The court also explained to the jury that the testimony of Hodges, who was not alleged to be an accomplice, could also corroborate both Cross and Walton. Finally, the court suggested to the jury to "basically go through step-by-step with each witness" or "group of evidence" to determine if it was corroborated, and if so "consider it in its entirety."

Cal. Ct. App. Opinion, p. 42.   After a defense objection, the judge instructed the jury that nothing he had just stated was intended to suggest that corroboration existed and that nothing he had just stated was intended to express his view of the evidence. RT 1035.

The California Court of Appeal explained that judicial comment on the evidence is legally permissible but, to avoid invading the jury's province, the comment "must be accurate,

United States District Court
For the Northern District of California

temperate, nonargumentative, and scrupulously fair." Cal. Ct. App. Opinion, p. 44. Here, it was.

> We find that the court's explanation of accomplice testimony did not result in a misstatement of the law or constitute a violation of the trial court's obligation to comment fairly and impartially upon the evidence.  More importantly, we do not think *the jury* interpreted the court's explanation, when read in its entirety, as any form of endorsement of the credibility of any of the witnesses or the corroboration of any particular testimony.  As we read the entirety of the court's response to the jury, unfair comment upon the evidence was avoided.  The court did not advise the jurors that a particular witness's testimony had been corroborated or was worthy of belief. . . .  Rather, the court merely identified the witnesses who may be accomplices – Cross, as a matter of law, and Walton if so found by the jury – and stated the requirements for corroboration of those witnesses before consideration of their testimony.  Merely referring to Walton and Hodges as possible corroborating witnesses was neither partial nor misleading, particularly where the court carefully avoided any evaluation of their testimony and specifically advised the jury that no opinion had been expressed "that corroboration exists in any particular witness's testimony or in any particular evidence."  The court properly advised the jury upon the standards for consideration of evidence of corroboration, but left to the jury the task of determining the issue. . . .  The court did not distort the record, withdraw material evidence from the jury's consideration, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. . . . Moreover, the court's comments were temperate, and neither exceeded the bounds of fair and impartial judicial comment nor suggested the manner in which the jury should consider the evidence.

Cal. Ct. App. Opinion, p. 45.  Not only were the comments not impermissible, the trial court had taken the additional precaution of instructing the jury that his comments were not meant to suggest what facts the jury should find nor to suggest his personal view of the evidence.  Id.  The appellate court saw no reason not to assume that the jurors properly followed the instructions they were given that it was the jury's duty to determine whether accomplice testimony was adequately corroborated.  Id.

A criminal defendant is "entitled to the uncoerced verdict" of the jury.  Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).  An "instruction is unconstitutionally coercive if it denies a defendant the due process right to a trial by a fair and impartial jury."  DeWeaver v. Runnels, 556 F.3d 995, 1007 (9th Cir. 2009) (no habeas relief under § 2254 because state appellate court's decision was consistent with Lowenfield in rejecting challenge to jury instruction about consideration of evidence that provided a hypothetical example that the state court found was prosecutorially slanted (because it only presented a hypothetical of a missing piece of cake in which the suspect was guilty) but did not misstate the law and did not deprive defendant of his right to a fair trial).  The trial judge "'must be ever mindful of the sensitive role [the court] plays

31

in a jury trial and avoid even the appearance of advocacy or partiality.'" Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995). A trial judge may comment on the evidence so long as he makes it clear that it is the jurors' duty to determine the facts. See Rodriguez v. Marshall, 125 F.3d 739, 749 (9th Cir. 1997), overruled on other grounds by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002). He may call to the jury's attention specific evidence "when he believes it will assist the jury" provided that he does not distort the evidence, add to it or present it in a one-sided fashion. Id. The question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

This court finds no merit in Cooper's argument that the trial judge overstepped the bounds of permissible comment on the evidence. Particularly telling is Cooper's failure to identify any misstatement of the law or any genuine suggestion of the court's view of the evidence. The trial judge did identify three particular witnesses by name, but the focus on those witnesses was entirely reasonable under the circumstances because one (i.e., Fred Cross) was an accomplice as a matter of law, the second (i.e., Goodie Walton) was argued by the defense to be an accomplice, and the third (i.e., Zanetta Hodges) gave testimony that was closest to Walton's as they were in the car together during the abduction. The comments were temperate and did not intrude on the jury's province as factfinder. Cooper faults the trial judge for, among other things, not pointing out a view of the accomplice evidence that was in his favor. However, that would have been non-responsive to the jury's request for help in handling this particular type of evidence, not in summarizing the substance of any particular witness' testimony. The state appellate court's rejection of Cooper's claim was not contrary to or an unreasonable application of clearly established federal law as set out by the U.S. Supreme Court.

J.    Inspector Wright's Identification Testimony (Claim 8)

Douglas Wright testified for the prosecution about what he saw and heard on September 3, 1995. At the time, Wright was a retired policeman who worked as an inspector for the District

United States District Court
For the Northern District of California

Attorney's office.  He was driving through Oakland, thought he heard two gunshots, and went to the corner of 12th and Market.  There, he saw a man standing next to a red Corvette, then the man quickly got into the Corvette and then the Corvette sped away.  Wright described the man as Black, about 5'11" tall, in his mid-20s, and weighing about 170-180 pounds. RT 463.  Wright was unable to identify the particular man next to the Corvette, but did testify that he had previously testified that Cooper's size and build were consistent with that of the man Wright saw by the Corvette.  RT 464.  At the second trial, he did not have an independent recollection of the man; his description was based on his notes prepared the day after the abduction and his earlier testimony.  RT 497.  At the second trial (as at the first trial), Wright was unable to identify the particular man at the Corvette and could only say that Cooper "was consistent in size and build" with the person he saw at the Corvette.  RT 464.

Cooper contends that he was denied due process, equal protection and a fair trial when Wright was allowed to testify that Cooper was not inconsistent with the person he saw at the crime scene.  Cooper argues that the evidence was not probative of anything and therefore should not have been admitted.  He argues further that the testimony was "very suggestive" because Cooper was the only Black male in the courtroom when Wright testified and because Wright was an ex-Oakland police officer.  Petition, p. 39.  He further suggests that Wright's testimony was unreliable because the second trial took place almost ten years after the first one. (The court's analysis of this claim very similar to its analysis of the claim when Cooper raised it with regard to Wright's testimony at his first trial because the law has not changed and only a few facts have changed.)

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967).  Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process."  Neil v. Biggers, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence deriving from suggestive identification procedures.  See id. at 196; cf. Manson v. Brathwaite,

432 U.S. 98, 106 n.9 (1977) (standards are not different for pretrial and in-trial identifications). Unnecessarily suggestive identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony. See id. at 114. In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. See id. at 114; Neil, 409 U.S. at 199-200.

To obtain habeas relief, Cooper must show that the in-court identification was unnecessarily suggestive and not sufficiently reliable. An in-court identification of a defendant who looks different from everyone else around him and is clearly the person on trial may be suggestive. See United States v. Rogers, 126 F.3d 655 (5th Cir. 1997) ("it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant"). Asking Wright if he had previously identified Cooper was suggestive if Cooper looked different from those around him -- a fact that this court cannot determine from the trial record but which Cooper states was the situation -- although for the reasons mentioned later, Wright's "identification" was so generalized that it was of little value. In any event, suggestiveness alone is not enough. Cooper has not shown that the identification testimony was unreliable. Consideration of the factors identified in Manson regarding the reliability of the identification leads to the conclusion that the evidence was not unreliable. First, Wright had just a fleeting opportunity to observe the man as Wright drove by him, but Wright also had seen the man standing next to the car where his general physique would have been visible. Second, Wright was likely more attentive than an average citizen because he was a retired police officer alerted by gunshots. Cf. Manson, 432 U.S. at 108 (trained police officer who realized he would have to find and arrest the person with whom he was dealing was paying attention to the identity of the person). Wright's attention had been drawn to the scene because he heard what sounded

like two gunshots; he scanned the scene to try to figure out what was going on.  This was not a situation where a person observed what appeared to be neutral facts but later turned out to be relevant to a criminal act.  When Wright heard the gunshots in the urban locale, he doubtless was thinking it was a crime scene.  And this was not a situation where the witness was the distressed and distracted victim of a crime.  Third, Wright's prior descriptions had been general but so was his trial testimony.  Fourth, the level of certainty demonstrated by Wright was adequate at trial.  As to both the third and fourth points, the facts cut against Cooper because Wright's description was rather general, but so was his trial testimony.  He did not actually identify Cooper as the man who drove the Corvette, but only that Cooper had characteristics consistent with those of that man.  The testimony was far less damaging to the defense than if Wright had said Cooper actually was the man.  Fifth, only about three months had lapsed between the observation of the witness and the identification at the first trial.  The "identification" at the second trial was not an independent identification but only a confirmation that he had made the identification at the first trial.  Three months is not a long time in light of the generality of the description and the identification testimony given.  It is far easier to believe that a witness could keep in his mind for three months an image of the general type of person he saw rather than the exact person he saw.  Cooper's argument that the ten year gap between the crime and the second trial made the identification unreliable is unpersuasive because, as noted above, Wright specifically stated he had no independent recollection and was working from his notes made one day after the event and his testimony given in 1995.  A ten year gap between crime and identification of the perpetrator would be cause for concern if that identification was the only identification and was purportedly based on an independent recollection of a crime, but those are not Cooper's facts.  A person's ability to read and repeat old reports and old testimony would not dissipate with the passage of time.  Considering the various factors together, this court finds that the in-court identification was sufficiently reliable.

The court hesitates to even call Wright's testimony an identification because, unlike the cases on due process requirements of identification testimony, Wright's "identification" was so

United States District Court
For the Northern District of California

1    very general.  Wright did not say that Cooper was the man, but only that Cooper's height, weight

2    and appearance were consistent with those of the man he had seen at the crime scene.  RT 464.

3    Bearing in mind that the body of law about identification testimony is aimed at avoiding

4    mistaken identification, one can say with confidence that there was no likelihood of mistaken

5    identification by Wright.  The vice of the admission of Wright's testimony was its weakness,

6    rather than that it may have been mistaken: one can reasonably guess that hundreds or thousands

7    of men in the Bay Area would have an appearance consistent with the description of a Black

8    male in his mid-20s, about 5'11" tall and about 170-180 pounds.[10]  Defense counsel made that

9    point on cross-examination.  RT 480.

10        The identification was weak and quite limited in that the witness only said Cooper's

11   appearance was consistent with that of the man observed earlier.  The defense obtained

12   testimony that established the witness' limited opportunity to observe, the commonness of

13   defendant's size, and the absence of a gun in the man's hands.  Cooper's right to due process was

14   not violated by the admission of Wright's testimony that Cooper's appearance was consistent

15   with that of the man he saw driving the red Corvette.  Cooper is not entitled to the writ on this

16   claim.

17

18   K.    Prosecutorial Misconduct Claim (Claim 7)

19        Cooper contends that the prosecutor engaged in misconduct at his trial in several different

20   ways.

21        The appropriate standard of review for a prosecutorial misconduct claim in a federal

22   habeas corpus action is the narrow one of due process and not the broad exercise of supervisory

23   power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights

24   are violated when a prosecutor's comments render a trial fundamentally unfair.  See id.; Smith

25

26        _____

27        [10]Though weak, the evidence was relevant in that it had some tendency in reason to prove
     Cooper's presence at the kidnapping scene, as the California court of appeal found.  Because the
28   evidence had some relevance to an issue in dispute, it was properly admitted.

v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

First, Cooper contends that the prosecutor "knowingly presented false evidence to jurors when he introduced co-defendant Cross['] impeached prior testimony." Petition, p. 36. The presentation of evidence that had been impeached in some respects does not amount to prosecutorial misconduct. The prior testimony of Cross that was read to the jury included extensive cross-examination of Cross. Cross has not shown that the introduction of Cross' prior testimony made his trial fundamentally unfair.

Second, Cooper argues that the prosecutor "knowingly elicited hearsay from Sergeant Krupp" and "asked leading questions of Walton." Petition, p. 36. Neither of these activities made the trial fundamentally unfair. During the testimony of Krupp and Walton, the court sustained some objections and overruled others. Those objections that were sustained resulted in the evidence not being before the jury. As to those instances where the objections were overruled, Cooper has not shown how any of them so infected the trial as to make the resulting conviction a denial of due process. The hearsay elicited from Krupp was inconsequential, i.e., that he had learned from witnesses the number of men involved in the abduction, RT 605. Several other hearsay objections that were overruled were properly overruled because the evidence was not hearsay: testimony that K.K. Parker and his girlfriend told Krupp to talk to a woman named Goodie Walton was not offered for the truth of the matter but instead to explain Krupp's later actions, RT 607, 615; and testimony that Krupp was looking for the red Corvette when he went to East Oakland and that he was looking for Goodie Walton on the evening of the abduction was not based on a statement by an out of court declarant, RT 612, RT 619. Similarly, Cooper has not shown that any of the allegedly leading questions asked of Walton so infected the trial as to make the resulting conviction a denial of due process. See RT 263-264, 271, 274, 338. Leading questions frequently can be rephrased to avoid the leading question problem. There is no indication here that any of the information elicited was vital and hinged on the prosecutor asking a leading question to obtain the testimony from Walton.

**United States District Court**
For the Northern District of California

1    Third, Cooper complains that the prosecutor improperly commented in closing argument

2    "that jurors had not heard from petitioner as to his whereabouts, and told jurors that if petitioner

3    had not done the crime, he would have testify (sic) to that fact." Petition, p. 28. The prosecutor

4    addressed the defense that Cooper was not present at the scene of the crime, arguing: "Where's

5    the evidence that he was somewhere else? There's no evidence in this trial that he was

6    somewhere else." RT 940. The court overruled the defense objection that this misstated the

7    defendant's obligation at trial. The prosecutor did not commit <u>Griffin</u> error, as his comments

8    did not ask the jury to draw an adverse inference from Cooper's silence or to treat Cooper's

9    silence as substantive evidence of guilt. <u>See Griffin v. California</u>, 380 U.S. 609, 615 (1965).

10   His comment was a permissible comment on the defense's failure to present exculpatory

11   evidence rather than an impermissible comment on Cooper's failure to testify. <u>See United States</u>

12   <u>v. Mende</u>, 43 F.3d 1298, 1301 (9th Cir. 1995). In addition to the comment not being <u>Griffin</u>

13   error, it was not otherwise fundamentally unfair as it was a reasonable comment on the evidence

14   at trial, rather than a misstatement of the burden of proof. The defense was free to and did argue

15   that the defendant had no burden to prove Cooper was elsewhere at the time of the crime. <u>See</u>

16   RT 949. Further dissipating any impact of the prosecutor's comment was the fact that the jury

17   was properly instructed on the burden of proof. There was no due process violation in the

18   closing argument.

19   Fourth, Cooper contends that, during jury selection, the prosecutor "called up a black

20   [prospective] juror who was 50 positions down the list," then told defense counsel that "he would

21   not seat another black juror." Petition, p. 36. Cooper has not identified any place in the record

22   where this alleged event occurred, or that the court allowed the prosecutor to select the order in

23   which jurors were voir dired. This unsupported speculation does not warrant habeas relief.

24   Fifth, Cooper contends that the prosecutor told the jury that Cooper had been in prison

25   twice and that Cooper had told Cross about his prior bad acts. This part of the prosecutor's

26   closing argument was fair comment on the evidence at trial, as Cross' testimony had included

27   such information. In fact, the parties had even stipulated that Cooper had been in custody for

28

1    almost a year – a fact which was helpful to the defense efforts to undermine Walton's testimony

2    that she saw Cooper frequently during the many months before the crime.

3          Cooper has not shown that there was prosecutorial misconduct at his trial.  Bearing in

4    mind that the prosecutor's conduct must render the trial "fundamentally unfair" for federal habeas

5    relief to be granted, see Darden, 477 U.S. at 181, it can be said with confidence that Cooper has

6    failed to meet that standard.

7

8    L.     Assistance of Trial Counsel (Claim 9)

9          The Sixth Amendment's right to counsel guarantees not only assistance, but effective

10   assistance, of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark

11   for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

12   functioning of the adversarial process that the trial cannot be relied upon as having produced a

13   just result.  Id.  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

14   Cooper must establish two things.  First, he must demonstrate that counsel's performance was

15   deficient and fell below an "objective standard of reasonableness" under prevailing professional

16   norms.  Id. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient

17   performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

18   errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable

19   probability is a probability sufficient to undermine confidence in the outcome.  Id.  The relevant

20   inquiry under Strickland is not what defense counsel could have done, but rather whether his

21   choices were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  A

22   lawyer need not file a motion or make an objection that he knows to be meritless on the facts and

23   the law.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434,

24   1445 (9th Cir. 1996) (failure to take futile action is not deficient performance).

25         Cooper contends that he received ineffective assistance of trial counsel.  He identifies

26   numerous problems with counsel's performance, which this court puts into groups for

27   convenience.  Although he presented a lengthy list of complaints, he failed to provide any

28

United States District Court
For the Northern District of California

citations to the record for almost all of his claims, and thus left it to respondent and this court to attempt to find that which he has not bothered to identify.

He contends that counsel failed to present his alibi defense. The record shows that counsel had considered and chosen not to present the alibi defense because she thought it was a bad defense that could actually harm him. At a <u>Marsden</u> hearing several months before the trial, counsel explained that the alibi defense that Cooper thought was "uncontroverted" was in fact "terrible" in that it "sounded like a lie" and would not help him. 7/6/04 RT 14. Counsel explained that the two alibi witnesses were interested parties (i.e., Cooper's wife (who didn't have a receipt to back up her alibi story of a shopping trip) and Carl Anderson (who was with Cooper when he was arrested just a few hours after the victim was put in the trunk of the car)). The <u>Marsden</u> hearing judge agreed, noting that "alibi witnesses are the most suspect witnesses in a trial," 7/6/04 RT 18, and could backfire. An alibi defense that fails has the downside potential to cause jurors to perceive the defendant to be a liar and from that to infer that he is guilty. Cooper has not demonstrated that counsel's informed decision not to call the alibi witnesses was deficient performance. And he has not demonstrated that her failure to present the weak alibi defense resulted in any prejudice. The conclusion that no prejudice resulted is made especially strong here by the fact that the alibi defense had been presented at the first trial and failed to persuade that jury.

Cooper complains that counsel put on no defense. Although the defense called no witnesses, and rested immediately after the prosecution rested its case, it mischaracterizes the situation to say defense counsel put on *no* defense. Counsel's rigorous cross-examination of the prosecution witnesses developed evidence to undermine the prosecution and to support the defense case. Her chosen defense was that the prosecution had not carried its burden to prove that Cooper was one of the perpetrators of the kidnapping and murder. She elicited testimony that some prosecution witnesses were not telling the truth, such as with her lengthy cross-examination of Walton. She also elicited testimony in cross-examination that some prosecution witnesses had not had a good opportunity to observe, which was especially important in this case

where identity was the focus.  Her closing argument was consistent with the evidence she had developed during the cross-examination of the prosecution witnesses: some of the witnesses were not truthful and some of the witnesses who gave testimony linking Cooper to the crimes had not had an opportunity to adequately observe the actions or the actor.

Cooper contends that counsel was deficient with respect to Fred Cross's testimony in numerous ways. He contends that she failed to object to the admission of his prior testimony and taped statements played to the jury.  As explained in section F, the admission of Cross' statements did not violate the Confrontation Clause.  Because the evidence was admissible, counsel did not engage in deficient performance if she did not make that objection.  Cooper also complains that counsel failed to require Cross to refuse to testify in front of the jury, failed to object to the court telling the jurors that Cross was unavailable, failed to tell the jurors that Cross refused to testify even though granted immunity, and failed to object to Cross' statements that Cooper had engaged in prior bad acts.  Cooper has not shown that counsel would have had a legal basis to urge the court to take any of these actions.  He has not established deficient performance or resulting prejudice from counsel's performance with respect to these items.

Cooper also contends that counsel was hostile to him.  For example, she reacted negatively when he tried to give input about the law, and used a "dissatisfied voice" when she commented to him during deliberations that he might be acquitted. Petition, p. 42.  The Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel; it only guarantees effective representation of counsel. Morris v. Slappy, 461 U.S. 1, 14 (1983). The record shows that Cooper was a demanding and dissatisfied client from the moment counsel was appointed.  Counsel's apparent irritation with him does not demonstrate that her legal representation of him was deficient.

Cooper complains that counsel did not adequately prepare for trial.  For example, he complains that attorney Levy failed to prepare opening or closing statements, even though she told him she did both.  Counsel made an opening statement, but the opening statements were not transcribed. RT 161.  Counsel made a lengthy closing argument, see RT 944-973, in which

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

she argued that the prosecution had failed to prove Cooper's guilt. The record would not support a finding that counsel made that argument without any preparation. Even if counsel had not written it out fully and in advance of her oral presentation, that does not mean she had not organized an argument in her head. Further, the closing argument of defense counsel, as here, frequently is largely responsive to what the prosecutor has argued in his closing argument and therefore often will not be fully developed until the prosecutor finishes his closing argument.

Cooper also complains about counsel's presentation on legal matters. He asserts that, in her motion for acquittal, she "only attacked the 187" and did not mention the kidnapping charge until "after petitioner begged her to do so." Petition, p. 42. He did not receive an acquittal on either count, and he has not shown that the failure to obtain an acquittal was due to counsel's performance. As discussed in section B above, there was sufficient evidence to support the verdict on both the kidnapping and murder counts. He has not shown deficient performance or resulting prejudice from counsel not requesting in writing that Cooper be acquitted of kidnapping. Cooper also argues that counsel failed to inform the jury about this court's evaluation of witnesses' credibility in the 1995 trial. This court's 2004 order would not have been admissible evidence, so Cooper cannot show deficient performance or resulting prejudice from counsel not attempting to introduce evidence of this court's view of the 1995 trial. He also protests that counsel "had numerous sidebars instead of objecting," Petition, p. 41, but fails to show any instance where an objection was not made on the record that would have been granted.

Cooper also asserts numerous complaints about counsel's handling of evidence and conduct of the trial, such as her failures to object to several areas of unfavorable evidence and opening the door to introduction of other unfavorable evidence. He complains that counsel failed to object to the prosecutor's leading questions to Walton, but the record shows that counsel did make objections that the questions were leading at several points – some of which were sustained and some of which were overruled. He also complains about counsel's cross-examination of sergeant Krupp, such as her statement that "associated [Cooper's] name with" "a clip filled with .45's bullets that co-defendant Cross' mother gave to police." Petition, p. 41.

42

Even if counsel misstated the evidence, Cooper has failed to show any resulting prejudice.  He also complains that counsel's questioning of sergeant Krupp "about what Walton had seen, which opened the door for the district attorney to do the same," id., but fails to explain how this amounted to deficient performance or resulted in any prejudice in light of the fact that Walton actually testified at trial.  He also objects to counsel's failure to object to the references to his arrest for carjacking, but has not shown that any such failure resulted in any prejudice.

Having considered the many complaints Cooper has identified with his attorney's performance, the court concludes that he has failed to show deficient performance and resulting prejudice on any of them.  He is not entitled to the writ on this claim.

M.    Motions For Substitute Counsel (Claim 15)

Cooper contends that the denial of his Marsden[11] motions against attorney Deborah Levy violated his rights to due process, equal protection and assistance of counsel.  The first motion was filed and rejected the day Levy was appointed, the second motion was heard on July 6, 2004, and the third motion was heard on September 21, 2004.

When Levy was appointed, Cooper immediately advised the court that "antagonism" had developed with counsel, and that counsel expressed that she did not want the case.  Levy explained that, although her relationship with Cooper was not pleasant, she was willing to take the case within the time constraints for the case in which speedy trial time had not been waived.  The court found no grounds to discharge counsel and denied the Marsden motion.

The second motion was heard on July 6, 2004.  At the hearing, the court allowed Cooper to explain his reasons for requesting substitution of counsel, allowed Levy to present her views, allowed Levy to describe her extensive criminal law practice background, and then denied the motion to substitute counsel.  Cooper mentioned numerous concerns, to which counsel responded.  Cooper complained that counsel initially stated that she did not want the case.  Levy

---

[11]People v. Marsden, 2 Cal. 3d 118 (1970), requires the California trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

explained that she initially told Cooper that she did not want the case in response to his comments that she should not take the case, and that he did not want her as counsel.  She also was concerned about the severe time constraints.  See 7/6/04 RT 17.  She had told the presiding judge at the time of appointment that she was prepared to accept the appointment, and remained ready to represent Cooper.  Cooper also complained that counsel had reported his  "strategy" to the court in violation of the attorney-client privilege.  Levy responded that she had asserted in court Cooper's belief that he had to be released in 60 days, which did not violate any confidentiality or secrets.  Cooper complained that counsel's investigator had not returned to visit him in jail after one meeting.  Levy responded that the investigator's time was best spent tracking down witnesses from the 1995 crime.  The court saw a reasonable strategy as to witness interviews and preparation, and noted there were particular concerns about alibi witnesses.  7/6/04 RT 19.  Cooper complained that counsel had been fidgety and irritated during a motion hearing.  Levy responded that she had been frustrated with the court's ruling and that she knew there was no jury present to be affected by her demeanor.  Cooper complained that counsel failed to object to an alleged misquotation of the law by the judge.  Levy responded that she had not allowed that to occur, and explained that Cooper had misunderstood the law which she read and interpreted differently from him.  The Marsden hearing judge explained to Cooper that a judge (such as the judge at the earlier hearing) cannot be compelled by a defense counsel to take a particular view of the law.  The judge stated that Levy's position on the law was the better view of the law.  Levy explained that a core concern in her relationship with Cooper from the outset was that Cooper believed she had to file and do whatever he instructed, and did not understand that she had control over certain tactical matters.  Levy specifically addressed Cooper's complaint that she wouldn't pursue his alibi defense by explaining that the allegedly "uncontroverted" alibi defense "was terrible," in that it "sounded like a lie" and would not help him.  7/6/04 RT 14.  The alibi witnesses were interested parties (i.e., Cooper's wife (who didn't have a receipt to back up her story of a shopping trip) and Carl Anderson (who was with Cooper when he was arrested just a few hours after the victim was put in the trunk of the car)).  The

44

judge agreed, noting that "alibi witnesses are the most suspect witnesses in a trial," 7/6/04 RT 18, and could backfire.  Levy also explained her reasons for not protesting when, at the bail hearing in 2004, the prosecutor mentioned Cooper's in-prison violence – a point the Marsden judge thought was a non-issue because "nobody was going to let you out on bail with these kind of charges." RT 20.  Counsel explained that she had read a minimum of 4,000 pages in Cooper's case for a trial that had to start within a week due to the speedy trial deadline.  Cooper argued that counsel's repeated strong disagreements with him on so many points showed that he could not have confidence in her.  The court responded that no other attorney would be able to be prepared to take his case to trial the following week. RT 17.  The judge later explained that, although there was a speedy trial issue, that was "not a factor on whether or not Ms. Levy gets removed."  RT 21.  When Cooper offered to consider waiving time, the judge told him that Marsden motion results were not negotiated, and that his decision was not based on the absence of a time waiver.  RT 21.  Client and counsel also disagreed about a double jeopardy motion counsel intended to file, and the court was unpersuaded by Cooper's statements on the legal question. The court then denied the Marsden motion, finding that "there has not been any breakdown" in the attorney-client relationship.  7/6/04 RT 25.

On September 21, 2004, the next Marsden motion was heard.  The court allowed Cooper to explain his reasons for requesting substitution of counsel, allowed Levy to present her views, and then denied the motion to substitute counsel.   This time, Cooper complained that counsel "blew up" and cussed at him, and that there had been repeated run-ins with counsel from the outset of the appointment.  9/21/04 RT 4-5.  Levy admitted that she recently had become angry at Cooper because he was arguing with her over his interpretation of the law, but also had apologized to him for her unprofessional behavior the next time she saw him.  Levy told the court that she and Cooper could work together, that she was ready for trial, and that, "despite Mr. Cooper's feelings that we don't get along," she was confident that she "could represent him completely and to the best that any lawyer could."  9/21/04 RT 9.  Cooper reiterated that he felt that he could not "get anything through to her" and that she had an "attitude."  Id.  Levy

disagreed that she was not listening to Cooper.  For example, she explained that she disagreed with Cooper's view about the admissibility of Fred Cross' prior  testimony – a legal point on which counsel was clearly correct in the view of the state courts and this court.  Levy agreed with Cooper's assertion that she had not yet formulated her opening statement.  The court denied the <u>Marsden</u> motion.  The court felt that Cooper's complaints of a lack of trust in, and ability to get along with, counsel were not sufficient to warrant substitution.

The California Court of Appeal rejected Cooper's argument that his <u>Marsden</u> motions should have been granted.

> Defendant's primary grievance is that counsel did not proceed with the case in the matter he requested.  His claims fall within the category of disagreement over strategy that does not compel substitution of counsel.  We cannot find fault with counsel's resolve to retain control over tactical matters . . . [¶] Nor do we find that the attorney-client relationship had so deteriorated that substitution of counsel was necessary. . . . Although defendant asserted the relationship with counsel had declined to the extent that it was "irreconcilable," counsel acknowledged the conflict but advised the court that she and defendant were capable of cooperating to a degree that competent representation would result.  Moreover, defendant did not in any way establish that ineffective representation was likely to occur.

Cal. Ct. App. Opinion, ¶. 33-34.

The Sixth Amendment grants criminal defendants who can afford to retain counsel a qualified right to hire counsel of their choice.  <u>See</u> <u>Wheat v. United States</u>, 486 U.S. 153, 159, 164 (1988).  A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing.  <u>See</u> <u>id.</u>  Nor is he entitled to an attorney who likes and feels comfortable with him.  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  <u>See</u> <u>Morris v. Slappy</u>, 461 U.S. 1, 14 (1983).  The essential aim is "to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." <u>Wheat</u>, 486 U.S. at 159.  Nonetheless, to compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive the defendant of counsel.  <u>Daniels v. Woodford</u>, 428 F.3d 1181, 1197 (9th Cir. 2005). "[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights."  <u>Schell v. Witek</u>, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc).  The

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

"ultimate constitutional question" on federal habeas review is whether the state trial court's denial of the <u>Marsden</u> motion "actually violated [petitioner's] constitutional rights in that the conflict between [the defendant] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." <u>Schell</u>, 218 F.3d at 1026.

The superior court conducted adequate inquiries into Cooper's concerns about his appointed counsel. <u>See Hudson v. Rushen</u>, 686 F.2d 826, 831 (9th Cir. 1982) (state court conducted adequate hearing when it invited defendant to make a statement and listened to defendant's reasons for wanting new counsel). The record shows that the trial court made a thorough inquiry into Cooper's <u>Marsden</u> motions. The first inquiry was quite short, but that was reasonable for a motion that was made immediately upon the appointment of counsel. The second and third inquiries were quite detailed and allowed ample room for Cooper to air his complaints with counsel and for counsel to respond to them.

The state appellate court reasonably rejected the argument that there was an irreconcilable breakdown in the relationship between attorney and client requiring replacement counsel. Cooper refused to cede to the lawyer's judgment on legal questions and matters of trial strategy, if he disagreed with it. A client's erroneous view of the law that counsel does not accept does not provide a sufficient reason to discharge counsel. The client's unwillingness to let the lawyer make tactical determinations is not a legitimate reason to compel appointment of new counsel. <u>See Schell v. Witek</u>, 218 F.3d at 1026 & n.8. Cooper's desire to micro-manage his case and to override his attorney's strategic decisions was evident at the <u>Marsden</u> hearing.

The state court's determination that counsel was performing adequately and that no irreconcilable conflict existed was not unreasonable. In light of the information provided at the hearings, it was not unreasonable for the trial court to think that Cooper's frustration with appointed counsel's exercise of her professional judgment would continue with new counsel and therefore did not warrant new counsel. Bearing in mind that the "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,'" <u>Wheat</u>,

486 U.S. at 159, this court sees no evidence that purpose went unfulfilled in this case or that a Sixth Amendment violation occurred. Cooper has not shown that counsel provided ineffective assistance on any particular matter. And he has not shown that there was an impediment that resulted in an attorney-client relationship that fell short of that required by the Sixth Amendment. The California Court of Appeal's rejection of Cooper's claim was neither contrary to nor an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court. Cooper is not entitled to the writ on this claim.

N.      *Faretta* Claim (Claim 14)

Cooper contends that the trial court improperly denied his requests to represent himself. He argues that his requests were unequivocal and timely and therefore should not have been denied.

Cooper's first mention of self-representation was on May 19, 2004, when he asked, "How do I represent myself?" 5/19/04 RT 12.

On July 6, 2004, the judge said there had been no time waiver, and he was ready to assign the case for trial. Cooper responded that he would go to trial with Levy as his attorney "for right now," but also said he wanted to represent himself. 7/6/04 RT 5. Shortly thereafter, he stated to his attorney, "I'm going to have to hire a new lawyer, Miss Levy." 7/6/04 RT 6. Two days later, he agreed to waive time so that his attorney could seek a writ at his request about some of the rulings made by the court. 7/8/04 RT 1.

On September 21, 2004, after Cooper's Marsden motion was denied in another courtroom, the judge indicated that he was ready to send the matter out for trial and noted that Cooper had told his attorney he wanted to represent himself. When the court questioned Cooper after telling him he would not receive a continuance, Cooper said he wanted to go to trial and would be ready for trial if counsel gave him everything that day. The court told Cooper to read the Faretta form to understand the risks and put the matter over until the next day. The court reiterated that a

**United States District Court**
For the Northern District of California

1    courtroom was available for trial.[12]

2        The next day, September 22, 2004, the court noted that Cooper had filled out the <u>Faretta</u>

3    form. After some discussion about whether Cooper had all the discovery and after counsel noted

4    that Cooper had most of the file but she needed to redact about 900 pages of police reports, the

5    court again considered the <u>Faretta</u> matter. Cooper stated that one of the reasons he wanted to

6    represent himself was to "appeal" the <u>Marsden</u> motion ruling. 9/22/04 RT 17. Cooper stated,

7    "It wasn't my first choice to want to go pro per. The only reason I wanted to get rid of the lady,

8    she cussed me out." <u>Id</u>. When the court asked if he was ready to trial, Cooper responded that

9    he wanted to appeal the <u>Marsden</u> ruling first. 9/22/04 RT 19. Cooper also said he needed his

10   discovery, and needed the transcript from Kingdom's trial, which he had not started to read. <u>Id.</u>

11   Cooper agreed that he was not ready to go to trial representing himself that day. The court then

12   denied the <u>Faretta</u> motion as untimely. <u>Id.</u> Cooper then complained that his "only option is to

13   get rid of this attorney." 9/22/04 RT 20. The court referred the case to Department 2 for trial,

14   which prompted defense counsel immediately to request automatic recusal of the judge presiding

15   in Department 2 under California Code Civil Procedure 170.6. The judge then said he would

16   find another courtroom available for a trial.

17       The next day, September 23, 2004, attorney Levy asked the court to reconsider the <u>Faretta</u>

18   motion. The judge noted that he had denied Cooper's earlier <u>Faretta</u> motion "as untimely,

19   because as I pointed out, the matter had been on for jury trial and continued by me, sometimes

20   by someone else, since September 13th." 9/23/04 RT 23-24. The court also noted that it had

21   been very difficult to find counsel for the client who did not want to waive time, and that Levy

22   had made the substantial effort to get ready for trial in a very short time frame. The court

23   observed that it was not insignificant that both defense counsel and the prosecutor "in short

24

25       [12]Here and elsewhere in the transcripts it appears that Cooper thought that the court had no
     choice but to grant him a continuance if he waived his speedy trial rights. When the judge reminded
26   him that "there is a courtroom waiting for you," Cooper responded, "You ain't scaring me. I have a time
     waiver on me." 9/21/04 RT 14. When the judge denied his <u>Marsden</u> motion as untimely the next day
27   because he was not ready to go, Cooper responded: "I have a time waiver anyway. What do you mean?
     I have a time waiver in right now." 9/22/04 RT 19. Cooper erred in believing that only the defendant
28   has an interest in a timely trial.

order, got ready to try a case, a complicated case and be ready.  So everybody was ready to go." 9/23/04 RT 24.  Under the circumstances – i.e., having set a trial date of September 13th, having both defense counsel and prosecutor ready to go, and having a trial courtroom available – the court determined that the request for self-representation "which included a request to continue the matter because he was not ready to represent himself, only desiring to represent himself, was untimely." Id.  The court then noted that the next courtroom for a trial would be available probably the Wednesday of the following week.  The court asked Cooper whether he would be ready for trial by the next Wednesday.  Once he was informed that the unread transcript of the Kingdom trial was 1500-2000 pages and that there would be about 14 pages of new police reports, Cooper stated that he did not know if he would be ready, even though defense counsel had made witness binders with their earlier testimony so it would easy for him to see what witnesses had said in earlier proceedings.  9/23/04 RT 25-26.  The judge then continued the matter to trial on the following Wednesday, but did not grant Cooper pro per status.  Cooper said he would need at least two weeks to read the transcript.  9/23/04 RT 26.  Cooper complained about his relationship with appointed counsel as he argued for a longer continuance, stating: "This isn't my first choice to go pro per.  I want counsel.  I wanted counsel to represent me on this. . . .  But the thing is, I would prefer to have counsel represent myself."  9/23/04 RT 27.

The California Court of Appeal rejected the Faretta claim in a reasoned decision.  The court explained that a request must be an unequivocal assertion of the self-representation right and made in a timely manner.  Cal. Ct. App. Opinion, p. 35.  The court reasonably gave little weight to Cooper's statements in May and July 2004, as those were not actual requests to represent himself.  The state appellate court focused on September 2004 activity, and concluded that the trial court correctly determined that Cooper's request for self-representation was both untimely and equivocal.  Cal. Ct. App. Opinion, p. 36.  The court agreed with Cooper that "a distinction is drawn between "an 'equivocal' request" and a "'conditional' request," id. at 37, but did not believe that distinction aided Cooper under the circumstances.

> [T]he record strongly suggests to us that defendant sought self-representation out of the annoyance or frustration associated with the denial of his requests to discharge his

United States District Court
For the Northern District of California

appointed attorney, not as a voluntary waiver of the right to counsel. . . . Defendant moved to represent himself only after denial of his <u>Marsden</u> motions, and obviously with great reluctance. He expressed on numerous occasions to the trial court that his "first choice" was not "to go pro per," but he felt compelled to do so due to the conflict with his appointed attorney. Even after defendant completed the <u>Faretta</u> form which advised him of the consequences of self-representation, he continued to emphasize to the court that he preferred to "have counsel." . . .[¶] Our reading of the record convinces us that defendant was obviously seeking to impress upon the court just how dissatisfied he was with his present counsel, more than he was voluntarily invoking the right to self-representation. . . . We agree with the trial court that under the circumstances presented defendant's request to represent himself was neither voluntary nor unequivocal. . . . [¶] Finally, the factors of the delay and stage of the trial and the disruption and delay that would result from granting self-representation also strongly support the trial court's denial of the <u>Faretta</u> motion.

Cal. Ct. App. Opinion, p. 38 (citations omitted).

A criminal defendant has a Sixth Amendment right to represent himself. See <u>Faretta v. California</u>, 422 U.S. 806, 818-19 (1975). The decision to represent oneself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay, <u>see</u> <u>id.</u> at 835; <u>United States v. Arlt</u>, 41 F.3d 516, 519 (9th Cir. 1994); <u>Adams v. Carroll</u>, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989). The two areas in question here are whether the requests were unequivocal and timely.

Requiring that the request for self-representation be unequivocal ensures that the defendant does not inadvertently waive his right to counsel and prevents him from taking advantage of the mutual exclusivity of the rights to counsel and self-representation. See <u>Adams</u>, 875 F.2d at 1444. If a defendant equivocates, he is presumed to have requested the assistance of counsel. <u>See</u> <u>id.</u>; <u>see also</u> <u>United States v. Bennett</u>, 539 F.2d 45, 49-51 (10th Cir. 1976) (defendant who unquestionably vacillated between representation by counsel and self-representation until 6 days before trial forfeited right to self-representation). A waiver is not considered equivocal merely because defendant chooses self-representation rather than to be represented by counsel he believes to be incompetent. See <u>United States v. Allen</u>, 153 F.3d 1037, 1041 (9th Cir. 1998); <u>see also</u> <u>United States v. Hernandez</u>, 203 F.3d 614, 617-18 (9th Cir. 2000), <u>overruled on other grounds by</u> <u>Indiana v. Edwards</u>, 128 S. Ct. 2379 (2008) (defendant's statement to judge, "if you can't change [my attorney], I'd like to represent myself" may have been conditional, but it was not equivocal).

1    Like the state courts, this court views Cooper as repeatedly equivocating on his requests

2    to represent himself.  Not only did he explicitly state that self-representation was not his first

3    choice, but he repeated that sentiment.  Cf. Stenson v. Lambert, 504 F.3d 873, 883 (9th Cir.

4    2007) (state court's determination that defendant had not made an unequivocal request was not

5    an unreasonable determination of the facts where defendant made several statements that he

6    really did not want to represent himself but felt the court and his existing counsel were forcing

7    him to do so, defendant had tried to locate another attorney and had not included a request to

8    represent himself in his final written request for new counsel, and requested a particular co-

9    counsel be retained as his counsel).  Also, his statements show that his Faretta motion was the

10   product of annoyance with the Marsden motion ruling more than any genuine desire to represent

11   himself.  This court sees Cooper's Faretta requests as efforts to steer himself toward a new

12   attorney rather than to represent himself.  Had Cooper's Faretta request and continuance been

13   granted, he doubtless quickly would have changed his mind and asked for appointment of

14   another attorney.

15       Further, Cooper's September 21 request to represent himself was untimely.  His request

16   was made the day set for trial to begin.  The prosecutor and defense counsel had readied

17   themselves for trial in a very short amount of time and with the expectation that the trial date was

18   a firm one because Cooper had not waived speedy trial time.  The case was a complicated one,

19   especially because it was a retrial and involved thousands of pages of transcripts from Cooper's

20   first trial and preliminary hearing as well as the separate trial of Kingdom.  A courtroom was

21   available for the trial the day the motion was heard.  Cooper was not then ready to represent

22   himself, and would not be for at least a couple of weeks. The state court's determination that the

23   request was properly denied because it was untimely was not contrary to or an unreasonable

24   application of Faretta.  See Marshall v. Taylor, 395 F.3d 1058, 1061 (9th Cir. 2005) (California

25   court's decision was not contrary to clearly established Supreme Court law when it found that

26   petitioner's Faretta request on the first day of trial before jury selection was untimely); Stenson,

27   504 F.3d at 884 (state court's determination that request first made on 20th day of voir dire, as

28

United States District Court
For the Northern District of California

1   voir dire was concluding and just before jury was impaneled was untimely was not objectively

2   unreasonable under AEDPA).  Cooper is not entitled to the writ on his <u>Faretta</u> claim.

3

4   O.   <u>Assistance Of Appellate Counsel (Claim 1)</u>

5        The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

6   the effective assistance of counsel on his first appeal as of right.  <u>See</u> <u>Evitts v. Lucey</u>, 469 U.S.

7   387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under

8   the <u>Strickland</u> standard, i.e., a defendant must show that counsel's advice fell below an objective

9   standard of reasonableness and that there is a reasonable probability that, but for counsel's

10  unprofessional errors, he would have prevailed on appeal.  <u>Miller v. Keeney</u>, 882 F.2d 1428,

11  1433-34 & n.9 (9th Cir. 1989) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984)).

12  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested

13  by the defendant.  <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54 (1983); <u>Miller</u>, 882 F.2d at 1434

14  n.10.  "The weeding out of weaker issues is widely recognized as one of the hallmarks of

15  effective appellate advocacy."  <u>Miller</u>, 882 F.2d at 1434.  <u>See also</u> <u>Jones</u>, 463 U.S. at 751-52.

16  As the court in <u>Miller</u> explained:

17       Like other mortals, appellate judges have a finite supply of time and trust; every weak
         issue in an appellate brief or argument detracts from the attention a judge can devote to
18       the stronger issues, and reduces appellate counsel's credibility before the court. For these
         reasons, a lawyer who throws in every arguable point - "just in case" - is likely to serve
19       her client less effectively than one who concentrates solely on the strong arguments.

20  882 F.2d at 1434.

21       The objective reasonableness of counsel's failure to pursue the claims on appeal depends

22  upon the merits of the claims.  The issues that Cooper contends counsel should have included

23  in his appellate brief have been rejected by this court and by the state courts for various reasons.

24  Therefore, it was not objectively unreasonable for appellate counsel to not pursue them.  <u>See</u>

25  <u>Miller</u>, 882 F.2d at 1434.  For similar reasons, there was no prejudice.  There is not a reasonable

26  probability that, but for counsel's failure to raise the claims, Cooper would have prevailed on

27  appeal.  <u>See</u> <u>Miller</u>, 882 F.2d at 1434, n.9 (citing <u>Strickland</u>, 466 U.S. at 688, 694).  Cooper also

28

53

1    apparently was dissatisfied with counsel's requests for extensions of time to file appellate briefs,

2    but requests for extension of time do not show ineffective representation of the client.

3          Not only were the claims not meritorious, but the inclusion of them would have

4    lengthened the appellate brief that was already longer than normally permitted under California

5    Rule of Court 8.360.  Having submitted a 108-page brief with seven issues, appellate counsel

6    reasonably and wisely decided not to submit a much lengthier brief that included all the claims

7    mentioned on the 13-page "issues for reversal" document Cooper prepared.  See Petition, Exh.

8    A.  Although courts have much higher tolerance levels for briefs written by unrepresented

9    litigants, an appellate court would be extremely dismayed to receive an oversized brief from a

10   lawyer raising many of the claims Cooper identified.  Many of the points he wanted raised were

11   inconsequential in nature (e.g., the claim that the prosecutor asked leading questions), were of

12   the sort he would be unable to prevail on because he did not have the necessary facts (e.g., the

13   challenge to the jury venire as not being a fair-cross section of the community, for which he had

14   no evidence of systematic exclusion), or were simply wrong on the law (e.g., the claim that the

15   kidnapping count was barred by the statute of limitations).  Skilled  attorneys prioritize issues,

16   raising the strongest rather than all issues.  Doing so does not amount to ineffective assistance

17   of appellate counsel.   Cooper is not entitled to the writ on this claim.

18

19   P.    Cumulative Error (Claim 18)

20         In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

21   the cumulative effect of several errors may still prejudice a defendant so much that his

22   conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003)

23   (reversing conviction where multiple constitutional errors hindered defendant's efforts to

24   challenge every important element of proof offered by prosecution).  Here, there were not

25   multiple errors to accumulate.  Cooper is not entitled to relief under the cumulative error

26   doctrine.

27

28

United States District Court
For the Northern District of California

Q.    Certificate of Appealability

Petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment of petitioner's claim that his right to due process was violated because the evidence was insufficient to support the murder conviction.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is GRANTED on that claim.  The certificate of appealability is DENIED as to all the other claims in the petition.  Cooper is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: June 22, 2010

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

55